JEAN E. WILLIAMS, Deputy Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
MICHAEL R. EITEL, Senior Trial Attorney
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov; michael.eitel@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, et al., | Case No.: 3:18-cv-00437-JR |
| Plaintiffs, | FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants, | |
| and | |
| CITY OF SALEM and MARION COUNTY, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................................1

LEGAL BACKGROUND ......................................................................................................2

   I.   FLOOD CONTROL ACTS .........................................................................................2

   II.   ENDANGERED SPECIES ACT ..................................................................................2

FACTUAL BACKGROUND ..................................................................................................4

   I.   THE WILLAMETTE RIVER BASIN AND WVP FACILITIES ..................................4

   II.   THE CORPS' MANAGEMENT OF THE WVP .........................................................5

   III.   OVERVIEW OF WVP OPERATIONS ......................................................................6

   IV.   THE BIOLOGICAL OPINION AND IMPLEMENTATION OF THE RPA ..................7

   V.   REINITIATED CONSULTATION ...............................................................................9

STANDARD OF REVIEW .....................................................................................................9

ARGUMENT .........................................................................................................................10

   I.   PLAINTIFFS CANNOT MEET THEIR "DOUBLY DEMANDING" BURDEN BECAUSE
      THEY SEEK HIGHLY DISFAVORED, MANDATORY INJUNCTIVE RELIEF. ......................10

   II.   PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE IRREPARABLY HARMED IN THE
      ABSENCE OF RELIEF. ...........................................................................................11

     A.   Plaintiffs' reliance on past harms leading to the current status of salmonids
         does not establish irreparable harm. ...........................................................11

     B.   Plaintiffs' alternative theories of irreparable harm are contrary to the
         law. ............................................................................................................15

     C.   Plaintiffs' proposed injunction is flawed and confirms that they have failed to
         establish irreparable harm. .........................................................................16

       1.   Plaintiffs' proposed reservoir drawdowns and spring spill operations at Detroit,
            Cougar, and Lookout Point dams. ..........................................................17

  a.   Plaintiffs' downstream passage measures are not implementable consistent with Federal and State law.................................................................17

  b.   Plaintiffs' measures will likely not benefit UWR salmonids. ..........................19

 2.   Plaintiffs' Fall Creek Dam measures will harm Chinook. ....................................23

 3.   Plaintiffs' remaining operational and coordination measures are unsupported. ...........................................................................................24

III.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH DECIDEDLY AGAINST AD HOC MODIFICATIONS TO WVP OPERATIONS.........................................................28

IV.   THE LAW AND FACTS DO NOT CLEARLY FAVOR PLAINTIFFS ON THE MERITS OF THEIR CLAIMS.........................................................................................................31

 A.   Plaintiffs are not likely to succeed on the merits of their "delayed" failure to reinitiate consultation claim.......................................................................31

 B.   Plaintiffs are not likely to succeed on the merits of their Sections 7 or 9 claims.......................................................................................................32

CONCLUSION..................................................................................................................35

# TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE**

*Alliance for the Wild Rockies v. Corps,*
    237 F. Supp. 3d 1079 (D. Or. 2017) ......................................................................................32

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011).................................................................................................9

*Alliance for the Wild Rockies v. Krueger,*
    35 F. Supp. 3d 1259 (D. Mont. 2014) ...................................................................................28

*Alliance for the Wild Rockies v. U.S. Dep't of Agric.,*
    772 F.3d 592 (9th Cir. 2014) ...............................................................................................32

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997)................................................................................................................31

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................................................32

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018)................................................................................................... 15, 16

*Bennett v. Spear,*
    520 U.S. 154 (1997)................................................................................................................3

*Britt v. Corps,*
    769 F.2d 84 (2nd Cir. 1985) ................................................................................................17

*Buckingham Corp. v. Karp,*
    762 F.2d 257 (2d Cir. 1985) ................................................................................................16

*Center for Biological Diversity v. U.S. Bureau of Reclamation*
    2016 WL 9226390 (D. Or. Apr. 6, 2016) ...............................................................10, 15, 16

*Center for Food Safety v. Vilsack,*
    636 F.3d 1166 (9th Cir. 2011)..............................................................................................12

*Chafin v. Chafin,*
    568 U.S. 165 (2013)..............................................................................................................31

*City of Tacoma, Wash. v. FERC,*
    460 F.3d 53 (D.C. Cir. 2006) ...............................................................................................28

*Conservation Cong. v. U.S. Forest Serv.,*
  2018 WL 4007093 (E.D. Cal. Aug. 17, 2018) .................................................................15

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
  789 F.3d 1075 (9th Cir. 2015) .........................................................................................14

*Defs. of Wildlife v. Corps,*
  730 F. App'x 413 (9th Cir. 2018) ............................................................................... 11, 13

*Defs. of Wildlife v. Salazar,*
  812 F. Supp. 2d 1205 (D. Mont. 2009) ...........................................................................10

*Friends of the Earth v. Laidlaw Envtl. Servs.,*
  528 U.S. 167 (2000) .........................................................................................................11

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ...........................................................................................10

*Genesis HealthCare Corp. v. Symczyk,*
  569 U.S. 66 (2013) ...........................................................................................................31

*Hamlin Testing Labs v. U.S. Atomic Energy Comm'n,*
  337 F.2d 221 (6th Cir. 1964) ...........................................................................................30

*Headwaters, Inc. v. Bureau of Land Mgmt.,*
  893 F.2d 1012 (9th Cir. 1990) .................................................................................... 31, 32

*Idaho Rivers United v. Corps,*
  156 F. Supp. 3d 1252 (W.D. Wash. 2015) .......................................................................22

*Idaho Watersheds Project v. Hahn,*
  307 F.3d 815 (9th Cir. 2002) ...........................................................................................30

*Libby Rod & Gun Club v. Poteat,*
  594 F.2d 742 (9th Cir. 1979) ...........................................................................................17

*Marlyn Nutraceuticals v. Mucos Pharma GmbH & Co.,*
  571 F.3d 873 (9th Cir. 2009) ...........................................................................................10

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ...........................................................................................................9

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.,*
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ...........................................................................14

*Michigan v. Corps,*
  667 F.3d 765 (7th Cir. 2011) ...........................................................................................35

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)................................................................................................ 27, 29

*National Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007)......................................................................................................18

*National Wildlife Fed'n v. FEMA,*
    2014 WL 5449859 (W.D. Wash. Oct. 24, 2014) ........................................................33

*National Wildlife Federation v. NMFS,*
    2017 WL 1829588 (D. Or. Apr. 3, 2017)...................................................................10

*National Wildlife Federation v. NMFS,*
    524 F.3d 917 (9th Cir. 2008)......................................................................................18

*National Wildlife Fed'n v. NMFS*
    886 F.3d 803 (9th Cir. 2018)................................................................................ 10, 28

*Nat'l Wildlife Fed'n v. Corps,*
    384 F.3d 1163 (9th Cir. 2004)...............................................................................12-13, 18

*Nat. Res. Def. Council v. Kempthorne,*
    2007 WL 1989015 (E.D. Cal. July 3, 2007) ...............................................................27

*NLRB v. Express Publ'g Co.,*
    312 U.S. 426 (1941)............................................................................................. 25, 27

*Northwest Envtl. Def. Ctr. v. Corps,*
    817 F. Supp. 2d 1290 (D. Or. 2011) ......................................................................... 13, 14

*Norton v. S. Utah Wilderness,*
    All., 542 U.S. 55 (2004) ..............................................................................................32

*Oakland Tribune v. Chronicle Publ'g Co.,*
    762 F.2d 1374 (9th Cir. 1985)....................................................................................16

*Pacific Radiation Oncology v. Queen's Med. Ctr.,*
    810 F.3d 631 (9th Cir. 2015).......................................................................................26

*Perfect 10, Inc. v. Google, Inc.,*
    653 F.3d 976 (9th Cir. 2011).......................................................................................14

*Pyramid Lake Paiute Tribe of Indians v. United States Dept. of the Navy,*
    898 F.2d 1410 (9th Cir. 1990).....................................................................................33

*Schmidt v. Lessard,*
    414 U.S. 473 (1974)............................................................................................. 25, 26

*SEC v. Chenery Corp*,
  318 U.S. 80 (1943) ...................................................................................................29

*South Yuba River Citizens League v. NMFS*,
  2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) .........................................................11

*Tribal Village of Akutan v. Hodel*,
  869 F.2d 1185 (9th Cir. 1988) .................................................................................33

*Humane Soc'y of the U.S. v. Bryson*,
  2012 WL 1952329 (D. Or. May 30, 2012) ...............................................................10

*United States v. 2,606.84 Acres of Land in Tarrant Cty. Tex.*,
  432 F.2d 1286 (5th Cir. 1970) ............................................................................17-18

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ...........................................................................................18, 29

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ..................................................................................................26

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ..............................................................................................passim


**STATUTES**


16 U.S.C. § 1532(6) ..............................................................................................................3

16 U.S.C. § 1532(19) ............................................................................................................4

16 U.S.C. § 1532(20) .....................................................................................................3, 15

16 U.S.C. § 1533(a) ..............................................................................................................3

16 U.S.C. § 1536(a)(2) .......................................................................................................28

16 U.S.C. § 1536(b)(1)(A) ...................................................................................................4

16 U.S.C. § 1536(b)(3)(A) ...................................................................................................3

16 U.S.C. § 1536(b)(4) .........................................................................................................4

16 U.S.C. § 1536(o)(2) ..................................................................................................34, 35

16 U.S.C. § 1538 ................................................................................................................28

16 U.S.C. § 1538(a)(1)(B) ...................................................................................................4

## FEDERAL REGULATIONS

50 C.F.R. § 402.02 .................................................................................................. 3

50 C.F.R. § 402.14(g)-(h) ....................................................................................... 3

50 C.F.R. § 402.15(a) ............................................................................................. 3

50 C.F.R. § 402.16 .................................................................................................. 4

64 Fed. Reg. 14308 (Mar. 24, 1999) .................................................................... 13

64 Fed. Reg. 14517 (Mar. 25, 1999) .................................................................... 13

## ACRONYMS AND ABBREVIATIONS

APA – Administrative Procedure Act

BiOp – biological opinion

Bonneville – Bonneville Power Administration

COP – Configuration Operation Plan

Corps – United States Army Corps of Engineers

DPE – downstream passage efficiency

ESA – Endangered Species Act

FWS – United States Fish and Wildlife Service

HD – House Document

ITS – incidental take statement

NMFS – National Marine Fisheries Service

NEPA – National Environmental Policy Act

OMET – Operational Measures Evaluation Team

RM&E – research, monitoring, and evaluation

RPA – reasonable and prudent alternative

RPM – reasonable and prudent measure

TDG – total dissolved gas

UWR – Upper Willamette River

UWR salmonids – Upper Willamette River Chinook salmon evolutionarily significant unit and

Upper Willamette River winter steelhead distinct population segment

WATER - Willamette Action Team for Ecosystem Restoration

WVP – Willamette Valley Project

## INTRODUCTION

Plaintiffs raise several claims against the United States Army Corps of Engineers ("Corps") disputing its compliance with the Endangered Species Act ("ESA"). At bottom, Plaintiffs want the Corps and the National Marine Fisheries Service ("NMFS") to reinitiate and complete a new ESA consultation on the Corps' continued operation and maintenance of the Willamette Valley Project ("WVP"). The agencies agree. They have reinitiated consultation, which will be informed by a National Environmental Policy Act ("NEPA") process, and are actively working to address how operating the WVP affects listed species and critical habitat. Despite arguing that this ESA consultation is the legally required way to address the effects of operating the WVP, Plaintiffs want the Court to divert agency time and resources *away* from that consultation. They prefer that the Court commandeer the ESA consultation process by ordering actions and managing the WVP based on select viewpoints presented during these expedited proceedings, effectively replacing the judgment and expertise of the Corps on how to operate an extremely complex hydrological system to both benefit ESA-listed species and comply with multiple laws.

There is no legal basis for this extraordinary request. Plaintiffs do not establish that the Corps' operation of the WVP *during the pendency of this case* irreparably harms them, which is the showing required to obtain relief. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); Argument Section II, *infra*. Nor does the science support Plaintiffs' proposed injunction. If ordered, the injunctive relief will provide no benefit to steelhead, potentially devastate a strongly performing Chinook population, and otherwise not have the benefits Plaintiffs speculate could possibly occur. Argument Section II.C, *infra*. Nor do the equities favor relief. Plaintiffs' proposed injunction usurps and violates the ESA; it does not adhere to its provisions or advance its implementation. Argument Section III, *infra*. Finally, the Corps adheres to the ESA in operating the WVP, as established through its consultation and ongoing close coordination with NMFS. Argument Section IV, *infra*.

Thus, for these reasons and those explained below, the Court should deny Plaintiffs' motion.

## LEGAL BACKGROUND

### I.    Flood Control Acts

In the Flood Control Act of 1936, Congress recognized that "destructive floods upon the rivers of the United States, upsetting orderly processes and causing loss of life and property, including the erosion of lands, and impairing and obstructing navigation, highways, railroads, and other channels of commerce between the States, constitute a menace to national welfare." Flood Control Act of 1936, Pub. L. No. 74-738, § 1, 49 Stat. 1570 (1936). Congress therefore directed the Corps' Chief of Engineers to investigate and improve rivers and other waterways for flood control, including waters in the Willamette River Basin. *Id.* §§ 2, 5.

In 1938, the Corps submitted a Chief of Engineers' report to Congress that included a comprehensive plan for the Willamette River Basin. H.R. Doc. No. 75-544. In the Flood Control Act of 1938, Congress approved and funded the "general comprehensive plan for flood control, navigation, and other purposes in the Willamette River Basin as set forth in House Document Numbered 544 [the Chief of Engineers' report]." Flood Control Act of 1938, Pub. L. No. 75-761, § 4, 52 Stat. 1215, 1222 (1938). Periodically, the Chief of Engineers submitted new reports to Congress updating its comprehensive plan for the Willamette River Basin. *See* H.R. Doc. No. 81-531; S.D. No. 86-104; H.R. Doc. No. 87-403. Congress explicitly adopted these reports in subsequent Flood Control Acts, stating that Corps' projects should be implemented "substantially in accordance with" the reports. *See, e.g.,* Flood Control Act of 1950, Pub. L. No. 81-516, § 204, 64 Stat. 163 (1950); Flood Control Act of 1954, Pub. L. No. 83-780, § 203, 68 Stat. 1248 (1954); Flood Control Act of 1960, Pub. L. No. 86-645, § 203, 74 Stat. 480 (1960).

### II.    Endangered Species Act

In the ESA, Congress directed the Secretaries of Commerce and Interior to list endangered

and threatened species.[1] 16 U.S.C. § 1533(a). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20).

Section 7(a)(2) requires federal agencies (known as "action agencies") to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. The action agencies consult with the appropriate expert "consulting agency" (either NMFS or FWS, or both, depending on the species involved) to analyze the potential impacts of a proposed action. Formal consultation leads to the issuance of a written biological opinion ("BiOp") by the consulting agency. 50 C.F.R. § 402.14(g)-(h). If a BiOp concludes that the proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify critical habitat, the consulting agency will suggest a reasonable and prudent alternative ("RPA"). 16 U.S.C. § 1536(b)(3)(A). A RPA is an alternative action that the consulting agency believes will not violate Section 7 of the ESA, can be implemented in a manner consistent with both the intended purpose of the action and the scope of the action agencies' legal authority and jurisdiction, and is economically and technologically feasible. 50 C.F.R. § 402.02.

Following consultation, the action agencies can choose to implement the RPA, modify the proposed action and consult again, decide not to undertake the proposed action, apply for an exemption, or disagree with the BiOp and proceed with its proposed action. *See* 50 C.F.R. § 402.15(a), (c); *Bennett v. Spear*, 520 U.S. 154, 170 (1997). Reinitiation of consultation may be required

---

[1] The Secretary of Commerce is generally responsible for marine and anadromous species, while the Secretary of the Interior is generally responsible for terrestrial species and inland fishes. The Secretary of Commerce and Secretary of the Interior have delegated their ESA responsibilities to NMFS and the United States Fish and Wildlife Service ("FWS"), respectively.

under certain enumerated circumstances. 50 C.F.R. § 402.16. The ESA does not include a mandatory

deadline for completing reinitiated consultation. *Compare* 16 U.S.C. § 1536(b)(1)(A) (consultation in

the first instance "shall be concluded within the 90-day period . . . or . . . within such other period of

time as is mutually agreeable to the Secretary and the Federal agency") *with* 50 C.F.R. § 402.16

(giving no timeline for completing reinitiated consultation).

Section 9 of the ESA prohibits the "take" of any endangered species, 16 U.S.C. §

1538(a)(1)(B). *See* 16 U.S.C. § 1532(19) (defining "take"). If, after consultation, the consulting agency

concludes that the incidental taking of a listed species as a result of the agency action will not violate

Section 7, it can issue an Incidental Take Statement ("ITS"). 16 U.S.C. § 1536(b)(4). Any taking in

compliance with the terms and conditions of the ITS is exempt from the general take prohibition in

Section 9. *Id.* § 1536(b)(4)(iv), (o)(2).

## FACTUAL BACKGROUND

## I.    The Willamette River Basin and WVP Facilities

The Willamette River Basin in northwest Oregon is the state's largest river basin, stretching

from south of Eugene to the Oregon and Washington border. *See* Petersen Decl. at Figure 1. The

Basin is comprised of the mainstem Willamette River and the River's numerous tributaries, with the

water generally flowing from south to north. *See id.* ¶ 8.

The Corps began constructing the WVP in the early 1940s. *See id.* ¶ 3. Today, the WVP

consists of 13 dams and reservoirs located in the Willamette River Basin: Big Cliff, Blue River,

Cottage Grove, Cougar, Detroit, Dexter, Dorena, Fall Creek, Fern Ridge, Foster, Green Peter, Hills

Creek, and Lookout Point. *Id.* Ten of these dams are storage dams, meaning that they can impound

a large amount of water behind the dams in reservoirs for later use. *See id.* The remaining three dams

(Big Cliff, Dexter, and Foster) are re-regulating dams. *Id.* These dams moderate the fluctuations in

downstream water flows resulting from hydropower production at upstream storage dams. *Id.* In

addition to the dams and reservoirs, the WVP also includes fish passage facilities, adult fish

collection facilities, fish hatcheries, recreation and natural resource areas, and approximately 42 miles

of fortified riverbank protections. *Id.*

## II.    The Corps' Management of the WVP

Congress authorized the Corps to construct, operate, and maintain the WVP in accordance

with the Flood Control Acts and the Chief of Engineers' reports incorporated in those Acts. *Id.* The

reports state that each dam must be managed for very specific purposes, known as "authorized

purposes." *Id.* ¶ 4. The authorized purposes of the dams comprising the WVP include flood control,

hydroelectric power generation, water quality improvement, municipal and industrial water supply,

irrigation, public recreation, fish and wildlife conservation, and navigation.[2] Petersen Dec. ¶ 4. The

authorized purposes differ from dam to dam. *Id.* Therefore, the Corps may not have Congressional

authority to conduct a specific operation at one dam in the WVP system, even though it has the

authority to conduct those same operations at another dam in the system. *Id.* The authorized

purposes of each dam can be found in the Petersen Declaration. *Id.* at Figure 2.

The Chief of Engineers' reports also include water control diagrams identifying how the

Corps will regulate water at each dam and reservoir to balance the authorized purposes of each dam.

*Id.* ¶ 5. The water control diagrams are described in water control plans, which are then incorporated

into the Corps' more detailed water control manuals. *Id.* The manuals specify how each of the WVP

dams and reservoirs will be operated to adhere to the authorized purposes. *Id.* The Corps

periodically reviews and revises the water control manuals to adapt to changes to or constraints on

the system, so that the Corps can continue to comply with the authorized purposes and water

---

[2] For more information about how the WVP provides flood control, water quality improvement, municipal and industrial water supply, irrigation, public recreation, and conservation benefits, *see id.* ¶ 3-5, 7-11. For information regarding power generation and the Bonneville Power Administration ("Bonneville")'s role in marketing the power, *see id.* ¶ 11-12 and the Connolly Decl.

control diagrams and plans for each dam. *Id.*

### III.    Overview of WVP Operations

The WVP system is primarily rain-driven. *Id.* ¶ 6. The Corps relies on river forecasting and river gauges on the mainstem Willamette River and its tributaries to make decisions regarding the operation of the system within the constraints of the authorized purposes of, and water control diagrams and plans for, each dam. *Id.* While the authorized purposes and water control diagrams and plans vary from dam to dam, an operational change or constraint at one dam or reservoir in the WVP impacts how the Corps can operate the remaining dams and reservoirs in the WVP. *Id.* Consequently, the Corps operates the WVP as a single unified system. *Id.*

Generally, beginning in September and continuing through November of every year, the Corps begins to draw down (reduce the amount of water in) reservoirs to the minimum conservation pool.[3] *Id.* ¶ 7. The drawdowns provide storage space for the periods of high inflow during the fall and winter. *Id.* The Corps then holds the reservoirs at the minimum conservation pool level during December and January—the major flood season—to provide maximum storage capacity for water that could cause flooding. *Id.* If there is a risk of flooding, the Corps allows the water to fill the reservoir instead of sending it downstream. *See id.*

Beginning in early February or March and continuing until early May, the Corps gradually begins to refill the reservoirs to the maximum conservation pool[4] level. *Id.* This conservation storage water is then used during periods of low inflow from early May through the end of August. *Id.* The conservation storage can be released during the summer for various authorized purposes, such as improving water quality and water temperature downstream for fish and wildlife. *See id.* ¶ 7, 9-10. At

---

[3] The minimum conservation pool is the elevation in each reservoir above the exclusive power storage, if applicable, or inactive storage.

[4] The maximum conservation pool is the elevation of storage space that can fill in each reservoir during the conservation season, and is below the summer flood pool and storage.

Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction - 6

the end of August the annual cycle begins again. *Id.* ¶ 7.

## IV.    The Biological Opinion and Implementation of the RPA

In 2008, the Willamette River Basin and surrounding areas contained 17 species that were listed under the ESA: 13 species of Pacific salmon and steelhead, bull trout, Oregon chub, the North American green sturgeon southern distinct population segment, and the Southern Resident killer whale distinct population segment. *See* BiOp, Exhibit A at 1-9 to 1-10. Pursuant to Section 7 of the ESA, the action agencies for the WVP (the Corps, Bonneville, and the U.S. Bureau of Reclamation) consulted with NMFS and the FWS[5] about the effects that the continued operation and maintenance of the WVP would have on these listed species and their critical habitats. On July 11, 2008, NMFS and FWS concluded the consultation by issuing separate BiOps. *See id.*

NMFS' BiOp concluded that the proposed action was not likely to adversely affect the Southern Resident killer whale or green sturgeon and was not likely to jeopardize 11 of the 13 species of Pacific salmon and steelhead. BiOp at 1-4. However, the BiOp also concluded that the proposed action was likely to jeopardize the continued existence of the Upper Willamette River ("UWR") Chinook salmon evolutionarily significant unit and UWR winter steelhead distinct population segment (collectively, "UWR salmonids"), two species listed as threatened under the ESA. *Id.* NMFS also found that the proposed action would adversely modify designated critical habitat for these species. *Id.* Because it reached a jeopardy conclusion, NMFS provided the action agencies with a RPA that the action agencies could implement for these two species. *Id.* at 1-4, 9-5 to 9-90. The Corps is the lead federal action agency for the BiOp and its RPA, but each action agency is responsible for implementing the parts of the RPA that are within their respective discretion and control.

---

[5] Under the ESA and its regulations, FWS is responsible for bull trout and Oregon chub.

The RPA included measures from the action agencies' proposed action, modifications to the proposed action, and additional measures developed by NMFS. *Id.* at 9-5. In order, these RPA measures are: coordination, including establishing the Willamette Action Team for Ecosystem Restoration ("WATER"), flow management, water contract programs, fish passage, water quality enhancement, hatchery supplementation, habitat restoration, ESA compliance and coordination, research, monitoring, and evaluation ("RM&E"), and maintenance. *Id.*; Brice Decl. ¶ 3.

The action agencies have substantially implemented most of the RPA measures. *See* Brice ¶ 8 (describing implementation of WATER); ¶ 6, 11, 12 (describing implementation of the Willamette Fish Operations Plan, comprehensive RM&E program, and completing the multi-year Configuration Operation Plan ("COP") study); ¶ 5 (detailing operational changes to improve downstream water flows and temperatures and interim fish passage operations, the replacement of a fish weir, construction of a portable floating fish collector at Cougar reservoir, construction of three new adult fish collection facilities, and improved release sites upstream of five dams). Implementation of the remaining RPA measures is ongoing. *Id.* ¶ 16-19. The Corps has begun the NEPA process for the planning and development of downstream juvenile fish passage and temperature control at Detroit Dam and downstream juvenile fish passage at Cougar Dam. *Id.* ¶ 18. The Corps, along with the other WATER participants, are also planning a "check in" in fiscal year 2019 on the direction of research to evaluate downstream juvenile fish passage at Lookout Point Dam. *Id.* ¶ 16, 18.

## V.    Reinitiated Consultation

In April 2018 the action agencies and NMFS reinitiated formal Section 7 consultation on the operation and maintenance of the WVP. *Id.*; Reinitiation Letter, Exhibit B. The agencies reinitiated consultation largely due to the large amount of new information gained since the BiOp was issued in 2008, primarily driven by the information obtained from the RM&E program that the Corps has implemented pursuant to the RPA.

During the reinitiated consultation process, the Corps intends to continue implementing the RPA measures included in the BiOp, subject to the availability of appropriations. Brice ¶ 20; Reinitiation Letter. The Corps has determined that continued operation and maintenance of the WVP pursuant to the RPA measures is not likely to jeopardize the continued existence of any listed species or adversely modify critical habitat. Section 7(d) Determination, Exhibit C at 2. The Corps also concluded that working to implement the RPA measures will not result in the Corps making an irreversible or irretrievable commitment of resources that will foreclose the implementation of any future RPA measure that NMFS might develop in coordination with the action agencies. *Id.* NMFS agrees that the Corps' decision to continue implementing the RPA while the reinitiated consultation process progresses "is a prudent course of action." Thom Decl. ¶ 5.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Winter*, 555 U.S. at 24; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). To obtain a prohibitory injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20. While courts within the Ninth Circuit evaluate these four elements on a "sliding scale," where a "stronger showing of one element may offset a weaker showing of another," a plaintiff seeking an injunction must still make a showing on all four prongs. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134-35 (9th Cir. 2011).

## ARGUMENT

I.    **Plaintiffs cannot meet their "doubly demanding" burden because they seek highly disfavored, mandatory injunctive relief.**

Plaintiffs ask the Court to alter WVP operations and compel the Corps and NMFS to act in several other ways, such as preparing analyses and reports and conferring with outside parties. ECF

36-44 (proposed order). This is not an injunction to preserve the status quo—the typical purpose of a preliminary injunction. As this Court explained in *Center for Biological Diversity v. U.S. Bureau of Reclamation*, Plaintiffs' injunction requests are mandatory injunctions that are highly disfavored and subject to heightened standards. No. 6:15-cv-2358-JR, 2016 WL 9226390 (D. Or. Apr. 6, 2016).

Plaintiffs disagree that any heightened standards apply by relying on *National Wildlife Federation v. NMFS*, 3:01-cv-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017), *aff'd*, 886 F.3d 803 (9th Cir. 2018). *See* ECF 36 at 31-32. In that case, the Court applied normal injunction standards when it altered operations of eight Federal dams on the Columbia and Snake Rivers in Oregon and Washington. *Id.* at *1. That injunction, however, came *after* "the Court . . . already decided the merits of the ESA and NEPA claims in this case." *Id.* at *2. In addition to relying on "law of the case" (inapplicable here), the Court focused the injunction inquiry on whether relief was warranted to redress *established violations*. *Id.* at *4 & n.2. The Ninth Circuit likewise relied on the established ESA violations in affirming the injunction. *National Wildlife Fed'n v. NMFS*, 886 F.3d at 819 (irreparable harm viewed in light of the established violation—there, that "the BiOp violates the ESA").

This Court's inquiry is different. The merits have not been litigated and no final decision exists. Plaintiffs request *preliminary* relief where the only relevant inquiry is whether the Court should act "to prevent harm that would impair th[e] court's ability to grant effective relief after resolving the merits of the case," *Humane Soc'y of the U.S. v. Bryson*, 3:12-cv-00642-SI, 2012 WL 1952329, at *5 (D. Or. May 30, 2012); *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009). Because Plaintiffs seek preliminary relief *and* a mandatory injunction, their burden is "doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). They must show "extreme or very serious damage," *Marlyn Nutraceuticals v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and the Court should deny relief "unless the facts and law clearly favor the moving party," *Garcia*, 786 F.3d at 740.

## II.    Plaintiffs have not shown that they are irreparably harmed in the absence of relief.

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *See* 11A Wright & Miller, Fed. Prac. & Proc. § 2948.1 (3d ed.). Plaintiffs assert recreational, aesthetic, and emotional harms tied to the current degraded status of salmonids. ECF 36 at 32-33. As Plaintiffs acknowledge, the relevant harm "is not injury to the environment but injury to the plaintiff." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000); *Winter*, 555 U.S. at 25-26. But Plaintiffs are incorrect that their synopsis of past harms and four standing declarations support a mandatory injunction.

### A.    Plaintiffs' reliance on past harms leading to the current status of salmonids does not establish irreparable harm.

To justify relief, Plaintiffs rely nearly exclusively on documenting past actions and harms, such as constructing and operating the WVP, that have led to the current status of UWR salmonids. *See, e.g.*, ECF 37 ¶ 30-45; ECF 38 ¶ 10-11, 44. Plaintiffs' standing declarants opine that the UWR salmonids' current status and condition harms them.[6] Plaintiffs thus seek injunctive relief to address a specific harm—that the UWR salmonids are in a "highly precarious state and vulnerable to extinction *due to their low abundance and recent declines*." ECF 36 at 32 (emphasis added). This does not qualify as irreparable harm justifying a mandatory preliminary injunction.

A preliminary injunction serves a specific purpose—preventing imminent, irreparable harm that would prevent the Court from issuing a meaningful decision on the merits. The relevant harm, then, is what occurs "before a decision on the merits can be rendered." *Winter*, 555 U.S. at 7, 20, 22; *South Yuba River Citizens League v. NMFS*, No. 2:13-cv-00042-MCE, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013). The Ninth Circuit recently reinforced this principle in *Defenders of Wildlife v. Corps*, 730 F. App'x 413 (9th Cir. 2018). While that case involved the Corps' construction of a new

---

[6] *See, e.g.*, ECF 40 ¶ 7-9, 15; ECF 41 ¶ 8; ECF 42 ¶ 16, 20; ECF 43 ¶ 13-14.

fish passage project, the district court granted an injunction because of harms from a different

action—"the operation and maintenance of the existing weir." *Id.* at *415. The Ninth Circuit

disagreed. "The law is clear that only harm that will occur 'in the absence of preliminary relief' may

be considered in determining irreparable harm." *Id.* (quoting *Winter*, 555 U.S. at 20).

Plaintiffs do not contend the UWR salmonids' threatened status (and alleged harms

stemming from that status) are harms that occur only "in the absence of preliminary relief." *Winter*,

555 U.S. at 20. The current status of UWR salmonids will continue even if the Court grants relief.

*See* Thom ¶ 8. Nor do Plaintiffs seriously argue the injunction will address the many harms they

purport to identify. Plaintiffs argue, for example, that UWR steelhead are in a degraded condition

that harms Plaintiffs' declarants. *See, e.g.*, ECF 36 at 32 (complaining that "steelhead are in a highly

precarious state"). But Plaintiffs do not propose measures to eliminate these harms; indeed, most of

the requested measures have nothing to do with UWR steelhead. Piaskowski Decl. ¶ 2, 25-26. By

predicating their motion on the current status of UWR salmonids, Plaintiffs do not establish

irreparable harm that is likely "in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

Plaintiffs nonetheless imply that past actions leading to the species' current status necessarily

dictates that such harms are likely to occur prospectively. *See, e.g.,* ECF 36 at 32. While "past harms"

can be relevant if they "show the threat of a repeated injury," *Center for Food Safety v. Vilsack*, 636

F.3d 1166, 1173 (9th Cir. 2011) (citation omitted), the past actions leading to the UWR salmonids'

current status do not inform the effects of the Corps' discretionary actions *in the interim period* before

the merits are decided, for two main reasons.

First, many of the past actions that worked to produce the current status of the salmonids

no longer occur in the same way today.[7] Since 2008, the action agencies have expended hundreds of

---

[7] Nor did the Corps cause many of the past actions or the continuing effects of all past actions, such
as the effects of the dams in blocking upstream passage and habitat. *Nat'l Wildlife Fed'n v. Corps*, 384

millions of dollars implementing many structural and operational actions that are benefiting salmonids. Brice ¶ 5, 11; Connolly ¶ 17; Factual Background Section IV, *supra*. Indeed, "[s]ignificant habitat restoration and protection actions at the Federal, state, tribal, and local levels have been implemented to improve degraded habitat conditions and restore fish passage." ECF 36-3 at 27. The harms borne from prior actions therefore cannot be assumed to continue in the present or into the future. *Northwest Envtl. Def. Ctr. v. Corps ("NEDC"),* 817 F. Supp. 2d 1290, 1314-15 (D. Or. 2011) (exploring the general effects of in-river mining is irrelevant where the case involved specific mining proposal with a "much narrower [] scope than generalized mining").

Second, the past actions and conditions that combined to result in the current status of UWR salmonids occurred for a half-century (or longer), while this case involves the effects of specific Corps' operations during a year or so before the merits are decided. The status of UWR salmonids under past WVP operations changed incrementally over time; they did not morph suddenly during a year or so of continued WVP operations. Indeed, the cumulative effect of all past actions over the past two decades did not change the ESA status of these salmonids—they were threatened in 1999 and NMFS confirmed they remain threatened in its 2016 status review. *See* 64 Fed. Reg. 14517 (Mar. 25, 1999); 64 Fed. Reg. 14308 (Mar. 24, 1999); ECF 36-3 (status review). Plaintiffs do not contest these facts; they, in fact, affirmatively rely on the status review and its findings that the ESA status of UWR salmonids has not changed since 1999. ECF 36 at 3-4, 14, 29.

NMFS' 2016 status review thus highlights a key flaw in Plaintiffs' speculation that one or two more years of continued WVP operations pursuant to the RPA measures is likely to change the status of UWR salmonids. As the NMFS' Regional Administrator explains, UWR salmonids are

---

F.3d 1163, 1178-80 (9th Cir. 2004) (refusing to conflate Congress' decision to authorize the dams with the Corps' operations; the "creation of dams is a matter of policy that is within the province of Congress, not the courts"); *Defs. of Wildlife,* 730 F. App'x at 415-16.

threatened by many factors, only one of which is the Corps' discretionary operation of the dams. Thom ¶ 8. "These threats, and potential responses to them, are expected to evolve over years or decades, and the yearly fluctuations in abundance of the species do not suggest that there is a need to take actions so quickly as to justify bypassing the processes currently in place." *Id.* The threats are not, as Plaintiffs state, likely to affect the overall status of these species during the one- or two-year interim period. *Id.*; *see also* Piaskowski ¶ 4-7, 13, 18, 25-92 (explaining that a host of factors affect these species and Plaintiffs' operational adjustments are not likely to alter the species' status).

Plaintiffs' inquiry disconnects the harms complained of from the effects of the Corps' interim actions before the merits are decided. By doing so, Plaintiffs fail to address the relevant factors—whether irreparable harm caused by the agency's interim operations is likely to occur in the absence of relief. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011) (requisite causal connection must exist between the alleged injury and the conduct sought to be enjoined); *NEDC*, 817 F. Supp. 2d at 1314-15. And, by failing to address the correct factors, Plaintiffs fail to meet their burden in proving entitlement to preliminary injunctive relief.

**B.    Plaintiffs' alternative theories of irreparable harm are contrary to the law.**

Seemingly aware that their case for relief wrongly hinges on the cumulative effect of past actions, including construction of the dams, Plaintiffs labor to diminish the showing required to obtain relief. They suggest the government bears the burden of proof simply because Plaintiffs allege ESA violations. ECF 36 at 22. They also rely on other courts that have granted injunctions. ECF 36 at 31-32. But no injunction is justified because a plaintiff *alleges* ESA violations or because courts issued injunctions in *other* cases. These arguments present "nothing more than a disguised presumption" of irreparable harm, *Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1211 n.13 (C.D. Cal. 2007), which is improper even in ESA cases, *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

Plaintiffs next suggest that *any* level of harm justifies relief, irrespective of how the Corps' actions in the interim period affect *the species*. ECF 36 at 32-33. But Plaintiffs express an interest in the UWR *species* and, therefore, must establish irreparable harm *to the species*.[8] *Center for Biological Diversity*, 2016 WL 9226390, at *4 (because plaintiffs seek a mandatory injunction, they must "present evidence that the dams' operations are causing irreparable harm to the spotted frog that 'would be significant for the species as a whole'"); *see also Conservation Cong. v. U.S. Forest Serv.*, No. 2:13-cv-1977-JAM-DB, 2018 WL 4007093, at *2 (E.D. Cal. Aug. 17, 2018) (a plaintiff "need not demonstrate a threat of extinction to the species" but must show irreparable injury and "harm 'significant' to the 'overall population.'").

Plaintiffs, in fact, noticeably fail to relate any adverse effects from the status quo operations of the WVP occurring while this case is pending to some concrete change in the species' *biological* status. *See* Piaskowski ¶ 12, 73-83 (explaining that an assessment of how an action affects a species must consider the viable salmonid population characteristics, an inquiry disregarded by Plaintiffs and their declarants). They instead rest on conclusory statements that the species are at imminent risk. ECF 36 at 35. The evidence refutes this speculation as well. The species are threatened, ECF 36-3, which means they are *not* in danger of extinction now. 16 U.S.C. § 1532(20).

Plaintiffs' delay in seeking relief confirms the absence of irreparable harm. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) (citation omitted). Yet Plaintiffs here waited years to sue and then waited eight more months before seeking relief. While they argue now that the status of UWR salmonids justifies relief and that irreparable harm is occurring, those allegations do "not change the

---

[8] Plaintiffs' declarants' interests in fishing prove this point. When they go fishing, they harass, harm, and even kill salmonids. *See, e.g.*, ECF 40 ¶ 7-9. But these harms do not necessarily irreparably harm the declarants or their interests in salmonids. The same is true here. Even assuming some harm occurs, that alone does not establish that the Corps is causing irreparable harm to the salmonids.

fact that plaintiffs could have sought a preliminary injunction much earlier." *Benisek*, 138 S. Ct. at 1944. Because "no new harm is imminent," there is "no compelling reason . . . to issue a preliminary injunction against a practice which has continued unchallenged for several years." *Oakland Tribune v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

### C.    Plaintiffs' proposed injunction is flawed and confirms that they have failed to establish irreparable harm.

"[T]he relevant harm" in the injunction inquiry is "the environmental harm likely caused" in the absence of relief and when the contested injunction measures are not implemented. *Winter*, 555 U.S. at 37 (Breyer, J., concurring); *id.* at 31 n.5 (majority agreeing with this analysis). The corollary is that irreparable harm is lacking where the injunction measures avoid no harm or affirmatively cause it. The "linchpin of [] interim relief is that threatened irreparable harm will be prevented by that injunction." *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985); *see also Center for Biological Diversity*, 2016 WL 9226390, at *4 (evidence must "clearly support the finding that plaintiffs requested relief would significantly improve conditions for the [listed species]"). Plaintiffs fail to establish that their proposed measures will avoid any harm to the UWR salmonids.

### 1.    Plaintiffs' proposed reservoir drawdowns and spring spill operations at Detroit, Cougar, and Lookout Point dams.

Plaintiffs propose measures governing fall reservoir drawdowns (Detroit, Cougar, and Lookout Point), the delayed spring refill (Cougar), and the spring spill operations (Lookout Point). ECF 36 at 34-35. Plaintiffs allege that these measures benefit juvenile downstream migrants. *See id.* at 14-17; 34-35. The full body of evidence, however, shows that the proposed measures will not benefit UWR winter steelhead. Piaskowski ¶ 26, 38, 46, 54, 63. The evidence also shows that these measures are unlikely to benefit UWR Chinook salmon while the case is pending, and worse, may in some cases affirmatively harm them. *Id.* ¶ 27-37, 39-45, 47-53, 55-62, 64-68.

### a.    Plaintiffs' downstream passage measures are not implementable consistent with Federal and State law.

Plaintiffs' proposed fall drawdowns at Detroit, Cougar, and Lookout Point dams cannot ameliorate any harm because they cannot be implemented under Federal and State law. In the authorizing Flood Control Acts, Congress specified that the Corps must operate the WVP dams "substantially in accordance with" the Chief of Engineers' plans for the dams contained in House Document (HD 531)[9]. Pub. L. 81-516, 64 Stat. 163, 179 (1950); Pub. L. 83-780, 68 Stat. 1248, 1265 (1954); Pub. L. 80-858, 62 Stat. 1171, 1178 (1948). HD 531 thus governs the Corps' authorities. *See, e.g.*, *Libby Rod & Gun Club v. Poteat*, 594 F.2d 742, 744-45 (9th Cir. 1979). And HD 531 is explicit on how the Corps must use storage volumes allocated for power production. "For the Willamette Basin projects, power storage is considered to be that increment of storage which lies directly above dead storage." HD 531, App'x J, at 2239; Wells Decl. at Figures 1-3 (depicting the power pools at Detroit, Cougar, and Lookout Point). This power storage volume "is reserved *exclusively* for power generation." HD 531, App'x J, at 2239 (emphasis added). The "exclusive use" direction "insure[s] that Willamette River plants would contribute, *in all years*" to supporting power production during the critical power production period of October through March. *Id.* at 2239 (emphasis added).

Plaintiffs' proposed injunction would intentionally drain the power pool at Detroit, Cougar, and Lookout Point for at least 1.5 to 2.5 months during the 6-month critical power production period. Wells ¶ 51, 60, 70, 83. This injunction thus *eliminates* any potential for power production for substantial periods during the time HD 531 reserved the power pool exclusively for power generation. While some flexibility exists for using the power pool for other purposes, the Corps lacks the authority to take actions "so foreign to the original purposes of the project as to be arbitrary and capricious," *Britt v. Corps*, 769 F.2d 84, 89 (2nd Cir. 1985); *United States v. 2,606.84 Acres*

---

[9] HD 531 is available at https://www.streamnetlibrary.org/?page_id=895.

*of Land in Tarrant Cty. Tex.*, 432 F.2d 1286, 1293 (5th Cir. 1970) (finding that the Corps permissibly made changes where "[t]he area served and the project purposes were not changed"). Considering the project purposes and direction in HD 531—reservation of the power pool exclusively for power production during a specific time of every year—Plaintiffs' proposal is a bridge too far.

Plaintiffs suggest the project authorizations are not limiting by relying on *National Wildlife Federation v. NMFS*, 524 F.3d 917 (9th Cir. 2008). ECF 36 at 36. That case did not analyze the authorizations for or purposes of the WVP dams. Nor are Congress' authorizations for Corps' projects fungible. *See* HD 531, App'x J, at 2057-59 (distinguishing authorized purposes for the WVP dams from those that apply to the Columbia and Snake River dams). Nor can Plaintiffs rely on the ESA to justify altering the project authorizations and purposes, as the ESA is not an independent font of authority that amends or repeals an agency's statutory mandates. *National Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 (2007). Because the Corps cannot implement the fall drawdowns proposed by Plaintiffs consistent with the project authorizations, the Court should not order them. *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) ("Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute.").

Plaintiffs' proposed injunction also likely violates State law. In implementing the Clean Water Act, Oregon has provided water quality standards governing total dissolved gas ("TDG") to protect aquatic life. *See* OR. ADMIN. R. 340-041-0001, 00031. Plaintiffs' fall drawdowns are likely to cause avoidable violations of these standards.[10] Wells ¶ 47, 58, 63, 78 (explaining that the drawdowns

---

[10] The Corps' WVP operations sometimes result in exceedances of the TDG limits. These exceedances stem from required operations of the dams (for flood risk management and other operations). They do not stem from discretionary operations where TDG exceedances could be avoided. *See, e.g., National Wildlife Fed'n v. Corps*, 384 F.3d at 1179 ("If state regulatory exceedances occur as a result of water impoundment required for operation of the federal dams, despite good-faith and diligent efforts of the Corps *to do all that is feasible to avoid such exceedances*, then we do not believe such an exceedance can be construed as a violation of the CWA." (emphasis added)).

would cause TDG to exceed 110% below the dams). Just as an injunction that usurps Congress' judgment expressed in authorizing legislation is improper, so too is an injunction that directs an agency to conduct operations that lead to avoidable violations of State law.

> **b.      Plaintiffs' measures will likely not benefit UWR salmonids.**

When these projects were constructed, Congress largely chose not to provide fish passage facilities that would allow adults to migrate upstream and juveniles to migrate downstream. It instead relied on hatcheries to offset the loss of spawning habitat created by the dams. Brice ¶ 10. With the species' decline, NMFS, the Corps, and other Federal and state agencies studied and implemented measures to provide upstream adult and downstream juvenile passage. *See id.* ¶ 5, 11-12.

The Corps, for example, has implemented RPA Measures 6.2.3 to successfully pass adult UWR Chinook above Detroit, Cougar, Foster, Lookout Point, and Hills Creek dams through trap and haul operations so they can volitionally spawn in upstream tributary habitats. *See* Piaskowski ¶ 25, 39, 62. The progeny of these hatchery fish rear in the tributary and reservoir habitats until they pass the dams through one of several available downstream passage routes—spill (at higher reservoir elevations), turbines (at intermediate reservoir elevations), and regulating outlets (at lower reservoir elevations). *See id.* ¶ 28-30, 40, 55, 57-58, 65. In addition, the Corps has implemented both structural and operational interim downstream passage measures under RPA Measure 4.8 and conducted substantial RM&E under RPA Measure 9. Brice ¶ 5, 11. And, after analyzing various structural and operational downstream passage alternatives in the COP study called for in RPA Measure 4.13, the Corps has begun the environmental review process under NEPA for downstream fish passage structures at Detroit and Cougar dams. *Id.* ¶ 5.

Through these reviews, the experts have concluded that operation and structural measures are required to facilitate improved juvenile passage conditions past these WVP dams. *Id.* ¶ 12, 14, 16, 18-19. Plaintiffs disagree. They suggest that their proposed operational measures alone, without

considering structural improvements, can increase adult returns and improve the species' status. *See* ECF 36 at 34-35. Plaintiffs' theory is flawed in three main ways.

First, Plaintiffs' proposed juvenile passage operations will not materially improve juvenile downstream passage or survival. To meet Plaintiffs' proposed fall drawdown elevations by mid-November at Detroit, Cougar, and Lookout Point dams, the Corps would have to evacuate the reservoir from late summer through mid-November. Wells ¶ 39-40, 43-44, 56, 73-75. These operations would pass higher volumes of water than normal through spill and turbines passage routes, which already have high downstream passage efficiency ("DPE")—the percent of juvenile fish entering the reservoir forebay that successfully pass the dam. *See id.* ¶ 43, 50, 55, 73, 75; Piaskowski ¶ 29. Most juveniles thus pass the dam before the proposed drawdown elevation is reached. *See* Piaskowski ¶ 28, 30, 45, 57. And once the reservoirs are fully drawn down, DPE plummets. At Detroit Dam, less than 10% of the juveniles entering the forebay are likely to pass when the reservoir is drawn down to Plaintiffs' preferred 1,370-foot elevation. *Id.* ¶ 30. At Lookout Point Dam the conditions are worse, with efficiency being less than 1% when reservoir elevations are low. *Id.* ¶ 57; *see also id.* ¶ 42-43 (discussing Cougar Dam).

Similar considerations would exist at Cougar and Lookout Point dam. At Cougar Dam in March and April when Plaintiffs propose to delay refill, about 80% of the juveniles are nowhere near the dam. *Id.* ¶ 47. At Lookout Point Dam, less than 5% are near the dam in the spring when Plaintiffs propose for the Corps to conduct spill operations. *Id.* ¶ 55. Not only is passage efficiency low, but the drawdowns are unlikely to decrease the reservoir size at Detroit Dam in ways that attract more juveniles to the dam face. *Id.* ¶ 30 (explaining that Detroit Dam's reservoir is 4.5 miles long and juveniles are distributed throughout the reservoir at Plaintiffs' proposed fall elevation). These extremely low passage rates and conditions will be further diminished because the Corps cannot hold the reservoirs at a static elevation as Plaintiffs request. Flood risk management

operations and nature will cause the reservoir elevations to fluctuate upward, reducing any efficiency of Plaintiffs' proposed drawdowns. Wells ¶ 46, 57, 76.

Second, even assuming an incremental benefit to an incremental portion of the juvenile downstream migrants, Plaintiffs do not address how that juvenile survival is meaningful to the *species*. UWR Chinook spawning aggregations above Detroit, Cougar, and Lookout Point dams are maintained by hatchery fish. Piaskowski ¶ 7, 16, 24. The long-term recovery goal is to cease trapping and transporting hatchery fish above the dams, which can occur only where enough natural-origin Chinook adults return to allow for their use in the trap and haul operations. *Id.* ¶ 24. But operational measures conducted in one or two years have no chance of ceasing the current reliance on hatchery fish to maintain spawning above the dams. *Id.* ¶ 30, 37, 45, 53, 62. Thus, Plaintiffs' proposed measures will not affect the species because the spawning aggregations above the dams will be sustained by hatchery fish (and not the returns Plaintiffs hope may possibly come from their proposed incremental survival improvements for a small fraction of juvenile out-migrants).[11]

Third, Plaintiffs' proposed operations would immediately degrade below-dam conditions in biologically significant ways for salmonids. To meet Plaintiffs' target fall drawdown elevation at Detroit and Lookout dams, downstream flows would increase during the entire drawdown period (late summer through fall). Wells ¶ 45, 77. This period corresponds to UWR Chinook spawning below the dams. Piaskowski ¶ 17, 33, 59. High flow conditions during spawning cause UWR Chinook to deposit their eggs in areas that will become dry once the river volumes subside. *Id.* ¶ 33, 59. For this reason, NMFS' RPA prescribes maximum flow targets that Plaintiffs now ask the action agencies to violate. BiOp at 9-12. Plaintiffs thus want to sacrifice the progeny of naturally spawning adult UWR salmonids below the dams in the hopes of benefiting the progeny of adult hatchery fish

---

[11] Plaintiffs tacitly agree, recognizing that recovery is impossible without major alterations to the dams. ECF 37 ¶ 44-45; ECF 38 ¶ 10.

transported and released above the dams. This is not a rational or permissible tradeoff. *Idaho Rivers United v. Corps*, 156 F. Supp. 3d 1252, 1267 (W.D. Wash. 2015) (injunction that "undermine[s] full implementation of the . . . operational parameters recommended by NMFS that are designed to benefit other listed and endangered species" is inconsistent with the law).

The proposed reservoir operations also would result in higher TDG levels in the river below the dams that could, at times, be above the limits the State of Oregon has enacted to protect aquatic life. Wells ¶ 47, 58, 63, 78. This means that salmonids (and other aquatic life) will be exposed to more harmful conditions, with salmonids likely to see increased incidence of gas bubble trauma (much like "the bends" in humans). *Id.* ¶ 47; Piaskowski ¶ 34, 44, 51. The proposed injunction likewise would increase sediment transport and turbidity (measure of suspended particulates in water) below Detroit, Lookout Point, and Fall Creek—conditions that can be harmful to salmonids. Wells ¶ 48-49, 79-81, 96; Piaskowski ¶ 36. And the injunction will immediately degrade downstream temperature conditions below the dams, including potentially exacerbating pre-spawning mortality rates. Wells ¶ 42, 50, 65-67, 82, 101 (explaining the Corps' use of temperature control towers or water outlets to mix the warm and cold portions of the reservoir and thus moderate temperature profiles below the dams; these methods become unavailable and result in degraded temperature conditions under Plaintiffs' operations); *see also* Piaskowski ¶ 5, 9, 35, 52, 60.

Plaintiffs identify the same harms—spawning adults face many challenges and should be protected (*see* ECF 36 at 1); TDG levels below the dams injure and kill fish (ECF 38 ¶ 22-25, 38; ECF 39 ¶ 36); sediment and turbidity harms salmonids (ECF 39 ¶ 68); and temperature conditions below the dams substantially harm salmonids (ECF 36 at 18, 29). Despite this, Plaintiffs offer an operation that intensifies these harms. As the experts have concluded, based on studies of similar operations and the available data present (much of which Plaintiffs choose to disregard), Plaintiffs' proposed operations are likely to have a short-term "net-negative effect for UWR Chinook."

Piaskowski ¶ 37. Plaintiffs' decision to turn a blind eye to the consequences associated with implementing their proposed measures shows why the Court should deny their motion.

### 2.    Plaintiffs' Fall Creek Dam measures will harm Chinook.

Plaintiffs propose to delay refill at Fall Creek Dam from April through June (and hold the reservoir at 685 feet) to facilitate juvenile outmigration during this period. ECF 36 at 34. This proposed measure is likely to substantially harm a critical component of UWR Chinook species.

The Corps has made substantial progress in reestablishing a *wild* spawning aggregation above Fall Creek Dam. Unlike Detroit, Cougar, and Lookout Point dams, where trap and haul operations rely on passing adult hatchery-origin UWR Chinook, the Corps traps and hauls natural-origin UWR Chinook returns above Fall Creek Dam. *See* Piaskowski ¶ 70. The Corps also manages reservoir operations in ways that are improving juvenile downstream passage. *Id.* ¶ 23; Wells ¶ 91. Juvenile salmonids are rearing to large sizes in the reservoir and, with improved passage conditions provided by a fall drawdown, the larger juveniles are surviving at high rates. Piaskowski ¶ 71, 79-83.[12]

As with other WVP dams, Fall Creek Dam does not include facilities allowing adults to pass upstream volitionally, so the Corps traps and hauls UWR Chinook above the dams. Plaintiffs' proposed operation to delay refill in the spring would, if implemented, preclude this operation. It would render the adult collection facility inoperable through June 30 and during times when an average of 87% of the adults trapped for transport are collected due to lack of water supply. *Id.* ¶ 70. Plaintiffs' operation also would make it unlikely that the collection facility later would become operational. *Id.* The adult collection facility is the only means of providing safe adult passage above the dams, and Plaintiffs want to take it out of service. *See id.*

Worse still, the evidence does not support Plaintiffs' idea that the operation would benefit

---

[12] Fall Creek is substantially different than other dams where operational adjustments, like a fall drawdown, are unlikely to increase juvenile downstream passage and survival rates. *Id.* ¶ 71.

juvenile migrants. Juveniles currently rear in the reservoir during the spring and summer and attain larger sizes before passing through the dam in the fall and winter. *See id.* ¶ 82. Plaintiffs' proposal, by contrast, would force smaller juveniles downstream in the spring and thus trade reservoir rearing for rearing in hostile and degraded downstream reaches. ECF 37 ¶ 53. The Independent Scientific Advisory Board highlighted the flaw in this logic. "Survival past the dams may be increased, but eventual survival may ultimately decrease if the habitats the fish encounter below the dams are not as productive as their home reservoir." ISAB Publication 2014-3, available at https://www.nwcouncil.org/sites/default/files/ISAB2014-3.pdf; *see also* Piaskowski ¶ 71. Plaintiffs' proposed operation, moreover, could continue to degrade downstream river conditions by violating flow conditions NMFS has identified as necessary for UWR Chinook rearing. Piaskowski ¶ 71; Wells ¶ 94.

Plaintiffs thus propose an operation where "the end result would be the extirpation of the recently-established wild Fall Creek UWR Chinook salmon run, which constitutes *greater than 80%* of all natural-origin UWR Chinook salmon in the Middle Fork Willamette River." Piaskowski ¶ 71 (emphasis added). Plaintiffs have failed to account for the life-cycle impacts of their proposed operation, and they have failed to meet their heavy burden of proof in seeking extraordinary relief.

**3.    Plaintiffs' remaining operational and coordination measures are unsupported.**

Plaintiffs propose other measures that likewise are not supported by the evidence or otherwise likely to confer a benefit to UWR salmonids.

Flood Risk Operations. Plaintiffs admit, as they must, that any injunction must not interfere with the Corps' flood risk management operations. ECF 36-44 at 1. Yet they propose onerous reporting, justification, and mitigation measures that will chill the Corps' ability to freely implement flood risk management operations that prevent the loss of life and property. *Id.* at 4 (¶ III.B.); Wells ¶ 113. Indeed, Plaintiffs proposals show a fundamental lack of understanding on how their

proposed operations impact other projects or authorized purposes—impacts that are not always predictable given changes in hydrology. *See* Piaskowski ¶ 4. Given the gravity of what is at stake, combined with the complexity of performing flood risk management operations, the Court should not grant any relief (or include language) that could even potentially impact the Corps' flood risk management operations. *See NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435-36 (1941) ("This Court will strike from an injunction decree restraints upon the commission of lawful acts which are thus disassociated from those which a defendant has committed.") (citation omitted)).

Prioritize Fish Over Other Project Purposes. Plaintiffs propose that the Court order the Corps to "prioritize needs of [UWR salmonids] over all other authorized purposes of the Willamette Project [except for flood control or human health and safety, including]…power production." ECF 36 at 34. Whether (unknown) future operations "prioritize" fish over other purposes is inherently subjective, rendering Plaintiffs' proposed instruction impermissibly vague. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (Rule 65 "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." (citations omitted)).

Green Peter Dam Outplanting. Plaintiffs request that the Corps harm, harass, and kill salmonids by collecting them and transporting them above Green Peter Dam. ECF 36-44 at 2 (¶ I.A.g., I.B.). But Plaintiffs propose an end-run around NMFS' RPA, which contemplated this operation only if NMFS determined that it must be implemented after further analysis and evidence. BiOp at 9-33, 9-35.[13] Nor does the operation make sense. Without resolving the structural and operational improvements needed to ensure adequate downstream juvenile passage—issues being

---

[13] Plaintiffs' declarants opine that the Corps has refused NMFS' requirement for outplanting. ECF 38 ¶ 44; ECF 39 ¶ 65. The declarants have their facts wrong. NMFS has not determined that these measures should occur under the ESA. Piaskowski ¶ 85.

actively analyzed and discussed at Detroit and Cougar dams—transplanting fish above Green Peter serves no biological purpose. *See* Piaskowski ¶ 84. And a directive to transplant salmonids violates Rule 65, as it provides no specificity into what is required. *Schmidt,* 414 U.S. at 476.

OMET Re-Evaluation. Plaintiffs want the Corps to perform a new analysis of potential operational measures in order to remedy an alleged "violation" that occurred in issuing the 2012 Operational Measures Evaluation Team ("OMET") report. ECF 36-44 at 2-3 (¶ I.C.-D). The Court lacks jurisdiction to issue remedies redressing a non-existent claim.[14] *Pacific Radiation Oncology v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."). Nor does a study avoid any irreparable harm. ECF 36-44 at 3 (admitting uncertainty exists after any new study is completed). And relief that dictates the types of analyses that must be conducted improperly propels "the court into the domain which Congress has set aside exclusively for the administrative agency.'" *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,* 435 U.S. 519, 544-45 (1978) (citation omitted)).

Water Quality Measures; Use of Lower Regulating Outlets. Plaintiffs propose to use the lower regulating outlets in the "fall" at Lookout Point and Detroit dams. ECF 36-44 at 3 (¶ II.A.). But structural constraints of these dams limit when the Corps can use the regulating outlets. Under current operations, the Corps cannot use the lower regulating outlets at Detroit until December, at which point their use will not alter downstream temperature conditions. Wells ¶ 101-102. At Lookout Point dam, based on past experience and modeling, temperature management operations have not been shown to be effective at moderating downstream water temperatures. Wells ¶ 104.

---

[14] Plaintiffs also err in asserting defects with the 2012 OMET report. In essence, Plaintiffs disagree that the Corps must operate the dams under the Congressional authorizations and project purposes. But Plaintiffs' dispute with the WVP's authorizing legislation is a matter for Congress, not the Corps in analyzing actions or the Court in granting relief.

Plaintiffs thus fail to substantiate these requests or show the Court must order them now.

<u>Maintenance Schedules and Emergency Protocols</u>. Plaintiffs want the Corps to "strictly follow" NMFS' and ODFW's maintenance schedules and emergency protocols. ECF 36-44 at 3 (¶ II.B.). Plaintiffs do not identify the harms avoided or benefits conferred in implementing these measures (as there are none). Nor do Plaintiffs identify those documents or show why they could be incorporated into an order. *See* Fed. R. Civ. P. 65(d). And Plaintiffs ask the Court to delegate the tasks of setting the terms of an injunction to third parties, which is wholly improper. *Nat. Res. Def. Council v. Kempthorne*, No. 1:05-cv-1207, 2007 WL 1989015, at *15 (E.D. Cal. July 3, 2007) (finding "legally infirm" under separation of powers principles a similar request to order a Federal agency to comply with recommendations from an outside panel).

<u>Coordination Measures</u>. Plaintiffs suggest a suite of onerous and duplicative coordination measures. ECF 36-44 at 3-4 (¶ III). The Corps already diligently coordinates "with the Services, ODFW, and the other agencies in implementation of the RPA," Piaskowski ¶ 93, rendering an injunction on these topics improper, *Express Publ'g*, 312 U.S. at 435-36 ("This Court will strike from an injunction decree restraints upon the commission of lawful acts which are thus disassociated from those which a defendant has committed."). Nor do these measures avoid imminent irreparable harm, and injunctions cannot "be justified as a prophylactic measure needed to guard against the possibility" of a future harm. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 161 (2010).

***

In sum, Plaintiffs do not seek relief to avoid some interim, irreparable harm. The evidence shows plainly that their proposed measures are not likely to benefit salmonids and, in fact, several measures could harm the species. Plaintiffs' motion is premised on a different idea. They want a "test," to "experiment" with salmonids, and "study" what could work. ECF 37 ¶ 51, 53-55; ECF 39 ¶ 59, 63, 66. These arguments, in fact, effectively concede that their proposals are uncertain and not

likely to be effective (hence, the need for a "test," "experiment," and "study"). A mandatory injunction should not issue because Plaintiffs are *curious* on how a new operations, coordination provisions, and management frameworks will affect ESA-listed species.

## III.    The balance of harms and public interest weigh decidedly against *ad hoc* modifications to WVP operations.

Plaintiffs argue that no balancing of harms is required because they pled ESA claims. ECF 36 at 21-22. In ESA cases, courts employ a presumption that the balance of interests weighs in favor of endangered and threatened species; they do not avoid the inquiry entirely. *National Wildlife Fed'n v. NMFS*, 886 F.3d at 817 (citation omitted). Nor may a court "merely assume that the Plaintiffs are acting in the species' best interest, especially when confronted with the type of comprehensive contradictory evidence that the Defendants have presented here." *Alliance for the Wild Rockies v. Krueger,* 35 F. Supp. 3d 1259, 1270 (D. Mont. 2014), *aff'd,* 664 F. App'x 674 (9th Cir. 2016). This is the case here. Plaintiffs' injunction will not advance the ESA, benefit the UWR salmonids, or further the public interests served by the Corps' operation of the WVP.

Plaintiffs' premise is that their injunction advances the ESA. They are wrong. In Section 7(a)(2), Congress expressed its judgment that new actions adversely affecting listed species should not occur without being subject to the rigors of an ESA consultation and an expert review by the expert wildlife agency—here, NMFS. 16 U.S.C. § 1536(a)(2), (b). Congress also provided that actions that "take" listed species are illegal without a permit or exemption issued by NMFS. 16 U.S.C. § 1538. These procedures reflect Congress' judgment on how ESA-listed species are to be protected and conserved. *See City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006) (Section 7(a)(2) "reflects Congress's awareness that expert agencies … are far more knowledgeable than other federal agencies about the precise conditions that pose a threat to listed species, and that those expert agencies are in the best position to make discretionary factual determinations about whether a proposed agency action will create a problem for a listed species and what measures might be

appropriate to protect the species.").

Plaintiffs here ask for relief that circumvents Congress' judgments and priorities expressed in the ESA. They argue that their proposed measures should be implemented now, even though some of the suite of injunction measures have not been subjected to an ESA consultation or reviewed by NMFS. Plaintiffs provide testimony that establishes their measures will "take" salmonids, *see, e.g.,* ECF 37 ¶ 18-20, yet they do not identify a permit or exemption of the "take" that will occur. And Plaintiffs propose measures that intentionally violate NMFS' fish-protection measures, like flow targets below the dams. Piaskowski ¶ 5; *see* Wells ¶ 109-112. Plaintiffs thus want to toss the ESA's provisions and safeguards aside because *their priorities* rest with ignoring the statute and implementing an *ad hoc* operation. But Congress' priorities matter, not Plaintiffs'. *Oakland Cannabis*, 532 U.S. at 497.

To the extent Plaintiffs argue that the Corps' operations are violating the ESA and so the options consist of allowing these allegedly unlawful actions to continue or ordering new, allegedly less harmful actions that also violate the ESA, this is a false choice. Plaintiffs have not established a legal violation, so the purported conflict does not exist. The Supreme Court also has rejected this reasoning—that an injunction must issue irrespective of whether less drastic remedies or other relief exists. *Monsanto*, 561 U.S. at 165-66; *Winter*, 555 U.S. at 33. If Plaintiffs are concerned with the adequacy of actions implemented in accordance with the RPA, the solution consistent with the ESA is to allow the experts to address WVP operations through the statutorily mandated reinitiated consultation process. The solution is not to abandon the ESA in favor of judicial remedies. *SEC v. Chenery Corp*, 318 U.S. 80, 88 (1943) ("judicial judgment" in the form of an injunction "cannot be made to do service for an administrative judgment" in implementing the ESA).

Indeed, as NMFS' Regional Administrator confirms, this injunction would disserve the ESA and the UWR salmonids that depend on the ESA's sound implementation. *See* Thom ¶ 6-8. The consultation process is necessary to ensure that the best available science and expertise of the federal

agencies are brought to bear on WVP operations. *See id.* ¶ 7. This process avoids precisely the type

of action Plaintiffs propose here—measures that may not advance the interests of the species and,

instead, could harm them. *See id.*; Piaskowski ¶ 5-6. The public interest therefore does not lie in

interfering with the ongoing consultation process, and the Court should defer to NMFS' considered

view that addressing WVP operations through the ongoing ESA consultation advances the ESA and

the interests of these threatened species. *Hamlin Testing Labs v. U.S. Atomic Energy Comm'n*, 337 F.2d

221, 222-23 (6th Cir. 1964) (proper "to give at least interim respect to the expert judgment of the

[agency] as a coordinate agency of government specifically created to further the public purposes in

this area"); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 830-31 (9th Cir. 2002).

 Finally, the proposed injunction threatens substantial harm to other significant public

interests. The injunction will substantially interfere with Congress' specification that the Corps must

operate the dams to achieve multiple public purposes. *See* HD 531, App'x. J, at 1700-1701, 1749-

1790, and 1816-1817. The injunction also interferes with the ability of the dams to generate power

by reallocating water reserved exclusively for power production and preventing the generation of

power for several weeks or months, depending on the project. Wells ¶ 51, 60, 70, 83, 88, 103, 107.

Degrading the power system and incurring millions in cost to implement operations likely to harm

salmonids is neither rational nor in the public interest. Nor, for that matter, does the public interest

lie in revamping Congressional authorizations under the guise of issuing injunctions. It is Congress'

decision to authorize the projects and determine their purposes, not the courts in issuing injunctions

or Plaintiffs in seeking them. In addition, the impacts of Plaintiffs' interim measures are not limited

to the WVP. If Congressional directives on project operations and authorized purposes can be

disregarded and supplanted in this case as Plaintiffs seek to do, there is a strong likelihood that

others will seek to assert their own view as to how every government-owned and operated dam in

the Pacific Northwest should operate. This would create a chilling effect on the action agencies'

ability to make informed decisions, including investment decisions, regarding future operations.

**IV.    The law and facts do not clearly favor Plaintiffs on the merits of their claims.**

Because Plaintiffs neither established irreparable harm nor have shown that the balance of harms tips sharply in their favor, no injunction should issue and the Court need not reach the merits of Plaintiffs' claims. But, even if the Court reaches the merits, Plaintiffs cannot show that they are likely to succeed in this case. The agencies have done exactly what the ESA requires—they consulted on WVP operation and, where new circumstances arose, reinitiated ESA consultation.

**A.    Plaintiffs are not likely to succeed on the merits of their "delayed" failure to reinitiate consultation claim.**

Plaintiffs' complaint alleges that the Corps has violated the ESA, and NMFS has violated the Administrative Procedure Act ("APA"), by "failing to reinitiate consultation over the Willamette Project." ECF 1 ¶ 82, 91. Plaintiffs asked this Court to "[a]djudge and declare" that the Corps and NMFS have violated the law by failing to reinitiate consultation and order the agencies "to immediately reinitiate consultation over the Willamette Project." *Id.* at 30-31. As Plaintiffs concede, the agencies reinitiated consultation on WVP operations more than 10 months ago. *See* ECF 36 at 24. Thus, their claims are moot.

Article III requires "an actual controversy . . . at all stages of review, not merely at the time the complaint is filed." *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). "[A] suit becomes moot, 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted). Put simply, a court cannot "take jurisdiction over a claim to which no effective relief can be granted." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015 (9th Cir. 1990) (citation omitted).

Here, Plaintiffs' failure to reinitiate claims are moot because there is no relief that would remedy the alleged legal violations. As Plaintiffs recognize, the appropriate remedy for a failure to

reinitiate claim is ordering the agencies to reinitiate consultation. ECF 1 at 30-31. Any other remedy, including the proposed injunction measures, would not remedy the violation and thus grant "*effective relief.*" *Headwaters*, 893 F.2d at 1015 (emphasis added). Plaintiffs' failure to reinitiate claims are thus moot. *See Alliance for the Wild Rockies v. U.S. Dep't of Agric.,* 772 F.3d 592, 601 (9th Cir. 2014) ("Reinitiation of consultation is the precise relief sought by Alliance. Accordingly, Alliance's Section 7 claim is moot."); *Alliance for the Wild Rockies v. Corps*, 237 F. Supp. 3d 1079, 1084, 1086 (D. Or. 2017) ("Federal Defendants have satisfied their procedural duty under the ESA by reinitiating consultation and they have provided Plaintiff with the precise relief that it has sought . . . Plaintiff's claim does not satisfy Article III's case or controversy requirement").

Plaintiffs argue that their failure to reinitiate claim "is not moot because the Court can still grant effective relief in the form of an injunction that would help alleviate harm to the species while the agencies complete the lengthy consultation process." ECF 36 at 24. But once a consultation is reinitiated, new legal obligations attach, like Section 7(a)(2) and 7(d). To show that relief is warranted during a consultation, Plaintiffs cannot rely on a past alleged violation. They must prove that the agencies are "in violation" of the Act during the consultation process. 16 U.S.C. § 1540(g)(1)(A) (providing a right of action to enjoin any person "who is alleged to be in violation" of the ESA). Plaintiffs have failed to make that showing.[15]

### B.    Plaintiffs are not likely to succeed on the merits of their Sections 7 or 9 claims.

The action agencies have implemented the majority of the RPA measures. *See* Factual Background Section IV, *supra*. For some measures where implementation is ongoing, the action

---

[15] To the extent that Plaintiffs are arguing that the Corps has unreasonably delayed reinitiating consultation under the APA, that argument is barred because it was not pled in Plaintiffs' complaint. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In any event, an unreasonable delay claim under the APA against either the Corps or NMFS would suffer from the same fatal defect—it is moot. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 68-69 (2004).

agencies did not complete the measures by the dates specified in the RPA. Plaintiffs contend that

any deviations or delays in implementation necessarily means the action agencies are jeopardizing

UWR salmonids. ECF 36 at 28-30. This conclusion is not supported by the ESA, which recognizes

that there can be multiple actions and ways to ensure against jeopardizing ESA-listed species

(including implementing different actions than the consulting agency originally proposed). *See*

*Pyramid Lake Paiute Tribe of Indians*, 898 F.2d 1410, 1415 (9th Cir. 1990) (agency is not legally required

to adopt the opinions or actions in a BiOp); *Tribal Village of Akutan*, 869 F.2d 1185, 1193-1194 (9th

Cir. 1988) (same); *National Wildlife Fed'n v. FEMA*, No. C11-2044-RSM, 2014 WL 5449859, at *21

(W.D. Wash. Oct. 24, 2014) (relevant inquiry is whether the plaintiff demonstrates that the agency's

implementation of an RPA "was an abuse of discretion or arbitrary and capricious" and not whether

all aspects of the RPA have been implemented exactly as originally prescribed).

The relevant question thus is whether the agencies' determinations (such the agencies'

substantive Section 7(a)(2) and 7(d) determinations) are arbitrary and capricious. *National Wildlife*

*Fed'n*, 2014 WL 5449859, at *21. Plaintiffs do not address this question. Their arguments ignore the

record, which shows that the action agencies and NMFS have closely coordinated with the Corps

for the last decade on the RPA measures and their implementation. Thom ¶ 4. The record also

shows that NMFS has assisted the Corps in developing its plan to implement the delayed measures.

*Id.*; Brice ¶ 16-17. As NMFS' Regional Administrator explains, "[w]hile the implementation of this

complex series of measures has not been without challenges, including working through how best to

implement some measures included in the 2008 RPA, it is my opinion that these issues are typical

for a project of this magnitude." Thom ¶ 4. The action agencies thus have repeatedly concluded that

the ongoing implementation of the RPA is not likely to jeopardize ESA-listed species even while

reinitiated consultation is ongoing. Section 7(d) Determination at 2. The constant, ongoing

consultation and collaboration among the federal agencies on WVP operations, combined with the

Corps' good faith, responsible implementation of the RPA and operation of the WVP, belies

Plaintiffs' rhetoric that the agencies violated the ESA or continue to do so now.

Plaintiffs' Section 9 claim fares no better. An ITS issued by the consulting agency provides

exemption from liability so long as the terms and conditions of the ITS are implemented. 16 U.S.C.

§ 1536(o)(2). As evidenced by Congress's unqualified language, this exemption applies even during

the reinitiated consultation process. *Id.* (stating that "*any taking* that is in compliance with the terms

and conditions specified . . . shall not be considered to be a prohibited taking") (emphasis added).

NMFS issued the Corps an ITS, and the Corps has complied with the terms and conditions of that

ITS. BiOp at 11-5 to 11-39. The Corps is thus exempt from any liability under Section 9.

Plaintiffs suggest that the Corps has violated a term and condition, but they do not identify

which term and condition the Corps is purportedly violating. ECF 36 at 30-31. The best that

Plaintiffs can say in support of their Section 9 claim is that "NMFS' statements make clear that one

of the conditions of the incidental take statement was that the Corps would implement the RPA."

*Id.* at 31. The language of the terms and conditions, not Plaintiffs' inferences, are relevant and

Plaintiffs have not shown noncompliance. In the ITS, NMFS specifically identified reasonable and

prudent measures ("RPMs") and detailed terms and conditions to implement those RPMs. BiOp at

11-40 to 11-58. As Plaintiffs seem to recognize, there is not a single RPM or term and condition that

requires the Corps *to implement* operations or construction projects in the RPA. *Id.*; ECF 36 at 30-31

(failing to identify a violated term and condition). Rather, the RPMs and terms and conditions detail

how the Corps should act *when implementing* the RPA. BiOp at 11-40 (stating that the terms and

conditions are "necessary and appropriate to minimize incidental take to the extent practicable and

to monitor the incidental take of the ESA-listed species *resulting from implementation* of the [proposed

action] and RPA") (emphasis added).

Because Plaintiffs have failed to establish that the Corps is not implementing terms and

conditions, the ITS take exemption applies and the Corps has not violated Section 9. 16 U.S.C. §

1536(b)(4)(iv), (o)(2). Moreover, even if there were some limited non-adherence to the terms and

conditions and the take exemption has lapsed, Plaintiffs must still demonstrate that the Corps has

"taken" species in violation of Section 9. Plaintiffs have not done so.

## CONCLUSION

The Corps reinitiated consultation with NMFS. The Corps also made a determination that it

will continue implementing the RPA throughout the consultation process—a determination that

NMFS believes is "prudent." Section 7(d) Determination at 2; Thom ¶ 5. The action agencies and

NMFS "are now actively considering and evaluating whether the 2008 RPA remains the complete

list of measures needed to avoid jeopardy . . . or if amendments, revisions or adjustments are

necessary." Thom ¶ 4. "The reinitiated consultation . . . is the best vehicle to make those

determinations." *Id.* ¶ 5.

The Court should let the agencies complete this Congressionally mandated process, which

benefits from the agencies' expertise, a thorough and complete scientific analysis, and time to

consider the consequences of potential measures on listed species. Plaintiffs' belated motion for

preliminary injunction and unverified interim measures would not only usurp this process, but could

negatively impact UWR salmonids, WVP operations, and consequently, Oregonians, for years.

When, as here, an injunction countermands the ESA's provisions, usurps NMFS' role in

administering the ESA and the Corps in fulfilling Congressional mandates, and "might hamper

agency efforts or can improve upon them only slightly, that is all the more reason to conclude that

the equities tilt in favor of the defendant." *Michigan v. Corps*, 667 F.3d 765, 796 (7th Cir. 2011).

Plaintiffs' motion should be denied.

Dated: February 25, 2019

JEAN E. WILLIAMS, Deputy Assistant Attorney General
SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Assistant Section Chief

/s/ Kaitlyn Poirier
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov

/s/ Michael R. Eitel
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Telephone: (303) 844-1479
Fax: (303) 844-1350
Email: michael.eitel@usdoj.gov

Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

I certify that on February 25, 2019, the foregoing was electronically filed through the Court's electronic filing system, which will generate automatic service on all Parties enrolled to receive such notice.

*/s/ Kaitlyn Poirier*
Kaitlyn Poirier
Trial Attorney, U.S. Department of Justice