IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

NORTHWEST ENVIRONMENTAL
DEFENSE CENTER, WILDEARTH
GUARDIANS, and NATIVE FISH
SOCIETY,

        Plaintiffs,

    v.

UNITED STATES ARMY CORPS OF
EINGINEERS and NATIONAL MARINE
FISHERIES SERVICE,

        Defendants.

CITY OF SALEM and MARION COUNTY,

        Intervenor Defendants.

No. 3:18-cv-00437-HZ

OPINION & ORDER

Elizabeth Hunter Potter
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Ave., Suite B
Portland, OR 97202

        Attorneys for Plaintiffs

Kaitlyn Poirier
United States Department of Justice
Environment & Natural Resources Division
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044

Michael R. Eitel
United States Department of Justice
Environment & Natural Resources Division
Ben Franklin Station
999 18th Street, South Terrace, Suite 302
Denver, CO 80202

       Attorneys for Defendants

Ashley L. Vulin
Lawrence B. Burke
Davis Wright Tremaine, LLP
1300 SW Fifth Avenue, Suite 2400
Portland, OR 97201

Robert E. Miller
Davis Wright Tremaine, LLP
777 108th Avenue, NE, Suite 2300
Bellevue, WA 98004

       Attorneys for Intervenor-Defendants City of Salem and Marion County

Jane E. Vetto
Marion County Counsel
555 Court Street NE, Suite 5242
Salem, OR 97309

       Attorneys for Intervenor-Defendant Marion County

HERNÁNDEZ, District Judge:

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction [36] and the Motion to Disqualify and Exclude the Testimony of Richard Domingue and John K. Johnson [61] filed by Defendants the United States Army Corps of Engineers ("the Corps") and the National Marine Fisheries Service ("NMFS") (collectively referred to as "the Federal Defendants"). For the reasons that follow, the Court DENIES Plaintiffs' Motion for Preliminary Injunction and DENIES the Federal Defendants' Motion to Disqualify Expert Testimony.

BACKGROUND

Plaintiffs initiated this action on March 13, 2018, bringing claims against the Federal Defendants for violation of the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA") principally on the basis that the Federal Defendants failed to reinitiate consultation under the ESA after the Corps did not timely implement various mitigation measures set out in a 2008 NMFS biological opinion ("BiOp"). The 2008 BiOp assessed the effect that the Corps' operations of the Willamette River Basin Flood Control Project ("the Willamette Project") has on Upper Willamette River Chinook salmon ("UWR Chinook") and steelhead ("UWR steelhead"). The UWR Chinook and steelhead are listed as "threatened" under the ESA.

The Willamette Project is a large network of 13 dams and related facilities on various tributaries in the Upper Willamette River basin. The Willamette Project was constructed beginning in 1940s to provide flood control, municipal and agricultural water supply, and hydroelectric power to the Willamette Valley. The dams most relevant to this case are located in the Middle Fork Willamette River, McKenzie River, South Santiam River, and North Santiam River subbasins. Dexter, Lookout Point, Hills Creek, and Fall Creek Dams are in the Middle Fork Willamette River subbasin; Cougar and Blue River Dams are in the McKenzie River subbasin; Green Peter and Foster Dams are in the South Santiam River subbasin; and Detroit and Big Cliff Dams are in the North Santiam River subbasin.

Both the UWR Chinook and steelhead are anadromous salmonids, which mean they are born in freshwater – typically in upstream tributaries – before migrating through river systems out to saltwater where they mature into adults before ultimately returning to their freshwater

habitat to spawn and to complete their life cycle. The UWR Chinook and steelhead were listed as "threatened" under the ESA in 1999.

As a result of the listing of the UWR Chinook and steelhead, the Corps, the Bonneville Power Administration, and the United States Bureau of Reclamation began consultation with NMFS in 2000 to determine whether the continued operation of the Willamette Project was likely to jeopardize the continued existence of the listed salmonids and/or adversely modify the salmonids' critical habitat.[1] Due to numerous delays, NMFS did not complete the consultation process and issue its BiOp until 2008. NMFS concluded in the 2008 BiOp that the continued operation of the Willamette Project as planned by the Corps was likely to jeopardize the continued existence of the UWR Chinook and steelhead and would likely destroy and/or adversely modify the species' critical habitat. The 2008 BiOp found the dams harmed the listed salmonids by, among other things, blocking downstream passage of juvenile salmonids, interfering with upstream migration of salmonids returning to their spawning grounds, and harming water quality and quantity downstream from the dams.

The reason the dams adversely affect salmonid migration is straightforward: Significant portions of the UWR Chinook and steelhead spawning habitat lie above at least one of the dams in the Willamette Project and salmonids cannot swim past dams at least without operational and structural measures to facilitate such passage. Approximately 70% of historic UWR Chinook and 33% of UWR steelhead spawning, incubation, and rearing habitat in the North Santiam River subbasin is blocked by dams. Decl. of Kirk Schroeder [ECF 37] ¶ 23. Approximately 70% of

---

[1] Of the three action agencies involved in the ESA consultation process only the Corps operates the dams that are subject to this litigation. The Bonneville Power Administration markets the hydroelectric power generated by the Willamette Project and the Bureau of Reclamation sells some of the storage water for irrigation. Accordingly, the latter two agencies are not directly involved in this case.

UWR Chinook and 33% of UWR steelhead habitat in the South Santiam River subbasin is blocked by dams. *Id.* ¶ 25. Over 90% of the historic habitat for spring UWR Chinook has been blocked by dams in the Middle Fork Willamette River subbasin. *Id.* ¶ 29.

The dams also affect water quality, quantity, and temperature below the dams and change the nature of the waterways above the dams in a variety of ways that can affect the ability of juvenile salmon to develop and survive downstream migration and the ability of adult salmonids to migrate upstream and spawn. For example, spill from the dams can cause high levels of dissolved gas in the downstream water, which can adversely affect both juvenile downstream-migrating salmonids and upstream-migrating adult salmonids. *See, e.g.*, *id.* ¶ 21. Moreover, because water downstream from dams is drawn from above-dam reservoirs, downstream water temperatures can be unnaturally warm during critical periods of the year. *See, e.g.*, *id.* The reservoirs can also affect juvenile fish that are hatched above the dams (ordinarily as a result of trap-and-transport operations in the previous generation) because the unnaturally slow water movement in the reservoirs can expose juvenile salmonids to greater levels of predation, parasites, diseases, and poor water quality than they would be exposed to under natural conditions. *See, e.g.*, *id.* ¶ 20.

As part of the 2008 BiOp, NMFS issued a Reasonable and Prudent Alternative ("RPA") in which it set out measures that the Corps and other stakeholders needed to take in order to allow for the continued operation of the Willamette Project without causing jeopardy to the listed species or adverse modification of their critical habitat. The actions set out in the RPA included structural modifications and operational changes at the dams and other Willamette Project facilities designed to mitigate many of the above adverse effects on the listed UWR salmonids.

The RPA also set out a variety of timelines by which the Corps needed to make many such changes in order to minimize adverse effects on the UWR Chinook and steelhead.

Together with the 2008 BiOp NMFS also issued an Incidental Take Statement ("ITS") that authorized the incidental take of listed species pursuant to the terms and conditions set out in the ITS. The terms and conditions of the ITS represented "no more than minor changes" from the RPA "because they only provide further elaboration on the more general measures in the [proposed action] and RPA." Pls.' Mot. [36] ex. 2, at 11-40.

Although the nature and extent of the delays are matters of dispute between the parties, it is undisputed that in the years after the issuance of the 2008 BiOp at least some of the mitigation actions set out in the RPA were delayed, some have not yet occurred, and/or some will not occur in time to meet future deadlines. As discussed more fully below, UWR Chinook and steelhead populations continue to decline, although both species remain listed as "threatened" after a 2016 NMFS status review.

Plaintiffs bring their first claim only against the Corps. In Claim One Plaintiffs allege the Corps has violated the ESA under three related theories. First, as noted, Plaintiffs allege the Corps failed to timely reinitiate consultation with NMFS after the Corps did not adequately and timely implement the measures set out in the RPA. Compl. [1] ¶ 84. Second, Plaintiffs allege the Corps is violating Section 7(a)(2) of the ESA (16 U.S.C. § 1536(a)(2)) on the basis that its failure to fully and timely implement the RPA measures is jeopardizing the UWR Chinook and steelhead and is causing adverse modification to the species' critical habitat. *Id.* ¶ 85. Finally, Plaintiffs allege the Corps is contributing to an unlawful "take" of the UWR Chinook and steelhead in violation of Section 9 of the ESA (16 U.S.C. § 1538) by failing to operate their Chinook salmon hatcheries pursuant to NMFS-approved Hatchery and Genetic Management

Plans and by failing to comply with the terms of the ITS that was issued with the 2008 BiOp. *Id.* ¶¶ 86–87.[2] In Claim Two Plaintiffs allege NMFS unreasonably delayed and/or unlawfully withheld the reinitiation of consultation with the Corps in violation of the APA, 5 U.S.C. § 706(1).[3]

After Plaintiffs filed this action the Corps and NMFS reinitiated consultation. The Federal Defendants currently estimate they will complete the BiOp from the reinitiated consultation by the end of 2022.

On June 25, 2018, the City of Salem filed a Motion to Intervene [ECF 7] as a Defendant on the basis that this case is likely to have an impact on the City's water supply. The Court granted that Motion on July 30, 2018. *See* Order [ECF 15]. Similarly, on September 6, 2018, Marion County filed a Motion to Intervene [ECF 18] on the basis that this case is likely to have an impact on the County's economic interests. The Court granted that Motion on September 25, 2018. *See* Order [ECF 26]. The interests of the City of Salem and Marion County (collectively referred to as "the Marion County Defendants") focus on the effect this litigation may have on operational and structural changes at Detroit Dam.

On November 30, 2018, Plaintiffs filed their Motion for a Preliminary Injunction in which they sought an injunction that directed the Corps to implement the following interim operational measures:

1. Draw down Detroit reservoir to the regulating outlets (1,370') by November 15 and hold until December 15, and prioritize use of the regulating outlets over turbines for that time.

---

[2] With respect to Plaintiffs' takings claim, the Motion for Preliminary Injunction focuses on the Corps' failure to comply with the terms and conditions of the ITS.
[3] Claim Two is not directly at issue in Plaintiffs' Motion for Preliminary Injunction because Plaintiffs do not seek preliminary relief from NMFS.

2.      Draw down Cougar reservoir to the regulating outlets (1,505') by November 15
        and hold until December 15. Maintain Cougar reservoir at minimum conservation
        pool (1,532') from March 1 to May 1 and prioritize use of regulating outlets over
        turbines for that time.

3.      Draw down Lookout Point reservoir to the regulating outlets (750') by November
        15 and hold until December 15. Conduct ungated spill at Lookout Point dam for
        2-4 weeks in spring.

4.      Conduct an additional draw down at Fall Creek dam to 728' from April 1 to June
        30.[4]

5.      Re-model [Operational Measures Evaluation Report] alternatives: drawdown of
        Detroit reservoir from fall through April, run-of-the-river operation at Cougar
        dam, and run-of-the-river operation at Lookout Point dam without assuming that
        the Corps must fulfill all authorized purposes of the Project.

6.      Outplant adult hatchery Chinook salmon above Green Peter dam to study
        spawning success and juvenile downstream migration through Green Peter.

7.      Reduce water temperatures below Lookout Point and Detroit dams in fall-winter
        by using the lowest regulating outlets to discharge colder water during draw down
        operations.

8.      Adopt and strictly follow maintenance schedules and emergency protocols
        provided by NMFS and [Oregon Department of Fish and Wildlife ("ODFW")] to
        reduce water quality impacts during such events.

9.      The Corps must coordinate with NMFS and ODFW on implementation of the
        above measures, monitoring of the measures, adjustments of measures based on
        that monitoring, and other interim measures the Corps should take to benefit
        UWR salmon and steelhead.

10.     The Corps must keep Plaintiffs and the Court apprised of its actions and the
        results, and the Court will resolve any disputes that arise over these measures.

Pls.' Mot. [36], at 34–35. The Marion County Defendants filed their Response [ECF 60] to

Plaintiffs' Motion on February 25, 2019. The Federal Defendants also filed their Response [ECF

64] to Plaintiffs' Motion for Preliminary Injunction on February 25, 2019. Together with that

---

[4] Plaintiffs initially requested an order directing the Corps to draw down the reservoir at Fall
Creek Dam to 685', but in their Reply Plaintiffs amended their request to a drawdown to 728' in
their Reply. Pls.' Reply [ECF 75], at 33.

Response, the Federal Defendants filed a Motion to Disqualify and Exclude Testimony of Richard Domingue and John K. Johnson [ECF 61], two of Plaintiffs' experts regarding the effect that the Willamette Project has on the protected salmonids and the feasibility and effectiveness of Plaintiffs' proposed operational changes. Plaintiffs filed a Response [ECF 74] to the Federal Defendants' Motion to Disqualify on March 11, 2019, and a Reply [ECF 75] in support of their Motion for Preliminary Injunction on March 19, 2019. The Federal Defendants filed a Reply [ECF 77] in support of their Motion to Disqualify on March 20, 2019. The Court heard oral argument on April 3, 2019, and took the matter under advisement on that date. As requested by the Court at oral argument, on April 11, 2019, Plaintiffs [ECF 82] and the Federal Defendants [ECF 81] filed respective timelines of the implementation of the RPA measures.

DISCUSSION

I.      <u>Federal Defendants' Motion to Disqualify</u>

The Federal Defendants contend the Court should disqualify the expert testimony of Richard A. Domingue and John K. Johnson on the basis that their testimony in this case violates the Ethics in Government Act, 18 U.S.C. § 207(a). Both Johnson and Domingue previously worked for NMFS on matters related to the 2008 BiOp.

A.      <u>Legal Standard</u>

As relevant to the Federal Defendants' Motion to Disqualify, the Ethics in Government Act provides:

> Any person who is an officer or employee . . . of the executive branch of the United States . . .. and who, after the termination of his or her service or employment with the United States . . . knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the United States . . . on behalf of any other person (except the United States or the District of Columbia) in connection with a particular matter—

> (A) in which the United States . . . is a party or has a direct and substantial interest,
>
> (B) in which the person participated personally and substantially as such officer or employee, and
>
> (C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216 of this title.

18 U.S.C. § 207(a). Short of criminal or civil penalties, the Ethics in Government Act authorizes the government to seek the exclusion of any testimony that violates the Act. 18 U.S.C. § 216(c).

The Act defines "particular matter" to "include[] any investigation, application, request for a ruling or determination, rulemaking, contract, controversy, claim, charge, accusation, arrest, or judicial or other proceeding." 18 U.S.C. § 207(i)(3). Although the statute includes an exception for testimony provided under oath, expert testimony is generally excluded from that exception unless a court issues an order authorizing such testimony. 18 U.S.C. § 207(j)(6).

The determinative question in the parties' dispute is whether this case is the same "particular matter" that "involve[s] a specific party or specific parties" that Domingue and Johnson participated in during their employment with NMFS. The Office of Governmental Ethics ("OGE") has engaged in rulemaking to further define these operative phrases:

> Particular matter involving a specific party or parties—
>
> (1) Basic concept. The prohibition applies only to communications or appearances made in connection with a "particular matter involving a specific party or parties." Although the statute defines "particular matter" broadly to include "any investigation, application, request for a ruling or determination, rulemaking, contract, controversy, claim, charge, accusation, arrest, or judicial or other proceeding," 18 U.S.C. 207(i)(3), only those particular matters that involve a specific party or parties fall within the prohibition of section 207(a)(1). Such a matter typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identified parties, such as a specific contract, grant, license, product approval application, enforcement action, administrative adjudication, or court case.

(2) Matters of general applicability not covered. Legislation or rulemaking of general applicability and the formulation of general policies, standards or objectives, or other matters of general applicability are not particular matters involving specific parties. International agreements, such as treaties and trade agreements, must be evaluated in light of all relevant circumstances to determine whether they should be considered particular matters involving specific parties; relevant considerations include such factors as whether the agreement focuses on a specific property or territory, a specific claim, or addresses a large number of diverse issues or economic interests.

(3) Specific parties at all relevant times. The particular matter must involve specific parties both at the time the individual participated as a Government employee and at the time the former employee makes the communication or appearance, although the parties need not be identical at both times.

\* \* \*

(5) Same particular matter—

(i) General. The prohibition applies only to communications or appearances in connection with the same particular matter involving specific parties in which the former employee participated as a Government employee. The same particular matter may continue in another form or in part. In determining whether two particular matters involving specific parties are the same, all relevant factors should be considered, including the extent to which the matters involve the same basic facts, the same or related parties, related issues, the same confidential information, and the amount of time elapsed.

5 C.F.R. § 2641.201(h).

B.    Discussion

As noted, the Federal Defendants move to exclude the expert testimony of Johnson and Domingue on the basis that their testimony in this case violates the Ethics in Government Act.

1.    *Johnson*

Johnson worked as a fisheries engineer for NMFS from 1997 until his retirement in 2008. Among other projects, Johnson worked on the consultation between the Corps and NMFS in relation to the Willamette Project and helped formulate the 2008 BiOp and the RPA. Johnson now works as a private fisheries consultant. Plaintiffs filed a Declaration [ECF 39] from Johnson

in support of their Motion for Preliminary Injunction in which Johnson provides expert testimony regarding the impacts of the Willamette Project on the listed salmonids and the feasibility and likely impacts of the interim measures that Plaintiffs seek in their Motion.

The Federal Defendants contend Johnson's work on the 2008 BiOp and RPA constitute work on the same "particular matter" involving "specific parties" as this case because Plaintiffs' claims assert the Federal Defendants failed to reinitiate consultation when the Corps did not fully implement the RPA measures and that, in doing so, the Corps also contributed to an unlawful taking of the listed salmonids and the continued jeopardization of the continued existence of the species. Because Plaintiffs' claims are closely related to the BiOp and RPA, the Federal Defendants assert this litigation relates to the same particular matter on which Johnson previously worked for NMFS.

The Court rejects the Federal Defendants' contention that Johnson's work formulating the BiOp and RPA constitutes the same "particular matter" involving "specific parties" as this case. The OGE regulations make clear that a "particular matter" "typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identified parties." 5 C.F.R. § 2641.201(h)(1).

The ESA consultation process and the resulting formulation of a BiOp and, if necessary, an RPA does not have the type of specificity that the "particular matter" provision requires. Instead, the interagency consultation process takes a wide-ranging look at the impacts of a proposed government action – in this case the operation of the Willamette Project, a large network of dams and related facilities – to determine whether that action will jeopardize the continued existence of listed species or adversely modify the critical habitat of such species. The consultation process in this case was an intragovernmental, in-depth scientific analysis of a large

government project that took eight years and produced a 1271-page BiOp. *See* Pls.' Mot. [ECF 36] Ex. 2. At least in this case Johnson's work on the consultation and the formulation of the BiOp was much more akin to work on general policy matters than it was to work on a "particular matter" involving "specific parties."

Accordingly, on this record the Court concludes Johnson's expert testimony on behalf of Plaintiffs does not violate the Ethics in Government Act. Moreover, even if the Court concluded the consultation process and formulation of the 2008 BiOp constituted a "particular matter" involving "specific parties," the Court would nonetheless authorize Johnson's expert testimony under 18 U.S.C. § 207(j)(6). As the OGE regulations make clear, the relevant provision in the Ethics in Government Act is intended to address corruption concerns about former government employees using knowledge of specific matters they obtained during their government service for the benefit of other parties involved in those same matters.[5] Johnson's testimony on behalf of three public-interest groups relating to a broad government program and its effect on listed species simply does not implicate such corruption concerns. As a result, even if Johnson's testimony fell within the scope of the Ethics in Government Act, the Court would authorize Johnson's testimony because excluding it would neither serve the purpose of the Act nor the public interest.

### 2. *Domingue*

Domingue worked as a hydrologist for NMFS from 1998 until 2017. In that role Domingue analyzed the impact that dams have on fish, particularly in the context of ESA analyses. Domingue was involved in the formulation of the 2008 BiOp and RPA. Domingue's role in drafting the BiOp and RPA included being "primarily responsible for developing water

---

[5] The Court observes the Federal Defendants do not identify any confidential or sensitive government information that Johnson or Domingue disclose in their respective Declarations.

release patterns necessary to meet fish habitat and passage needs in the rivers downstream from the dams while meeting other authorized project purposes." Domingue Decl. [ECF 38] ¶ 5. After completion of the 2008 BiOp, Domingue served on the Willamette Action Team for Ecosystem Management ("WATER"), on which he worked with the Corps on an ongoing basis as the Corps implemented the RPA measures. Domingue submitted a Declaration in support of Plaintiffs' Motion for Preliminary Injunction in which he provides expert testimony regarding the Willamette Project and its effect on the listed salmonids, the Corps' implementation of the RPA measures, and the effectiveness of the operational changes that Plaintiffs seek in their Motion.

For many of the same reasons as with Johnson, the Court rejects the Federal Defendants' contention that the Court should exclude Domingue's expert testimony under the Ethics in Government Act. Like the BiOp, Domingue's work on the ongoing implementation of the RPA measures was not work on a "particular matter" that involved "specific parties." In many respects Domingue's work for NMFS on WATER is similar to working on the consultation process because it represented ongoing coordination between the Corps and NMFS (among other stakeholders) regarding the operation of the Willamette Project and its impacts on the listed salmonids. Accordingly, the Court concludes Domingue's work for NMFS on the BiOp and the ongoing implementation of the RPA did not constitute work on a "particular matter" involving "specific parties."

On this record, therefore, the Court concludes Domingue's expert testimony is not barred by the Ethics in Government Act. Even if the Ethics in Government Act applied to Domingue's expert testimony, the Court would authorize that testimony pursuant to 18 U.S.C. § 207(j)(6) for the same reasons as it would with Johnson's testimony.

For these reasons, the Court denies the Federal Defendants' Motion to Disqualify and Exclude the Testimony of Richard Domingue and John K. Johnson [61].

## II.  Plaintiffs' Motion for Preliminary Injunction

As noted, Plaintiffs move for a preliminary injunction that directs the Corps to make various interim changes to the operations of many of the dams in the Willamette Project during the pendency of these proceedings. The Federal Defendants oppose the entirety of Plaintiffs' Motion for Preliminary Injunction. The Marion County Defendants oppose only that portion of Plaintiffs' Motion that affects operations at Detroit Dam.

### A.  Standard

Plaintiffs seeking a preliminary injunction bear the burden to show that (1) they are "likely to succeed on the merits," of their claims; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [their] favor;" and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "'[S]erious questions going to the merits'" and a balance of hardships that tips sharply towards the plaintiff[s] can support issuance of a preliminary injunction, so long as the plaintiff[s] also show[] that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (hereinafter "*AWR I*").

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *Id.* At the preliminary-injunction stage, the relevant inquiry is "whether the requested relief is necessary to avoid irreparable harm *during the interim period* that the relief is to be provided." *S. Yuba River Citizens League v. Nat. Marine Fisheries Serv.*, Nos. 2:13-cv-00059-MCE, 2:13-cv-00042-MCE, 2013 WL 4094777, at *7 (E.D.

Cal. Aug. 13, 2013) (emphasis in original); s*ee also Winter*, 555 U.S. at 22 (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995)) (noting the "applicant must demonstrate that in the absence of a preliminary injunction, 'the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'").

Plaintiffs in ESA cases need not show "an extinction-level threat to the listed species" in the interim period in order to establish irreparable harm. *Nat'l Wildlife Fed'n v. Nat. Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) (hereinafter "*NWF II*"). Plaintiffs must, however, show a "'definitive threat of future harm to protected species'" in order to establish irreparable harm. *Id.* at 819 (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (hereinafter "*NWF I*")).

In ESA cases, the balance of the equities and whether an injunction serves the public interest generally[ ]tips in favor of the plaintiffs "because Congress 'afford[ed] first priority to the declared national policy of saving endangered species.'" *Cottonwood Envtl. L. Ctr. v. United States Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015); *see also NWF II*, 886 F.3d at 817. Accordingly, with respect to preliminary injunctions in ESA cases courts "presume . . . that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *NWF II*, 886 F.3d at 817.

B.      Discussion

As noted, Plaintiffs bear the burden of demonstrating they are entitled to a preliminary injunction.

A.      *Likelihood of Success on the Merits*

With respect to likelihood of success on the merits Plaintiffs contend they are likely to prevail on the three related theories they advance in Claim One.

At its most fundamental level Plaintiffs' argument regarding their likelihood of success on the merits is straightforward: Because the BiOp represented a determination that the Corps' operation of the Willamette Project would jeopardize the continued existence of the UWR Chinook and steelhead and because the RPA represented the steps that the Corps needed to take to avoid such jeopardy, the Corps' operation of the Willamette Project without timely implementing a significant number of those measures is jeopardizing the listed salmonids. Accordingly, Plaintiffs contend (1) that the Corps and NMFS had an obligation to reinitiate consultation when it became clear that the Corps would not timely implement the RPA measures, (2) that the Corps' current operation of the Willamette Project is jeopardizing the UWR Chinook and steelhead in violation of Section 7(a)(2) of the ESA, and (3) that the current operation of the Willamette Project is resulting in an unlawful "take" of the UWR Chinook and steelhead in violation of Section 9 of the ESA.

The Federal Defendants, on the other hand, contend Plaintiffs cannot establish a likelihood of success on the merits because the failure-to-reinitiate-consultation prong of Plaintiffs' Claim One is now moot in light of the reinitiation of consultation after Plaintiffs filed this action. Moreover, the Federal Defendants assert Plaintiffs cannot establish a likelihood of success on the merits of the other prongs of Claim One because the Corps has implemented the majority of the RPA requirements, the delays in the implementation of some other RPA measures are typical of projects the size of the Willamette Project, and, in any event, the Corps continues to work with NMFS regarding implementation of the RPA measures even during the reinitiated consultation.

i.        *Mootness*

With respect to their mootness argument, the Federal Defendants largely rely on *Alliance for the Wild Rockies v. United States Dep't of Agric.*, 772 F.3d 592, 600–01 (9th Cir. 2014) (hereinafter "*AWR II*"), and *Alliance for the Wild Rockies v. United States Army Corps of Engineers*, 237 F. Supp. 3d 1079 (D. Or. 2017) (hereinafter "*AWR III*"), for the proposition that a failure-to-reinitiate-consultation claim under Section 7(a)(2) of the ESA becomes moot when the action agency reinitiates consultation. 772 F.3d at 600–01. In *AWR II* the Ninth Circuit found a failure-to-reinitiate consultation claim to be moot after the agencies had completed the reinitiated consultation. *Id.* at 601. As this Court noted in *AWR III*, however, the Ninth Circuit's discussion in *AWR II* "is not dispositive of the issue of whether reinitiation itself is sufficient to moot a Section 7[(a)] claim" because the defendants in *AWR II* had completed the reinitiated consultation. *AWR II*, 237 F. Supp. 3d at 1085. Nonetheless, this Court in *AWR III* found the plaintiff's Section 7(a)(2) claim in that case to be moot on the basis that there was not any further relief that the Court could order because it alleged "only a procedural violation in the Complaint." *Id.* The Court in *AWR III* specifically noted that the plaintiff in that case "d[id] not allege any parallel substantive violation of the ESA for which the Court could grant relief." *Id.*

In this case, Plaintiffs allege two parallel substantive ESA violations together with their failure-to-reinitiate-consultation claim: Plaintiffs' jeopardy claim under Section 7(a)(2) of the ESA and Plaintiffs' takings claim under Section 9 of the Act. Unlike *AWR III*, therefore, there remain in this case parallel substantive violations of the ESA for which the Court could grant relief. Accordingly, the Court rejects the Federal Defendants' argument that Plaintiffs cannot establish a likelihood of success on the merits because Plaintiffs' failure-to-reinitiate-consultation claim is moot.

*ii.*     *Plaintiffs' Showing of Likelihood of Success on the Merits*

As noted, to demonstrate a likelihood of success on the merits Plaintiffs must at least

demonstrate "serious questions going to the merits" of their claims. *See AWR I*, 632 F.3d at 1135.

Reinitiation of consultation is required when the conditions of 50 C.F.R. § 402.16 are met. That

regulation provides:

> Reinitiation of formal consultation is required and shall be requested by the Federal
> agency or by the Service, where discretionary Federal involvement or control over the
> action has been retained or is authorized by law and:
>
>> (a) If the amount or extent of taking specified in the incidental take statement is
>> exceeded;
>>
>> (b) If new information reveals effects of the action that may affect listed species
>> or critical habitat in a manner or to an extent not previously considered;
>>
>> (c) If the identified action is subsequently modified in a manner that causes an
>> effect to the listed species or critical habitat that was not considered in the
>> biological opinion; or
>>
>> (d) If a new species is listed or critical habitat designated that may be affected by
>> the identified action.

50 C.F.R. § 402.16. With respect to Plaintiffs' jeopardy claim, Plaintiffs must demonstrate the

ongoing operation of the Willamette Project without timely implementing the RPA measures is

"likely to jeopardize the continued existence of any endangered species or threatened species or

result in the destruction or adverse modification of habitat of such species" in light of the delayed

RPA measures. 16 U.S.C. § 1356(a)(2). Finally, with respect to Plaintiffs' Section 9 takings

claim, Plaintiffs must demonstrate the Corps' operation of the Willamette Project violates the

terms and conditions of the ITS and, therefore, the ITS does not shelter the Corps from liability

for the takings of UWR Chinook and steelhead in the course of operating the Project.

At this early stage of the proceedings Plaintiffs have compiled a compelling record that

indicates (1) the Corps has delayed the implementation of several important RPA measures;

(2) the condition of the UWR Chinook and steelhead continues to deteriorate; and (3) it is likely that the delays in the implementation of the RPA measures has had a material adverse effect on the listed salmonids and their critical habitat.

In support of their claims Plaintiffs point to the Corps' failures to implement interim operational changes to improve salmonid passage and water quality at the dams and the Corps' failure to timely make prescribed structural changes at many of the dams. In particular, Plaintiffs point out that the Corps has missed or will miss the following deadlines to implement RPA measures at the Willamette Project dams:

North Santiam subbasin dams (Detroit and Big Cliff): (1) an April 2010 deadline to begin implementing initial water-quality measures that has not yet been met; (2) a May 2011 deadline to begin implementing additional water-quality measures and to begin implementing fish-passage measures that has not yet been met; (3) a December 2018 deadline for the completion of a water temperature control tower (to be put into operation by March 2019) that has not yet been met and is now estimated to not be completed until 2023; (4) a December 2023 deadline for completion of a downstream fish-passage structure (to be put into operation by March 2024) that the Corps now estimates will not be completed until 2028.

South Santiam subbasin dams (Foster and Green Peter): (1) an April 2010 deadline to begin implementing initial water-quality measures that has not yet been met; and (2) a May 2011 deadline to begin implementing additional water-quality and fish-passage measures that has not yet been met.[6]

---

[6] Plaintiffs acknowledge the Corps installed a fish weir at Foster Dam in 2018 to make conditions in the spillway more favorable for downstream-migrating fish, but point out that it is currently not in use due to high fish mortality.

McKenzie subbasin dams (Cougar): (1) a May 2011 deadline to begin implementing interim fish-passage measures that has not yet been met;[7] and (2) a December 2014 deadline for completion of a downstream fish-passage structure (to be put into operation by 2015) that is now predicted to be completed in 2022.

Middle Fork Willamette subbasin dams (Lookout Point, Dexter, Hills Creek, Fall Creek): (1) a 2008 deadline to begin implementing winter deep drawdowns of the reservoir at Fall Creek Dam that was not implemented until 2010, but has continued to be successfully implemented since; (2) an April 2010 deadline to begin implementing initial water-quality measures that has not yet been met; (3) a May 2011 deadline to implement additional water-quality measures and begin implementing additional fish-passage measures that has largely not yet been met;[8] and (4) a December 2021 deadline to complete construction of a downstream fish-passage structure at Lookout Point Dam by December 2021 to be put into service by March 2022.

The Federal Defendants set out various measures that they have implemented or are in the process of implementing pursuant to the RPA. *See* Fed. Defs.' Notice [ECF 81] ex. 2. Although the Federal Defendants are correct that they have taken and continue to take some actions in response to the RPA, a close examination of the Federal Defendants' Notice reveals that Plaintiffs are largely correct that many of the most significant actions necessary to improve fish-passage and water-quality conditions have been substantially delayed and/or not yet completed. *Compare id.* ex 2, at 8–10, 12 *with* Pls.' Notice [ECF 82], at 3–8. After reviewing the record, the

---

[7] Plaintiffs acknowledge the Corps tested a deep drawdown as an interim fish-passage measure in December 2012, but that the Corps did not continue such drawdowns. Moreover, Plaintiffs point out a 2014 test of a floating fish collector failed.

[8] Plaintiffs acknowledge the Corps used spill and powerhouse intakes, but not the lower regulating outlets, to regulate the water temperature at Lookout Dam from 2012 to 2014.

Court concludes Plaintiffs have established the Corps has not timely implemented many of the RPA measures most vital for improving fish-passage and water-quality conditions.

The Court also finds Plaintiffs have established that the condition of the UWR Chinook and steelhead continues to deteriorate. Although the parties disagree as to the severity of the continued decline of the UWR Chinook and steelhead, it is undisputed that the salmonids remain threatened. The Court finds the record demonstrates that, as a whole, the UWR Chinook and steelhead are in a more precarious condition today than they were at the time that NMFS issued the BiOp. *See, e.g.*, Schroeder Decl. ¶¶ 11–13, 33–37; Second Schroeder Decl. [ECF 76] ¶ 28; Decl. of Barry A. Thom [ECF 68] ¶ 8 (acknowledging "NMFS is concerned about the status and trends applicable to both UWR Chinook salmon and steelhead.").

Finally, the Court finds Plaintiffs have demonstrated at this early stage of the proceedings that the Corps' failure to implement RPA measures aimed at improving salmonid-passage and water-quality conditions has been a significant factor in the continued decline of the listed salmonids. The Federal Defendants insist – and Plaintiffs readily agree – that the Willamette Project is not the only factor contributing to the decline of the listed salmonids. *See* Thom Decl. ¶ 8. The BiOp, however, makes clear that the operation of the Willamette Project is a significant contributor to the decline of the UWR Chinook and steelhead. Moreover, Plaintiffs point out that salmonid populations have begun to recover in other river basins in which fish-passage measures have been implemented whereas the UWR Chinook and steelhead continue to decline in the Upper Willamette. *See* Schroeder Decl. ¶ 32–34, 37.

The BiOp, in particular, identified the Willamette Project's effect on fish passage and water quality to be significant factors contributing to the risk that the UWR Chinook and steelhead would become extinct. Pls.' Mot. ex. 2, at 8-3–8-5. The 2008 BiOp found that the RPA

measures were necessary to avoid jeopardizing the continued existence of the UWR Chinook and steelhead and to avoid destroying or adversely modifying their critical habitat. *See* Pls.' Mot. ex. 2, at 9-5. The BiOp itself, therefore, strongly suggests that the Corps' failure to timely implement many of the RPA measures most important to fish passage and water quality would result in the jeopardization of the continued existence of the UWR Chinook and steelhead and/or the destruction or adverse modification of their critical habitat. There is not any significant evidence in the record that indicates that these findings in the BiOp are no longer true today; in fact, to the contrary, there is substantial evidence in the record that the Corps' failure to implement the important RPA measures is a significant factor in the continued decline of the listed salmonids.

In other words, Plaintiffs' theory regarding the jeopardy and takings prongs of their Claim One is well-supported by the record at this early stage of the proceedings: (1) The BiOp and RPA set out the measures that the Corps needed to implement in order to avoid jeopardy and unlawful takings; (2) the Corps materially failed to timely implement many of the RPA measures most critical to improving conditions for the listed salmonids; and (3) that failure has likely caused unlawful takings of UWR Chinook and steelhead and is likely a significant factor jeopardizing the long-term existence of those species. Accordingly, on this record the Court concludes Plaintiffs have at least established "serious questions going to the merits" of their claims. *See AWR I*, 632 F.3d at 1135.

B.    *Irreparable Harm*

As noted, "plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *Id.* Plaintiffs must demonstrate a "'definitive threat of future harm'" to the UWR Chinook and steelhead during the course of these proceedings in order to establish irreparable harm. *NWF II*, 886 F.3d at 819

(quoting *NWF I*, 23 F.3d at 1512 n.8); *see also S. Yuba River Citizens League*, 2013 WL 4094777, at *7.

As discussed above, Plaintiffs have demonstrated that the condition of the UWR Chinook and steelhead is deteriorating and that the Corps' failure to timely implement the RPA measures is a significant factor contributing to that continued decline. The record that Plaintiffs have assembled, however, falls short of establishing that the species will suffer irreparable harm during the pendency of these proceedings.

Although Plaintiffs are not required to demonstrate the species are likely to suffer extinction-level harm during this case, the preliminary-inunction standard requires that Plaintiffs make a showing that the species is likely to suffer irreparable harm before the Court can resolve the merits of Plaintiffs' claims. This could, for example, take the form of a showing that developments during this case will materially diminish the species' prospects for future survival or recovery and/or will "appreciably diminish the value of their critical habitat." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 660 F. Supp. 2d 1195, 1207–08 (E.D. Cal. 2008); *see also Wild Equity Inst. v. City and Cty. of San Francisco*, NO. C 11–00958 SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011).

Plaintiffs' declarants fall short of establishing that such irreparable species-level harm will occur during the pendency of this litigation absent preliminary injunctive relief. For example, with respect to the condition of the listed salmonids, Schroeder concluded:

> The abundance of salmon and steelhead in the UWR basin is at a historic low, and most populations are showing a downward trend with numbers that are below replacement levels. Because some of the naturally produced adult salmon are likely the first generation progeny of hatchery fish spawning in the rivers, the status of wild salmon may be even more precarious than is currently known. Estimated numbers of wild spring Chinook at Willamette Falls has declined 42% from 2002–2007 to 2008–2018, with a recent steady decline from 8,800 in 2015 to about 4,800 in 2018. The "genetic legacy" and core population in the McKenzie subbasin has declined by over 50% from 2002–

2007 to 2008–2017 to an average abundance of less than 1,600 wild adults. The late run of winter steelhead at Willamette Falls has decreased by 58% from 1975–2007 to 2008–2018 with a further decline in the last two years of 76% to an average of just 888 adults.

Schroeder Decl. ¶ 61.[9] Although Schroeder opines that the condition of the UWR Chinook and steelhead continues to decline, he stops short of opining that the nature of that decline is such that the species will suffer irreparable harm before the conclusion of these proceedings unless the Court grants preliminary relief. That distinction is dispositive in the context of a preliminary injunction. *See AWR I*, 632 F.3d at 1135 ("[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction.").[10]

On this record, therefore, the Court concludes Plaintiffs are not entitled to a preliminary injunction because they have failed to demonstrate they will suffer irreparable harm during the pendency of these proceedings in the absence of preliminary relief. Inherent in the Court's conclusion is an assessment that these proceedings can proceed to adjudication of the merits and, if appropriate, the issuance of relief within 12 to 24 months. The Court observes that the record currently before the Court is already well-developed and the parties plan to file dispositive motions on the merits by September 2019. *See* Stipulation [ECF 83]. Nonetheless, the Court notes Plaintiffs may become entitled to preliminary relief if it becomes apparent that this litigation will extend materially beyond that anticipated timeline.

---

[9] The Court observes that single-year fish-abundance numbers in isolation are not a reliable measure of the condition of the species, and that several years of data are necessary to reliably determine any trend in species abundance.

[10] Because the Court concludes Plaintiffs have not established a likelihood of irreparable harm during the pendency of these proceedings, the Court need not balance the equities or determine whether an injunction is in the public interest. Accordingly, at this stage of the proceedings the Court need not address the important matters raised by the Marion County Defendants with respect to Detroit Dam.

CONCLUSION

For these reasons, the Court DENIES Plaintiffs' Motion for Preliminary Injunction [ECF

36] and DENIES the Federal Defendants Motion to Disqualify Expert Testimony [ECF 61].

IT IS SO ORDERED.

DATED this _____ day of June, 2019.

_____
MARCO A. HERNÁNDEZ
United States District Judge