**LAWRENCE B. BURKE, OSB #892082**
larryburke@dwt.com
**ASHLEY L. VULIN, OSB #145454**
ashleyvulin@dwt.com
**ROBERT E. MILLER**, *admitted Pro Hac Vice*
robertmiller@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

**JANE E. VETTO, OSB #914564**
jvetto@co.marion.or.us
555 Court Street, NE, Ste. 5242
Salem, OR 97309
Telephone: (503) 588-5220

**THOMAS V. CUPANI, OSB #924654**
tcupani@cityofsalem.net
555 Liberty St. SE, Room 205
Salem, Oregon 97301
Telephone: (503) 588-6003
Facsimile: (503) 361-2202

Attorneys for City of Salem and Marion County

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, WILDEARTH GUARDIANS, and NATIVE FISH SOCIETY,<br><br>PLAINTIFFS,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS and NATIONAL MARINE FISHERIES SERVICE,<br><br>DEFENDANTS. | Case No. 3:18-cv-00437-PK<br><br>**OPPOSITION OF CITY OF SALEM AND MARION COUNTY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

The City and the County intervened to protect their citizens' interests in the North Santiam River. The City of Salem (the "City") has relied on water from the North Santiam River—on which Detroit Dam creates a reservoir—for 75 years. The City's nearly 200,000 customers depend on this source every day for drinking water. Moreover, many surrounding farms in Marion County (the "County") depend on water from the reservoir and river for crop irrigation, and the reservoir is a popular recreational destination that sustains many local businesses.

In their Complaint, Plaintiffs asked the Court to order "such declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter," (Complaint at 31) and have here moved for summary judgment that the Corps is in violation of the ESA. Plaintiffs previously unsuccessfully sought a preliminary injunction, where they demanded that the U.S. Army Corps of Engineers ("the Corps") partially drawdown Detroit Lake and evaluate complete drawdown between fall and April.

As argued by the City and County in response to Plaintiffs' Motion for a Preliminary Injunction, such drawdowns could:

1) Shut down the City's water treatment facility;

2) Reduce City water supply and quality below what is necessary to serve the City's population (as allowed by its legally granted water rights);

3) Impact the County's funding for basic health and safety services; and

4) Threaten the viability of many local businesses and farmers.

Therefore, the failure to perform such drawdowns in the past should not be a basis for a finding of ESA liability. In fact, in their Motion, Plaintiffs claim any "cost-benefit" consideration was prohibited and that the Court must therefore ignore any adverse impacts of the drawdown, even if they would have impacted the City's water supply. Motion at pp. 16-17. Plaintiffs fail to recall that they previously admitted the Court may not enter an injunction that would threaten

human health and safety, and that compromising the City of Salem's water supply would present such a threat. While Plaintiffs now insist the Corps should have ignored these "costs," the proposed additional drawdown demanded certainty as to the impacts. Plaintiffs have provided no assurance here that further lowering Detroit Lake would not have not threatened human health and safety.

Furthermore, Plaintiffs are also wrong in alleging the Corps is in violation of the ESA at Detroit Dam because it has already successfully implemented protective measures at Detroit Dam, has re-initiated consultation of its initial Biological Opinion ("BiOP") (which was never invalidated) and is moving forward with amended dam modifications to address these critical concerns. Plaintiffs have no basis of liability to force a further drawdown of the reservoir outside the existing process and without full review of reasonable alternatives. The City and County intervened in this lawsuit to prevent exactly that and oppose Plaintiffs' Motion to the extent their claims seek such liability to support such relief.

The Court should deny all relief requested by Plaintiffs to the extent it affects the operation of Detroit Dam and reservoir. The City and the County express no opinion on other relief Plaintiffs seek.

## II.   BACKGROUND

### A.   Detroit Dam and the Willamette Project

Detroit Dam (the "Dam") is one of thirteen dams that comprise the Willamette River Basin Flood Control Project ("Willamette Project"). Dkt. No. 36-2 (2008 Biological Opinion) at 4.6-6. The Dam forms a reservoir known as Detroit Lake, which is within the North Santiam Watershed. In 2000, the United States Army Corps of Engineers ("the Corps"), along with the Bureau of Reclamation and Bonneville Power Administration, initiated consultation with the National Marine Fisheries Service ("NMFS") pursuant to the Endangered Species Act ("ESA") over effects of the configuration, operations, and maintenance of the Willamette Project on Upper Willamette River Chinook salmon and steelhead. *See id.* at 1-3–1-4. NMFS completed

consultation and issued a biological opinion in 2008. *Id.* Ex. 2. NMFS directed the Corps to implement reasonable and prudent alternatives ("RPAs") to mitigate impacts and to ensure survival of those species with an adequate potential for recovery. *See id.* at 9-1. With respect to Detroit Dam, the 2008 BiOp directed the Corps to implement "structural modifications or major operational changes for improved water quality to at least one of the Project dams," with Detroit Dam being the highest priority for "construction of a temperature control structure or operational changes to achieve temperature control." *See id.* at 9-82. The 2008 BiOp did not evaluate the impacts of partial or full reservoir drawdown. *See id.*

In 2017, the Corps signaled its intent to move forward with changes at Detroit Dam by publishing its "Notice of Intent to Prepare an Environmental Impact Statement for the Detroit Dam Downstream Passage Project" ("EIS Notice") in the Federal Register. 82 Fed. Reg. 55,830 (Nov. 24, 2017). The Corps solicited "scoping" comments from the public to identify issues and alternatives to be considered during the Corps' development of the Environmental Impact Statement ("EIS"). *Id.* The Corps stated that it would consider operational as well as structural changes at Detroit Dam as part of the EIS. *Id.* Both the County and the City provided scoping comments to inform the Corps of Detroit Lake's crucial role in the local economy and in providing safe drinking water. *See* Dkt. No. 63-1 (Goeres-Priest Decl. Ex. A); Dkt. No. 62-2 (Hogue Decl. Ex. B) In January 2018, however, the Corps announced plans to completely drain Detroit Lake, potentially for years, in order to build a 300-foot water temperature control tower.[1]

The County and the City intervened in this lawsuit *See* Dkt. No. 57.

---

[1] *See* Defendant-Interveners' Amended Answers to Complaint and Cross Claim, Dkt. No. 57, at 9, ¶ 16; Zach Urness, Statesman Journal, *Major dam project could empty Detroit Lake for years, in fish recovery plan*, Jan. 13, 2018, available at https://www.statesmanjournal.com/story/news/2018/01/13/detroit-lake-oregon-reservoir-empty-army-corps-engineers-salmon-steelhead-low-water/1015180001/.

Page 4 – OPPOSITION OF CITY OF SALEM AND MARION COUNTY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

4820-7492-0616v.4 0783034-000012

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610

Plaintiffs filed a motion for preliminary injunction, requesting that the Court order the Corps to immediately implement interim actions, including significant operational changes at Detroit Dam. Specifically, with respect to Detroit Dam, Plaintiffs asked the Court to order the Corps to:

- Drawdown the reservoir at Detroit Dam to 1,370 feet elevation by November 15 [presumably of 2019] and hold until December 15, and prioritize use of regulating outlet discharge (Dkt. 36-44, at 1, ¶ I.A.a);
- Reevaluate the "[d]rawdown of Detroit reservoir from fall through April" "without incorporating the assumption that the agency must fulfill purposes of hydropower, recreation, irrigation, and municipal and industrial water supply" (*Id.* at 2, ¶ I.C); and
- Use the "lowest regulating outlets on" Detroit Dam "during fall to discharge cold water to meet temperature targets" (*Id.* at 3, ¶ II.A).

These proposed drawdown measures had not been the subject of an environmental impact statement or any other consideration of potential impacts.

The Court rejected the Motion, the parties agreed to bifurcate liability and remedy, and the Motion at issue here is just for the liability issue. Since the 2008 BiOp, the Corps has successfully implemented interim measures to improve conditions for salmonids. In the North Santiam River, such measures have included interim temperature control and downstream fish passage enhancement through operational modifications at Detroit Dam, in addition to upstream passage enhancement through the collection of an adult fish collection facility. *See* U.S. Army Corps of Engineers, *Corps juggles dam operations, fish survival in the Willamette Valley*, Feb. 16, 2018, available at https://www.nwp.usace.army.mil/news/feature/Article/1444666/corps-juggles-dam-operations-fish-survival-in-the-willamette-valley/ (noting the agencies have completed "a significant amount of 'Biological Opinion' actions, and federally-funded obligations of $194 million through Fiscal Year 2016" throughout the Willamette Project).

### B.    The City's and the County's Vital Interests in Detroit Lake

#### 1.    City of Salem's Drinking Water Supply

For more than 75 years, the North Santiam River—where the Detroit Dam and reservoir are located—has served as the primary drinking water source for the City of Salem. Dkt. No. 63-1 (Goeres-Priest Decl. Ex. A) ¶ 2. The City still primarily relies on the North Santiam River for water to serve over 192,000 customers and three wholesale customers: the City of Turner, Suburban East Salem Water District, and Orchard Heights Water Association. *Id.*

The City's drinking water treatment facility is located on Geren Island in the North Santiam River, 45 miles downstream from Detroit Dam. *Id.* The high water quality of the North Santiam River allows the City to use slow sand filtration as part of the treatment process. *Id.* ¶ 4. Slow sand filtration is a natural filtration process, allowing naturally existing biota in the river to form a biological layer which then degrades and/or removes particulates and microbial contaminants in the water. *Id.* Under normal operating conditions, the slow sand filters are operated without pretreatment (coagulation, floculation, and sedimentation). *Id.* Normal operating conditions require raw water turbidity of less than 10 Nephelometric Turbidity Units (NTU). *Id.*

The Geren Island Treatment Facility is capable of handling short-term turbidity events of a few days, which are frequently caused by unregulated flows in the fork of the river where the treatment facility's intake is located. *Id.* In such instances, the intake to the City's treatment facility is shut, and the City may rely on back-up water supplies and in-town finished water storage. *Id.* The City may also rely on temporary alterations of operations to mix groundwater with the river water or add additional filters. *Id.* However, the City's back-up supplies of water are limited. *Id.* The back-up supplies depend to some extent on what other municipal water providers are able to provide to the City at the time, which can vary. *Id.* As a result, if high turbidity levels persist beyond a few days into weeks or longer, the City's inability to normally

operate its treatment facility for an extended period would present a serious risk that the City would not be able to provide sufficient water for its customers. *Id.*

Turbidity is also a problem for the City's water supply because, even if the turbidity does not force a shutdown of the treatment facility, the turbidity may be too high for the treatment process to effectively remove it. *See id.* ¶ 5. The result could produce water for the City's customers that violates standards set by the Safe Drinking Water Act ("SDWA"). *Id.*

The drawdowns of Detroit Lake proposed by Plaintiffs could compromise the City's water supply by causing a prolonged shutdown of the Geren Island Facility or high turbidity in the water. *See id.* ¶ 6. The water level in Detroit Lake is maintained at no lower than 1,450 feet as established in the Water Control Diagram maintained by the Corps. *Id.* In the summer, the water level elevation is approximately 1,560 feet. *Id.* Lowering the water level to 1,370 feet in November and December, as Plaintiffs proposed, is likely to result in high levels of turbidity because wet and stormy weather may cause significant erosion to the newly exposed shoreline. *Id.* The type of sediment in Detroit Lake is light and does not settle to the bottom of the lake easily. *Id.* Further, lower water volume means the sediment is more concentrated in the lake. *Id.* As a result, much of the sediment may flow through the dam and downstream, creating high turbidity. *Id.* Thus, a drawdown to 1,370 for a full month in late fall could result in a high-turbidity event much longer than a few days. *Id.*

Plaintiffs' proposal to drawdown the reservoir even further (with no elevation level stated) between the fall months and April is even more concerning. *Id.* ¶ 7. The problems described above—such as exposed shoreline erosion and low volume of water—could be seriously exacerbated, creating a higher risk of excessively turbid water. *Id.* Moreover, the months-long draw down creates a higher risk of a long-term high-turbidity event and a higher risk that the City is unable to comply with the SDWA. *Id.*

The impacts of drawing down the reservoir between fall and April would not be limited to those months. If the reservoir is nearly empty in April, it is unlikely to refill to the regular

level of 1,560 feet during the summer. *See id.* ¶ 8. The consequences of inadequate water in the reservoir during the late spring and summer months could be severe. *See id.*

As the weather gets warmer, the City's water needs more than double from approximately 20 million gallons per day to approximately 50 million gallons per day. *Id.* ¶ 9. If the reservoir is near empty in late spring, as Plaintiffs propose, the City would be largely reliant on natural flow levels of the river during dry months. *Id.* As a result, the City may simply not have enough water for its customers' demand. *Id.* The City holds municipal water rights in the North Santiam River, and decreasing flows in the river as a result of drawdowns at Detroit Lake would likely interfere with those rights. *Id.*

The City's treatment facility relies on flows that pass by the facility's intake structure in the river channel on the north side of Geren Island. *Id.* ¶ 10. In order for the treatment plant to function properly, the water level at this point of the river must be 2.3 feet, which requires flows of 700 cubic feet per second (cfs). *Id.* A sustained drawdown into April poses the threat that flow levels in the following months will not be sufficient for the facility to operate, as water is needed to refill the reservoir. *See id.*

Lower water elevations in the reservoir as the weather warms is likely to lead to higher water temperatures in the North Santiam River. *Id.* ¶ 11. Any deviations from normal water quality parameters may impact the operations of the water treatment plant, including but not limited to changing the filter performance and chemical dosage. *Id.* Higher water temperatures may also increase the occurrence and magnitude of algal blooms in Detroit Reservoir and the North Santiam River. *Id.* Algal blooms negatively impact the water treatment process by (1) clogging filters and inhibiting the City's ability to meet water demand, (2) producing algal toxins, and (3) creating taste and odor issues caused by Geosmin and 2-Methylisoborneol (MIB). *Id.*

If the City were to obtain alternative water supply sufficient to mitigate the potential impacts described above, the process would take years, not months. *See id.* ¶ 12.

Case 3:18-cv-00437-HZ   Document 100   Filed 10/16/19   Page 9 of 15

### 2. Marion County's and its Residents' Reliance on Detroit Lake

Marion County's economy relies heavily on water in the North Santiam Watershed, and in particular, Detroit Lake. Dkt. No. 62-2 (Hogue Decl. Ex. B) ¶ 2. More than half of the North Santiam Watershed is in Marion County, and more than one-third of the County is in the North Santiam Watershed. *Id.* ¶ 6.

Detroit Lake is a popular recreational site, and approximately 70% of jobs in the Detroit Lake area are in recreation and accommodation. *See id.* ¶¶ 2, 4. Lower water levels throughout the summer could impact and effectively eliminate recreational use of Detroit Lake. *Id.* ¶ 4. The docks and marinas on Detroit Lake are at different elevations, but they range from 1,530 to 1,560 feet (with the exception of one, which is approximately 1,450 feet). *Id.* If the water level remains too low to accommodate recreation throughout the summer, many business would likely be forced out. *Id.* The County estimates that, for recreation in the Detroit Lake area, prolonged "low lake" conditions could lead to economic losses of approximately $11 million per year to local businesses and industries. *Id.* ¶ 6.

Beyond recreational industries, Marion County is also the largest producing agricultural county in the state of Oregon. *Id.* ¶ 5. As of 2012, Marion County's agricultural land area totaled 286,194 acres. *Id.* The agriculture and food processing industry is the longest-standing industry in Marion County, with nearly 800 firms employing over 16,000 people with payroll of nearly $550 million dollars. *Id.* The area that would be affected by the draining of Detroit Lake and resulting prolonged low water levels of Detroit Lake and the North Santiam River comprises 19% of the county land area and 41% of county jobs. *Id.* Many farms and businesses in southern Marion County that rely on the North Santiam River Watershed for crop irrigation could be severely impacted by low water conditions. *Id.*

In addition to the City of Salem, a number of small communities in the Detroit Lake area rely on the reservoir for drinking water, including Stayton and Gates. *Id.* ¶ 8.

4820-7492-0616v.4 0783034-000012

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610

Lowering the water in Detroit Dam would have a ripple effect, extending beyond just businesses in close proximity to the lake and depriving nearby farmers of irrigation water. *Id.* ¶ 7. The economic impact would inevitably affect tax revenue to the county, which funds essential health and safety services. *See id.*

### III.  ARGUMENT

#### A.  Plaintiffs Have Not Demonstrated an ESA Violation for Failure to Drawdown Detroit Lake.

Plaintiffs fail to meet their burden of demonstrating Corps' liability regarding Detroit Lake because the remedy they argue should have been implemented would have threatened human health and safety. Instead of presenting any evidence on the human health and safety impact of the proposed remedies, Plaintiffs merely consider impacts as being costs which must not be weighed. The remedy for Detroit Dam is being developed appropriately, considering relevant impacts. This Court should deny the motion regarding ESA violations at Detroit Lake.

#### B.  If There Are ESA Violations at Detroit Lake, the Corps' Liability Should Be Limited to Inactions Other Than Drawdowns.

First, the Court should deny ESA liability for failure to drawdown Detroit Reservoir from fall through April, for the same reasons it rejected the same request in the Motion for Preliminary Injunction. Pls.' Proposed Order, Dkt. No. 36-44, at 2. Plaintiffs' Motion should be limited to seeking liability for actions that would not impinge on "flood control or human health and safety." Plaintiffs recognize that the "human health and safety exception includes protecting Salem's drinking water supply." Pls.' Mot. for Preliminary Injunction ("PI Mot."), Dkt. No. 36 at 34 n.7 ("Plaintiffs seek an order from the Court that directs the Corps to prioritize the needs of UWR salmon and steelhead over all other authorized purposes of the Willamette Project so long as the actions do not impair flood control or human health and safety… The human and health safety exception includes protecting Salem's drinking water supply."). Of course, Plaintiffs' recognition is consistent with the law, as the Court may not order the Corps to do anything that

Page 10 – OPPOSITION OF CITY OF SALEM AND MARION COUNTY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

4820-7492-0616v.4 0783034-000012

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610

would compromise the City of Salem's water supply or cause any other human health concern. *See NWF*, 886 F.3d at 815 (9th Cir. 2018) (proposed injunction accommodated "power emergencies, health and safety, or other issues"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-0640-SI, 2017 WL 1829588, at *10 (D. Or. Apr. 3, 2017), *aff'd in part, appeal dismissed in part,* 886 F.3d 803 (9th Cir. 2018) ("The Court . . . consider[s] Defendants' arguments relating to the potential harm to the listed species and to human life versus the benefits asserted by the [] Plaintiffs in evaluating the appropriate injunctive relief."); *Nat. Res. Def. Council v. Kempthorne*, No. 1:05-CV-1207 OWW, 2007 WL 4462395, at *13 (E.D. Cal. Dec. 14, 2007) ("Although the ESA does not expressly recognize an exception for human health and safety, Plaintiffs have offered and it is prudent to apply . . . .").

Although Plaintiff argues that health and safety should not be part of any cost-benefit analysis, Plaintiffs' cited authority in fact supports the Intervenor's position. The injunction requested by the plaintiff in the recent Ninth Circuit case incorporated concessions to address "power emergencies, ***health and safety***, or other issues," so the court there did not evaluate the issue. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 815 (2018) (emphasis added). Furthermore, this Court already considered that case during Plaintiffs' failed request for an injunction, and still concluded that prior to any injunction issuing the Court must "balance the equities" and "determine whether an injunction is in the public interest," which requires considering the "important matters" related to health and human safety raised by the City and County. Order on Pls' Motion for a Prelim. Injunction, at 11 n. 10. And the older Supreme Court case did not upend this established human health and safety exception. *See Tenn. Valley Auth. V. Hill*, 437 U.S. 153, 183, 194 (1978) (addressing only vague economic concerns, not those involving human health and safety).

Since Plaintiffs previously asked the Court to order the Corps to conduct its reevaluation "*without* incorporating the assumption that the agency must fulfill purposes of hydropower, recreation, irrigation, and *municipal and industrial water supply*," the City and County

Page 11 – OPPOSITION OF CITY OF SALEM AND MARION COUNTY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

reasonably fear that Plaintiffs are seeking a finding of liability against the Corps as a predicate of relief they know may impact health and human safety. Pls.' Proposed Order, Dkt. No. 36-44, at 2 (emphasis added). If the Court does find ESA violations, the Court should still disregard Plaintiffs' request for a finding of liability for failure to further drawdown Detroit Lake since the Corps did what was required to avoid impacting human health and safety.

The Court should deny the request for liability based on a fall-through-April drawdown at Detroit Lake because the consequences of a drawdown would be serious and far reaching. Plaintiffs have presented no evidence to the contrary. As noted, the City of Salem relies primarily on water from the North Santiam River just below Detroit Dam to supply safe drinking water to 192,000 customers, in addition to three wholesale municipal customers who in turn supply their citizens with drinking water. *See* Dkt. No. 63 (Goeres-Priest Decl.) ¶ 1. Lowering Detroit Lake threatens the functionality of the City's water treatment facility, the City's ability to comply with the Safe Drinking Water Act, and the City's ability to provide sufficient quantity of water. *See id.* ¶¶ 4-11.

The health and safety risks extend beyond the City's water supply. Small local communities depend on the reservoir for drinking water without the use of the City's treatment facility. *See* Dkt. No. 62 (Hogue Decl.) ¶ 8. Further, such a long term drawdown could compromise the reservoir's ability to refill during the spring months, and as a result, threaten agricultural needs. *See* Dkt. No. 63 (Goeres-Priest Decl.) ¶ 8; Dkt. No. 62 (Hogue Decl.) ¶ 3; *see also Nat. Res. Def. Council v. Kempthorne*, No. 1:05-CV-1207 OWW GSA, 2007 WL 4462395, at *12–13 (E.D. Cal. Dec. 14, 2007) (identifying "[a]dverse effects on agriculture including, but not limited to, loss of jobs, increased groundwater pumping, fallowed land, and land subsidence" as part of potential human health and safety concerns). The impact of lowering the reservoir on agriculture and recreation would inevitably extend to Marion County's tax revenue and, consequently, its funding of essential health and safety services. *See* Dkt. No. 62 (Hogue Decl.) ¶ 7.

Plaintiffs appear to argue cost-benefit analysis may play no role in the Court's decision, but courts have not been so inflexible. In a recent ESA case, interveners argued that an "the relief would not only reduce water available for crops but prompt a mid-season shutoff that would financially ruin farmer families." *Klamath Tribes v. United States Bureau of Reclamation*, No. 18-CV-03078-WHO, 2018 WL 3570865, at *16 (N.D. Cal. July 25, 2018). The court recognized that, while courts generally are "not permitted to favor economic interests over potential harm to endangered species," a "mandatory preliminary injunction is an *extraordinary remedy* and I need to be *certain* that the remedy requested is likely to be effective. In that respect, I consider the intervenors' concerns and I recognize the complex interests that would be affected by preliminary relief." *Id.* (emphasis added). The court noted there were "competing expert opinions on the effectiveness of the remedy, which is concerning in light of the magnitude of interests that would be affected by the preliminary injunction." *Id.* at *17. As a result, the court denied the request for injunctive relief. *Id.* Similarly, this Court can, and should, recognize that ruling that, lack of drawdown actions sought previously in the Motion for an injunction cannot form the basis for liability.

## IV.   CONCLUSION

The City and County request that the Court limit any finding of liability to findings that do not involve actions potentially impacting the City of Salem's water supply, along with many other vital interests to the surrounding Marion County community. Plaintiffs broadly alleged that the Corps should have lowered water levels in Detroit Lake without regard to interests of the County and the City. As a result, the City and the County respectfully request that the Court deny Plaintiffs' motion to the extent it would impact the operation of the Detroit Dam and reservoir.

DATED this 16th day of October, 2019.

                DAVIS WRIGHT TREMAINE LLP

By _____
LAWRENCE B. BURKE, OSB #892082
larryburke@dwt.com
ASHLEY L. VULIN, OSB #145454
ashleyvulin@dwt.com
ROBERT E. MILLER, *admitted Pro Hac Vice*
robertmiller@dwt.com
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

JANE E. VETTO, OSB #914564
jvetto@co.marion.or.us
555 Court Street, NE, Ste. 5242
Salem, OR 997309
Telephone: (503) 588-5220

THOMAS V. CUPANI, OSB #924654
tcupani@cityofsalem.net
555 Liberty St. SE, Room 205
Salem, Oregon 97301
Telephone: (503) 588-6003
Facsimile: (503) 361-2202

Attorneys for City of Salem and Marion County

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2019, a true and correct copy of the above **Opposition of City of Salem and Marion County to Plaintiffs' Motion for Summary Judgment** was electronically filed with the Clerk of the Court using CM/ECF. Copies of this document will be served upon interested counsel via the Notices of Electronic Filing that are generated by CM/ECF.

Dated this 16th day of October, 2019.

DAVIS WRIGHT TREMAINE LLP

By _____
LAWRENCE B. BURKE, OSB #892082
larryburke@dwt.com
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

Of Attorneys for City of Salem and Marion County

Page 1 – CERTIFICATE OF SERVICE

4820-7492-0616v.4 0783034-000012

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax