JEAN E. WILLIAMS, Deputy Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
MICHAEL R. EITEL, Senior Trial Attorney
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov; michael.eitel@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, et al., | Case No.: 3:18-cv-00437-HZ |
| Plaintiffs, | FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants, | |
| and | |
| CITY OF SALEM and MARION COUNTY, | |
| Defendant-Intervenors. | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's June 20, 2019

Scheduling Order, Federal Defendants the United States Army Corps of Engineers ("Corps") and

National Marine Fisheries Service ("NMFS") hereby move for summary judgment on all the claims

in Plaintiffs' complaint.[1] Federal Defendants respectfully request that their motion for summary

judgment be granted, Plaintiffs' motion for summary judgment be denied, and judgment entered in

favor of Federal Defendants on all claims.

Dated: November 6, 2019        JEAN E. WILLIAMS, Deputy Assistant Attorney General
                               SETH M. BARSKY, Section Chief
                               S. JAY GOVINDAN, Assistant Section Chief

                               */s/ Kaitlyn Poirier*
                               KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
                               U.S. Department of Justice
                               Environment & Natural Resources Division
                               Wildlife & Marine Resources Section
                               Ben Franklin Station, P.O. Box 7611
                               Washington, D.C. 20044-7611
                               Telephone: (202) 307-6623
                               Fax: (202) 305-0275
                               Email: kaitlyn.poirier@usdoj.gov

                               */s/ Michael R. Eitel*
                               MICHAEL R. EITEL, Senior Trial Attorney
                               U.S. Department of Justice
                               Environment & Natural Resources Division
                               Wildlife & Marine Resources Section
                               999 18th Street, South Terrace 370
                               Denver, Colorado 80202
                               Telephone: (303) 844-1479
                               Fax: (303) 844-1350
                               Email: michael.eitel@usdoj.gov

                               Attorneys for Federal Defendants

---

[1] In their complaint, Plaintiffs alleged that the Corps has violated Section 9 of the Endangered Species Act by "taking" listed species through its funding of hatcheries. Complaint, ECF 1 ¶ 86. Plaintiffs have waived this claim by failing to address it in their opening brief. Federal Defendants' memorandum in support will address the remaining claims in Plaintiffs' complaint.

**MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

PAGE

ACRONYMS AND ABBREVIATIONS ..............................................................................viii

INTRODUCTION .........................................................................................................1

LEGAL BACKGROUND .................................................................................................2

    I.   Flood Control Acts ...........................................................................................2

    II.  Endangered Species Act ...................................................................................4

FACTUAL BACKGROUND ..............................................................................................6

    I.   The Willamette River Basin and WVP Facilities ...............................................6

    II.  The Corps' Management of the WVP .................................................................6

    III. Overview of WVP Operations...........................................................................7

    IV. The Biological Opinion and Implementation of the RPA .....................................9

    V.  Reinitiated Consultation .................................................................................10

STANDARD OF REVIEW................................................................................................10

ARGUMENT................................................................................................................11

    I.   The Corps has not violated Section 7 of the ESA. .............................................11

        A.  The Corps reasonably concluded that continuing its current operations and maintenance is consistent with its Section 7(a)(2) obligations. ...........................................................13

        B.  An action agency's delay in implementing an RPA does not equate to jeopardy as a matter of law.....................................................................................15

        C.  The delayed RPA measures relating to fish passage do not mitigate for only the effects of the Corps' discretionary operation and maintenance of the WVP. .........................................17

    II.  Plaintiffs have not established a Section 9 violation..........................................20

A.  Plaintiffs have not proven that the Corps' discretionary actions have caused take. ..................................................................................................21

B.  Plaintiffs have not proven that the Corps has violated the ITS's terms and conditions. ......................................................................................23

III.  Plaintiffs' failure to reinitiate claim is moot................................................28

CONCLUSION...........................................................................................................31

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                          <u>PAGE</u>

*All. for the Wild Rockies v. U.S. Dep't of Agric.,*

    772 F.3d 592 (9th Cir. 2014) ..................................................................................29

*All. for the Wild Rockies v. U.S. Army Corps of Eng'rs,*

    237 F. Supp. 3d 1079 (D. Or. 2017) ...............................................................29-30

*Abdul-Jabbar v. G.M. Corp.,*

    85 F.3d 407 (9th Cir. 1996) ...................................................................................11

*Anderson v. Liberty Lobby, Inc.,*

    477 U.S. 242 (1986) ...............................................................................................11

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*

    515 U.S. 687 n.13 (1995) ...................................................................................20-21

*Bell Atl. Corp. v. Twombly,*

    550 U.S. 544 (2007) ...............................................................................................30

*Bennett v. Spear,*

    520 U.S. 154 (1997) ....................................................................................5, 16, 26

*California v. Campbell,*

    138 F.3d 772 (9th Cir. 1998) .................................................................................11

*Campbell v. California,*

    525 U.S. 822 (1998) ...............................................................................................11

*Cascadia Wildlands v. Kitzhaber,*

    911 F. Supp. 2d 1075 (D. Or. 2012) ......................................................................21

*Chafin v. Chafin,*

    568 U.S. 165 (2013) ...............................................................................................29

*Citizens to Pres. Overton Park v. Volpe,*

    401 U.S. 402 (1971) ...............................................................................................11

*Claar v. Burlington N. R.R.*,

    29 F.3d 499 (9th Cir. 1994) .................................................................................................23

*Cold Mountain v. Garber*,

    375 F.3d 884 (9th Cir. 2004) ...............................................................................................21

*Ctr. for Biological Diversity & Desert Survivors v. U.S. Bureau of Land Mgmt.*,

    Case No. CV 08-7679-JFW, 2009 WL 10675702 (C.D. Cal. Mar. 23, 2009).....................29

*Daubert v. Merell Dow Pharm.*,

    43 F.3d 1311 (9th Cir. 1995) ...............................................................................................23

*Defs. of Wildlife v. EPA*,

    420 F.3d 946 (9th Cir. 2005) ...............................................................................................16

*Forest Guardians v. U.S. Forest Serv.*,

    329 F.3d 1089 (9th Cir. 2003) .............................................................................................28

*Friends of Endangered Species v. Jantzen*,

    589 F. Supp. 113 (N.D. Cal. 1984) .....................................................................................11

*Gen. Elec. Co. v. Joiner*,

    522 U.S. 136 (1997) .............................................................................................................23

*Genesis HealthCare Corp. v. Symczyk*,

    569 U.S. 66 (2013) ...............................................................................................................28

*Greenpeace Found. v. Mineta*,

    122 F. Supp. 2d 1123 (D. Haw. 2000) ................................................................................29

*Gustafson v. Alloyd Co.*,

    513 U.S. 561 (1995) .............................................................................................................26

*Headwaters, Inc. v. Bureau of Land Mgmt.*,

    893 F.2d 1012 (9th Cir. 1990) ......................................................................................28, 29

*Hoopa Valley Tribe v. NMFS*,

    230 F. Supp. 3d 1106 (N.D. Cal. 2017) ........................................................................30, 31

*Leocal v. Ashcroft*,

    543 U.S. 1 (2004) .................................................................................................................23

*Nat. Res. Def. Council v. Norton,*

   236 F. Supp. 3d 1198 (E.D. Cal. 2017) ................................................................ 20, 21

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*

   551 U.S. 644 (2007) ..................................................................................................... 20

*Nat'l Wildlife Fed'n v. FEMA,* No. C11-2044-RSM,

   2014 WL 5449859 (W.D. Wash. Oct. 24, 2014) ......................................................... 13

*Norton v. S. Utah Wilderness All.,*

   542 U.S. 55 (2004) ....................................................................................................... 30

*Oceana v. Bureau of Ocean Energy Mgmt.,*

   37 F. Supp. 3d 147 (D.D.C. 2014) .............................................................................. 16

*Pac. Nw. Generating Coop. v. Brown,*

   822 F. Supp. 1479 (D. Or. 1993) ........................................................................... 28, 29

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs,*

   538 F. Supp. 2d 242 (D.D.C. 2008) ........................................................................... 22

*Preiser v. Newkirk,*

   422 U.S. 395 (1975) ..................................................................................................... 28

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*

   898 F.2d 1410 (9th Cir. 1990) .................................................................................... 16

*San Luis & Delta Water Auth. v. Jewell,*

   747 F.3d 581 (9th Cir. 2014) ...................................................................................... 11

*Sierra Club v. Marsh,*

   816 F.2d 1376 (9th Cir. 1987) ................................................................................. 12-13

*Sturgeon v. Frost,*

   136 S. Ct. 1061 (2016) ................................................................................................ 26

*Tribal Vill. of Akutan v. Hodel,*

   869 F.2d 1185 (9th Cir. 1988) ........................................................................ 13, 16, 26

*Triton Energy Corp. v. Square D Co.,*

   68 F.3d 1216 (9th Cir. 1995) ...................................................................................... 11

*U.S. Dep't of Transp. v. Pub. Citizen,*

    541 U.S. 752 (2004) ........................................................................................................21

*U.S. Parole Comm'n v. Geraghty,*

    445 U.S. 388 (1980) ........................................................................................................28

*U.S. v. Geophysical Corp. of Alaska,*

    732 F.2d 693 (9th Cir. 1984) ..........................................................................................28

*Univ. of Tex. v. Camenisch,*

    451 U.S. 390 (1981) ........................................................................................................28

*Wyo. Outdoor Council v. Bosworth,*

    284 F. Supp. 2d 81 (D.D.C. 2003) .................................................................................12

## STATUTES

5 U.S.C. § 706 ........................................................................................................................11

16 U.S.C. § 1532 ...........................................................................................................4, 5, 22

16 U.S.C. § 1533 ......................................................................................................................4

16 U.S.C. § 1536 .............................................................................................................passim

16 U.S.C. § 1538 ......................................................................................................................5

16 U.S.C. § 1540 ...........................................................................................................23, 27, 30

Pub. L. No. 74-738 ..................................................................................................................2

Pub. L. No. 75-761 ............................................................................................................3, 18

Pub. L. No. 81-516 ......................................................................................................3, 4, 6, 18

Pub. L. No. 83-780 ..................................................................................................................7

Pub. L. No. 86-645 ..................................................................................................................3

## FEDERAL REGULATIONS

50 C.F.R. § 402.14 .........................................................................................................passim

50 C.F.R. § 222.102 ...............................................................................................................22

50 C.F.R. § 402.02 .........................................................................................................passim

50 C.F.R. § 402.03 .................................................................................................................20

50 C.F.R. § 402.15 ................................................................................................. 5, 16

50 C.F.R. § 402.16 ...................................................................................................... 5

51 Fed. Reg. 19,926 (June 3, 1986) ..................................................................... 16, 24

OTHER AUTHORITIES

Fed. R. Civ. P. 8(a)(2) ..............................................................................................30

Fed. R. Civ. P. 56 .....................................................................................................10

## ACRONYMS AND ABBREVIATIONS

APA – Administrative Procedure Act

BiOp – biological opinion

Bonneville – Bonneville Power Administration

Corps – United States Army Corps of Engineers

ESA – Endangered Species Act

FWS – United States Fish and Wildlife Service

ITS – incidental take statement

NMFS – National Marine Fisheries Service

NEPA – National Environmental Policy Act

RM&E – research, monitoring, and evaluation

RPA – reasonable and prudent alternative

UWR – Upper Willamette River

UWR salmonids – Upper Willamette River Chinook salmon evolutionarily significant unit and

Upper Willamette River winter steelhead distinct population segment

WATER - Willamette Action Team for Ecosystem Restoration

WVP – Willamette Valley Project

# INTRODUCTION

Over the past decade, the Corps has operated and maintained the complex Willamette Valley Project ("WVP") according to its statutory authorities and responsibilities, including the Endangered Species Act ("ESA"). Indeed, it has completed numerous reasonable and prudent alternative ("RPA") measures for the benefit of ESA-listed Upper Willamette River ("UWR") salmonids, consistent with the recommendations of NMFS' 2008 Biological Opinion ("BiOp"). Among other things, the Corps has completed measures to improve upstream passage, tested operations relating to downstream passage, and implemented a comprehensive research, monitoring, and evaluation ("RM&E") program. The Corps has also begun the National Environmental Policy Act ("NEPA") process for the planning and development of downstream passage and temperature control at Detroit Dam and downstream passage at Cougar Dam. Thus, far from idly sitting on its hands as Plaintiffs suggest (ECF 96 at 33), the Corps has taken significant steps to ensure that the WVP is operated and managed in a manner that addresses the needs of ESA-listed species.

There is no disagreement that the Corps has not completed the RPA measures relating to downstream passage within the time period specified in the RPA. But that lapse in timing does not negate the benefits of the significant measures that the Corps has implemented, or the progress that the Corps has made in implementing the delayed RPA measures. Nor does the delay per se constitute a violation of the ESA. Instead, the Corps did exactly what was required under the ESA— it reinitiated consultation and is working diligently with NMFS to complete the consultation in a way that protects UWR salmonids and complies with the ESA. Given these facts, the Corps reasonably determined that its continued operation and maintenance of the WVP during the reinitiated consultation period will not jeopardize the continued existence of UWR salmonids. There is no basis for the Court to reject that judgment.

# LEGAL BACKGROUND

## I.     Flood Control Acts

In the Flood Control Act of 1936, Congress recognized that "destructive floods upon the rivers of the United States, upsetting orderly processes and causing loss of life and property, including the erosion of lands, and impairing and obstructing navigation, highways, railroads, and other channels of commerce between the States, constitute a menace to national welfare[.]" Flood Control Act of 1936, Pub. L. No. 74-738, § 1, 49 Stat. 1570 (1936). Congress therefore directed the Corps' Chief of Engineers to investigate and improve rivers and other waterways for flood control, including waters in the Willamette River Basin. *Id.* §§ 2, 5.

In 1938, the Corps submitted a Chief of Engineers' report to Congress outlining a comprehensive plan for the Willamette River Basin. H.R. DOC. NO. 75-544. The Corps recommended building a system of seven storage dams and reservoirs that would regulate stream flow, thereby helping with flood control, navigation, irrigation, and stream purification.[2] *Id.* at 100-04. However, the Corps informed Congress that "the proposed Willamette Basin projects [will affect] migratory spring chinook salmon and steelhead trout" as the dams "will prevent through migration on the streams." *Id.* at 90. And, "[d]ue to the height of the storage dams proposed on these streams and to the large seasonal variation in pool levels, there is much doubt as to the feasibility of providing for migration past these structures by means of fish ladders or elevators." *Id.* at 91. Therefore, the Corps' proposal did not include either upstream or downstream fish passage at the dams. The proposal instead called for "extensive and enlarged modern hatcheries . . . to replace or supplement the existing hatcheries[3] with a view to providing facilities for artificial propagation as

---

[2] "A serious pollution problem ha[d] developed on the lower Willamette River, as a result of the discharge into the river in an untreated state of domestic sewage and industrial wastes." *Id.* at 9.
[3] Even in 1938, the "greater part" of Chinook salmon in the Willamette River system were already propagated artificially by the Oregon Fish Commission at existing hatcheries. *Id.* at 90.

a substitute for the natural spawning grounds made inaccessible by the proposed improvements." *Id.* at 91.

Congress, anticipating that there would be no upstream or downstream passage for fish once the dams were constructed, approved and funded the general comprehensive plan in the Chief of Engineers' report. Flood Control Act of 1938, Pub. L. No. 75-761, § 4, 52 Stat. 1215, 1222 (1938).

In 1948, the Corps submitted another report to Congress on the Willamette River Basin. H.R. DOC. NO. 81-531. Once again, the Corps informed Congress that the "proposed dams would be too high to permit the passage of migrant fish by means of facilities of demonstrated efficacy." H.R. DOC. No. 81-531 Appendix J at 1732. "It is apparent, therefore, that any spawning, feeding, and rearing above the dams would become inaccessible to migrant fish. Reservoir operations also would affect the quantity, quality, and temperature of the water in the streams below the dams." *Id.* The Corps noted that "plans for the restitution of losses of salmon habitat caused by construction of authorized and proposed dams provide for a substantial increase" in hatchery programs and "a more intensive use of the spawning and rearing areas located below the dam sites", but no upstream or downstream passage at the dams. *Id.* at 1733. Congress approved and funded the Corps' plan. Flood Control Act of 1950, Pub. L. No. 81-516, § 204, 64 Stat. 163 (1950).[4]

Periodically, the Chief of Engineers submitted new reports to Congress updating its comprehensive plan for the Willamette River Basin.[5] Congress explicitly adopted these reports in

---

[4] Prior to construction of Green Peter, Cougar, and Fall Creek dams—but after Congress authorized the Corps to construct those dams with no fish passage facilities—the Corps modified its plans for the dams and constructed fish horns. *See* USACE 209626 (Cougar); 209628 Figure 28 (schematic of fish horns at Cougar); 209609 (Green Peter); 209653 (Fall Creek). Fish horns can provide downstream passage. Unfortunately, the fish horns did not perform effectively at these dams and their use was discontinued. *See, e.g.*, USACE 209643, 209658.

[5] In one report to Congress, the Corps stated that "provisions would be made at [Foster] dam for the upstream and downstream passage of migratory fish." S. DOC. NO. 86-104 at 28. But, "[t]he specific nature of these facilities would be dependent on further study by the Fish and Wildlife Service." *Id.* This led to the construction of a fish weir to aid in downstream passage, which was

subsequent Flood Control Acts, thereby directing that Corps' projects shall be implemented

"substantially in accordance with" the reports. *See, e.g.*, Flood Control Act of 1950, Pub. L. No. 81-

516, § 204, 64 Stat. 163 (1950); Flood Control Act of 1954, Pub. L. No. 83-780, § 203, 68 Stat. 1248

(1954).

## II.    Endangered Species Act

In the ESA, Congress directed the Secretaries of Commerce and Interior to list endangered

and threatened species.[6] 16 U.S.C. § 1533(a). An "endangered species" is "any species which is in

danger of extinction throughout all or a significant portion of its range[,]" *id.* § 1532(6), and a

"threatened species" is "any species which is likely to become an endangered species within the

foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

Section 7(a)(2) requires federal agencies (known as "action agencies") to ensure that any

action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse modification" of

designated critical habitat. *Id.* § 1536(a)(2). The action agencies consult with the appropriate expert

"consulting agency" (either NMFS or FWS, or both, depending on the species involved) to analyze

the potential impacts of a proposed action. Formal consultation leads to the issuance of a written

BiOp by the consulting agency. 50 C.F.R. § 402.14(g)-(h). If a BiOp concludes that the proposed

action is likely to jeopardize the continued existence of a listed species or destroy or adversely

modify critical habitat, the consulting agency will suggest an RPA. 16 U.S.C. § 1536(b)(3)(A). An

RPA is an alternative action that the consulting agency believes will not violate Section 7 of the ESA,

---

recently upgraded by the Corps pursuant to RPA measure 4.12. Implementation Spreadsheet, ECF
81-2 at 10.
[6] The Secretary of Commerce is generally responsible for marine and anadromous species, while the
Secretary of the Interior is generally responsible for terrestrial species and inland fishes. The
Secretary of Commerce and Secretary of the Interior have delegated their ESA responsibilities to
NMFS and the United States Fish and Wildlife Service ("FWS"), respectively.

can be implemented in a manner consistent with both the intended purpose of the action and the scope of the action agencies' legal authority and jurisdiction, and is economically and technologically feasible. 50 C.F.R. § 402.02.

Following consultation, the action agencies can choose to implement the RPA, decide not to undertake the proposed action, apply for an exemption, or disagree with the BiOp and proceed with the original or an alternate proposed action that it believes will satisfy the ESA's standards. *See id.* § 402.15(a), (c); *Bennett v. Spear*, 520 U.S. 154, 170 (1997). Reinitiation of consultation may be required under certain enumerated circumstances. 50 C.F.R. § 402.16. The ESA does not include a mandatory deadline for completing reinitiated consultation. *Compare* 16 U.S.C. § 1536(b)(1)(A), (B) (consultation in the first instance "shall be concluded within the 90-day period . . . or . . . within such other period of time as is mutually agreeable to the Secretary and the Federal agency") *with* 50 C.F.R. § 402.16 (giving no timeline for completing reinitiated consultation).

Section 9 of the ESA prohibits the "take" of any endangered species, 16 U.S.C. § 1538(a)(1)(B). *See* 16 U.S.C. § 1532(19) (defining "take"). If, after consultation, the consulting agency concludes that the incidental taking of a listed species as a result of the agency action will not violate Section 7, it can issue an Incidental Take Statement ("ITS"). *Id.* § 1536(b)(4). An ITS specifies the impact of the incidental taking on the listed species, establishes reasonable and prudent measures (which are distinct from RPAs) that are necessary or appropriate to minimize the amount or extent of incidental take, and states the terms and conditions that the action agency must comply with to implement the reasonable and prudent measures. *Id.* § 1536(b)(4)(C)(i)-(iv); 50 C.F.R. § 402.02 (defining reasonable and prudent measures). Any taking in compliance with the terms and conditions of the ITS is exempt from the general take prohibition in Section 9. 16 U.S.C. § 1536(b)(4)(iv), (o)(2).

## FACTUAL BACKGROUND

### I.      The Willamette River Basin and WVP Facilities

The Willamette River Basin in northwest Oregon is the state's largest river basin, stretching

from south of Eugene to the Oregon and Washington border. *See* BiOp at 2-10.[7] The Basin is

comprised of the mainstem Willamette River and the River's numerous tributaries, with the water

generally flowing from south to north. *See id.*

The Corps began constructing the WVP in the early 1940s. *Id.* at 2-9. Today, the WVP

consists of 13 dams and reservoirs located in the Willamette River Basin: Big Cliff, Blue River,

Cottage Grove, Cougar, Detroit, Dexter, Dorena, Fall Creek, Fern Ridge, Foster, Green Peter, Hills

Creek, and Lookout Point. *Id.* at 1-3, 2-10. Ten of these dams are storage dams, meaning that they

can impound a large amount of water behind the dams in reservoirs for later use. *Id.* at 2-11. Two of

the remaining dams (Big Cliff and Dexter) are re-regulating dams, which moderate the fluctuations

in downstream water flows resulting from hydropower production at the upstream storage dams. *Id.*

at 2-10 to 2-11, 2-20. Foster Dam is a re-regulating dam that also has storage capabilities. *Id.* at 2-9

to 2-10. In addition to the dams and reservoirs, the WVP also includes adult fish collection facilities,

fish hatcheries, recreation and natural resource areas, and approximately 42 miles of fortified

riverbank protections. *See id.* at 2-28, 2-33 (adult fish collection facilities); 1-3, 1-6 to 1-7 (hatcheries);

2-21 (recreation); 2-12 (revetments).

### II.     The Corps' Management of the WVP

Congress authorized the Corps to construct, operate, and maintain the WVP in accordance

with the Flood Control Acts and the Chief of Engineers' reports incorporated in those Acts. *See, e.g.,*

Flood Control Act of 1950, Pub. L. No. 81-516, § 204, 64 Stat. 163 (1950); Flood Control Act of

---

[7] The BiOp can be found at USACE 947926-949196. For ease, all citations to the BiOp in this brief will refer to the actual BiOp page numbers instead of the record citation.

1954, Pub. L. No. 83-780, § 203, 68 Stat. 1248 (1954). The reports state that each dam must be managed for very specific purposes, known as "authorized purposes." The authorized purposes of the dams comprising the WVP include flood control, hydroelectric power generation, water quality improvement, municipal and industrial water supply, irrigation, public recreation, fish and wildlife conservation, and navigation.[8] BiOp at 2-13 to 2-24. The authorized purposes differ from dam to dam. Petersen Declaration, ECF 65 ¶ 4, Figure 2. Therefore, the Corps may not have Congressional authority to conduct a specific operation at one dam in the WVP system, even though it has the authority to conduct those same operations at another dam in the system. *Id.* ¶ 4.

The Chief of Engineers' reports also include water control diagrams identifying how the Corps will regulate water at each dam and reservoir to balance the authorized purposes of each dam. *Id.* ¶ 5. The water control diagrams are described in water control plans, which are then incorporated into the Corps' more detailed water control manuals. *Id.* The manuals specify how each of the WVP dams and reservoirs will be operated to adhere to the authorized purposes. *Id.* The Corps periodically reviews and revises the water control manuals to adapt to changes to or constraints on the system, so that the Corps can continue to comply with the authorized purposes and water control diagrams and plans for each dam. *Id.*

III.    **Overview of WVP Operations**

The WVP system is primarily rain-driven. *Id.* ¶ 6. The Corps relies on river forecasting and river gauges on the mainstem Willamette River and its tributaries to make decisions regarding the operation of the system within the constraints of the authorized purposes of, and water control

---

[8] For more information about how the WVP provides flood control, water quality improvement, municipal and industrial water supply, irrigation, public recreation, and conservation benefits, *see* Petersen Declaration, ECF 65 ¶ 3-5, 7-11. For information regarding power generation and the Bonneville Power Administration ("Bonneville")'s role in marketing the power, *see id.* ¶ 11-12 and the Connolly Declaration, ECF 66.

diagrams and plans for, each dam. *Id.* While the authorized purposes and water control diagrams and plans vary from dam to dam, an operational change or constraint at one dam or reservoir in the WVP impacts how the Corps can operate the remaining dams and reservoirs in the WVP. *Id.* Consequently, the Corps operates the WVP as a single unified system. *Id.*

Generally, beginning in September and continuing through November of every year, the Corps begins to draw down (reduce the amount of water in) reservoirs to the minimum conservation pool.[9] *Id.* ¶ 7. The drawdowns provide storage space for the periods of high inflow during the fall and winter. *Id.* The Corps then holds the reservoirs at the minimum conservation pool level during December and January—the major flood season—to provide maximum storage capacity for water that could cause flooding. *Id.* If there is a risk of flooding, the Corps allows the water to fill the reservoir instead of sending it downstream. *See id.* At most WVP dams with hydroelectric power generation facilities, the Corps concurrently maintains an exclusive power pool, which is water stored below the minimum conservation pool level and above the minimum power pool level for use for hydroelectric power generation during the critical power production period (generally from October to March). *Id.*

Beginning in early February or March and continuing until early May, the Corps gradually begins to refill the reservoirs to the maximum conservation pool[10] level. *Id.* This conservation storage water is then used during periods of low inflow from early May through the end of August. *Id.* Water in conservation storage can be released during the summer for various authorized purposes, such as irrigation, hydropower, and improving passage, water quality, and water

---

[9] The minimum conservation pool is the elevation in each reservoir above the exclusive power storage, if applicable, or inactive storage.
[10] The maximum conservation pool is the elevation of storage space that can fill in each reservoir during the conservation season, and is below the summer flood pool and storage.

temperature downstream for fish and wildlife. *See id.* ¶ 7, 9-10. At the end of August, the annual

cycle begins again. *Id.* ¶ 7.

## IV.     The Biological Opinion and Implementation of the RPA

In 2008, the Willamette River Basin consultation included 17 species that were listed under

the ESA: 13 species of Pacific salmon and steelhead, bull trout, Oregon chub, the North American

green sturgeon southern distinct population segment, and the Southern Resident killer whale distinct

population segment. *See* BiOp at 1-9 to 1-10. Pursuant to Section 7 of the ESA, the action agencies

for the WVP (the Corps, Bonneville, and the U.S. Bureau of Reclamation) consulted with NMFS

and the FWS[11] to evaluate the effects that the continued operation and maintenance of the WVP

would have on these listed species and their critical habitats. *See id.* at 1-3. On July 11, 2008, NMFS

and FWS each issued BiOps.

NMFS' BiOp concluded that the proposed action was not likely to adversely affect the

Southern Resident killer whale or green sturgeon and was not likely to jeopardize 11 of the 13

species of Pacific salmon and steelhead. *Id.* at 1-4. However, the BiOp also concluded that the

proposed action was likely to jeopardize the continued existence of the UWR Chinook salmon

evolutionarily significant unit and UWR winter steelhead distinct population segment, two species

listed as threatened under the ESA. *Id.* NMFS also found that the proposed action would adversely

modify designated critical habitat for these species. *Id.* Because it reached a jeopardy conclusion,

NMFS provided an RPA that the action agencies could implement for these two species. *Id.* at 1-4,

9-5 to 9-90. The Corps is the lead federal action agency for the BiOp and its RPA, but each action

agency is responsible for implementing the parts of the RPA that are within their respective

discretion and control.

---

[11] Under the ESA and its regulations, FWS is responsible for bull trout and Oregon chub. The Oregon chub was removed from the threatened and endangered species list in 2015 due to recovery.

The RPA included measures from the action agencies' proposed action, modifications to the proposed action, and additional measures developed by NMFS. *Id.* at 9-5. There are approximately 96 RPA measures as tallied by the action agencies. *Id.* at 9-7 to 9-90. In order, these RPA measures fall into the following categories: coordination, including establishing the Willamette Action Team for Ecosystem Restoration ("WATER"), flow management, water contract programs, fish passage, water quality enhancement, hatchery supplementation, habitat restoration, ESA compliance and coordination, RM&E, and maintenance. *Id.* The action agencies consider 82 of the 96 RPA measures to be completed, implemented, or on-going.[12] Implementation Spreadsheet, ECF 81-2.

## V.    Reinitiated Consultation

In April 2018, the action agencies and NMFS reinitiated formal Section 7 consultation on the operation and maintenance of the WVP. USACE 021143. The agencies reinitiated consultation largely due to the new information gained since the BiOp was issued, primarily driven by the information obtained from the RM&E program that the Corps has implemented pursuant to the RPA and the current schedule for implementing the remaining RPA measures. USACE 021142. After the Corps reinitiated consultation, it determined that continuing to implement the proposed action and RPA will not violate Section 7(a)(2) or 7(d) during the reinitiation period. USACE 021138-39.

## STANDARD OF REVIEW

A court can render summary judgment if there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact

---

[12] After the Corps submitted the RPA implementation status spreadsheet (ECF 81-2) to the Court, the Corps received NMFS' authorization to implement hatchery and genetic management plans. Therefore, the Corps is currently implementing RPA measures 6.1.1 and 6.2.1.

could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Facts are material if they "might affect the outcome of the suit under the governing law . . . ." *California v. Campbell*, 138 F.3d 772, 782 (9th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *cert. denied*, *Campbell v. California*, 525 U.S. 822 (1998). A court's role on summary judgment is not to weigh the evidence or resolve disputed issues of fact; rather, it is to determine whether there are any genuine issues for trial. *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

Under the Administrative Procedure Act ("APA") a court may set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This standard is "highly deferential" and requires a reviewing court to consider only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (*quoting Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). Although the inquiry must be thorough, the agency's decision is "entitled to a presumption of regularity" and the Court "may not substitute [its] judgment for that of the agency." *Id.* When there are no material facts in dispute, summary judgment is an appropriate procedure. *See, e.g., Friends of Endangered Species v. Jantzen*, 589 F. Supp. 113, 118 (N.D. Cal. 1984), *aff'd*, 760 F.2d 976 (9th Cir. 1985).

## ARGUMENT

## I.    The Corps has not violated Section 7 of the ESA

To "jeopardize the continued existence of" a listed species means that an agency "engage[s] in an action that would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Here, the Corps has implemented numerous

actions to both mitigate the impacts of its discretionary operations and affirmatively improve their survival prospects—including redressing Congress' decision not to provide upstream fish passage at these projects. *See* Implementation Spreadsheet, ECF 81-2.

And yet, Plaintiffs broadly allege that the Corps' delay in completing certain RPA measures *per se* jeopardizes the continued existence of UWR salmon and steelhead. *See* ECF 96 at 27-33. But Supreme Court and Ninth Circuit case law demonstrates that completing an RPA exactly on schedule is not the only way to avoid jeopardy. Moreover, several of the delayed RPA measures that Plaintiffs have identified were intended to address the effects of the dams' existence, and thus Congress' decision to not include fish passage at the dams. By taking steps to resolve the passage problems, the Corps is offsetting the effects of Congress' decisions as well as its own. Thus some delay in implementing fish passage measures does not (and cannot) equate to automatic jeopardy.

The Corps also evaluated its actions and responsibilities when reinitiating consultation and determined its actions comply with the law. USACE 021138-39. NMFS, for its part, agreed with the need to reinitiate and did not object to the Corps' continued operations during the reinitiation period. *See* Thom Declaration, ECF 68 ¶ 5 ("Given the extensive work that has taken place and will continue into the next Biological Opinion, a prudent course of action would be to continue implementing the 2008 RPA while the reinitiation process progresses."); *cf. Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 95 (D.D.C. 2003) (discussing FWS's and NMFS's obligations in administering the ESA and explaining the agencies "presumably will speak up" if the action agency is violating the law). NMFS has also assisted the Corps in developing its plan to implement the delayed measures. As NMFS' Regional Administrator explains, "[w]hile the implementation of this complex series of measures has not been without challenges, including working through how best to implement some measures included in the 2008 RPA, it is my opinion that these issues are typical for a project of this magnitude." Thom Declaration, ECF 68 ¶ 4; *see Sierra Club v. Marsh*, 816 F.2d

1376, 1388 (9th Cir. 1987) (not every modification to a "complex and lengthy project" requires reinitiation, much less jeopardizes listed species).

Therefore, as explained more fully below, the Corps has acted reasonably and Plaintiffs have failed to carry their burden of proving a violation of law.

### A.    The Corps reasonably concluded that continuing its current operations and maintenance is consistent with its Section 7(a)(2) obligations

The relevant inquiry is whether Plaintiffs have demonstrated that the Corps has violated Section 7(a)(2) through its implementation of the RPA. That question does not depend on whether the full RPA has been implemented, but on whether the Corps has a reasonable basis for concluding the actions comply with Section 7(a)(2). *See Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988); *Nat'l Wildlife Fed'n v. FEMA*, No. C11-2044-RSM, 2014 WL 5449859, at \*21 (W.D. Wash. Oct. 24, 2014) (relevant inquiry is whether the plaintiff demonstrates that the agency's implementation of an RPA "was an abuse of discretion or arbitrary and capricious" and not whether all aspects of the RPA have been implemented exactly as originally prescribed). Plaintiffs do not address this question because the Corps *has* reasonably concluded that its actions comply with the ESA. After the Corps reinitiated consultation, it determined that continued operation and maintenance of the WVP pursuant to the proposed action and RPA will not violate Section 7(a)(2) or 7(d) during the reinitiation period. USACE 021138-39.

The Corps' conclusion is supported by the actions it has taken to implement the RPA. From 2008 to present, the Corps fully completed or is actively working on an array of RPA measures that benefit UWR salmonids. Implementation Spreadsheet, ECF 81-2. These important RPA measures include implementing WATER, the Willamette Fish Operations Plan, comprehensive RM&E program, and completing the multi-year Configuration Operation Plan study. *Id.* at 1, 11, 13, 17-19. Contrary to Plaintiffs' assertions, the Corps has also tested and implemented operational changes to improve downstream water flows, temperatures, and interim fish passage operations. ECF 96 at 30-

Federal Defendants' Motion for Summary Judgment and Memorandum in Support - 13

33; *id.* at 8 (noting operational changes for downstream passage at Fall Creek and Cougar dams and temperature management operations at Fall Creek and Lookout Point dams). The Corps also replaced a fish weir, constructed a portable floating fish collector at Cougar reservoir as a prototype to inform the long-term downstream fish passage project there, built three new adult fish collection facilities, and enhanced fish release sites upstream of five dams. *Id.* at 7-8.

Additionally, the Corps has continued hauling adult salmonids above WVP dams so that they can spawn—even though Congress did not mandate that the Corps do so when authorizing the WVP dams. *Id.* at 5-6, 15; *see infra* Argument Section I.C. Similarly, the Corps has begun the NEPA process for the planning and development of downstream juvenile fish passage and temperature control at Detroit Dam and downstream juvenile fish passage at Cougar Dam. Implementation Spreadsheet, ECF 81-2 at 10. So, while the Corps has not fully completed all RPA measures relating to permanent downstream passage, it has completed the vast majority of the RPA measures relating to its operation and maintenance of the WVP. *See id.* at 1-19.

As for the two listed species, Plaintiffs have not shown that the Corps' delay in implementing the RPA measures is the cause of the salmonids' recent declines. UWR salmonids are threatened by a wide array of factors, only one of which is the Corps' discretionary operation of the dams. BiOp at 3-17 to 3-19, 3-24 to 3-25 (describing predation, ocean conditions, climate change, habitat degradation, harvest, etc.); *see also* Piaskowski Declaration, ECF 70 ¶ 13 (describing UWR steelhead declines due to poor ocean conditions and sea lion predation). Indeed, even Plaintiffs' declarant acknowledges "[t]here are certainly other problems that these species face—conditions in the rivers downstream, ocean conditions, etc." Second Declaration of John Johnson, ECF 99 ¶ 6.

Additionally, UWR salmonids were listed as threatened in 1999. NMFS 6562. They were still threatened when the 2008 BiOp and RPA were released. BiOp at 3-8. Seven years into the RPA implementation period, NMFS confirmed that the species remain threatened (i.e., they do not meet

the definition of endangered species in the ESA). NMFS 6604. In fact, since the construction of the dams (the last dam was completed 50 years ago), UWR salmonids have not had downstream fish passage facilities with the exception of the Foster Dam fish weir and the now non-operational fish horns. Yet their ESA-status has remained the same since the listing of the species. NMFS 6604.

Indeed, between the release of the BiOp and 2017, the number of adult UWR Chinook salmon passing over Willamette Falls has actually increased—despite poor ocean conditions that have affected the survival of nearby Columbia Basin salmon. Piaskowski Declaration, ECF 70 ¶ 18. The geometric mean of adult UWR Chinook salmon counted at Willamette Falls from 2013 to 2017 is 33,841, higher than the geometric mean of 33,269 counted for 2008 to 2017. *Id.* The recent numbers are also fairly consistent with the average number of UWR Chinook salmon that passed Willamette Falls prior to the construction of, and commencement of operations at, most WVP dams. *Id.* (between 1946 to 1952 an average of 36,571 UWR Chinook salmon passed Willamette Falls compared with a mean of 33,841 from 2013 to 2017).

Given the Corps' actions to date in implementing the RPA, the current status of the species, and the agencies' close coordination on these issues, it was reasonable for the Corps to conclude that operating and maintaining the WVP during the pendency of the consultation will not "reduce appreciably the likelihood of both the survival and recovery of a listed species[.]" *See* 50 C.F.R. § 402.02. The constant ongoing consultation and collaboration among the federal agencies on WVP operations, combined with the Corps' good faith, responsible implementation of the RPA and operation of the WVP, belies Plaintiffs' rhetoric that the Corps is currently jeopardizing listed species or will jeopardize listed species prior to the completion of consultation.

### B.    An action agency's delay in implementing an RPA does not equate to jeopardy as a matter of law

Plaintiffs contend that any deviations or delays in RPA implementation necessarily means that the Corps is jeopardizing UWR salmonids. *See* ECF 96 at 28. This conclusion is not supported

by the ESA's implementing regulations, which recognize that an action agency can *decide* whether to
implement the RPA. *See* 50 C.F.R. § 402.15(a) ("Following the issuance of a biological opinion, the
Federal agency shall determine whether and in what manner to proceed with the action in light of its
section 7 obligations and the Service's biological opinion."). The final rule adopting this regulation
declined to require the action agency to provide its reasons for choosing to disregard a BiOp
"because it remains the responsibility of each Federal agency to insure that it is in compliance with
section 7(a)(2)[.]" NMFS' and FWS' Final Rule on Interagency Cooperation—Endangered Species
Act of 1973, as Amended, 51 Fed. Reg. 19,926, 19,956 (June 3, 1986). If an RPA was the only
method of complying with Section 7(a)(2), the ESA and its regulations would require action agencies
to complete the RPA exactly as written, apply for an exemption, or abandon their proposed action.

    The Supreme Court and Ninth Circuit have also found that an action agency is not required
to implement an RPA. In *Bennett*, the Supreme Court explained that the "action agency is technically
free to disregard the Biological Opinion and proceed with its proposed action" although the agency
still must meet its substantive obligations under Section 7(a)(2) and Section 9. 520 U.S. at 170. In a
Ninth Circuit case that is even more on point, *Tribal Village of Akutan*, 869 F.2d 1185, the action
agency rejected one of NMFS' RPA measures for the protection of gray whales. The Ninth Circuit
held that the action agency's "departure from the suggestions in the biological opinion does not by
itself constitute a violation of [the] ESA; [it] satisfied section 7(a)(2) if [it] took alternative, reasonably
adequate steps to insure the continued existence" of gray whales. *Id.* at 1193*; see also Pyramid Lake
Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) (action agency cannot
rely on BiOp "to establish conclusively its compliance" with Section 7(a)(2) of the ESA); *Defs. of
Wildlife v. EPA*, 420 F.3d 946, 976 (9th Cir. 2005) (action agency has "an independent duty under
section 7(a)(2) to ensure" compliance with the ESA); *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F.
Supp. 3d 147, 178 (D.D.C. 2014) (same).

Thus an agency does not, as a matter of law, jeopardize the continued existence of listed species by failing to implement the RPA. Plaintiffs' argument to the contrary is unavailing.

### C.    The delayed RPA measures relating to fish passage do not mitigate for only the effects of the Corps' discretionary operation and maintenance of the WVP

Plaintiffs claim that it is the Corps' operation of the Willamette Project that jeopardizes listed species. ECF 96 at 27-28. However, to support their claim, Plaintiffs largely rely on the Corps' delay in completing RPA measures that do not relate to the operation of the WVP. For example, Plaintiffs identify the lack of fish passage as having the "greatest impact" on listed salmonids because the dams "block access to historic spawning habitat upstream of the dams" and also limit passage downstream. *Id.* at 5, 10, 30-33. Blocked passage is a consequence of the dams—the presence of a physical barrier in the river. Plaintiffs ignore the reality that Congress elected to construct the dams in the WVP, knowing full well that the dams would block the very salmonids at issue in this case from migrating. *See* Legal Background Section I. The delayed RPA passage measures attempt to mitigate for Congress' decisions from decades ago; they do not mitigate only for the effects of the Corps' discretionary operation and maintenance of the WVP. Because of this, the Corps is mitigating for its own actions *and* taking action to improve the condition of the listed species by addressing baseline harms (the existence of the dams). The Corps' determination that the RPA actions implemented aggressively since 2008 ensure against jeopardy, notwithstanding delays associated with some actions addressing baseline harms, is reasoned and supported by the record. *See supra* Argument Section I.A.

In 1938, the Corps informed Congress that the WVP dams would prevent Chinook salmon and steelhead trout from migrating both upstream and downstream. H.R. DOC. NO. 75-544 at 90. Moreover, the height of the dams and the large seasonal variations in the levels of the reservoir pools meant that man-made upstream passage routes (e.g., fish ladders or elevators) were considered likely infeasible at the time. *Id.* at 91. Therefore, the Corps' proposal did not include upstream

passage at the WVP dams. Because there was no upstream passage routes, the Corps' proposal did not account for downstream passage. Congress adopted that proposal and authorized the Corps' to begin constructing the dams without either upstream or downstream passage. Flood Control Act of 1938, Pub. L. No. 75-761, § 4, 52 Stat. 1215, 1222 (1938).

Several years later, the Corps again informed Congress that the "proposed dams would be too high to permit the passage of migrant fish by means of facilities of demonstrated efficacy." H.R. DOC. No. 81-531 Appendix J at 1732. "It is apparent, therefore, that any spawning, feeding, and rearing above the dams would become inaccessible to migrant fish. Reservoir operations also would affect the quantity, quality, and temperature of the water in the streams below the dams." *Id.* Congress approved and continued funding the Corps' plan. Flood Control Act of 1950, Pub. L. No. 81-516, § 204, 64 Stat. 163 (1950). No subsequent Flood Control Act or Water Resources Development Act required the Corps to implement upstream or downstream passage at the WVP dams.

Nonetheless, the Corps traps and hauls adult ESA-listed salmonids above six WVP dams that block access to historically-utilized habitat (UWR spring Chinook are hauled above Detroit, Foster, Cougar, Lookout Point, Hills Creek, and Fall Creek dam while UWR steelhead are hauled above Foster reservoir) so they can spawn. Implementation Spreadsheet, ECF 81-2 at 5-6. During the term of the 2008 BiOp, the Corps also improved release sites upstream of five dams, constructed three new adult fish collection facilities (North Santiam, Foster, and Fall Creek Fish Facilities), and built a portable floating fish collector at Cougar reservoir as a prototype to inform the long-term downstream fish passage project there. *Id.* at 7-8. In addition, the Corps continues to operate an adult fish collection facility at Cougar Dam.

Because the Corps hauls adult ESA-listed salmonids upstream above the WVP so that they can spawn (an action that presumably Plaintiffs would support), juvenile salmon born upstream of

the dams must migrate past them to the ocean. The Corps would not have invested in costly actions to improve upstream passage if it did not intend to complete actions to provide downstream passage for juvenile fish born upstream. To that end, the Corps has completed several actions during the term of the 2008 BiOp that assist juvenile fish in passing the dams and continues to work toward implementation of others. Shortly following issuance of the 2008 BiOp, the Corps began to investigate and test numerous operational changes at Detroit, Cougar, Fall Creek, Foster, and Lookout Point dams that could potentially benefit downstream juvenile fish passage. *Id.* at 8. Based on information gained through those investigations, the Corps has implemented changes to improve downstream juvenile passage, including replacing and extending operations of the Foster fish weir, instituting an annual drawdown of Fall Creek Reservoir, conducting nighttime regulating outlet operations at Cougar Dam, and performing surface spill operations at Detroit Dam. *Id.*; USACE 047178, 259982, 287739, 329414, 337075, 308981 (Foster fish weir); USACE 049023, 061326, 066972, 068055 (Fall Creek drawdowns); USACE 048816, 395153 (Cougar operations); USACE 044490, 055939, 858030 (Detroit temperature and passage). Data from these investigations is also integral to the design of structural solutions for downstream passage being considered at Detroit and Cougar dams. While efforts to improve downstream passage continue, the Corps' actions to date have already resulted in the re-establishment of populations of UWR spring Chinook salmon above Foster and Fall Creek dams. *See* Piaskowski Declaration, ECF 70 ¶ 22-24.

NMFS and the Corps understand that "lack of passage is one of the single most significant adverse effects on both the fish and their habitat." BiOp at 9-33. But without the Corps' actions to date, upstream passage would not exist and ESA-listed species would neither have access to native upstream habitats for spawning and rearing nor have any downstream passage at all. This highlights a key flaw in Plaintiffs' arguments—downstream passage is a priority only because the Corps has taken numerous actions to improve upstream passage at the dams. In other words, it is only because

of the Corps' diligence in implementing the RPA to provide effective upstream passage that an opportunity exists for further recovery through improving downstream passage conditions. Plaintiffs do not contend with this reality for good reason. Because the Corps has not focused merely on addressing its own discretionary operations, the delay in implementing some actions directed at addressing baseline harms (the dams) does not per se undermine the Corps' compliance with the ESA over the past decade.

## II.      Plaintiffs have not established a Section 9 violation

To prove that the Corps has violated Section 9, Plaintiffs must first establish that the Corps' discretionary actions proximately caused the take of an ESA-listed species. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696 n.9, 700 n.13 (1995) (Section 9 claim must be supported by proximate cause and foreseeability); *Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1239 (E.D. Cal. 2017) (an agency cannot be the proximate cause of any take that occurs as a result of a non-discretionary agency action); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666-67 (2007) (upholding 50 C.F.R. § 402.03, which provides that the ESA applies to those actions in which the agency retains discretionary involvement or control). Plaintiffs must then demonstrate that the take is unlawful, as Section 9's prohibition against take is not absolute. Rather, the Corps is exempt from Section 9 liability for "any" incidental take resulting from the proposed agency action so long as the agency complies with the ITS's terms and conditions. 16 U.S.C. § 1536(b)(4), (o). As evidenced by Congress's unqualified language, this exemption applies even during the reinitiated consultation process. *Id.* (stating that "*any taking* that is in compliance with the terms and conditions specified . . . shall not be considered to be a prohibited taking") (emphasis added).

Plaintiffs have failed on both fronts. They have not established that the Corps' discretionary actions in operating and maintaining the WVP have caused the take of listed salmonids. Nor have Plaintiffs shown that the Corps has exceeded the limits set in the ITS or violated the terms and

conditions. Because Plaintiffs cannot make one, much less both, of the necessary showings, the Corps cannot be held liable under Section 9.

### A.    Plaintiffs have not proven that the Corps' discretionary actions have caused take

To establish a Section 9 violation, Plaintiffs must first show that the Corps' actions proximately caused the take of listed species. *Babbitt*, 515 at 700, n. 13 (noting that the "ordinary requirements of proximate causation and foreseeability" apply to the ESA); *Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012) ("It is well accepted that proximate cause is an element of ESA Section 9 claims."). But Plaintiffs cannot simply point to any Corps' action to demonstrate proximate cause. As a matter of law, the Corps cannot be the proximate cause of take if it "has no ability to prevent [it] due to its limited statutory authority over the relevant actions[.]" *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767-70 (2004); *Nat. Res. Def. Council*, 236 F. Supp. 3d at 1236-39. Therefore, Plaintiffs must identify "take" proximately caused by the agency action, where the take would not have otherwise occurred in the absence of the discretionary agency action. *Pyramid Lake Paiute Tribe of Indians*, 889 F.2d at 1420 (no violation where the party failed to distinguish between the causal factors governing take, such as the influences of the agency and third party actions); *see also Cold Mountain v. Garber*, 375 F.3d 884, 890 (9th Cir. 2004) (affirming grant of summary judgment for federal government on Section 9 claim because plaintiff failed to establish link between agency action and effect allegedly causing take).

Plaintiffs assert that it is "the Corps' operation[] of the Willamette Project [that] continue[s] to kill and injure these fish and degrade their habitat due to impacts that impair their migration, spawning, incubation and rearing, which constitutes take." ECF 96 at 35. As purported evidence that the Corps has taken listed species in violation of Section 9, Plaintiffs rely on documents suggesting that lack of passage harms listed salmonids. *Id.* (citing USACE 209606, 209660-63, 251540-45, 209663, 460488, 802627 and NMFS 3723). But Plaintiffs need to prove that a discretionary Corps

action, as opposed to the mere existence of dams that Congress authorized decades ago knowing that they would block passage, is the proximate cause of the alleged take.[13] Plaintiffs do not, and cannot, contend that all salmonid mortality or harm in the Willamette system is attributable to a discretionary Corps action. Nor do Plaintiffs provide evidence differentiating or apportioning take between the Corps' discretionary actions, third party actions (like Oregon Department of Fish and Wildlife's operation of hatcheries), Congress' actions (authorizing the dams), natural factors, or any other source. Instead, Plaintiffs would have the Court presume that all take in the WVP project area is proximately caused by some specific, but as yet unidentified, operation that the Corps had the discretion to modify or forego. These presumptions are not supportable. *See supra* Legal and Factual Background (explaining that Congress was aware that there would be no passage at the dams, acts of Congress require the Corps to operate dams for particular authorized purposes, and operations have to be "substantially in accordance with" Chief of Engineers' reports).

Finally, to the extent Plaintiffs are arguing that the Corps' delay in implementing RPA measures itself is necessarily causing take, Section 9 concerns what *actions* the agency took and whether those *actions* proximately caused take. 16 U.S.C. § 1532(19) (take definition only includes actions—"harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct"); 50 C.F.R. § 222.102 ("harm" under the take definition provides means "an act which actually kills or injures fish or wildlife"); *see also Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 261 (D.D.C. 2008) ("The ESA does not hold the [agency] accountable for an inaction" under Section 9).

---

[13] Or, in the case of upstream passage, that the Corps' discretionary action—as opposed to the physical configuration of Dexter Dam's fish collection system that was built prior to any fish being listed under the ESA—has taken listed species. *See* ECF 96 at 35 (citing USACE 460488). USACE 460488 states that the "facility" does not meet ESA requirements or the current standard for fish handling adopted by NMFS as adult fish "jump at the wall between the raceways and the presort pool, often causing injuries."

To be clear, the ESA sets forth civil and criminal penalties for violation of Section 9, and its terms are applied the same whether in a criminal or civil context. 16 U.S.C. § 1540(b)(1); *see, e.g.,* *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). In this context, Plaintiffs' assertions that an entity, like the Corps, is necessarily responsible for "take" falls well short of establishing a legal violation of the ESA. These allegations and conclusory statements—including by Plaintiffs' declarant[14]—fail to set forth "a process of reasoning beginning from a firm foundation" or otherwise "explain the methodology" used to reach their conclusions. *See Daubert v. Merell Dow Pharm.*, 43 F.3d 1311, 1319 (9th Cir. 1995). Nor do Plaintiffs make "any effort to rule out other possible causes" of take to salmonids. *See Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). For these reasons, Plaintiffs' Section 9 claim fails.

### B.    Plaintiffs have not proven that the Corps has violated the ITS's terms and conditions

Plaintiffs' Section 9 claim also fails for an additional reason: Plaintiffs have not proven that the Corps has violated the ITS's terms and conditions.

Despite submitting hundreds of pages of briefing, documents, and declarations, Plaintiffs have not presented any facts demonstrating the Corps has exceeded the amount or extent of take allowed in the ITS. Instead, Plaintiffs argue that the Corps has violated the terms and conditions in the ITS and therefore is not shielded from Section 9 liability. 16 U.S.C. § 1536(b)(4)(iv), (o)(2); *see* ECF 96 at 34. Plaintiffs' argument rests on a single sentence in the ITS: "These terms and conditions constitute no more than minor changes because they only provide further elaboration on

---

[14] The Second Declaration of Richard A. Domingue states that the "extended take of ESA-listed species exceeds the take authorization issued by NMFS." ECF 98 ¶ 41. But it provides no facts or other evidence to support this contention. *See id.* These statements lack any foundation and should be disregarded. *Claar*, 29 F.3d at 501 (district court is "both authorized and obligated to scrutinize carefully the reasoning and methodology" underlying the expert's proffered testimony); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (excluding expert "opinion evidence that is connected to the existing data only upon [his] *ipse dixit*").

the more general measures in the PA and RPA." BiOp at 11-40. Plaintiffs assert that this sentence

"make[s] clear that one of the conditions of the incidental take statement was that the Corps would

implement the RPA" and, because the Corps has not implemented the RPA exactly as NMFS wrote

it in 2008, the Corps is liable under Section 9. ECF 96 at 34. Plaintiffs fundamentally misconstrue

both the ESA and the ITS.

        First, the plain language of the ESA and its implementing regulations do not contemplate the

wholesale incorporation of an agency's action or an RPA into the reasonable and prudent measures

or the terms and conditions. During a consultation, if the consulting agency determines that an

agency action is likely to jeopardize the continued existence of species, it suggests an RPA. An RPA

is an alternative action that the consulting agency expects will avoid jeopardy, can be implemented in

a manner consistent with both the intended purpose of the action and the scope of the action

agencies' legal authority and jurisdiction, and is economically and technologically feasible. 50 C.F.R.

§ 402.02. Among other things, an RPA can include "[s]ubstantial design and routing changes" from

a proposed action. 51 Fed. Reg. at 19,937.

        Importantly, "reasonable and prudent measures are not the same as reasonable and prudent

alternatives." *Id.* Reasonable and prudent measures are measures that the consulting agency

considers necessary or appropriate to minimize the impact of incidental take that *will result from the*

*implementation* of an RPA or proposed action. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(i)(1);

Endangered Species Consultation Handbook at 4-48, 4-53, 4-56, *available at*

https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf. Similarly, terms

and conditions only "set out the specific methods by which reasonable and prudent measures are to

be accomplished, e.g., who is to be educated, when/what/how; the actions necessary to reduce

predation; who may remove or how to avoid the species; or the protocol for monitoring."

Endangered Species Consultation Handbook at 4-54; *see* 16 U.S.C. § 1536(b)(4)(C)(iv). An RPA

cannot minimize the impact of incidental take that will result from the implementation of that same RPA. Thus, it is nonsensical to construe the ESA as providing that an entire RPA can also be a reasonable and prudent measure, much less a term and condition identified to implement the reasonable and prudent measures.

Second, the ITS at issue does not expressly incorporate the entire RPA as a reasonable and prudent measure or a term and condition. NMFS was explicit; it determined that the following reasonable and prudent measures were "necessary and appropriate to minimize incidental take to the extent practicable and to monitor the incidental take of the ESA-listed species resulting from implementation of the PA and RPA":

1) Minimize incidental take from general construction activities associated with implementation of the Proposed Action and RPA by applying best management practices to avoid or minimize adverse effects to listed species or to water quality, riparian habitat, or other aquatic system components of critical habitat.

2) Minimize incidental take from continued maintenance of revetments and from habitat restoration or mitigation activities by complying with the in-water work period and applying best management practices.

3) Minimize incidental take from general Research, Monitoring and Evaluation activities.

4) Ensure completion of a monitoring and reporting program to demonstrate compliance with the requirements of this ITS.

5) Minimize incidental take from operation of the Hatchery Mitigation Program

BiOp at 11-40.

None of these reasonable and prudent measures require the Corps to implement RPA measures—much less the RPA measures relating to upstream and downstream passage that Plaintiffs' lawsuit is centered on. *Id.*; *see* 16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(i)(1); Endangered Species Consultation Handbook at 4-48, 4-53, 4-56. Rather, as they should, the reasonable and prudent measures identify separate tasks that the Corps should undertake within the broader context

of implementing the RPA (or an alternative action that complies with Section 7(a)(2)) to minimize the extent of incidental take that the ITS has authorized.[15]

The terms and conditions also do not contain language incorporating wholesale the entire RPA. BiOp at 11-40 to 58. To the contrary, where NMFS intended to adopt a specific portion of the RPA as part of a term and condition, it did so expressly. *Id.* at 11-57 (action agencies "must complete all monitoring and reporting requirements in the RPA and Proposed Action.") An ITS is akin to a permit, *Bennett*, 520 U.S. at 170, and "should not be read as a series of unrelated and isolated provisions." *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). Here, the ITS is explicit as to which components of the RPA are included as part of a term and condition. Those terms do not, as Plaintiffs argue, include the entire RPA.

Faced with reasonable and prudent measures and terms and conditions that plainly do not incorporate the RPA wholesale, Plaintiffs are left with a single sentence in the prefatory section of the ITS—that "the terms and conditions constitute no more than minor changes because they only provide further elaboration on the more general measures in the PA and RPA." BiOp at 11-40. Plaintiffs, however, construe this one phrase "in the abstract" and without regard to whether "it is ultimately inconsistent with both the text and context of the [ITS] as a whole." *See Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016). Rather than incorporate the RPA into the terms and conditions discussed later, this sentence actually repeats the regulatory text—that "reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. §

---

[15] As noted above, the Corps can fulfill its Section 7(a)(2) responsibilities by implementing an RPA or taking an alternative action that complies with the statute. *Tribal Vill. of Akutan*, 869 F.2d at 1193-1194 (action agency "not [legally] required to" follow advice contained in a BiOp). This provides yet another reason why Plaintiffs err in arguing that a reasonable and prudent measure includes the wholesale adoption of an RPA, as this tack would effectively preclude agencies from taking otherwise legal actions—i.e., implementing alternative actions that comply with the ESA. *See id.*

402.14(i)(2). NMFS included that sentence solely to demonstrate its own compliance with the ESA regulations, not to impose further requirements on the Corps.[16] Indeed, this "minor change rule" confirms that the RPA is not incorporated into the reasonable and prudent measures, as the whole point of such reasonable and prudent measures is to impose minor changes to an action. The purpose is not, as Plaintiffs argue, to duplicate the action itself.

At bottom, Plaintiffs are left with the argument that the Court should read language into an ITS's terms and conditions that does not exist. This argument is inappropriate. As mentioned above, an agency is exempt from Section 9 liability for any incidental take resulting from the proposed agency action so long as it complies with the terms and conditions. 16 U.S.C. § 1536(b)(4), (o). However, if the agency is not complying with the terms and conditions and take occurs, the agency could be assessed a civil penalty or even face criminal prosecution. *Id.* § 1540(a)(1), (b)(1). Consulting agencies draft terms and conditions carefully to ensure that an action agency knows exactly what it must do to avoid civil penalties or criminal prosecution. Reading language into terms and conditions (or inferring that it is there) after the terms and conditions are issued and the agencies begin implementing the action simply cannot be what Congress intended in enacting the ESA. *See, e.g.*, S. REP. NO. 97-418 at 21 (consulting agency required to specify those reasonable and prudent measures that must be followed to minimize takings and those measures "shall be mandatory"); H. REP. NO. 97-567 at 56 (compliance with these measures would provide a defense to prosecution).

---

[16] As further evidence that NMFS did not intend for this sentence to be a term and condition, the sentence is not treated like the terms and conditions. The sentence is placed in the section's prefatory paragraph as opposed to being located with the actual numbered terms and conditions. *See* BiOp at 11-40. Moreover, this sentence is not tied to a reasonable and prudent measure—unlike all of the true terms and conditions. *Id.* at 11-40 to 58.

III.     **Plaintiffs' failure to reinitiate claim is moot**

Plaintiffs' complaint alleges that the Corps has violated the ESA, and NMFS has violated the

APA, by "failing to reinitiate consultation over the Willamette Project." Complaint, ECF 1 ¶ 82, 91.

Plaintiffs asked this Court to "[a]djudge and declare" that the Corps and NMFS have violated the

law by failing to reinitiate consultation and order the agencies "to immediately reinitiate consultation

[] over the Willamette Project." *Id.* at 30-31. As Plaintiffs concede, the agencies reinitiated

consultation on WVP operations over one and a half years ago. *See* ECF 96 at 27. Thus, their claims

are moot.

Article III requires "an actual controversy . . . at all stages of review, not merely at the time

the complaint is filed." *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 71-72 (2013) (quoting *Preiser

v. Newkirk,* 422 U.S. 395, 401 (1975)) (citation omitted). An entire lawsuit becomes moot when

either "'the issues presented are no longer live or the parties lack a legally cognizable interest in the

outcome.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted); *U.S. Parole Comm'n v.

Geraghty*, 445 U.S. 388, 396 (1980) (same). However, individual claims within a lawsuit can also

become moot. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 393-394 (1981) ("This, then, is simply

another instance in which one issue in a case has become moot, but the case as a whole remains

alive because other issues have not become moot"). So courts must examine mootness on a claim-

by-claim basis. *Pac. Nw. Generating Coop. v. Brown*, 822 F. Supp. 1479, 1506 (D. Or. 1993), *aff'd* 38 F.3d

1058 (9th Cir. 1994); *see also Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015 (9th Cir.

1990) (separately addressing mootness as to different forms of relief requested); *U.S. v. Geophysical

Corp. of Alaska*, 732 F.2d 693, 698 (9th Cir. 1984) ("A claim is moot if it has lost its character as a

present, live controversy. We cannot take jurisdiction over a claim as to which no effective relief can

be granted.") (citations omitted). Courts do not analyze ESA claims any differently. *See, e.g., Forest

Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1096 (9th Cir. 2003) (separately analyzing Section 7 and

Section 9 claims for mootness); *Greenpeace Found. v. Mineta*, 122 F. Supp. 2d 1123, 1127-28 (D. Haw. 2000) (finding that a failure to reinitiate consultation claim was moot but a substantive Section 7 claim was not).

Here, Plaintiffs' failure to reinitiate claims are moot because there is no relief that would remedy the alleged legal violations. As Plaintiffs recognize, the appropriate remedy for a failure to reinitiate claim is ordering the agencies to reinitiate consultation. Complaint, ECF 1 at 30-31. Any other remedy, including Plaintiffs' anticipated request for injunctive relief, would not remedy a failure to reinitiate consultation or give "*effective* relief." *Headwaters*, 893 F.2d at 1015 (emphasis added). Plaintiffs' failure to reinitiate claims are thus moot. *See All. for the Wild Rockies v. U.S. Dep't of Agric.,* 772 F.3d 592, 601 (9th Cir. 2014) ("Reinitiation of consultation is the precise relief sought by Alliance. Accordingly, Alliance's Section 7 claim is moot."); *All. for the Wild Rockies v. U.S. Army Corps of Eng'rs*, 237 F. Supp. 3d 1079, 1084, 1086 (D. Or. 2017) ("*Alliance III*") ("Federal Defendants have satisfied their procedural duty under the ESA by reinitiating consultation and they have provided Plaintiff with the precise relief that it has sought . . . Plaintiff's claim does not satisfy Article III's case or controversy requirement"); *see also Ctr. for Biological Diversity & Desert Survivors v. U.S. Bureau of Land Mgmt.*, Case No. CV 08-7679-JFW, 2009 WL 10675702, at *2 (C.D. Cal. Mar. 23, 2009) (reinitiation moots a failure to reinitiate claim).

In its opinion and order denying Plaintiffs' motion for preliminary injunction, the Court noted that the present case is different from *Alliance III* in that the Plaintiffs here bring substantive claims under the ESA. ECF 84 at 18. But whether or not the Plaintiffs have brought substantive claims has no bearing on whether their failure to reinitiate claim is moot. *See Pac. Nw. Generating Coop.*, 822 F. Supp. at 1506, *aff'd* 38 F.3d 1058 (9th Cir. 1994) (mootness analyzed on a claim-by-claim basis); *Greenpeace Found.*, 122 F. Supp. 2d at 1127-28 (finding that a failure to reinitiate consultation claim was moot but a substantive Section 7 claim was not). In *Alliance III*, the Court

held that the Corps had satisfied its duty under the ESA by reinitiating consultation, and the plaintiff

had achieved the outcome desired by its suit. 237 F. Supp. at 1086. The same is true here. The Corps

and NMFS have satisfied their procedural duty under the ESA by reinitiating consultation and thus

have provided Plaintiffs with the relief they sought for this procedural claim. Complaint, ECF 1 at

30-31.

Plaintiffs argue that their failure to reinitiate claim "is not moot because the Court can still

grant effective relief that would help alleviate harm to the species while the agencies complete the

lengthy consultation process." ECF 96 at 24. But once a consultation is reinitiated, new legal

obligations attach, like Section 7(a)(2) and 7(d). To show that relief is warranted during a

consultation, Plaintiffs cannot rely on a past alleged violation. They must prove that the agencies are

"in violation" of the Act during the consultation process. 16 U.S.C. § 1540(g)(1)(A) (providing a

right of action to enjoin any person "who is alleged to be in violation" of the ESA). Plaintiffs have

failed to make that showing.[17]

Moreover, Plaintiffs' reliance on *Hoopa Valley Tribe v. NMFS*, 230 F. Supp. 3d 1106 (N.D.

Cal. 2017), is misplaced. *See* ECF 96 at 25-26. In that case, the district court in Northern California

found that the U.S. Bureau of Reclamation was operating without a valid BiOp and had "greatly

exceeded" the take limits in their ITS. *Id.* at 1120. The ITS stated that the disease infection rate for

ESA-listed salmon could not exceed 49%, and in actuality the rate reached 81% and 91% in

successive years. *Id.* The court noted that Reclamation had delayed two years before reinitiating

formal consultation after the ITS was exceeded in 2014, and determined that this delinquency made

---

[17] To the extent that Plaintiffs are arguing that the Corps has unreasonably delayed reinitiating consultation under the APA, that argument is barred because it was not pled in Plaintiffs' complaint. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In any event, an unreasonable delay claim under the APA against either the Corps or NMFS would suffer from the same fatal defect—it is moot. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 68-69 (2004).

Federal Defendants' Motion for Summary Judgment and Memorandum in Support - 30

an injunction necessary for the species. *Id.* at 1112. Here, Plaintiffs cannot establish that the Corps has ever exceeded the ITS or violated the terms and conditions, and the Corps is already in the process of reinitiating consultation. *Supra* Argument Section II.

When examined on a claim-by-claim basis, it is apparent that Plaintiffs' failure to reinitiate claim is moot. There is no dispute that the agencies have reinitiated consultation, and that is the precise relief that Plaintiffs requested in relation to this claim.

## CONCLUSION

The Corps has completed or implemented many significant RPA measures designed to benefit UWR salmonids. The Corps has also reinitiated consultation with NMFS and made a determination that it will continue implementing the RPA throughout the consultation process. USACE 021138-39. The agencies' decision to reinitiate consultation has rendered Plaintiffs' failure to reinitiate claim moot. In addition, the Corps' determination that its actions are not jeopardizing the continued existence of UWR steelhead is reasonable, and Plaintiffs have not proven otherwise. Plaintiffs also cannot prove that the Corps has ever violated the ITS or the terms and conditions. In sum, all of Plaintiffs' claims fail and their motion for summary judgment must be denied. The Corps' and NMFS' motion for summary judgment should be granted, and the agencies should be allowed to focus their efforts on completing the reinitiated consultation and complying with the ESA.

Dated: November 6, 2019   JEAN E. WILLIAMS, Deputy Assistant Attorney General
            SETH M. BARSKY, Section Chief
            S. JAY GOVINDAN, Assistant Section Chief

            */s/ Kaitlyn Poirier*
            KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
            U.S. Department of Justice
            Environment & Natural Resources Division
            Wildlife & Marine Resources Section
            Ben Franklin Station, P.O. Box 7611
            Washington, D.C. 20044-7611
            Telephone: (202) 307-6623

Fax: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov

*/s/ Michael R. Eitel*
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Telephone: (303) 844-1479
Fax: (303) 844-1350
Email: michael.eitel@usdoj.gov

Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

I certify that on November 6, 2019, the foregoing was electronically filed through the

Court's electronic filing system, which will generate automatic service on all Parties enrolled to

receive such notice.

_/s/ Kaitlyn Poirier_
Kaitlyn Poirier
Trial Attorney, U.S. Department of Justice