Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave. Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL DEFENSE CENTER**, **WILDEARTH GUARDIANS**, and **NATIVE FISH SOCIETY**, | Case No.  **3:18-cv-00437-HZ** |
| Plaintiffs, | **REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS MOTION** |
| v. | |
| **U.S. ARMY CORPS OF ENGINEERS** and **NATIONAL MARINE FISHERIES SERVICE**, | |
| Defendants, | |
| and | |
| **CITY OF SALEM** and **MARION COUNTY**, | |
| Defendant-Intervenors, | |

## TABLE OF CONTENTS

INTRODUCTION …………………………………………………………….......…1

ARGUMENT …………………………………………………………………………2

I.    THE CORPS IMPROPERLY PRIORITIZES IMPLEMENTATION OF THE
      FLOOD CONTROL ACTS OVER THE ESA……....………………………………2

II.   NMFS, NOT THE CORPS, IS THE EXPERT ON ESA COMPLIANCE…………..6

III.  PLAINTIFFS' REINITIATION OF CONSULTATION CLAIM IS
      NOT MOOT……………………………………………………………………..9

IV.   THE CORPS' ONGOING OPERATION AND MAINTENANCE OF THE
      WILLAMETTE PROJECT IS CAUSING JEOPARDY AND ADVERSE
      MODIFICATION OF CRITICAL HABITAT…………………………….......…12

      A.    The Corps' Failure to Implement Critical RPA Measures is
            Continuing to Jeopardize UWR Chinook Salmon and Steelhead…………..12

      B.    The Existence of the Dams Combined with the Corps' Operation
            and Maintenance of them is Violating ESA Section 7………………………..20

V.    THE CORPS' ONGOING OPERATION AND MAINTENANCE OF THE
      WILLAMETTE PROJECT IS CAUSING TAKE…………………………………...24

      A.    The Corps' Noncompliance with the RPA Invalidated the ITS, Leaving the
            Corps Liable for Violations of ESA Section 9…………...…………………24

      B.    The Existence of the Dams Combined with the Corps' Operation and
            Maintenance of them is Causing Take of UWR Chinook and Steelhead…...29

CONCLUSION……………………………………………………...…………………..33

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. U.S. Army Corps of Eng'rs*, 237 F. Supp. 3d 1079 (D. Or. 2017)....11

*All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592 (9th Cir. 2014)………………...11

*Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230 (D.D.C. 2003)……………...4, 29

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001)……..25

*California Trout, Inc. v. U.S. Bureau of Reclamation*,
115 F. Supp. 3d 1102 (C.D. Cal. 2015)……………………….……………………..10, 25

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
No. 08-cv-7679, 2009 WL 10675702 (C.D. Cal. Mar. 23, 2009)……………………………11

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012)………………………………………………………3, 7, 26, 28

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015)…...………………………………………………………19

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012)……………………….........16

*City of Tacoma v. F.E.R.C.*, 460 F.3d 53 (D.C. Cir. 2006)…………………………………...7

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1092 (9th Cir. 2015)………3

*Defs. of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 2000)…………………………………29

*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 871 (9th Cir. 1995)…………33

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006)……………………………9, 10

*Headwaters, Inc. v. Bureau of Land Mgmt*, 893 F.2d 1012 (9th Cir. 1989)………………….11

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,
230 F. Supp. 3d 1106 (N.D. Cal. 2017)……………………………………………9, 10, 11, 25

*In re Operation of the Missouri River Sys. Litig.*, 421 F.3d 618 (8th Cir. 2005)…………………4

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012) (en banc)………....3, 6, 7

*Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999)……………3

*Lee v. United States*, 137 S. Ct. 1958 (2017)…………………………………………………16

*Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*,
716 F.3d 535 (11th Cir. 2013)…………………………………………………………………4

*Nat'l Labor Relations Bd. v. Int'l Ass'n of Bridge, Structural, Ornamental, and Reinforcing Iron
Workers, Local 229, AFL-CIO*, 941 F.3d 902 (9th Cir. 2019)……………………………………6

*Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*,
No. C11-2044-RSM, 2014 WL 5449859 (W.D. Wash. Oct. 24, 2014)…………………………13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
2005 WL 1278878 (D. Or. May 26, 2005)…………………………………………………3, 4

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
184 F. Supp. 3d 861 (D. Or. 2016)……………………………………………………...21, 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005)…………..4, 7

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008)………………………………………………………3, 4, 19, 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803 (9th Cir. 2018)…………......4

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*,
No. 12-cv-431-HA, 2013 WL 12120102 (D. Or. May 16, 2013)…………………………25, 27

*Nw. Envt'l Defense Ctr. v. Gordon*, 849 F.2d 1241 (9th Cir. 1988)……………………………..9

*Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147 (D.D.C. 2014)………………...16

*Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982 (D. Or. 2010)…………………...10, 25, 33

*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007)…………………………...25, 26, 28

*Our Children's Earth v. Leland Stanford Junior University*,
No. 13-cv-402-EDL, 2015 WL 12745786 (N.D. Cal. Dec. 11, 2015)…………………………30

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
426 F.3d 1082 (9th Cir. 2005)…………………………………………………………………3

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2016)………………30

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
686 F. Supp. 2d 1026 (E.D. Cal. 2009)………………………………………………………...29

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)…………………………………...3, 6, 9, 14

*Sw. Ctr. for Biological Diversity v. Babbitt*,
No. 97-cv-474, 2000 WL 33907602 (D. Ariz. Sept. 26, 2000)…………………………14, 28, 29

*Strahan v. Roughead*, 910 F. Supp. 2d 358 (D. Mass. 2012)…………………………10, 11, 25

*Swinomish Indian Tribal Comm. v. Skagit County Dike Dist.*,
618 F. Supp. 2d 1262 (W.D. Wash. 2008)……………………………………………………7, 29

*Tribal Village of Akutan v. Hodel*, 869 F.2d 1185 (9th Cir. 1988)………………………13, 14, 16

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
878 F.3d 725 (9th Cir. 2017)………………………………………………………………………19

*United States v. Carey*, 929 F.3d 1092 (9th Cir. 2019)……………………………………………26

*United States v. Charette*, 893 F.3d 1169 (9th Cir. 2018)…………………………………………26

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2010)…………………………6

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853 (9th Cir. 2004)………………….6

*WildEarth Guardians v. U.S. Forest Serv.*,
No. 10-cv-385, 2011 WL 11717438, at *5 (D Ariz. July 21, 2011)………………………………10

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010)…………………………...23, 30

*Wishtoyo Found. v. United Water Conservation Dist.*, 2018 WL 6265099
(C.D. Cal. Sept. 23, 2018)……………………………………………………...7, 29, 30, 31, 33

**Statutes**

16 U.S.C. § 1536………………………………………………………………………....26

16 U.S.C. § 1538………………………………………………………………………31, 32

16 U.S.C. § 1539………………………………………………………………………26

**Regulations**

50 C.F.R. § 222.102…………………………………………………………………....31, 32

50 C.F.R. § 402.01…………………………………………………………………………...6

50 C.F.R. § 402.14……………………………………………………………...24, 25

64 Fed. Reg. 60,727…………………………………………………………………..30

**INTRODUCTION**

Federal Defendant U.S. Army Corps of Engineers ("the Corps") responds to Plaintiffs' opening summary judgment brief by raising various legal arguments to try and escape responsibility for its violations of the Endangered Species Act ("ESA").  This tactic is not surprising because the facts in this case overwhelmingly demonstrate that the Corps' ongoing operation and maintenance of the Willamette River Flood Control Project ("Willamette Project") causes significant injury to and mortality of Upper Willamette River ("UWR") Chinook Salmon and steelhead and severely degrades their critical habitat, preventing the recovery of these species and impairing their very survival.  The continuing harm to these fish is largely due to the Corps' failure to implement key actions that the National Marine Fisheries Service ("NMFS") required by certain deadlines in its 2008 Biological Opinion ("2008 BiOp").

The Corps does not attempt to dispute the well-established adverse effects the operation and maintenance of the Willamette Project causes to these species but, rather, raises various legal arguments in an effort to dodge its liability under the ESA.  These arguments all fail, however, because they are unsupported by law and contradicted by NMFS's own conclusions.  First, the Corps' argument that Plaintiffs' reinitiation of consultation claim is moot is contrary to numerous cases showing this claim is still live due to the ongoing nature of the agency action and the ability of the court to order an effective remedy for the Corps' unlawful and lengthy delay in reinitiating consultation with NMFS.

Second, the Corps claims it is not causing jeopardy to the species because the primary harm is from lack of fish passage due to the existence of the dams, not the Corps' discretionary operations, and Congress never intended for passage to occur at these dams when it authorized them in the Flood Control Acts.  This argument is unavailing given Ninth Circuit law specifically

holding that the existence of the dams must be incorporated into the jeopardy determination.

Even the Corps' cherry-picked statements from the 1949 Chief of Engineers' report regarding

infeasibility of fish passage at that time are countered by other statements from that same report

noting the need to study fish passage at these dams and the potential for it to occur in the future.

As Plaintiffs have demonstrated, the dams combined with the Corps' operations are causing

jeopardy to UWR salmon and steelhead because of the agency's failure to implement critical

measures needed to ensure the survival and recovery of these species.

Finally, the Corps argues that it cannot be liable for "taking" UWR salmon or steelhead

because the Incidental Take Statement ("ITS") in the 2008 BiOp shields it from liability, and

regardless it is not "causing" take because all of the harm to the species is from the preexistence

of the dams. These arguments are similarly flawed. An agency is liable for take if it has

exceeded the limit of take identified in an ITS, and the *agency* has the burden of demonstrating it

has complied with that limit. Here, the Corps has not proven its compliance with the ITS take

limits, and such compliance depended upon full implementation of the RPA. Furthermore, as

courts and NMFS have recognized, the existence of the dams plus the Corps' operations can

cause take of fish, and there is ample evidence here that the Corps' operation and maintenance of

the Willamette Project is killing, wounding, and harming fish in violation of the ESA.

## ARGUMENT

## I.    THE CORPS IMPROPERLY PRIORITIZES IMPLEMENTATION OF THE FLOOD CONTROL ACTS OVER THE ESA.

One of the key flaws with the Corps' response is that it fails to recognize the agency must

place top priority on protecting ESA-listed species, even at the expense of its primary mission.

Defendants rely heavily on a few statements from the lengthy Chief of Engineers' reports

accompanying the 1938 and 1950 Flood Control Acts, which acknowledged that structural fish

passage facilities were not feasible at that time, to claim that the Corps has no obligation to provide any fish passage at the dams. *See* Def. Br. at 2-4, 17-18 (ECF No. 101). The Corps' incorrect assumption that these statements trump its ESA obligations is contradicted by well-established law and is not even supported by the Chief's reports themselves.

The Ninth Circuit has repeatedly stated that, as long as federal agencies have some management discretion, they must give ESA-listed species priority over the agencies' primary missions, including for agency projects authorized before the ESA was enacted. *Sierra Club v. Marsh,* 816 F.2d 1376, 1383 (9th Cir. 1987), *abrogated on other grounds as recognized by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,* 789 F.3d 1075, 1090-91 (9th Cir 2015); *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1213 (9th Cir. 1999); *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,* 426 F.3d 1082, 1084 (9th Cir. 2005); *Karuk Tribe of Cal. v. U.S. Forest Serv.,* 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc); *Ctr. for Biological Diversity v. U.S. Bureau of Land Management,* 698 F.3d 1101, 1115-16 (9th Cir. 2012). And specifically with regard to dams authorized by the Flood Control Acts, the Ninth Circuit and this Court have both explained that ESA obligations are the Corps' highest priority when managing the dams, even if it means curtailing other authorized purposes. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 928-29 (9th Cir. 2008); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* No. 01-cv-640-RE, 2005 WL 1278878, at *9-10 (D. Or. May 26, 2005).

The Flood Control Acts imposed broad goals on the Corps but did not dictate how it must fulfill those goals, giving the Corps considerable discretion in choosing what specific actions to take when managing its dams. *Nat'l Wildlife Fed'n,* 524 F.3d at 928-29; *Nat'l Wildlife Fed'n,* 2005 WL 1278878, at *10. Subsequent Acts, such as the Fish and Wildlife Coordination Act of

1958, the ESA, and the 1980 Northwest Power Act, put constraints on the Corps' operation of dams in the Columbia River system to elevate fish and wildlife protection. *Nat'l Wildlife Fed'n*, 524 F.3d at 928-29 & n.8; *Nat'l Wildlife Fed'n*, 2005 WL 1278878, at *9. One of these constraints is that the Corps must manage its dams in compliance with the ESA's no-jeopardy mandate regardless of the expense or burden, even if it curtails other uses of the dams. *Nat'l Wildlife Fed'n*, 524 F.3d at 929; *Nat'l Wildlife Fed'n*, 2005 WL 1278878, at *10; *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 252-53 (D.D.C. 2003); *Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Eng'rs*, 716 F.3d 535, 541-42 (11th Cir. 2013); *In re Operation of the Missouri River System Litigation*, 421 F.3d 618, 630-31 (8th Cir. 2005).

In fact, the Ninth Circuit has upheld changes to operations of the Columbia River dams to benefit fish passage at the expense of hydropower production. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803 (9th Cir. 2018). Like the Willamette dams, the Columbia River dams were authorized under the 1950 Flood Control Act and thus were also included in HD 531. Accordingly, the Corps must provide fish passage at the Willamette dams if that action is necessary to fulfill its substantive ESA duties.

The select statements from the Chief's reports that Defendants cite do not alter this settled law. First, these reports were created before the ESA existed and UWR Chinook and steelhead were listed as threatened species. Def. Br. at 2-3 (citing 1938 and 1948 reports). Thus, the legal obligation to provide fish passage arose later. Second, the Chief's reports simply acknowledged that fish passage *facilities*—such as fish ladders—were not feasible due to the height of the dams. *Id.* But these statements did not preclude or forbid fish passage by other means—such as trapping and hauling adult fish above the dams, which is what NMFS required

in the 2008 BiOp.  2008 BiOp at 9-33 to 9-35.  Finally, the reports considered hatchery fish to be a substitute for wild fish and mitigate the loss of spawning habitat above the dams.  Def. Br. at 2-3.  But it has now become clear that hatchery fish are a detriment to wild fish and cannot mitigate for the loss of wild UWR Chinook and steelhead or their habitat.  *See* 2008 BiOp at 5.1-27 to 5.1-56 (discussing effects of hatchery fish); Third Declaration of Kirk Schroeder ¶¶ 11, 22 (ECF No. 97); Second Declaration of Kirk Schroeder ¶¶ 2-8 (ECF No. 76).

Moreover, other statements in the Chief's reports make clear that these reports were just a "general guide" for management of the dams, and the Corps could make "modifications" or "adjustments" to its management if necessary or advisable as changed circumstances or new information arose.  HD 531 at 5, 15-16, 19-21, 324, 342 (1948 Chief's report).[1]  In fact, the 1948 report specifically required more research on fish, stating that "[a]dditional investigations and studies are required in order satisfactorily to solve the problem of maintaining fish life" in the Willamette Basin  *Id.* at 2284.  Notably, this research included studies for *passing fish over high dams*.  *Id.* at 253, 1824 (noting the need for "development, by means of research and experimentation, of facilities for passing anadromous fish over high dams").  The report explicitly contemplated future development of fish passage measures in the Willamette Basin, stating that hatcheries would have to be relied on to mitigate the dams' impacts "[u]ntil positive means for passing migratory fish over high dams are developed."  *Id.* at 1866.[2]  When considering HD 531 as a whole, it does not support Defendants' assumption that Congress never intended for fish passage at the Willamette Project dams.

In sum, the Corps' cherry-picked statements from the Chief's reports about the

---

[1] HD 531 is found at https://catalog.streamnetlibrary.org/cgi-bin/koha/opac-detail.pl?biblionumber=6860&query_desc=kw%2Cwrdl%3A%20531.
[2] Pages 1824, 1866, and 2284 of HD 531 are all within Appendix J, which is dedicated entirely to the Willamette River Basin.

infeasibility of structural passage facilities at that time do not negate its current obligation under the ESA to provide for passage in light of the changed legal landscape and scientific information that has arisen in the last seventy years.

## II.    NMFS, NOT THE CORPS, IS THE EXPERT ON ESA COMPLIANCE.

The second overarching flaw in Defendants' response is the assumption that the Court should simply accept the Corps' determination that its ongoing operation of the Willamette Project complies with the ESA.  Defendants' brief repeatedly cites to the Corps' letter reinitiating consultation, which asserted that continued Project operations during the consultation period would comply with ESA Sections 7(d) and 7(a)(2).  Def. Br. at 10, 12, 13, 31.  However, the Court owes no deference to the Corps' opinion because it is not the agency responsible for administering the ESA.  NMFS is the expert agency on ESA compliance, and therefore its conclusions about jeopardy and take carry much more weight.

A court owes no deference to an agency's interpretation of a statute or regulation outside its administration and expertise; rather the court reviews such an interpretation *de novo*.  *Karuk Tribe*, 681 F.3d at 1017; *Nat'l Labor Relations Bd. v. Int'l Ass'n of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, Local 229, AFL-CIO*, 941 F.3d 902, 904 (9th Cir. 2019).  "The responsibility for administering and enforcing the ESA falls to the NMFS for marine life and the FWS for terrestrial life."  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 973-74 (9th Cir. 2004) (citing 50 C.F.R § 402.01).  Accordingly, courts will defer to NFMS and FWS rather than the action agencies on conclusions about effects to listed species and compliance with the ESA.  *See Sierra Club v. Marsh*, 816 F.2d at 1388 (deferring to FWS rather than Corps on ESA compliance because it has the "more appropriate expertise" for protecting endangered species); *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 497 (9th

Cir. 2011) (deferring to FWS opinion rather than BLM about effects to species); *Ctr. for Biological Diversity*, 698 F.3d at 1115 (deferring to FWS rather than BLM for interpretation of ESA); *see also City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d 53, 75 (D.C. Cir. 2006) (discussing expertise of NMFS and FWS); *Karuk Tribe*, 681 F.3d at 1029 ("Congress made a conscious decision in the ESA to require that federal agencies consult with the expert wildlife agencies, not merely with biologists within their own agencies, about the adverse effects that their actions might have on listed species.").

In light of this deference to the expert agencies, this Court should look to NMFS's conclusions, rather than the Corps', in determining whether the Corps is violating the ESA with its ongoing operation of the Willamette Project. *See Wishtoyo Found. v. United Water Conservation Dist.*, No. 16-cv-3869-DOC, 2018 WL 6265099, at *17 (C.D. Cal. Sept. 23, 2018), *appeal filed* 19-55380 (9th Cir. Apr. 3, 2019) (finding jeopardy and take conclusions in NMFS BiOp "highly relevant" for determining whether take of species was likely to occur); *Swinomish Indian Tribal Comm. v. Skagit County Dike Dist.*, 618 F. Supp. 2d 1262, 1270-71 (W.D. Wash. 2008) (looking to conclusions in NMFS BiOp to determine take was likely to occur); *Nat'l Wildlife Fed'n*, 422 F.3d at 797 (upholding district court's reliance on recommendations from prior NMFS BiOp to determine appropriate injunction on operation of dams).

As explained in Plaintiffs' opening brief, and discussed further below, NMFS's 2008 BiOp and Incidental Take Statement, as well as subsequent statements from NMFS biologists, provide substantial evidence that the Corps' ongoing operation of the Willamette Project will continue to jeopardize and take UWR Chinook salmon and steelhead and adversely modify their critical habitat. *See* Pl. Opening Br. pp. 7-12, 13-15, 25-27, 30-31, 33-34; *infra* pp. 12-33.  For instance, NMFS made the following statements expressing its concerns about the Corps' lack of

action to improve fish passage: "[r]ecovery in Willamette cannot be achieved without downstream fish passage in all 4 basins. This is essential to avoiding jeopardy. . . ," and "[t]he most important action to support survival and recovery is to provide passage . . . . Corps/BPA focus needs to be on blocked passage because it is the most significant limiting factor for survival and recovery of these populations, and is caused by their dams." NMFS 3774; Pl. Ex. 6 at 2, 3 (ECF No. 36-6).

NMFS recently reiterated the ongoing adverse effects to UWR Chinook salmon and steelhead due to the Corps' lack of compliance with key RPA measures and the declining status of the species. Pl. Ex. 59 (attached hereto) (NMFS biological opinion over the Corps' allocation of storage water within the Willamette Project[3]). Specifically, NMFS stated in June 2019 that:

- "We issued a jeopardy biological opinion and RPA on the WVS [Willamette Valley System] in 2008. Full implementation of the RPA in the 2008 biological opinion was expected to avoid jeopardy and adverse modification of critical habitat."
- "The Corps has implemented parts of the RPA, but key elements of the RPA remain in process, including the installation of a temperature control tower at Detroit Dam on the North Santiam and establishment of downstream fish passage at several WVS dams."
- "Both species remain at high risk as they continue to experience the adverse effects caused by operation of the WVS without full implementation of the RPA."
- "The status of both species has declined since 2008."

*Id.* at 95.

NMFS is the agency with the scientific and technical expertise necessary to assess the impacts of an action on a threatened fish species, and whether certain measures are sufficient to insure that the action will not jeopardize or take that species. Here, the court should defer to NMFS's statements and conclusions in the record, which strongly support Plaintiffs' contentions

---

[3] Even though the Corps and NMFS are currenty consulting over the entire Willamette Project, the Corps separately analyzed and made a determination that allocated the storage water within the Willamette Project to various uses, including irrigation, municipal and industrial, and fish and wildlife. *See* https://www.nwp.usace.army.mil/willamette/basin-review/.

that the Corps' operation of the Willamette Project is violating ESA Sections 7 and 9.[4]

## III.    PLAINTIFFS' REINITIATION OF CONSULTATION CLAIM IS NOT MOOT.

As Plaintiffs explained in their opening brief, the Corps was required to reinitiate consultation when it failed to complete by set deadlines key parts of the RPA that were necessary to avoid jeopardizing UWR Chinook salmon and steelhead and adversely modifying their critical habitat.  Pl. Opening Br. at 24-27. These were not minor or insignificant measures within the RPA but, rather, were critical pieces to insure the Corps' operation of the Willamette Project would not jeopardize the continued existence of the species, and the Corps' failure to implement them on time undermined NMFS's no-jeopardy conclusion for the RPA.  Thus, the Corps had a duty to reinitiate consultation.  *See Sierra Club v. Marsh*, 816 F.2d at 1388 (failure to implement land transfer that was necessary to insure against jeopardy triggered need to reinitiate consultation); *Forest Guardians v. Johanns*, 450 F.3d 455, 463-66 (9th Cir. 2006) (failure to comply with monitoring requirements and grazing standards critical to avoid adverse effects to species triggered requirement to reinitiate); *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1134-35 (N.D. Cal. 2017) (violation of ESA where agency failed to reinitiate consultation for two years after authorized level of take was exceeded, which undermined no-jeopardy conclusion).

Defendants' only argument regarding Plaintiffs' reinitiation of consultation claim is that the claim is moot.  Def. Br. at 28-31.  A claim is not moot, however, "where *any* effective relief may be granted."  *Forest Guardians*, 450 F.3d at 461 (citing *Nw. Envt'l Defense Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988)) (emphasis included in original).  That relief could consist

---

[4] Even though NMFS is a defendant in this case, none of its biologists submitted a declaration defending the Corps' actions.  The only NMFS declaration in this case came from the Regional Administrator, and it carefully avoided making conclusions about whether the Corps' actions jeopardize or take the species.  Def. Br. at 12 (citing Thom Declaration, ECF No. 68).

of declaratory or injunctive relief.  *Id.* at 462-63; *Hoopa Valley*, 230 F. Supp. 3d at 1132.  In fact,

as multiple courts have held, where ongoing agency actions are at issue in the case, reinitiation of

consultation claims are often not moot because there is some sort of declaratory or injunctive

relief available.  *Forest Guardians*, 450 F.3d at 462-63; *Hoopa Valley*, 230 F. Supp. 3d at 1132;

*Or. Natural Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 994-95 (D. Or. 2010); *California*

*Trout, Inc. v. U.S. Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1112-16 (C.D. Cal. 2015);

*WildEarth Guardians v. U.S. Forest Serv.*, No. 10-cv-385, 2011 WL 11717438, at *5 (D Ariz.

July 21, 2011); *Strahan v. Roughead*, 910 F. Supp. 2d 358, 378-81 (D. Mass. 2012).

For instance, if the action at issue will continue during the consultation process, a

declaratory judgment that the agency had violated the ESA by failing to comply with the prior

consultation would provide effective relief by governing the agency's actions during the new

consultation period to help prevent further violations.  *Forest Guardians*, 450 F.3d at 462-63;

*Tidwell*, 716 F. Supp. 2d at 995.  Furthermore, a declaratory judgment that an agency unlawfully

delayed reinitiation of consultation could ensure that defendants comply with the reinitiation

regulation in the future.  *California Trout,* 115 F. Supp. 3d at 1115.  Similarly, where the

ongoing action is likely to cause continuing harm to the listed species, injunctive relief may also

be appropriate to reduce that harm during the consultation period.  *Id.*; *Hoopa Valley*, 230 F.

Supp. 3d at 1132, 1135; *Strahan*, 910 F. Supp. 2d at 380-81.

Defendants try to distinguish *Hoopa Valley*, but that case is directly on point.  Def. Br. at

30-31.  Regardless of exactly what facts triggered the duty to reinitiate consultation, the

reasoning in *Hoopa Valley* regarding the appropriateness of injunctive relief is directly relevant

here.  The court determined that the agency failed to reinitiate consultation for two years after the

requirement to reinitiate was triggered, allowing increased harm to the species to occur.  *Hoopa*

*Valley*, 230 F. Supp. 3d at 1135.  Because the defendants' significant delay in reinitiating

consultation was a substantial procedural violation of the ESA, it warranted injunctive relief.  *Id.*

And because such injunctive relief was available to remedy the reinitiation claim, that claim was

not moot.  *Id.* at 1132.

 In contrast, Defendants cite cases in which there was no ongoing agency action, the

requested consultation had already been completed, or the only remedy plaintiffs sought was

reinitiation of consultation.  Def. Br. at 29, citing *Headwaters, Inc. v. Bureau of Land Mgmt*, 893

F.2d 1012, 1014-15 (9th Cir. 1989) (challenged logging had been completed); *All. for the Wild*

*Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014) (requested consultation was

already completed); *All. for the Wild Rockies v. U.S. Army Corps of Eng'rs*, 237 F. Supp. 3d

1079, 1086 (D. Or. 2017) (only requested relief was reinitiation of consultation); *Ctr. for*

*Biological Diversity & Desert Survivors v. U.S. Bureau of Land Mgmt.*, No. 08-cv-7679, 2009

WL 10675702, at *2 (C.D. Cal. Mar. 23, 2009) (same).

 As summarized in *Strahan v. Roughead*, reinitiation of consultation claims are not moot

"where a continuing practice is at issue that involves ongoing violations of the ESA, where

future injunctive relief may be available, or where declaratory relief would serve some other

valid purpose."  910 F. Supp. 2d at 378.  Each of those factors applies here.  First, the Corps'

ongoing operation of the Willamette Project continues to violate the ESA by jeopardizing UWR

Chinook and steelhead, adversely modifying their critical habitat, and causing take of the

species, as shown in Plaintiffs' opening brief and below.  Second, injunctive relief is available to

remedy the additional harm to the species caused by the Corps' significant delay in reinitiation of

consultation (which resulted from the Corps' failure to comply with key RPA requirements

needed to avoid jeopardy).  Such relief could take the form of interim operational measures to

improve fish passage or water quality.  Third, a declaratory judgment could govern the Corps'

ongoing operations and reduce the likelihood of future ESA violations by ensuring the Corps

either complies with critical RPA requirements or reinitiates consultation in a timely manner that

does not allow for excessive harm to the species.  Accordingly, Plaintiffs' reinitiation of

consultation claim is not moot.

## IV.    THE CORPS' ONGOING OPERATION AND MAINTENANCE OF THE WILLAMETTE PROJECT IS CAUSING JEOPARDY AND ADVERSE MODIFICATION OF CRITICAL HABITAT.

The Corps claims that it has completed many of the RPA measures from the 2008 BiOp,

and it does not need to address lack of fish passage anyway, and therefore the court should defer

to the Corps' conclusion that its ongoing operation of the Willamette Project will not violate its

duty to ensure against jeopardizing UWR Chinook salmon and steelhead and adversely

modifying their critical habitat.  Def. Br. at 11-20.  The Corps' conclusion is not reasonable,

however, because the agency has avoided implementing critical RPA measures necessary to

avoid jeopardy, which includes fish passage measures.  In fact, the Corps' conclusion is in direct

contrast to statements and conclusions by the expert agency NMFS as well as Plaintiffs' experts,

and is refuted by data showing a continuing decline of both UWR Chinook and steelhead that is

largely attributable to the Willamette Project.  Because the facts in this case do not support the

Corps' conclusion, the Court should reject that conclusion and find the Corps in violation of ESA

Section 7(a)(2).

### A.    The Corps' Failure to Implement **Critical** RPA Measures is Continuing to Jeopardize UWR Chinook Salmon and Steelhead.

Defendants do not dispute that the Corps has a duty to comply with ESA Section 7 by

ensuring that its ongoing operation of the Willamette Project is not likely to jeopardize UWR

salmon and steelhead or adversely modify their critical habitat during reinitiation of consultation.

PLAINTIFFS' REPLY BRIEF                                                                                    12

Instead, it claims it has done enough under the RPA, and will continue to implement the RPA, to satisfy its Section 7 duty.  Def. Br. at 13.  As Plaintiffs explained in their opening brief, however, the Corps is not implementing RPA measures that are vital for the survival and recovery of these species, nor has it taken alternative actions that would equally insure against jeopardy.  *See* Pl. Opening Br. at 27-33.  Regardless of how many other RPA measures it completes, failure to implement the most important actions for avoiding jeopardy shows the Corps is not fulfilling its Section 7 duty.

Contrary to Defendants' assertion, Plaintiffs are not claiming that *any* deviation from an RPA automatically constitutes jeopardy to a species.  Def. Br. at 15.  If an agency departs from an RPA, however, it must take "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species." *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988).  Any decision to depart from an RPA must be "well reasoned and supported by the record." *Id.* at 1194.  Thus, whether the failure to implement an RPA violates Section 7 is a factual inquiry that considers the harm that will likely occur to the species.

In situations where harm was not imminent, or where partial RPA implementation and/or alternative measures were sufficient to avoid jeopardy, deviations from an RPA did not cause a violation of ESA Section 7.  *See Tribal Village of Akutan*, 869 F.2d at 1194-95 (no Section 7 violation where there was little risk to the species from the current action and the agency had implemented alternative protective measures); *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, No. C11-2044-RSM, 2014 WL 5449859, at *10-21 (W.D. Wash. Oct. 24, 2014) (no Section 7 violation where RPA required various processes to influence local land-use decisions, and agency had sufficiently implemented measures or taken alternative actions).  In contrast, where an agency fails to implement or delays on-the-ground measures that were critical for a no-

jeopardy conclusion in a biological opinion, its actions do not comply with its substantive Section 7 duty. *See Sierra Club v. Marsh*, 816 F.2d at 1385-86 (failure to complete land transfer that was critical element for no-jeopardy and no-adverse modification of critical habitat conclusions in biological opinion resulted in violation of Section 7); *see also Sw. Ctr. for Biological Diversity v. Babbitt*, No. 97-cv-474, 2000 WL 33907602, at *10-12 (D. Ariz. Sept. 26, 2000) (extending RPA deadlines did not comply with ESA when original RPA established that measures and deadlines were necessary to avoid jeopardy). Here, the measures the Corps has failed to implement on time were vital to the BiOp's no-jeopardy conclusion.

The Corps claims it has implemented "an array of RPA measures" that benefit UWR salmonids and supports its conclusion that continued operation of the Willamette Project will not violate ESA Section 7 during reinitiation of consultation. Def. Br. at 13-14. The Corps' conclusion is not well-reasoned or supported by the facts, however. The evidence in this case shows the Corps is not implementing many RPA measures that NMFS deemed critical for avoiding jeopardy to the species and adverse modification of critical habitat, nor taking alternative adequate steps to insure the species' survival and recovery while it operates the Willamette Project. Therefore, it is unreasonable to conclude its continuing operation of the Project complies with Section 7. *Tribal Village of Akutan*, 869 F.2d at 1193-94.

Very few of the Corps' RPA actions address the measures NMFS deemed most important for survival and recovery of these species: improved downstream fish passage and improved water quality below the dams. *See* Pl. Opening Br. at 7-23, 29-33; BiOp at 9-33, 9-52, 9-61, NMFS 3774-75, NMFS 3417-18, NMFS 3808-09, NMFS 3903-04, NMFS 3852-55, NMFS 3738, USACE 213870-71, USACE 841136, Pl. Ex. 6 at 2-3 (ECF No. 36-6) (all NMFS statements regarding importance of addressing fish passage and water quality). Eight years after

issuing the BiOP, NMFS continued to state that "[l]ack of passage is the effect causing the most harm" and the long-term passage and water temperature measures in the RPA are "the most important and necessary to avoid jeopardy due to harm caused by:  blocked passage to significant amounts of good quality spawning and rearing habitat above the dams [and] elevated temperature downstream."  USACE 006584.

Defendants' brief mentions a few such measures it has tested or implemented, but only the operational measures at Fall Creek dam are presently occurring.  Def. Br. at 13-14; Def. Timeline Ex. 2 at 8 (ECF No. 81-2) (noting annual Fall Creek drawdowns, Cougar passage operations in 2011 and 2012, and Lookout Point temperature control in 2012); USACE 300098 (no current passage operations at Cougar); USACE 300122-24, 332974-76, 101794, 041127 (no current temperature control or passage operations at any of the Middle Fork dams except Fall Creek); Third Declaration of Kirk Schroeder Ex. A (ECF No. 97) (new Foster fish weir not currently in use due to high injury and mortality of fish); USACE 832528, NMFS 6543 (2014-2016 trial of Cougar portable floating fish collector had poor results).  The Corps has considered but refused to implement other downstream passage operations, such as deep drawdowns, that would likely improve passage quickly.  *See* Pl. Opening Br. at pp. 16-20.

The Corps admits that required facilities for long-term downstream fish passage and temperature control at Detroit and Cougar dams are still only in the planning stages—and it omits any mention of Lookout Point dam because no planning is occurring at all for that dam. Def. Br. at 14; Def. Timeline Ex. 2 at 10.  None of these facilities will be completed until well past their RPA deadline, and only the Cougar downstream passage structure is estimated to be finished in the next several years.  Def. Timeline Ex. 2 at 10-12.  Given the history of delays with these projects, the Corps' estimates for completion dates should be met with skepticism.

The other RPA actions to which Defendants point are merely studies or plans the Corps completed, not actions that provide actual benefits to the fish. Def. Br. at 13. Thus, the Corps' conclusion that its implementation of the RPA is avoiding jeopardy is not well-reasoned or supported by the facts when the agency is not fulfilling actions NMFS deems critical for the survival and recovery of these species. As the expert agency, NMFS's conclusions in the 2008 BiOp and subsequent statements by its biologists carry much more weight than the Corps' conclusions. *See supra* pp. 6-8.[5]

Furthermore, while the Corps may not be obligated to complete the RPA exactly as written, it has not taken any alternative actions that are insuring the survival and recovery of the species. *Tribal Village of Akutan*, 869 F.2d at 1193; *see also Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 178-81 (D.D.C. 2014) (finding no Section 7 violation where agency had "taken steps to insure that its actions do not cause harm to endangered species" during reinitiation of consultation). Plaintiffs' experts confirm that impacts from the Willamette Project, especially lack of fish passage and poor water quality, are jeopardizing UWR salmon and steelhead. Third Schroeder Decl. ¶¶ 17-21, 24-31, 41, 45, 48; Second Declaration of Richard Domingue ¶¶ 6, 15, 17-22, 26-42 (ECF No. 98); Second Declaration of John Johnson ¶¶ 6-10, 16-17, 24 (ECF No. 99). Each of Plaintiffs' experts—former NMFS or Oregon Department of Fish and Wildlife biologists intimately familiar with the Willamette Project and

---

[5] The broad statements of the NMFS Regional Administrator (Declaration of Barry Thom, ECF No. 68) do not undercut the conclusions of NMFS biologists who were directly involved with the Willamette Project, particularly when the declaration was prepared as a post hoc litigation position. *See, e.g., Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (noting that an agency's interpretation of a regulation is owed no deference "when it appears that the interpretation is nothing more than a convenient litigating position or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack" (internal citations, quotations, and alterations omitted)); *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017) (noting the limited value of post hoc assertions relative to contemporaneous evidence).

its impacts on these fish—unequivocally stated that impacts from the dams and their operations are impairing the survival and recovery of the species.  Mr. John Johnson stated:

> [T]he lack of adequate fish passage—specifically, the ability to access and successfully utilize habitat upstream of WVP [Willamette Valley Project] dams—and then emigrate downstream through these WVP reservoirs and their dams to the ocean—remains a key limiting factor for adult UWR Chinook salmon and steelhead that is impeding the recovery of the species . . . . [T]he dams are a primary threat to the survival and recovery of UWR Chinook salmon and steelhead.

Second Johnson Decl. ¶ 6.

Likewise, Mr. Richard Domingue stated that changes to the hydrologic regime, adverse effects to water quality, and lack of access to upstream spawning habitat caused by the dams "limit the potential for the fish to survive and recover"; and the Corps' management has "allowed the Project to continue harming and impeding the survival and recovery of UWR Chinook salmon and steelhead in many ways and for much longer than NMFS contemplated in the 2008 BiOp."  Second Domingue Decl. ¶ 41.  He concluded that:

> [T]he long-term viability of UWR Chinook salmon and steelhead requires the development of highly productive populations upstream of Project dams and safe passage through the dams and reservoirs as well as improvements in the quality of water discharged at the dams (water temperature and dissolved gas) that would also require changes in operations and project configurations. . . . The Corps has failed to take steps that are necessary to improve the abundance, productivity, spatial structure, and diversity of both species and therefore is impairing not only their recovery but even their continued survival.

Second Domingue Decl. ¶ 42.

Mr. Kirk Schroeder provided further explanation:

> All of the attributes considered as critical for long-term viability of the salmon and steelhead populations continue to be affected by operation of the dams. Effects include: abundance and productivity levels well below recovery levels; lack of spatial structure because of blocked access to historic habitats and loss of downstream passage for juvenile fish to disperse and migrate naturally; loss of genetic diversity because of low abundance of adults and presence of hatchery fish; and disruption to rearing and migratory life histories.

Third Schroeder Decl. ¶ 31.  Mr. Schroeder stated that "the Corps' ongoing operation and

maintenance of its dams have contributed to the continued decline of spring Chinook salmon and

winter steelhead and prevented their recovery," and that "progress toward recovering these

species will not be possible as long as adult salmon and steelhead are restricted to a fraction of

their historic range downstream of the dams."  *Id.* ¶¶ 38, 39.  He concluded that:

> The Corps' dams are a significant cause of the historic decline and continued
> poor status of these species, and impair not only their recovery but their very
> survival.  . . . [S]ubstantial and timely actions are needed for survival and
> recovery of the species including changes to dam operations and implementation
> of meaningful measures to benefit the populations.

*Id.* ¶ 48.  These experts clearly and emphatically agree that the continued operation and

maintenance of the Willamette Project will jeopardize UWR Chinook salmon and steelhead until

significant improvements to fish passage and water quality occur.

Indeed, the decline of the species since 2008 shows that the Corps has not made changes

to its operation of the Project that are allowing for the survival and recovery of these fish.  The

Corps claims that the status of the species has not declined, and in fact that UWR Chinook have

increased, Def. Br. at 14-15, but Plaintiffs have already soundly refuted those assertions.  *See* Pl.

Prel. Inj. Reply at 13-14 (ECF No. 75); Pl. Opening Br. at 2-5.  As explained thoroughly in Mr.

Schroeder's third declaration, these species are at high risk of extinction because all or most of

their populations have: (1) very small or declining abundance, (2) low productivity due to poor

reproductive success, (3) poor spatial distribution due to lack of access to historic habitat, and (4)

poor genetic diversity due to low abundance, limited life histories, and influence of hatchery fish.

Third Schroeder Decl. ¶¶ 10-14, 32-37, 45, 48.  NMFS has also stated that significant population

*increases* are necessary to reduce extinction risk to avoid jeopardy.  USACE 006584.

Yet, as Mr. Schroeder explains, "[t]he abundance of salmon and steelhead in the UWR

basin is at a historic low, and most populations are showing a downward trend with numbers that are below replacement levels." Third Schroeder Decl. ¶ 48. The North Santiam, South Santiam, and Middle Fork Chinook populations "have remained at low abundance for years, keeping them at very high risk of extinction," while the previously strong McKenzie population has declined significantly. *Id.* UWR steelhead has decreased as well, with a "steadily declining trend in recent years." *Id.*; *see also* USACE 213869, 213896, USACE 049439, USACE 765136, USACE 23758 (noting declines in both species); Pl. Ex. 59 at 95 (NMFS 2019 biological opinion stating that "[t]he status of both species has declined since 2008."). Improvements to all four viability factors—abundance, productivity, spatial distribution, and genetic diversity—are important to recover these species, and such a result will not be possible without access to historic habitat above the dams. USACE 036525; Third Schroeder Decl. ¶¶ 14, 31, 38-39, 45; Second Domingue Decl. ¶¶ 6, 41-42.

Finally, Defendants imply that the Corps' operations must be the sole cause of the species' decline to show jeopardy. Def. Br. at 14. But Plaintiffs do not need to make such a showing; if the Corps' actions contribute to the species' poor status and lack of recovery, the agency is violating ESA Section 7. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 737-39 (9th Cir. 2017) (rejecting no-jeopardy conclusion that discounted harm to species from agency action because it was minor compared to harm from other factors); *Nat'l Wildlife Fed'n*, 524 F.3d at 930 (action that "deepens" the jeopardy to a species by causing "additional" harm violates Section 7); *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 807 F.3d 1031, 1052 (9th Cir. 2015) (stating that federal action "must cause *some incremental deterioration* in the species' pre-action condition" to show jeopardy) (emphasis added). Thus, if the Corps' continuing operations contribute to the species' poor

survival and lack of recovery, the Corps is violating Section 7.

While other factors may adversely affect UWR salmon and steelhead, the operation and maintenance of the Willamette Project is one of the primary factors impairing the survival and recovery of these species.  BiOp at 8-3 to 8-5; USACE 036592, 036600, 036613, 036618, 036654, 036657, 036663, 036666, 036671, 036673; Third Schroeder Decl. ¶¶ 37, 38 ("the Corps' ongoing operation and maintenance of its dams have contributed to the continual decline of spring Chinook salmon and winter steelhead and prevented their recovery"), 41 (noting other effects to the species but emphasizing that "the dams are the primary reason that the species were listed as threatened under the ESA and recovery will not be possible without major alterations to the dams and dam operations"), 48 ("the Corps' dams are a significant cause of the historic decline and continued poor status of these species");  Second Johnson Decl. ¶ 6 (acknowledging other problems for the fish, "but the dams are a primary threat to the survival and recovery of UWR Chinook salmon and steelhead").  The Corps' operations that continue to impair water quality and fish passage deepen the jeopardy to these species, in violation of Section 7.

### B. The Existence of the Dams Combined with the Corps' Operation and Maintenance of them is Violating ESA Section 7.

The Corps tries to escape its Section 7 responsibility by making a novel argument that it does not need to provide fish passage because lack of passage is a consequence of the existence of the dams, not a result of the Corps' discretionary operations.  Def. Br. at 17-18.  This argument is a misapplication of the law and is directly contradicted by NMFS's biological opinion that specifically requires improvements to fish passage to avoid jeopardy to the fish.  Notably, the Corps cites no cases to support its convoluted argument that it need not provide downstream fish passage.  Def. Br. at 17-20.

As the Ninth Circuit explained with regard to dams on the Columbia River:

> The current existence of the . . . dams constitutes an "existing human activity" which is already endangering the fishes' survival and recovery.  Although we acknowledge that the existence of the dams must be included in the environmental baseline, the operation of the dams is within the federal agencies' discretion under both the ESA and the Northwest Power Act, 16 U.S.C. § 839.  Any proposed agency action must be evaluated in the context of this baseline in order to properly determine whether the proposed actions will jeopardize the listed fishes.

*Nat'l Wildlife Fed'n,* 524 F.3d at 930-31 (citation omitted).  The very same reasoning applies here.  The existence of the Willamette Project dams is part of the environmental baseline, which must be incorporated into the jeopardy and adverse modification determinations.

Furthermore, the Corps has discretion in how it operates the dams, and must give threatened and endangered fish priority even at the expense of other Project purposes.  *See supra* pp. 2-5.  The Corps' reliance on select statements from HD 531 to argue that Congress never authorized fish passage at these dams is belied by other passages in HD 531 that discussed the need to study fish passage at high dams, that hatcheries would mitigate the effects of the dams *only until* means for passing fish over high dams are developed, and that the Corps could make modifications to its management if changed circumstances or new information arose.  *See supra* pp. 4-5 (citing HD 531 at pp. 5, 15-16, 19-21, 253, 324, 342, 1824, 1866, 2284).  Clearly the Corps has discretion to provide fish passage at these dams.

Despite the Corps' attempt to muddy the waters, the path here is clear.  "[W]here baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm." *Nat'l Wildlife Fed'n,* 524 F.3d at 930; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 930 (D. Or. 2016) (where baseline conditions already cause severe degradation of critical habitat, ongoing actions that cause additional degradation violate Section 7)  As NMFS found in the 2008 BiOp, the Corps' discretionary operations, when added to the degraded environmental baseline, cause jeopardy to

UWR salmon and steelhead and adverse modification of their critical habitat.  BiOp at 8-3 to 8-5; *see also infra* pp. 29-33 (explaining how ongoing operations cause continuing harm to species).  In order to avoid jeopardy, NFMS determined that the Corps must make numerous changes to its operations—with the most important change being the requirement to provide upstream and downstream fish passage.  BiOp at 9-33 to 9-60.  The Corps seems to pat itself on the back for its efforts to provide upstream passage—which include both operational and structural changes—as though they were voluntary actions.  Def. Br. at 18-20.  But those measures were specifically required by the 2008 RPA.  BiOp at 9-33 to 9-42.

Downstream passage measures were also required by the RPA, but the Corps has done very little to implement them.  BiOp 9-42 to 9-60.  It cites a handful of operations it has completed in the past eleven years but only the annual Fall Creek drawdown has significantly improved downstream passage.  Def. Br. at 19; USACE 049023, USACE 337883 (noting success of Fall Creek drawdowns).  The Foster fish weir is not operating until it is modified to reduce injury and mortality of fish, which will not occur until sometime in 2021 at the earliest.  Second Schroeder Decl. Ex. A; Pl. Ex. 60 at p.3 (attached hereto).  Prioritizing use of the regulating outlets at Cougar dam without a corresponding drawdown of the reservoir to the level of those deep outlets does not provide great benefit for downstream passage.  USACE 861271-72 (test operation showing passage survival through regulating outlets without deep drawdown much lower then with drawdown); Second Johnson Decl. ¶ 13 (explaining difficulty for fish to sound deep enough to find regulating outlets even when reservoir is at low winter levels); *see also* USACE 300098 (2018 Fish Operations Plan stating that no current downstream passage operations occur at Cougar).  And the spill operations at Detroit are primarily for temperature control.  USACE 044490, 300057.  Notably, the Corps does not mention any operational

measures it has conducted for Hills Creek, Lookout Point, and Dexter dams on the Middle Fork Willamette even though that Chinook population is a core population *critical* to the recovery of the species.  Def. Br. at 19; BiOp at 4.2-9, NMFS 3852, USACE 024150.

In fact, the Corps has refused to take other operational actions that would likely provide for greater downstream passage survival, such as deep drawdowns of reservoirs.  *See* Pl. Opening Br. at 16-20, 31-32 (discussing drawdown operations the Corps has refused to take). And it is far behind schedule on the required long-term downstream passage facilities, with Detroit and Lookout Point structures still eight or more years away.  Def. Timeline Ex. 2 at 10-11; Pl. Opening Br. at 15.  Its operations also continue to impair water temperatures and dissolved gas levels in spawning and rearing habitat below the dams, but again the Corps has failed to take further measures to address these problems, and the Detroit temperature control structure is at least four years away.  Pl. Opening Br. at 20-22, 31-33.

The continued decline of these species since 2008 is evidence that the Corps' actions have not resulted in improved survival of UWR Chinook or steelhead populations, with the exception of the Fall Creek Chinook population.  Third Schroeder Decl. ¶¶ 12, 32-37, 48; Pl. Ex. 59 at 95 (stating that both species have declined since 2008 and remain at high risk due to continued operation of the Willamette Project without full implementation of the RPA).  An increase in the size of these populations is necessary for them to survive, let alone recover. USACE 006584 ("[s]ignificant population increases are necessary to reduce extinction risk to avoid jeopardy"), USACE 040282 (noting that the longer a species remains at low population levels, the greater the probability of extinction); *Nat'l Wildlife Fed'n*, 184 F. Supp. 3d at 891 (same); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 526-29 (9th Cir. 2010) (action that contributes to the decline of a species already at low abundance impairs its survival).  Due to the

continued lack of access to habitat above the dams and poor water quality below the dams, abundance of these populations remains low or in decline, productivity is below replacement levels, spatial distribution is still limited, and genetic diversity remains poor. Third Schroeder Decl. ¶¶ 31, 38-39, 45-48; Second Domingue Decl. ¶ 42. The Corps' operations will continue to jeopardize the species and adversely modify their critical habitat until significant changes occur to improve fish passage and water quality. Third Schroeder Decl. ¶¶ 41-42, 48.

## V.    THE CORPS' ONGOING OPERATION AND MAINTENANCE OF THE WILLAMETTE PROJECT IS CAUSING TAKE.

Defendants claim that Plaintiffs have not shown the Corps has violated the Incidental Take Statement ("ITS") in the 2008 BiOp, nor that the Corps' ongoing discretionary operations are causing take of UWR salmon and steelhead. Def. Br. at 20-27. Defendants are wrong on both counts. It is the Corps' burden to show compliance with the ITS, and it cannot do so due to its failure to implement the RPA. Because the ITS no longer shields the Corps from liability for take, it is liable for the various harms it causes to UWR salmon and steelhead through the operation of the Project, as demonstrated below.

### A.    The Corps' Noncompliance with the RPA Invalidated the ITS, Leaving the Corps Liable for Violations of ESA Section 9.

The Corps argues that it is not liable for take because it is following the specific "Terms and Conditions" listed in the ITS. Def. Br. at 23-27. The Corps construes its responsibility far too narrowly, however, because another condition of an ITS is that the Corps not exceed the amount or extent of take identified therein. Compliance with the RPA was necessary for the Corps to stay within the take limits of the ITS here.

An ITS must identify the amount or extent of take that is anticipated to occur from the agency action and a "trigger" to show when that level of take is exceeded.  50 C.F.R. §

402.14(i)(1)(i); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,* 273 F.3d 1229, 1249 (9th Cir. 2001).  If the trigger is reached, it results in an unacceptable level of incidental take that invalidates the safe harbor provision of the ITS and leaves the agency liable for take. *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007) (citing *Ariz. Cattle Growers' Ass'n,* 273 F.3d at 1249); *Tidwell*, 716 F. Supp. 2d at 1005.

Thus, compliance with an ITS encompasses more than just following the specific "Terms and Conditions" put in place to minimize the impact of the anticipated taking.  50 C.F.R. § 402.14(i)(1)(ii), (iv).  It also requires staying within the allowed level of take.  *Allen*, 476 F.3d at 1038; *Tidwell*, 716 F. Supp. 2d at 1005 (compliance with "conditions" of ITS included not exceeding authorized level of take); *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, No. 12-cv-431-HA, 2013 WL 12120102, at *9, 13 (D. Or. May 16, 2013) (take is unlawful if it exceeds that allowable by the ITS); *Hoopa Valley Tribe*, 230 F. Supp. 3d at 1119 (safe harbor provision of ITS invalid once take limits were exceeded even if agency continued to follow Terms and Conditions); *California Trout*, 115 F. Supp. 3d at 1115 ("takes outside the scope of an ITS can give rise to the requirement to reinitiate consultation *and* liability for violation of Section 9") (emphasis in original); *Strahan v. Roughead*, 910 F. Supp. 2d at 374 (agency shielded from Section 9 liability only if it "complies with the conditions *and take limits* established by the ITS") (emphasis added).  That reasoning is precisely highlighted in the ITS here when NMFS explained that the terms and conditions were only minor changes because they just "provide[d] further elaboration on the more general measures in the [proposed action] and RPA" that NMFS expected the Corps to implement to stay within the ITS take limits.  BiOp at 11-40.  In sum, compliance with the ITS requires not only following its specific "terms and conditions" but also staying within the amount or extent of take identified in the ITS that is anticipated to occur from

the agency action.

In addition, an agency action "may be exempt from the blanket prohibition on takings only if it does not place any listed species in jeopardy and does not adversely modify listed species' critical habitat." *Allen*, 476 F.3d at 1040 (citing 16 U.S.C. §§ 1536(b)(4), (o)(2)); 50 C.F.R. § 402.14(i)(1) (incidental take allowed only if it will not violate Section 7(a)(2)). If an agency does not comply with conditions needed to avoid jeopardy it must reinitiate consultation, which causes the original biological opinion *and its accompanying incidental take statement* to lose their validity, no longer shielding the action agency from penalties for takings. *Ctr. for Biological Diversity*, 698 F.3d at 1108.

Importantly, as the Ninth Circuit recently made clear, the burden is on the holder of the ITS to prove that the exemption from take liability is valid and in force. *United States v. Charette*, 893 F.3d 1169, 1174-75 (9th Cir. 2018). As the court explained, Congress explicitly addressed who bears the burden of proving that an exemption from the ESA take prohibition is in force by stating in the ESA itself:

> In connection with any action alleging a violation of [ESA Section 9], any person claiming the benefit of any exemption or permit under [the ESA] shall have the burden of proving that the exemption or permit is applicable, has been granted, and was valid and in force at the time of the alleged violation.

*Charette*, 893 F.3d at 1174 (quoting 16 U.S.C. § 1539(g)). The court additionally noted that the House Report for that ESA subsection "clarified congressional intent further" by stating that § 1539(g) "provided for an *affirmative defense* where a prima facie violation of the Act is established whereby the holder must show that the permit or exemption is applicable, has been granted, and is valid and in force." *Id.* at 1174-75 (emphasis added) (quoting H.R. Rep. 94-823, at 6 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 1685, 1689); *see also United States v. Carey*, 929 F.3d 1092, 1099 n.5 (9th Cir. 2019) (discussing *Charette* analysis with approval). This court

likewise noted that an ITS serves as a defense to allegations of take, and the burden is on the defendant to prove the exemption is valid and they are in compliance with it. *Native Fish Soc'y*, 2013 WL 12120102, at *9, 11. Thus, a person alleged to have "taken" an endangered or threatened species bears the burden of proving that an exemption is in force and they are in compliance with the exemption to avoid liability for such taking.

Here, the Corps failed to plead and prove that it has stayed within the limits of take allowed under the ITS. As noted in Plaintiffs' opening brief, the ITS discussed generally the amount or extent of take anticipated to occur from various impacts during implementation of the RPA, which as a whole were not likely to result in jeopardy to the species because NMFS had already determined the RPA would not jeopardize the species. Pl. Opening Br. at 34-35; BiOp at 11-5 to 11-10. The ITS then identified specific estimates for the amount or extent of take associated with each type of impact. BiOp at 11-11 to 11-39.

For instance, it identified the amount of take that was anticipated to occur from trap and haul of adult salmon and steelhead for upstream passage as well as from juvenile downstream passage in each subbasin. *Id.* at 11-11 to 11-14. For UWR Chinook, the ITS estimated that 1-2% of adult fish would be injured and 1-4% would die when trapped and collected, and 1-2% more would die when released upstream. *Id.* at 11-11 to 11-13. For downstream passage, the ITS estimated juvenile mortality of up to 65% at Detroit and Big Cliff dams, up to 83% at Green Peter and up to 10% at Foster dams, up to 32% at Cougar Dam, up to 68.3% at Fall Creek Dam, up to 21% at Lookout Point and Dexter dams, and up to 60% at Hills Creek Dam. *Id.* It had similar numbers for take of steelhead during upstream and downstream passage. *Id.* at 11-14. For the remaining impacts, the ITS listed the type of take, the geographic extent of take, and the temporal extent of take expected from implementation of the RPA. *Id.* at 11-15 to 11-39. For

example, the ITS estimated the location and time period when it expected the Corps would not

meet flow objectives, water temperature objectives, and dissolved gas objectives for each species

in each subbasin. *See id.* at 11-15 to 11-21.

The Corps has not proven that it has stayed within the limits of incidental take identified

in the ITS. In particular, it has not shown the injury and mortality estimates for upstream and

downstream passage have not been exceeded. *Id.* at 11-11 to 11-14. In fact, it is almost certain

that the amount of take estimated for these impacts has been exceeded in numerous instances

because the Corps has failed to implement almost all downstream passage measures from the

RPA as well as the upgrade to the Dexter trap, and higher than expected mortality continues to

occur during the trapping of adults and release upstream. Def. Timeline Ex. 2 at 7-8, 10-11;

Third Schroeder Decl. ¶¶ 18, 24, 26-29. NMFS noted in the ITS that the estimates of take during

passage were the *maximum* amounts of incidental take expected to occur, and that as the RPA

was implemented, incidental take in the forms of adult and juvenile passage mortality was

expected to decline. BiOp at 11-6. Yet eight years later, NMFS stated that current juvenile

mortality estimated at the dams was 71-89% —which exceeds the take estimates in the ITS.

USACE 006584. The Corps' failure to implement critical RPA measures for passage indicates

that the amount of take authorized in the ITS for each subbasin has been exceeded. In addition,

this failure also triggered the need to reinitiate consultation. Both of these results invalidate the

ITS. *Allen*, 476 F.3d at 1038; *Ctr. for Biological Diversity*, 698 F.3d at 1108. Therefore, the

Corps cannot establish that it is exempt from liability for take.

Indeed, courts have recognized that failure to comply with an RPA invalidates not only

the biological opinion but also the ITS and renders an agency liable for take. *Sw. Ctr. for

Biological Diversity*, 2000 WL 33907602, at *11-13 (failure to complete mandatory RPA actions

PLAINTIFFS' REPLY BRIEF                                                                    28

invalidated ITS and agency was liable for take of species); *American Rivers*, 271 F. Supp. 2d at

243, 250, 257 (agency liable for take where it failed to complete RPA action and ITS required

implementation of all aspects of RPA); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 686

F. Supp. 2d 1026, 1038-41 (E.D. Cal. 2009) ("[I]f Reclamation had disregarded the RPA, the

2008 BiOp would not have provided an exemption from the ESA's take prohibitions, potentially

subjecting the operators to civil and criminal liability."). Here, failure to implement the RPA has

caused the Corps to exceed the level of take authorized in the ITS and triggered the need to

reinitiate consultation, both of which invalidated the ITS and leave the Corps liable for take.

> **B.    The Existence of the Dams Combined with the Corps' Operation and Maintenance of them is Causing Take of UWR Chinook and Steelhead.**

The Corps' final argument is that Plaintiffs have not shown the agency's discretionary

actions are the proximate cause of take of UWR salmon and steelhead. Def. Br. at 20-23.

Specifically, it claims that all of the harm to the fish results from the existence of the dams or

actions by other parties and thus the Corps is not the cause of the harm. *Id.* As explained below,

Plaintiffs have shown by a preponderance of the evidence that the Corps' ongoing operation and

maintenance of the Willamette Project results in take of UWR salmon and steelhead. *Defs. of*

*Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000) (discussing burden of proof to show take).

First, NMFS clearly found the Corps is causing take of UWR salmon and steelhead in

various ways, including through injury and mortality during fish passage. BiOP at 11-5 to 11-7,

11-11 to 11-39. This court should be persuaded by NMFS's finding. *See Wishtoyo Found.*, 2018

WL 6265099, at *17, 58 (stating that NMFS's finding of take in Biological Opinion was "highly

relevant" and "persuasive"); *Sw. Ctr. for Biological Diversity*, 2000 WL 33907602, at *12-13

(citing conclusions in biological opinion to support finding of take); *Swinomish Indian Tribal*

*Community*, 618 F. Supp. 2d at 1270-71 (same); *American Rivers*, 271 F. Supp. 2d at 257-58

(same).  Given that NMFS is the expert agency on interpretation and enforcement of the ESA, the court should reject the Corps' assertion that it is not causing any take.

Second, the Corps' claim that the existence of the dams cannot be taken into account when assessing take is unsupported.  As noted in *Wishtoyo Foundation v. United Water Conservation District*, "[h]arm that stems from a structure's preexistence can constitute take." No. 16-cv-3869-DOC, 2018 WL 6265099, at *58 (C.D. Cal. Sept. 23, 2018) (*citing Our Children's Earth v. Leland Stanford Junior University*, No. 13-cv-402-EDL, 2015 WL 12745786, at *7-8 (N.D. Cal. Dec. 11, 2015)).  *Our Children's Earth* likewise rejected the argument that harm from preexisting dams cannot be considered take of species where the agency continues to operate and maintain those dams.  2015 WL 12745786, at *7.  The court noted its interpretation was consistent with NMFS's biological opinions that concluded dams' continued existence constituted a "take" under the ESA, as well as NMFS's Final Rule defining "harm" under the ESA.  *Id.* (citing two biological opinions and 64 Fed. Reg. 60727-01).  NMFS stated in its Rule that:

> simply holding title to a barrier that affects access to the habitat of listed species is not necessarily a take under the ESA.  However, maintaining or improving an existing facility may actually injure or kill members of a listed species if it significantly impairs essential behavioral patterns such as spawning, rearing or migrating.  *Maintaining an existing barrier that prevents or impedes access to habitat may cause take of listed species, if adequate comparable habitat is not otherwise available to the listed population.*

64 Fed. Reg. 60727, 60729 (Nov. 8, 1999) (emphasis added).  NFMS has issued other incidental take statements for harm that arose fully or largely due to existing structures.  *See Wild Fish Conservancy*, 628 F.3d at 517-18, 530 (existing barriers at hatchery that blocked upstream passage of bull trout constituted take by preventing or delaying spawning migration and impairing access to historic spawning habitat); *San Luis & Delta-Mendota Water Auth. v. Jewell*,

747 F.3d 581, 594-95, 599 (9th Cir. 2016) (entrainment of fish was take caused by existence of projects plus operations).  As the court in *Wishtoyo Foundation* held, take occurs when existing structures block or impede fish passage to historic spawning habitat and kill or injure fish that try to pass through them.  2018 WL 6265099, at *58-59.

Here, the Corps does much more than hold title to Willamette Project dams; it takes actions on a regular basis to maintain and repair those dams. *See, e.g.,* BiOp at 2-42; USACE 028320, USACE 029805-06, USACE 102318, USACE 256360, USACE 329146, USACE 750260, 750262 (discussing maintenance and repair actions); Pl. Ex. 61 (same) (attached hereto); USACE 300060-61, 300080, 300100, 300124-25, 300627 (2018 Fish Operations Plan identifying maintenance target periods and gate repairs at dams).  These dams prevent or impede access to important upstream spawning and rearing habitat that is much more extensive and higher quality than other available spawning and rearing habitat below the dams.  This lack of access significantly impairs essential breeding and migration patterns and impedes recovery of the species, resulting in "harm" that constitutes take.  *Wishtoyo Found.*, 2018 WL 6265099, at *58; 50 C.F.R. § 222.102 (definition of "harm"); Third Schroeder Decl. ¶¶ 38-41, 45-48; Second Domingue Decl. ¶¶ 6, 41-42.  In addition, UWR salmon and steelhead are wounded and killed during the upstream trap and haul process as well as when they are trying to get through the dams to migrate downstream, which also constitutes take.  16 U.S.C. § 1538(a)(1)(B); Third Schroeder Decl. ¶¶ 18-19, 24, 26-29; Second Johnson Decl. ¶¶ 9-14.

Finally, the Corps is also causing take of UWR Chinook salmon and steelhead through its ongoing "discretionary operations" of the Willamette Project.  The Corps' management of reservoirs and water flows causes injury and mortality to fish, as well as harm from significant habitat degradation that significantly impairs essential behavioral patterns such as breeding,

feeding or sheltering.  16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 222.102.  For instance, take occurs

from the following operations:

- Releases of storage water that do not coincide with natural flow patterns or timing needed to support good fish habitat; fluctuating flow levels that impair spawning or rearing below dams by desiccating or scouring redds, or stranding or flooding rearing juveniles; power peaking operations that cause large flow fluctuations below dams.  *See, e.g.,* BiOp at 2-20, 4.1-8, 11-15; USACE 281366–67, USACE 317672–74, USACE 317846–48, USACE 331879–80, USACE 067641, USACE 034664, USACE 073081–073085, USACE 073757-71, USACE 494844–45, USACE 256176; Pl. Ex. 62 (attached hereto); Third Schroeder Decl. ¶¶ 16-17, 25, 27; Second Domingue Decl. ¶¶ 7-13; Second Johnson Decl. ¶¶ 19-22.

- Releases of storage water that cause low water temperatures in spring and summer below dams, impairing adult Chinook pre-spawn behavior and juvenile steelhead emergence, and high water temperatures in fall, impairing Chinook spawning and egg incubation.  BiOp at 4.1-8, 4.1-9, 11-15 to 11-16; USACE 455190-96, USACE 041021-22, USACE 102662-64, USACE 101748-51, 101758-60, 101763-64, 101790-91, USACE 041078-82, 041090-92, 041096-98, 041124, USACE 101686, 101706-07, 101731-33, USACE 041015, 041036-40, 041063, 041123-24, USACE 101718-21, USACE 041049-52; Third Schroeder Decl. ¶¶ 21, 29; Second Domingue Decl. ¶¶ 17-19, 29-30, 33, 39.

- Releases of storage water that cause high levels of dissolved gas downstream of dams, which impairs fish and incubating eggs below the dams.  BiOp at 4.1-11, 11-16; USACE 041022, USACE 026742-43, USACE 023372-84, USACE 023385-94, USACE 023397, USACE 026316-18, USACE 041041-43, 041057-58, USACE 101710-13, 101726-27, USACE 832525, USACE 022813; Third Schroeder Decl. ¶ 25; Second Domingue Decl. ¶¶ 14-16, 27-28, 32, 40.

- Maintaining full reservoirs for 4-6 months of the year, which impairs juvenile downstream migration by making it harder to navigate to the dams and find outlets through the dams, increases predation of juvenile salmon and steelhead, and increases disease and infection in the fish.  USACE 760712, USACE 245836, USACE 024920 (harder to navigate to dam and find outlets when reservoir at high level); USACE 848602, 848621, USACE 516952 (predation); USACE 208484-92, USACE 288041-42, 288070-81, USACE 834302 (copepod infection); Third Schroeder Decl. ¶ 20; Second Domingue Decl. ¶¶ 21-22, 26, 31, 35; Second Johnson Decl ¶¶ 8, 10-12, 16-21.

- Implementing maintenance and responding to emergency events in ways that injure fish through water temperature changes, flow changes, or excessive dissolved gas.  BiOp at 9-36 to 9-38, 9-66 to 9-67; USACE 048814-15, USACE 049571-72, USACE 101712, USACE 296746-47, USACE 256364; Pl. Ex. 39 (ECF No. 36-39), Pl. Ex. 61 (attached hereto).

These operations have been occurring and will continue to occur in the immediate future, causing ongoing take of UWR salmon and steelhead. Thus, Plaintiffs have provided sufficient evidence of "past injury, present injury, [and] an 'imminent threat' of future injury" to establish the Corps' unlawful take of UWR Chinook salmon and steelhead. *Wishtoyo Found.*, 2018 WL 6265099, at *57 (*citing Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 871, 785 (9th Cir. 1995)).

Plaintiffs have shown, through facts in the administrative record and their own experts, that the Corps' operation and maintenance of the Willamette Project continues to kill, wound, and harm UWR Chinook salmon and steelhead. *See Tidwell*, 716 F. Supp. 2d at 1006 (relying on administrative record and parties' extra-record materials to conclude take likely occurred). Therefore, Plaintiffs have met their burden to establish the Corps is causing take of these species, in violation of ESA Section 9.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for summary judgment and deny Defendants' cross motion.

Dated: December 13, 2019       Respectfully submitted,


                               /s/Lauren M. Rule
                               Lauren M. Rule (OSB #015174)
                               Elizabeth H. Potter (OSB #105482)

---

[6] Plaintiffs have not addressed Defendant-Intervenors' response brief because the arguments raised there are not relevant to the legal claims at issue in the summary judgment phase of the case. Intervenors' argument revolves around the potential to draw down Detroit Lake to assist downstream migration of juvenile fish, but that addresses the question of remedy in the event the Court finds an ESA violation. The question at issue here is simply whether the Corps' current operations—which do not include a draw down at Detroit—are causing jeopardy and take of UWR salmon and steelhead. For that reason, Intervenors' arguments are beside the point at this stage of the proceedings.

ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave, Suite B
Portland, OR  97202
Tel: (503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

Attorneys for Plaintiffs