JEAN E. WILLIAMS, Deputy Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
MICHAEL R. EITEL, Senior Trial Attorney
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov; michael.eitel@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, et al., | Case No.: 3:18-cv-00437-HZ |
| Plaintiffs, | FEDERAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants, | |
| and | |
| CITY OF SALEM and MARION COUNTY, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

PAGE

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

    I.    Plaintiffs have not proven that the Corps has violated Section 7(a)(2) ......................2

        A.    The WVP dams are not the same as the Columbia River dams ...........................3

        B.    The Corps has substantially implemented meaningful RPA measures ...............4

        C.    Plaintiffs misrepresent NMFS' position .........................................................8

    II.    Plaintiffs have not established a Section 9 violation ...................................................10

        A.    Reinitiating consultation or exceeding the take estimate does not automatically invalidate an ITS.......................................................................................................10

        B.    The ITS is applicable, has been granted, and remains valid ................................14

        C.    Plaintiffs have not met their burden of proving that the Corps has exceeded the ITS....15

    III.    Plaintiffs' failure to reinitiate consultation claims are moot....................................................18

CONCLUSION.........................................................................................................................22

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                    <u>PAGE</u>

*All. for the Wild Rockies v. U.S. Army Corps of Eng'rs,*
    237 F. Supp. 3d 1079, 1085-86 (D. Or. 2017) .......................................................20

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
    515 U.S. 687 n.13 (1995) ...................................................................................16

*Bayer v. Neiman Marcus Grp.,*
    861 F.3d 853 (9th Cir. 2017) ....................................................................18, 19, 20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 555 (2007) ...................................................................................16

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...........................................................................................11

*Cal. Trout, Inc. v. U.S. Bureau of Reclamation,*
    115 F. Supp. 3d 1102 (C.D. Cal. 2015) ..............................................................21

*Ctr. for Biological Diversity v. Marina Point Dev. Co.,*
    566 F.3d 794 (9th Cir. 2009) ..................................................................15, 16, 22

*Ctr. for Biological Diversity v. Salazar,*
    695 F.3d 893 (9th Cir. 2012) ..............................................................................11

*Ctr. for Biological Diversity v. U.S. Bureau of Land Management,*
    698 F.3d 1101 (9th Cir. 2012) ........................................................................ 11, 12

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ...........................................................................................15

*Defs. Of Wildlife v. Bernal,*
    204 F.3d 920 (9th Cir. 2000) ..............................................................................17

*Forest Conservation Council v. Rosboro Lumber Co.,*
    50 F.3d 781 (9th Cir. 1995) ................................................................................22

*Forest Guardians v. Johanns,*

    450 F.3d 455 (9th Cir. 2006) ................................................................................19

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.,*

    484 U.S. 49 (1987) ............................................................................................22

*Headwaters, Inc. v. Bureau of Land Mgmt.,*

    893 F.2d 1012 (9th Cir. 1990) ............................................................................18

*Hewitt v. Helms,*

    482 U.S. 755 (1987) ..........................................................................................19

*Hoopa Valley Tribe v. NMFS,*

    230 F. Supp. 3d 1106 (N.D. Cal. 2017) ..............................................................21

*Medimmune, Inc. v. Genentech, Inc.,*

    549 U.S. 118 (2007) ..........................................................................................19

*Native Fish Soc'y v. NMFS,*

    Case No. 3:12-cv-00431-HA, 2013 WL 12120102 (D. Or. May 16, 2013).......................17

*Nat'l Wildlife Fed'n v. FEMA,*

    Case No. C11-2044-RSM, 2014 WL 5449859 (W.D. Wash. Oct. 24, 2014) .................. 2, 3

*Nat'l Wildlife Fed'n v. NMFS,*

    Case No. 01-cv-640-RE, 2005 WL 1278878 (D. Or. May 26, 2005)....................................3

*Nat'l Wildlife Fed'n v. NMFS,*

    524 F.3d 917 (9th Cir. 2008) ..............................................................................3

*Or. Nat. Desert Ass'n v. Tidwell,*

    716 F. Supp. 2d 982 (D. Or. 2010) ....................................................................21

*Oregon Natural Resources Council v. Allen,*

    476 F.3d 1031 (9th Cir. 2007) ................................................................11, 12, 14

*ORNC Action v. Columbia Plywood, Inc.,*

    286 F.3d 1137 (9th Cir. 2002) ............................................................................16

*Pac. Nw. Generating Coop. v. Brown,*

    822 F. Supp. 1479 (D. Or. 1993) ........................................................................18

*Pitts v. Terrible Herbst, Inc.,*

    635 F.3d 1081, 1086 (9th Cir. 2011) ................................................................18

*Ruiz v. City of Santa Maria,*

    160 F.3d 543 (9th Cir. 1998) .......................................................19, 20, 21

*Strahan v. Roughead,*

    910 F. Supp. 2d 358 (D. Mass. 2012) ....................................................21

*Tribal Vill. of Akutan v. Hodel,*

    869 F.2d 1185 (9th Cir. 1988) ..................................................................2

*United States v. Geophysical Corp. of Alaska,*

    732 F.2d 693 (9th Cir. 1984) ........................................................... 17, 18

*United States v. Charette,*

    893 F.3d 1169 (9th Cir. 2018) ......................................................... 14, 15

*United States v. Ramirez,*

    448 F. App'x 727, 729 (9th Cir. 2011) ...................................................16

*Univ. of Tex. v. Camenisch,*

    451 U.S. 390 (1981) ................................................................................18

*WildEarth Guardians v. U.S. Forest Serv.,*

    Case No. CV-10-385-TUC-DCB, 2011 WL 11717438 (D. Ariz. July 21, 2011) ..............................21

*Wyo. Outdoor Council v. Bosworth,*

    284 F. Supp. 2d 81 (D.D.C. 2003) ...........................................................9

## STATUTES

16 U.S.C. § 1536 .........................................................11, 12, 13, 14, 16

16 U.S.C. § 1539(g) ...................................................................... 14, 15

16 U.S.C. § 1540(g)(1)(A) ............................................................ 21, 22

28 U.S.C. § 2401(a) ................................................................................15

## FEDERAL REGULATIONS

50 C.F.R. Pt. 402 .....................................................................................11

50 C.F.R. § 402.02 ........................................................................................................ 2

50 C.F.R. § 402.14(i)(5) ............................................................................................... 11

50 C.F.R. § 402.16 .................................................................................................. 11, 21

<u>OTHER</u>

Fed. R. Civ. P. 8 ......................................................................................................... 16

Fed. R. Civ. P. 12 ....................................................................................................... 18

H.R. Doc. No. 81-531 (1950) ................................................................................... 3, 4

H.R. Rep. No. 97-567 (1982) ..................................................................................... 13

## ACRONYMS AND ABBREVIATIONS

APA – Administrative Procedure Act

BiOp – biological opinion

Bonneville – Bonneville Power Administration

COP – Configuration Operation Plan

Corps – United States Army Corps of Engineers

ESA – Endangered Species Act

FWS – United States Fish and Wildlife Service

ITS – incidental take statement

NMFS – National Marine Fisheries Service

NEPA – National Environmental Policy Act

RM&E – research, monitoring, and evaluation

RPA – reasonable and prudent alternative

UWR – Upper Willamette River

UWR salmonids – Upper Willamette River Chinook salmon evolutionarily significant unit and

Upper Willamette River winter steelhead distinct population segment

WATER - Willamette Action Team for Ecosystem Restoration

WVP – Willamette Valley Project

## INTRODUCTION

The Corps operates and maintains the Willamette Valley Project ("WVP") according to all of its statutory authorities and responsibilities, including the Endangered Species Act ("ESA"). Over the past several years, the Corps has completed a number of significant reasonable and prudent alternative ("RPA") measures consistent with NMFS' 2008 biological opinion ("BiOp"). The Corps' efforts to date have contributed to both the survival and recovery of ESA-listed Upper Willamette River ("UWR") salmonids. Although there have been delays in completing a few of the RPA measures, those delays do not negate the benefits that UWR salmonids have received thus far.

The Corps reinitiated ESA consultation with NMFS in April 2018, and the agencies are working diligently to complete that consultation. In the interim period before the consultation is completed, the Corps has determined that its continued operation and maintenance of the WVP pursuant to the RPA measures will not jeopardize the continued existence of UWR salmonids or adversely modify the species' critical habitat. NMFS did not object to the Corps' determination and called the Corps' decision to continue operating pursuant to the RPA during the reinitiated consultation period "prudent." *See* Thom Declaration, ECF 68 ¶ 5 (NMFS Regional Administrator: "Given the extensive work that has taken place and will continue into the next Biological Opinion, a prudent course of action would be to continue implementing the 2008 RPA while the reinitiation process progresses").

Plaintiffs disagree with the expert agencies. They claim that the Corps' delay in completing some of the RPA measures amounts to jeopardy and adverse modification. But Plaintiffs have not addressed the salient question: whether the Corps reasonably determined that proceeding with the operation and maintenance of the WVP during the reinitiated consultation process is consistent with Section 7(a)(2) and 7(d). And, even if Plaintiffs had addressed that question, they would not have been able to prove that the Corps' actions were arbitrary and capricious or an abuse of discretion.

Moreover, despite raising new arguments in their reply brief regarding the Corps' compliance with its incidental take statement ("ITS"), Plaintiffs have not proven that the Corps has either exceeded the take estimates in the ITS or violated the ITS's terms and conditions. Finally, even though the agencies reinitiated consultation almost two years ago, Plaintiffs do not recognize that their failure to reinitiate consultation claims are moot. Plaintiffs cannot use relief designed to address their substantive claims, or new relief they belatedly assert for the first time in their reply brief, to keep those claims alive. In sum, Plaintiffs' motion for summary judgment should be denied, Federal Defendants' motion for summary judgment should be granted, and judgment should be entered in favor the agencies.

## ARGUMENT

### I.    Plaintiffs have not proven that the Corps has violated Section 7(a)(2)

The Corps' determination that it is not "reduc[ing] appreciably the likelihood of both the survival and recovery" of UWR salmonids through its continued operation and maintenance of the WVP is reasonable and supported by evidence before the Court. 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of"); USACE 021138-39. As explained in Federal Defendants' opening brief, the Corps' determination is supported by: (1) its efforts to date in completing RPA measures that both mitigate the impacts of the Corps' discretionary operations and Congress's decision to authorize the dams without fish passage, as well as affirmatively improve the UWR salmonids' survival prospects; (2) the current status of the species; and (3) the agency's close coordination with NMFS throughout the term of the BiOp. Federal Defendants' Opening Brief, ECF 101 at 11-20.

Plaintiffs have failed to argue, much less prove, that the Corps' decision was arbitrary and capricious or an abuse of discretion. *See* Plaintiffs' Opening Brief, ECF 96; Plaintiffs' Reply Brief, ECF 103; *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988); *Nat'l Wildlife Fed'n v.*

*FEMA*, Case No. C11-2044-RSM, 2014 WL 5449859, at *21 (W.D. Wash. Oct. 24, 2014) (relevant inquiry is whether the plaintiff demonstrates that the agency's implementation of an RPA "was an abuse of discretion or arbitrary and capricious" and not whether all aspects of the RPA have been implemented exactly as originally prescribed). Instead of focusing on that inquiry, Plaintiffs improperly assert that the Corps has the discretion to modify the choices Congress made in the Flood Control Acts, disparage the RPA measures that the Corps has completed to date, and wrongly claim that the Corps has done "very little" to improve juvenile downstream passage. Plaintiffs' Reply Brief, ECF 103 at 15-16, 20-23. Plaintiffs even go so far as to suggest that NMFS affirmatively disagrees with the Corps' determination that it is not violating Section 7(a)(2). *Id.* at 6-9, n.4. Plaintiffs' arguments are inaccurate and must be rejected by the Court.

### A.    The WVP dams are not the same as the Columbia River dams

Citing to ESA cases challenging the operation and maintenance of dams on the Columbia River, Plaintiffs assert that the Flood Control Acts "imposed broad goals on the Corps but did not dictate how it must fulfill those goals, giving the Corps considerable discretion in choosing what specific actions to take when managing its dams." *Id.* at 3-4 (citing *Nat'l Wildlife Federation v. NMFS*, 524 F.3d 917, 928-29 (9th Cir. 2008); *Nat'l Wildlife Federation v. NMFS*, Case No. 01-cv-640-RE, 2005 WL 1278878, at *9-10 (D. Or. May 26, 2005)). Plaintiffs note that the dams on the Columbia River were included in the report that the Corps submitted to Congress ("House Document 531") (H.R. DOC. NO. 81-531 (1950)) and authorized by the Flood Control Act of 1950, just like the WVP dams. *Id.* at 4. Therefore, Plaintiffs submit, the Corps not only has the discretion to modify their operations to benefit fish—just as the action agencies did for the Columbia River dams—but it "must" do so if the action is necessary to fulfill Corps' ESA duties. *Id.*

To the contrary, House Document 531 specifies that certain dams in the WVP (Detroit, Cougar, Lookout Point, Hills Creek, and Green Peter) maintain a power pool, which is water stored

directly below the minimum conservation pool level and above the minimum power pool level, that is reserved and used exclusively for hydroelectric power generation during the critical power production period from October to March. Petersen Declaration, ECF 65 ¶ 7; *see, e.g.*, H.R. DOC. NO. 81-531 Appendix J at 1787. The Corps does not have the discretion to modify its operations in a manner that eliminates an authorized purpose—such as generating hydropower using the exclusive power pool. House Document 531 does not contain a similar restriction for dams on the Columbia River. Plaintiffs cannot shoehorn the WVP dams and this litigation to fit the prior litigation on the Columbia River dams.

**B.    The Corps has substantially implemented meaningful RPA measures**

As Federal Defendants discussed in their opening brief, the Corps has completed dozens of RPA measures that benefit UWR salmonids and is actively working on others. Federal Defendants' Opening Brief, ECF 101 at 13-14, 19-20. Nonetheless, Plaintiffs believe that some of these RPA measures as unimportant. *See* Plaintiffs' Reply Brief, ECF 103 at 16 ("The other RPA actions to which Defendants point are merely studies or plans that Corps completed, not actions that provide actual benefits to the fish"). This is both hypocritical, as Plaintiffs argue that the Corps has to either complete all of the RPA measures to avoid jeopardizing listed species or take alternative, reasonably adequate steps to avoid jeopardy, and inaccurate, as these measures benefit listed salmonids. *See* Plaintiffs' Opening Brief, ECF 96 at 9 (describing the BiOp: "It also stated that avoidance of jeopardy and adverse modification of critical habitat is based on *successful completion of the RPA measures*."); Plaintiffs' Reply Brief, ECF 103 at 13.

In RPA Measure 4.13, NMFS advised the Corps to complete the Configuration Operation Plan ("COP"), "a multi-year, multi-level study process, to evaluate a range of potentially beneficial actions for listed fish species at Project dams and reservoirs." BiOp at 9-56. The Corps completed COP Phase I in 2009 and COP Phase II in 2015. Implementation Spreadsheet, ECF 81-2 at 11. The

COP is a preliminary step, which had to be done before the Corps could implement many other RPA measures, including the water quality and long-term downstream measures that Plaintiffs say are "critical." Plaintiffs' Reply Brief at 9; BiOp at 9-57 (stating that the COP should study adult fish release cites, interim operations for downstream fish passage, head-of-reservoir juvenile collection facilities, long-term downstream passage facilities or operations, temperature control facilities or operations, interim operations for temperature control that require detailed study, and system-wide operational changes). Thus, the COP and other studies listed in the RPA measures were critical to improving the status of ESA-listed species in the long-term and to support the agencies' request for funding for the additional measures.

The Corps has also implemented several interrelated processes called for under the RPA that benefit salmonids: the comprehensive research, monitoring, and evaluation ("RM&E") program; the Willamette Fish Operations Plan; and the Willamette Action Team for Ecosystem Restoration ("WATER"). Implementation Spreadsheet, ECF 81-2 at 1, 6, 17-19. The RM&E program collects and provides the information necessary to make informed adaptive management decisions. BiOp at 9-83. NMFS described the RM&E program as "essential to guiding Action Agencies' decisions in carrying out [proposed action] and RPA measures and [] will affect productivity, abundance, spatial distribution, and genetic diversity of listed fish species." *Id.* The Willamette Fish Operations Plan is the "critical link" between the RPA and on-the-ground implementation activities as it helps "ensure that fish facilities are operated based on best practices and consistent with the terms" of the BiOp. *Id.* at 9-37. Based on the RM&E and other information, the Willamette Fish Operations Plan identifies the optimal operating criteria for dams to minimize adult and juvenile fish injury and mortality; protocols for handling, sorting, and releasing ESA-listed salmonids; the number, origin, and species of fish to be released into habitat upstream of the dams; describes scheduled and representative types of unscheduled maintenance of existing infrastructure that could negatively

impact listed fish and develop measures to minimize the impacts; and outlines protocols for emergency events and deviations. *Id.* at 9-36. Implementation of the Willamette Fish Operations Plan is completed through coordination with WATER, a collaborative body that advises the Corps in the implementation of environmental protection and conservation measures. *Id.* at 9-7.

Through this iterative and interrelated process, the Corps has implemented numerous changes in operations that provide long-term benefits for salmonids, including the improvements in water quality, downstream fish passage, and upstream fish passage discussed in the following paragraphs. *See, e.g.*, USACE 107277, 106585, 105588, 103013, 102709, 102426, and 101671 (water quality); USACE 390464, 507089, 446471, 958999 (downstream passage); USACE 449590 and 300702 (upstream passage). It has also resulted in improved hatchery operations (*e.g.*, removal of hatchery fish from Leaburg Dam and enhancements to the McKenzie Fish Hatchery ladder and water supply to increase homing and reduce spawning of hatchery fish) and flow management (*e.g.*, Sustainable Rivers Program flows and tributary instream flow releases provided by life stage periodically for UWR salmonids). USACE 156531 (hatcheries); USACE 049397, 057022, 058459, 072913 (flow management). Thus, contrary to Plaintiffs' arguments, these RPA measures benefit ESA-listed salmonids.

While the Corps has not completed all of the RPA measures relating to downstream passage and water quality, it has completed a number of significant measures. *See id.*; Implementation Spreadsheet, ECF 81-2. Shortly after the issuance of the BiOp, the Corps investigated and tested numerous operations at Detroit, Cougar, Fall Creek, Foster, and Lookout Point dams that could potentially improve downstream juvenile fish passage and water quality. *Id.* at 8. Based on the information gained from these early tests and investigations, the Corps has made numerous improvements to both downstream juvenile passage and water quality in the WVP since 2008. *Id.*

Where operational changes have been within its authority, the Corps has implemented changes for the benefit of the species. For example, the Corps has conducted a drawdown for juvenile downstream passage at Fall Creek Dam, a facility with no hydropower generation. *Id.* at 8; USACE 049023, 061326, 066972, 068055. Even Plaintiffs recognize that the operational changes at Fall Creek "ha[ve] significantly improved downstream passage." Plaintiffs' Reply Brief, ECF 103 at 22. The Corps also altered operations at Cougar Dam to prioritize the use of the regulating outlets, and performs surface spill operations at Detroit Dam to improve downstream passage. Implementation Spreadsheet, ECF 81-2 at 8; USACE 048816, 395153 (Cougar passage); USACE 044490, 055939, 858030 (Detroit passage). And, the Corps has begun the NEPA process for the planning and development of permanent downstream fish passage at Detroit and Cougar dams. As for non-operational improvements, the Corps has replaced the Foster Dam fish weir and created a portable floating fish collector at Cougar reservoir as a prototype to inform the long-term downstream fish passage project there. Implementation Spreadsheet, ECF 81-2 at 7-8. While efforts to improve downstream passage continue, the Corps' actions to date have already resulted in the re-establishment of populations of UWR spring Chinook salmon above Foster and Fall Creek dams. *See* Piaskowski Declaration, ECF 70 ¶ 22-24.

Importantly, the Corps' implementation of RPA measures relating to upstream passage also have the effect of improving downstream passage. As Federal Defendants' explained in their opening brief, the WVP blocks adult salmon from accessing historically-utilized spawning habitat. Federal Defendants' Opening Brief, ECF 101 at 16-17. Therefore, if not for the Corps' trapping and hauling of adult salmon above the dams so that they can spawn, there would be no juvenile salmon to migrate downstream. *Id.* at 18-19. The Corps currently transfers adult ESA-listed salmonids above six WVP dams (UWR spring Chinook are hauled above Detroit, Foster, Cougar, Lookout Point, Hills Creek, and Fall Creek dams while UWR steelhead are hauled above Foster reservoir).

Implementation Spreadsheet, ECF 81-2 at 5-6. During the term of the 2008 BiOp, the Corps has also built three new adult fish collection facilities (North Santiam, Foster, and Fall Creek Fish Facilities) and improved release sites upstream of five dams to give ESA-listed salmonids the best chance of spawning success, thus, increasing the amount of juveniles that hatch and migrate downstream. *Id.* at 7-8.

Regarding water quality, the Corps has implemented operational changes at Fall Creek, Lookout Point, and Detroit dams to address temperature fluctuations. *Id.* at 8. The Corps also conducts water temperature control tower operations at Cougar Dam. *See, e.g.*, USACE 107277, 106585, 105588, 103013, 102709, 102426, and 101671. Regarding total dissolved gas, the Corps has implemented operations to reduce total dissolved gas at Cougar and Big Cliff dams (limiting spill, prioritizing unit operations at Big Cliff Dam, and spreading the spill that does occur at Big Cliff Dam when feasible). *See, e.g.*, *id.* In addition, the Corps has instituted maintenance periods in the North Santiam, South Santiam, and McKenzie rivers to reduce total dissolved gas and benefit salmon incubation. *See, e.g.*, *id.*

The completion of these and other RPA measures, and the Corps' progress in implementing the remaining measures, contributed to the Corps' reasonable decision that operating and maintaining the WVP during the remainder of the consultation would not violate Section 7(a)(2) or 7(d).

### C.     Plaintiffs misrepresent NMFS' position

Plaintiffs suggest that NMFS does not agree with the Corps' determination that it is in compliance with Section 7(a)(2) and 7(d). Plaintiffs' Reply Brief, ECF 103 at 6-8. That suggestion is baseless for two reasons. First, when it became clear that the Corps would not be able to complete some of the RPA measures by the timelines indicated in the BiOp, NMFS assisted the Corps in developing a plan to implement those delayed measures. As NMFS' Regional Administrator

explained, "[w]hile the implementation of this complex series of measures has not been without challenges, including working through how best to implement some measures included in the 2008 RPA, it is my opinion that these issues are typical for a project of this magnitude." Thom Declaration, ECF 68 ¶ 4. Notably, NMFS did not demand that the Corps reinitiate consultation in light of the delay. Nor did NMFS determine that the Corps' new schedule would likely violate Section 7(a)(2). For NMFS to determine whether an action jeopardizes the continued existence of species or adversely modifies species' habitat, it would first have to complete a new biological opinion. Any suggestion by Plaintiffs to this effect confuses the reinitiation of consultation— whereby NMFS and the action agency re-engage on an action—with a potential outcome of that consultation.

Second, once the agencies reinitiated consultation, NMFS did not object to the Corps continuing to operate and maintain the WVP pursuant to the new RPA implementation schedule during the reinitiation period. *See id.* ¶ 5 ("Given the extensive work that has taken place and will continue into the next Biological Opinion, a prudent course of action would be to continue implementing the 2008 RPA while the reinitiation process progresses."); *cf. Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 95 (D.D.C. 2003).

Plaintiffs' citation to a separate NMFS biological opinion is also inappropriate. Plaintiffs' Reply Brief, ECF 103 at 8. In that biological opinion, NMFS was not analyzing the Corps' progress in implementing the RPA measures. Instead, NMFS was analyzing a different action concerning the allocation of water within the WVP system. Plaintiffs' selective characterization of statements is misleading as that biological opinion was not intended to provide any kind of judgment about the Corps' current compliance with the ESA operation and maintenance of the WVP.[1]

---

[1] The action that NMFS consulted on was required to implement RPA Measure 2.9.

**II.      Plaintiffs have not established a Section 9 violation**

In their opening brief, Plaintiffs argued that NMFS had incorporated all of the RPA

measures in the terms and conditions of the ITS. Plaintiffs' Opening Brief, ECF 96 at 34. Thus

Plaintiffs asserted that, by not completing a few of the RPA measures by the specified timelines, the

Corps violated the terms and conditions and is liable for take under Section 9. *Id.* at 34-35. This

argument was firmly dispelled in Federal Defendants' opening brief. ECF 101 at 23-27. Having been

proven wrong, Plaintiffs abandoned that argument and crafted new arguments for their reply brief.

Plaintiffs' Reply Brief, ECF 103 at 24-29. They now submit that the existing ITS was invalidated and

extinguished as soon as the agencies reinitiated consultation and, in any event, the Corps has

exceeded the take estimate in the ITS by not completing some RPA measures on schedule. *Id.* at 26-

29. In another change from their opening brief, Plaintiffs attempt to shift their burden of proof on

Section 9 claims to the Corps. *Id.* at 26-27.

The Court must reject Plaintiffs' attempts to change the playing field at this late stage in the

proceedings. The fact remains that Plaintiffs do not prove that the Corps exceeded the ITS.

Therefore, the Corps cannot be held liable under Section 9.

**A.      Reinitiating consultation or exceeding the take estimate does not
        automatically invalidate an ITS**

Plaintiffs first suggest that the ITS's protections immediately lapsed when the agencies

reinitiated consultation in April 2018. *See id.* at 26 ("If an agency does not comply with conditions

needed to avoid jeopardy it must reinitiate consultation, which causes the original biological opinion

*and its accompanying incidental take statement* to lose their validity."). Plaintiffs also assert that exceeding

the take estimate in the ITS renders an action agency liable for take. *Id.* at 25. These arguments are

contrary to the plain text of the ESA and its regulations and, if accepted, would constitute an

unwarranted expansion of Ninth Circuit case law.

The ESA states that "any taking that is in compliance with the terms and conditions specified . . . shall not be considered to be a prohibited taking." 16 U.S.C. § 1536(o)(2). Congress placed the emphasis on an agency's compliance with the terms and conditions; it did not limit the take exemption in any other manner. As evidenced by Congress's unqualified language, the existing ITS therefore remains valid during the reinitiated consultation process, so long as the action agency continues to comply with the terms and conditions. *Bennett v. Spear*, 520 U.S. 154, 170 (1997) (because of 16 U.S.C. § 1536(o)(2), the ITS exempts liability for incidental take "so long as it respects the Service's 'terms and conditions'"). Congress's language is echoed in the implementing regulations for the ESA developed by NMFS and the United States Fish and Wildlife Service—the agencies responsible for listed species and issuing ITSs to action agencies. 50 C.F.R. § 402.14(i)(5). Neither the statute nor the regulations even suggest that an ITS is invalidated as a result of the reinitiated consultation process. 50 C.F.R. Pt. 402. Quite the contrary. The regulations provide that the recourse when the take estimate is exceeded is reinitiation of consultation, not invalidation of the ITS. 50 C.F.R. §§ 402.14(i)(4), 402.16(a); *see also Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (9th Cir. 2012) (recognizing that take "that complies with the terms and conditions" is not prohibited and that the recourse for exceeding take is reinitiation of consultation).

The Ninth Circuit's decisions in *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007) and *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101 (9th Cir. 2012), do not support Plaintiffs' theory that the ITS was invalidated as soon as the agencies reinitiated consultation on the Willamette Project. In *Allen*, the Ninth Circuit held that the Fish and Wildlife Service's withdrawal of a material portion of the BiOp (the BiOp had initially approved timber sales impacting 22,227 acres of habitat designated for the northern spotted owl but then withdrew its approval to log at least 5,383 acres of that habitat), invalidated the accompanying ITS because the ITS "is now broader than the project and allows for the take of more spotted owls than

are affected by the remaining portions of the BiOp." 476 F.3d at 1037. "Without understanding the scope and purpose of the action itself—information contained in the BiOp—there is no way to know whether the take being authorized is properly 'incidental.'" *Id.* at 1036-37. It is apparent that the consulting agency's withdrawal of substantial portions of the BiOp in *Allen* is dissimilar to reinitiating consultation on a BiOp that accurately describes the proposed action, as the agencies did here. The Court did not consider *that* question—whether an ITS is invalid immediately upon reinitiation of consultation.[2]

In *Center for Biological Diversity*, the Ninth Circuit stated without any discussion that "[w]hen reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings." 698 F.3d at 1108. This statement is based on a misreading of *Allen*, which did not address this precise issue, and the Endangered Species Consultation Handbook. *Ctr. for Biological Diversity*, 698 F.3d at 1108 (citing *Allen*, 476 F.3d at 1037, and the Endangered Species Consultation Handbook at 4-23, *available at* https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.). The Endangered Species Consultation Handbook actually states that "a biological opinion for the proposed action *(not an ongoing action)* is no longer valid because reinitiation of consultation is required and the action agency has been so informed in writing by the Services, or has requested that the Services reinitiate consultation." Endangered

---

[2] *Allen*, in fact, did little more than restate the ESA and failed to analyze statutory or regulatory provisions on when ITSs are no longer operative as a matter of law. *Compare* 476 F.3d at 1040 ("Generally, the project may be exempt from the blanket prohibition on takings only if it does not place any listed species in jeopardy and does not adversely modify listed species' critical habitat") *with* 16 U.S.C. § 1536(b)(4) ("If after consultation under subsection (a)(2), the Secretary concludes that—(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection; [and] (B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection . . . the Secretary shall provide" an ITS).

Species Consultation Handbook at 4-23 (emphasis added). The Handbook thus addresses a very different situation—where an agency has not yet acted but reinitiated consultation. The Handbook also recognizes that action agencies should be informed by the Services invalidation of a biological opinion and ITS, which is very different from the statute or regulations setting triggers that render and ITS inoperative and thus automatically imposes liability on the action agencies for take. Moreover, the Handbook did not and cannot change the plain language of the ESA. 16 U.S.C. § 1536(o)(2) ("any taking that is in compliance with the terms and conditions specified . . . shall not be considered to be a prohibited taking"). The Ninth Circuit's statement therefore is untethered to the statute or its own precedent and is based on an incorrect reading of the Endangered Species Consultation Handbook.

Applying that statement here would also be contrary to congressional intent and create perverse results. In 1982, Congress recognized a flaw in the ESA statutory design. Agencies could consult and obtain the expert opinions of the wildlife services, but no statutory mechanism existed to exempt the agencies from liability for take occurring incidental to otherwise lawful actions. H.R. REP. NO. 97-567 at 26-27 (1982). Congress therefore altered the statute to grant exemptions from liability for take where the agencies comply with the services' ITS. *Id.* It would be incongruous and produce absurd results to suggest that Congress intended for agencies to be exempt from liability when they follow an ITS, only to strip that protection away and hold the agencies retroactively liable for take whenever more consultation on an ongoing action is required. In that scenario, the agencies are put in an impossible position. The Corps in this case, for example, would be faced with either continuing to operate the Willamette Project and be liable for take or, stop operating the project and cause Portland to flood, prevent the City of Salem from obtaining water for drinking and other recreational purposes, cut off electricity to communities in Oregon, and so on. This is not what

Congress intended in the ESA, evidenced by the lack of any language in the statute even suggesting Congress's intent for protections in an ITS to lapse immediately upon reinitiation of consultation.[3]

In short, the plain language of the ESA and its regulations, *Allen*, and *Center for Biological Diversity* do not support Plaintiffs' contention that the ITS was automatically invalidated in April 2018 when the agencies reinitiated consultation. The ITS remains valid and the Corps is shielded from liability under Section 9 so long as the agency complies with its terms and conditions.

**B.    The ITS is applicable, has been granted, and remains valid.**

Citing *United States v. Charette*, 893 F.3d 1169 (9th Cir. 2018), Plaintiffs next argue that it is the Corps' burden to prove that the ITS is "valid and in force." Plaintiffs' Reply Brief, ECF 103 at 26. The Ninth Circuit was faced with a very narrow issue in *Charette*. It was "tasked with determining whether the government or the defendant bears the burden of proof regarding the exception in [50 C.F.R.] § 17.32(b)," which allows private parties to obtain a permit to take threatened wildlife. *Charette*, 893 F.3d at 1174. The Ninth Circuit held that Congress explicitly addressed this particular issue in 16 U.S.C. § 1539(g):

> In connection with any action alleging a violation of section 1538 of this title, any person claiming the benefit of any exemption or permit under [the ESA] shall have the burden of proving that the exemption or permit is applicable, has been granted, and was valid and in force at the time of the alleged violation.

*Id.*

The Ninth Circuit's opinion that 16 U.S.C. § 1539(g) applies in cases involving private parties does not mean it applies to ITSs issued to federal agencies. *Compare* 16 U.S.C. § 1539(g) (located in Section 10 of the ESA, which deals with private individuals and parties seeking permits or exemptions for incidental take of listed species) *with* 16 U.S.C. § 1536(b)(4) (outlining process for an ITS being issued to federal agencies). Take permits are an entirely different mechanism from an

---

[3] This interpretation of the law would also disincentivize action agencies from ever reinitiating consultation with the consulting agencies.

ITS. But even assuming that 16 U.S.C. § 1539(g) and *Charette* apply to this case, the Corps has easily met its burden.

First, the ITS is applicable to the Corps' WVP operations. The ITS expressly applies to the Corps' continued operation and maintenance of the WVP. BiOp at 11-5 ("Incidental take will occur as a result of the continued operation of the Willamette Project dams and reservoirs, maintenance of revetments, administration of Reclamation's water contract program, implementation, of on- and off-site habitat mitigation measures, operation of the Willamette Hatchery Mitigation Program, and RM&E activities."). Second, there is no question in this case that the ITS is valid. NMFS appropriately issued the ITS in 2008, and Plaintiffs neither challenge the ITS nor proffer any argument that the ITS is defective or deficient. Nor could they, as the ITS is presumptively valid and the time to challenge the ITS has lapsed. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (agency's "decision is entitled to a presumption of regularity"); 28 U.S.C. § 2401(a). Third, the ITS was, and remains, in force. The ITS was issued by NMFS in July 2008 and "[t]he term of . . . the Opinion and incidental take statement is through 2023." BiOp at 1-11. NMFS has not withdrawn the BiOp or the ITS and no court has held that these documents are invalid. In the absence of such affirmative action, the ITS remains in full force since its issuance. *See supra* Argument Section II.B.

### C. Plaintiffs have not met their burden of proving that the Corps has exceeded the ITS

Plaintiffs failed to argue in their notice of intent to sue, complaint, or their opening brief that the Corps has exceeded the take estimates in the ITS. *See* Plaintiffs' Notice of Intent to Sue, Exhibit A; Complaint, ECF 1; Plaintiffs' Opening Brief, ECF 96. Plaintiffs have now added this argument in their reply brief but inexplicably claim that it is not their burden to prove that the Corps has exceeded the take estimates in the ITS. Plaintiffs' Reply Brief, ECF 103 at 26-27.

As a preliminary manner, the Court lacks jurisdiction over this claim because it was not in Plaintiffs' notice of intent to sue. *See* Plaintiffs' Notice of Intent to Sue, Exhibit A; *Ctr. for Biological*

*Diversity v. Marina Point Dev. Co.*, 566 F.3d at 801 (9th Cir. 2009) (discussing a notice of intent to sue in the Clean Water Act context and holding that "even at our most lenient we have never abandoned the requirement that there be a true notice that tells a[n agency] precisely what it did wrong, and when. The [agency] is not required to play a guessing game in that respect."). Plaintiffs alleged that unlawful take was occurring because the Corps allegedly disregarded the ITS's terms and conditions and reasonable and prudent measures, as well as funded Chinook salmon hatcheries. *See* Plaintiffs' Notice of Intent to Sue, Exhibit A at 16-17. But Plaintiffs did not allege that the Corps had exceeded the take estimates in the ITS. *See id.* "[W]hen a notice [tells] the defendant that it had committed one specific violation, the defendant [is] not 'required to speculate as to all possible attacks . . . that might be added to a citizen suit' at a later time." *Marina Point*, 566 F.3d at 801 (quoting *ORNC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002)). The Court thus lacks jurisdiction to decide this issue. *Id.* at 800. Moreover, Plaintiffs have waived these arguments by not pleading them in their complaint or mentioning them in their opening brief. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *United States v. Ramirez*, 448 F. App'x 727, 729 (9th Cir. 2011) (requiring a separate and distinct argument in the opening brief to avoid waiver). But Plaintiffs' arguments also fail on their merits.

Plaintiffs cannot transfer their burden to the Corps. To prove a Section 9 claim, Plaintiffs must first prove that a discretionary Corps action was the proximate cause of take. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696 n.9, 700 n.13 (1995) (Section 9 claim must be supported by proximate cause and foreseeability). Plaintiffs must then demonstrate that the take is unlawful, as Section 9's prohibition against take is not absolute. By statute, the Corps is automatically exempt from Section 9 liability for any incidental take resulting from the proposed agency action so long as the agency complies with the ITS's terms and conditions. 16 U.S.C. § 1536(b)(4), (o). Thus, Plaintiffs have to prove that the Corps is not in compliance with the terms and

conditions of the ITS. *See Defs. Of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000) (to prevail on a

Section 9 claim, plaintiff had to prove that the action "would result in an *unlawful* 'take'") (emphasis

added); *Native Fish Soc'y v. NMFS*, Case No. 3:12-cv-00431-HA, 2013 WL 12120102, at *11 (D. Or.

May 16, 2013) ("To prove take in violation of § 9 of the ESA, plaintiffs would need to prove that

NMFS' funding causes 'take' beyond that allowed in the ITS . . . At this time, plaintiffs have not met

their burden of persuasion.") (citation omitted). Furthermore, as is the case with any claim (whether

in the ESA context or not), the onus is on the party bringing the claim to prove it.

 Plaintiffs have not met their burden of proving that the Corps has exceeded the take

estimate in the ITS. Plaintiffs allege that "[c]ompliance with the RPA was necessary for the Corps to

stay within the take limits of the ITS." Plaintiffs' Reply Brief, ECF 103 at 24. "In fact, it is almost

certain that the amount of take estimated for these impacts [injury and mortality estimates for fish

passage] has been exceeded in numerous instances because the Corps has failed to implement"

certain RPA measures. *Id.* at 28. Putting aside the fact that Plaintiffs want to hold the Corps liable

under a criminal statute based on "almost certain[ties]" and unidentified "numerous instances" (*id.*),

Plaintiffs' argument is based on faulty logic. The ITS specifies the "maximum amounts or extents of

take that NMFS anticipated will occur as a result of the RPA and Proposed Action." BiOp at 11-6.

But the amount or extent of take in the ITS is not based on whether Corps has implemented the

RPA measures. Thus, the Corps did not exceed the ITS the day after the BiOp was issued—even

though it had not yet completed any RPA measures. Likewise, Plaintiffs cannot prove that the Corps

exceeded the ITS now after it has completed many of the RPA measures.

 Furthermore, the ITS outlines the exact amount or extent of take that can occur during the

proposed action. *See, e.g.*, BiOp at 11-15 (tributary flows may fall below the minimums in Table 9.2-2

only 5% of the days in June unless otherwise coordinated through the WATER flow management

committee process). Plaintiffs have not demonstrated that any of these take limits have been

exceeded.[4] Plaintiffs have therefore failed to meet their burden of proving that the Corps has violated the ITS.

## III.    Plaintiffs' failure to reinitiate consultation claims are moot

The Corps and NMFS reinitiated consultation in April 2018. Nevertheless, Plaintiffs argue that their failure to reinitiate consultation claims against the agencies are not moot as the Court may grant effective declaratory and injunctive relief. Plaintiffs' Reply Brief, ECF 103 at 9-12. But none of Plaintiffs' proposed remedies address the alleged legal violations—the failure to reinitiate consultation. *See id.*; Complaint, ECF 1 at 30-31. The agencies have reinitiated and nothing more can be done to remedy those claims. Thus, Plaintiffs' claims are moot and must be dismissed.

Article III of the Constitution "requires that an actual, ongoing controversy exist at all stages of federal court proceedings" for a Court to retain jurisdiction over a claim. *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 862 (9th Cir. 2017) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011)). If this requirement is not met, the claim is moot and the Court must dismiss it. Fed. R. Civ. P. 12(h)(3). Courts must examine mootness on a claim-by-claim basis because it is possible for some claims to become moot during the pendency of the case, while other claims remain live and judiciable. *Pac. Nw. Generating Coop. v. Brown*, 822 F. Supp. 1479, 1506 (D. Or. 1993), *aff'd* 38 F.3d 1058 (9th Cir. 1994); *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 393-394 (1981); *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015 (9th Cir. 1990); *United States v. Geophysical Corp. of Alaska*, 732 F.2d 693, 698 (9th Cir. 1984).

Generally, an individual claim becomes moot when it loses its character as a present, live controversy between the parties and the court cannot grant any effective relief. *Geophysical Corp. of*

---

[4] Plaintiffs cite a single PowerPoint presentation, USACE 006584, to support its assertion that the Corps has exceeded the take estimates in the ITS. The presentation estimated that the juvenile mortality is 71-89% at the dams. USACE 006584. But no source data is provided, much less the "dams" this data refers to.

*Alaska*, 732 F.2d at 698. The test for determining whether a claim for declaratory relief becomes moot "is whether the facts alleged, show that there is a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Bayer*, 861 F.3d at 864 (quoting *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). A claim for injunctive relief becomes moot when "subsequent events have made clear the conduct alleged as the basis for the requested relief 'could not reasonably be expected to recur.'" *Id.* at 864 (quoting *Ruiz v. City of Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998)). In other words, claims that fail to meet the *Bayer* tests are moot because the relief does not remedy the alleged legal violations and is not effective.

The declaratory and injunctive relief Plaintiffs sought in their complaint—declaratory relief stating that the agencies had unlawfully failed to reinitiate consultation and injunctive relief ordering the agencies to reinitiate—do not satisfy the *Bayer* tests. *See* Complaint, ECF 1 at 30-31. When Plaintiffs filed their complaint in March 2018, there was a live controversy regarding the failure to reinitiate consultation claims as the agencies had not yet reinitiated consultation. But that controversy died just over a month later when the agencies reinitiated consultation. *See* Plaintiffs' Opening Brief, ECF 96 at 27 (conceding that the agencies reinitiated consultation in April 2018). Therefore, the declaratory judgment Plaintiffs request in their complaint would do nothing more than adjudicate a purported past violation of law. A court order adjudicating alleged past violations of law "is not an appropriate exercise of federal [court] jurisdiction" and is not of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Bayer*, 861 F.3d at 867-68. Plaintiffs' request for injunctive relief—an order to reinitiate consultation—likewise is moot because that relief has already occurred. As the agencies are already in reinitiated consultation and NMFS will be producing a new BiOp, it is clear that this alleged violation will not recur. *See Ruiz*, 160 F.3d at 549 ("subsequent events have made it clear that the alleged violations could not reasonably be expected to recur.") (citation omitted).

Recognizing that the relief requested in their complaint is either inappropriate (declaratory relief) or has already occurred (injunctive relief), Plaintiffs now submit that other relief would be effective at remedying their failure to reinitiate claims. Plaintiffs' Reply Brief, ECF 103 at 11-12. Plaintiffs suggest that the Court could order unidentified interim operational measures for the Willamette Project that might improve fish passage and quality. *Id.* at 11-12. Or the Court could order relief that Plaintiffs propose for the first time in their reply brief—an order that would "govern the Corps' ongoing operations and reduce the likelihood of future ESA violations by ensuring the Corps complies with critical RPA requirements or reinitiates consultation in a timely manner that does not allow for excessive harm to the species." *Id.* at 12. But Plaintiffs' new proposed relief fares no better than the relief outlined in their complaint.

As an initial matter, Plaintiffs' proposed relief does not even relate to their failure to reinitiate claims. Reinitiation of consultation is a procedural duty, not a substantive one. *See All. for the Wild Rockies v. U.S. Army Corps of Eng'rs*, 237 F. Supp. 3d 1079, 1085-86 (D. Or. 2017) (referring to the duty to reinitiate consultation as "procedural" and a failure to reinitiate claim as a "procedural violation"). Yet Plaintiffs' proposed relief relates to substantive matters—improving the habitat and survival of UWR salmonids during the consultation process. *See* Plaintiffs' Reply Brief, ECF 103 at 11-12. The protection of fish during the consultation relates to separate statutory duties—Section 7(a)(2) or 7(d) of the ESA. Plaintiffs are thus improperly trying to keep the reinitiation claim live by pointing to claims for relief that are unassociated with a procedural failure to reinitiate claim.

Regardless, Plaintiffs' new proposed relief is also moot. Injunctive relief mandating interim operational measures for the Willamette Project or requiring the Corps to complete RPA measures does not satisfy the *Bayer* test. As explained above, the challenged activity relating to this claim—the failure to reinitiate consultation—ceased when the agencies reinitiated consultation in April 2018. *See*

*Ruiz*, 160 F.3d at 549. By reinitiating consultation, the agencies "have made it clear that the alleged violations could not reasonably be expected to recur." *See id.* (citation omitted).

And, a declaratory judgment requiring the agencies to reinitiate consultation in a timely manner would have no effect because the agencies have already reinitiated. As the Ninth Circuit explained in *Bayer*, "the 'value of the judicial pronouncement—what makes it a proper judicial resolution of a case or controversy rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*'" 861 F.3d at 868 (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)). A declaratory judgment ordering the agencies to reinitiate consultation in a timely manner in the future after NMFS completes its new BiOp would be conjectural. Any future reinitiation obligations depend on facts and circumstances that are neither known now nor pled as a legal violation in Plaintiffs' complaint. *See* Complaint, ECF 1. Plaintiffs cannot obtain jurisdiction over prospective agency actions under the guise of a "remedy" for an alleged past violation of the law. Such relief would also be ineffective as the ESA's regulations dictate when agencies must reinitiate consultation. *See* 50 C.F.R. § 402.16. In short, Plaintiffs' new proposed relief does not save their failure to reinitiate consultation claims—the claims are jurisdictionally moot under the tests outlined in the Ninth Circuit's recent *Bayer* decision.[5]

Plaintiffs' claim against the agencies must also be dismissed for a separate reason: the agencies are not "in violation" of the ESA by failing to reinitiate consultation. 16 U.S.C. § 1540(g)(1)(A) (providing a right of action to enjoin any person "who is alleged to be in violation" of

---

[5] *Forest Guardians*, as well as the other cases Plaintiffs rely on to support the notion that their failure to reinitiate claims are not moot, were decided before *Bayer* and do not appear to use the tests outlined therein. *See Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006); *Hoopa Valley Tribe v. NMFS*, 230 F. Supp. 3d 1106 (N.D. Cal. 2017); *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982 (D. Or. 2010); *Cal. Trout, Inc. v. U.S. Bureau of Reclamation*, 115 F. Supp. 3d 1102 (C.D. Cal. 2015); *WildEarth Guardians v. U.S. Forest Serv.*, Case No. CV-10-385-TUC-DCB, 2011 WL 11717438 (D. Ariz. July 21, 2011); *Strahan v. Roughead*, 910 F. Supp. 2d 358 (D. Mass. 2012).

the ESA). The Ninth Circuit has held that the ESA "allow[s] a citizen suit for the purpose of obtaining injunctive relief only," *Marina Point*, 566 F.3d at 804, meaning the provision "is by its very nature directed at future actions," *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995). *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1987) (analogous citizen-suit provision using the same "to be in violation" language as the ESA requires plaintiffs to allege "either continuous or intermittent violation[s]"). As Plaintiffs concede, the agencies reinitiated consultation nearly two years ago and injunctive relief—an order to reinitiate— has already occurred and therefore is unavailable. Plaintiffs cannot rely on a past alleged violation to maintain a present ESA claim. Plaintiffs are not without recourse, however. Once consultation is reinitiated, different legal obligations attach, including compliance with Sections 7(a)(2) and 7(d). Plaintiffs are free to pursue, and have pursued, those claims. Their failure to reinitiate consultation claim, however, has become jurisdictionally moot.

## CONCLUSION

The Corps has made a good faith effort to comply with all of the RPA measures that NMFS determined would benefit UWR salmonids. The Corps has completed dozens of RPA measures to date that mitigate for its discretionary operation and maintenance of the WVP, including executing a robust RM&E program, implementing tributary flow objectives, and completing hatchery and genetic management plans. *See* Implementation Spreadsheet, ECF 81-2; Federal Defendants' Opening Brief, ECF 101 at 10, n.12. The Corps has also completed measures to redress Congress's decision to authorize the construction of the WVP dams knowing that there would be no upstream or downstream passage for UWR salmonids. *See* Federal Defendants' Opening Brief, ECF 101 at 2-4, 17-20. Among other things, the Corps traps and hauls adult salmon above the dams so they can spawn and migrate downstream and has implemented operations to improve downstream passage for juvenile salmon. Implementation Spreadsheet, ECF 81-2 at 5-8. There is no doubt that the

Corps' efforts to date have benefited UWR salmonids. *See, e.g.,* Plaintiffs' Reply Brief, ECF 103 at 22 (Fall Creek operations have "significantly improved downstream passage").

While the Corps has not completed all of the measures by the precise timelines stated in the RPA and achieving the species' recovery goals remains a significant challenge for all stakeholders, the Corps is still actively pursuing the remaining measures to mitigate WVP impacts. USACE 021138-39 (Corps will continue operating the WVP pursuant to the RPA measures). The Corps is also working closely with NMFS during the reinitiated consultation period to complete the consultation in a manner that protects UWR salmonids and complies with the ESA. Given these facts, and because Plaintiffs have not established a violation of law, there is no reason to disrupt the agencies' reinitiated consultation process or require the Corps to change its current operation and maintenance of the WVP. Plaintiffs' motion for summary judgment must be denied and the agencies' motion for summary judgment should be granted.

Dated: January 15, 2020        JEAN E. WILLIAMS, Deputy Assistant Attorney General
                               SETH M. BARSKY, Section Chief
                               S. JAY GOVINDAN, Assistant Section Chief

                               */s/ Kaitlyn Poirier*
                               KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
                               U.S. Department of Justice
                               Environment & Natural Resources Division
                               Wildlife & Marine Resources Section
                               Ben Franklin Station, P.O. Box 7611
                               Washington, D.C. 20044-7611
                               Telephone: (202) 307-6623
                               Fax: (202) 305-0275
                               Email: kaitlyn.poirier@usdoj.gov

                               */s/ Michael R. Eitel*
                               MICHAEL R. EITEL, Senior Trial Attorney
                               U.S. Department of Justice
                               Environment & Natural Resources Division
                               Wildlife & Marine Resources Section
                               999 18th Street, South Terrace 370
                               Denver, Colorado 80202

Telephone: (303) 844-1479
Fax: (303) 844-1350
Email: michael.eitel@usdoj.gov

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I certify that on January 15, 2020, the foregoing was electronically filed through the Court's electronic filing system, which will generate automatic service on all Parties enrolled to receive such notice.

/s/ Kaitlyn Poirier
Kaitlyn Poirier
Trial Attorney, U.S. Department of Justice