IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, WILDEARTH GUARDIANS, and NATIVE FISH SOCIETY, | No. 3:18-cv-00437-HZ |
| | OPINION & ORDER |
| Plaintiffs, | |
| v. | |
| UNITED STATES ARMY CORPS OF EINGINEERS and NATIONAL MARINE FISHERIES SERVICE, | |
| Defendants. | |
| CITY OF SALEM and MARION COUNTY, | |
| Intervenor-Defendants. | |

Elizabeth Hunter Potter
Lauren M. Rule
Advocates for the West
3701 SE Milwaukie Avenue, Suite B
Portland, OR 97202

       Attorneys for Plaintiffs

Kaitlyn Poirier
United States Department of Justice
Environment & Natural Resources Division

Wildlife and Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044
Michael R. Eitel
United States Department of Justice
Environment & Natural Resources Division
999 18th Street
South Terrace, Suite 302
Denver, CO 80202

      Attorneys for Defendants

Ashley L. Vulin
Lawrence B. Burke
Robert E. Miller
Davis Wright Tremaine, LLP
1300 SW Fifth Avenue, Suite 2400
Portland, OR 97201

Jane E. Vetto
Marion County Counsel
555 Court Street NE, Suite 5242
Salem, OR 97309

Thomas V. Cupani
555 Liberty Street SE, Room 205
Salem, OR 97301

      Attorneys for Intervenor-Defendants

HERNÁNDEZ, District Judge:

      Currently before the Court are Plaintiffs Northwest Environmental Defense Center,

WildEarth Guardians, and Native Fish Society, and Defendants the United States Army Corps of

Engineers ("the Corps") and National Marine Fisheries Service ("NMFS")'s cross motions for

summary judgment. For the following reasons, the Court GRANTS Plaintiffs' Motion for

Summary Judgment [ECF 96] and DENIES Defendants' Motion for Summary Judgment [ECF

101].

**BACKGROUND**

Plaintiffs initiated this action on March 13, 2018, bringing claims against Defendants for violations of the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA"), principally on the basis that Defendants failed to reinitiate consultation under the ESA after the Corps did not timely implement various mitigation measures set out in a 2008 NMFS biological opinion ("BiOp"). The 2008 BiOp assessed the effect that the Corps' operation and maintenance of the Willamette River Basin Flood Control Project ("WVP") has on Upper Willamette River Chinook salmon ("UWR Chinook") and steelhead ("UWR steelhead").

The WVP is a large network of 13 dams and related facilities on various tributaries in the Willamette River basin. The WVP was constructed beginning in the 1940s to provide flood control, municipal and agricultural water supply, recreation, and hydroelectric power to the Willamette Valley. The dams relevant to this case are in the Middle Fork Willamette River, McKenzie River, South Santiam River, and North Santiam River subbasins. Dexter, Lookout Point, Hills Creek, and Fall Creek dams are in the Middle Fork Willamette River subbasin; Cougar and Blue River dams are in the McKenzie River subbasin; Green Peter and Foster dams are in the South Santiam River subbasin; and Detroit and Big Cliff dams are in the North Santiam River subbasin.

Both UWR Chinook and steelhead are anadromous salmonids, meaning they are born in freshwater—typically in upstream tributaries—before migrating through river systems out to saltwater where they mature into adults before ultimately returning to their freshwater habitat to spawn and to complete their life cycle. The UWR Chinook and steelhead were listed as "threatened" under the ESA in 1999.

As a result of the listing of UWR Chinook and steelhead, the Corps, the Bonneville Power Administration, and the United States Bureau of Reclamation began consultation with NMFS in 2000 to determine whether the continued operation of the WVP was likely to jeopardize the continued existence of the listed salmonids and/or adversely modify the salmonids' critical habitat.[1] Due to numerous delays, NMFS did not complete the consultation process and issue its BiOp until 2008. NMFS concluded in the 2008 BiOp that the continued operation of the WVP as proposed by the Corps was likely to jeopardize the continued existence of the UWR Chinook and steelhead and would likely destroy and/or adversely modify the species' critical habitat. The 2008 BiOp found the dams harmed the listed salmonids by, among other things, blocking downstream passage of juvenile salmonids, interfering with upstream migration of salmonids returning to their spawning grounds, and harming water quality and quantity downstream from the dams.

The reason the dams adversely affect salmonid migration is straightforward: Significant portions of the UWR Chinook and steelhead spawning habitat are located above the WVP dams and salmonids cannot swim past dams, at least without operational and structural measures to facilitate such passage. Approximately 70% of historic UWR Chinook and 33% of UWR steelhead spawning, incubation, and rearing habitat in the North Santiam River and South Santiam River subbasins is blocked by dams. Third Decl. of Kirk Schroeder ("Schroeder Decl.") ¶¶ 24, 26, ECF 97. Approximately 16% of historic UWR Chinook habitat in the McKenzie River

---

[1] Of the three action agencies involved in the ESA consultation process only the Corps operates the dams that are subject to this litigation. The Bonneville Power Administration markets the hydroelectric power generated by the WVP and the Bureau of Reclamation sells some of the storage water for irrigation. Accordingly, the latter two agencies are not directly involved in this case.

subbasin is blocked by dams. BiOp 4.3-10.[2] Over 90% of the historic habitat for UWR Chinook

has been blocked by dams in the Middle Fork Willamette River subbasin. Schroeder Decl. ¶ 29;

BiOp 4.2-36.

The dams also adversely affect water quality, quantity, and temperature below the dams,

and change the nature of the waterways above the dams in a variety of ways that can affect the

ability of juvenile salmon to develop and survive downstream migration and the ability of adult

salmonids to migrate upstream and spawn. For example, spill from the dams can cause high

levels of dissolved gas in the downstream water, which can adversely affect both juvenile

downstream-migrating salmonids and upstream-migrating adult salmonids. *See*, *e.g.*, BiOp 4.1-

11. Moreover, because water downstream from the dams is drawn from above-dam reservoirs,

downstream water temperatures can be unnaturally warm during critical periods of the year. *See*,

*e.g.*, BiOp 4.1-9. The reservoirs can also affect juvenile salmonids (the progeny of adult fish

trapped, hauled, and replanted above the dams) because the unnaturally slow water movement in

the reservoirs can expose the juvenile fish to greater levels of predation, parasites, disease, and

poor water quality than they would be exposed to under natural conditions. *See, e.g.,* Schroeder

Decl. ¶ 20.

As part of the 2008 BiOp, NMFS issued a Reasonable and Prudent Alternative ("RPA"),

in which it set out measures that the Corps and other stakeholders needed to carry out in order to

allow for the continued operation of the WVP without causing jeopardy to the listed species or

adverse modification of their critical habitat. As discussed in more detail below, the actions set

out in the RPA included structural modifications and operational changes at the dams and other

---

[2] The 2008 BiOp begins at NMFS 0001. *See* Notice of Lodging of the Admin. Record, ECF 88. Due to large number of citations to this document, and for ease of reference, the Court refers to the BiOp's original page numbers rather than the Bates numbers.

WVP facilities designed to mitigate many of the above adverse effects on the UWR salmonids. The BiOp also set out various deadlines by which the Corps needed to carry out the RPA measures. Together with the 2008 BiOp, NMFS also issued an Incidental Take Statement ("ITS") that authorized the incidental take of listed species pursuant to the terms and conditions set out in the ITS. The BiOp and ITS were intended to last through 2023.

Although the nature and extent of the delays are matters of dispute between the parties, it is undisputed that significant RPA measures were never carried out, some were delayed, some have not yet occurred, and some will not occur in time to meet future deadlines. Meanwhile, UWR Chinook and steelhead populations continue to decline, although both species remain listed as "threatened" after a 2016 NMFS status review.

Shortly after Plaintiffs filed this action, the Corps and NMFS reinitiated formal ESA consultation in April 2018. Defendants currently estimate they will complete the BiOp from the reinitiated consultation by the end of 2022.

On June 25, 2018, the City of Salem filed a Motion to Intervene [ECF 7] as a Defendant on the basis that this case is likely to have an impact on the City's water supply. The Court granted that Motion on July 30, 2018. Order, ECF 15. Similarly, on September 6, 2018, Marion County filed a Motion to Intervene [ECF 18] on the basis that this case is likely to have an impact on the County's economic interests. The Court granted that Motion on September 25, 2018. Order, ECF 26. The interests of the City of Salem and Marion County focus on the effect this litigation may have on operational and structural changes at Detroit Dam.

On November 30, 2018, Plaintiffs filed a Motion for Preliminary Injunction [ECF 36], in which they sought an order directing the Corps to implement various operational measures intended to address downstream fish passage and water quality issues. The Court denied

Plaintiffs' motion on June 5, 2019 because Plaintiffs failed to demonstrate they would suffer irreparable harm during the pendency of these proceedings absent preliminary relief. *See* Op. & Order, ECF 84.

On September 25, 2019, Plaintiffs filed their Motion for Summary Judgment [ECF 96]. Intervenor-Defendants filed a Response in opposition to Plaintiffs' motion on October 16, 2019 [ECF 100]. On November 6, 2019, Defendants filed their Motion for Summary Judgment [ECF 101]. As stipulated by the parties [ECF 83], this case has been bifurcated into a liability phase and a remedy phase. The instant motions address only the issue of Defendants' liability.[3]

In Claim One, Plaintiffs allege the Corps is violating the ESA's substantive and procedural requirements. First, Plaintiffs claim the Corps is violating Section 7(a)(2) of the ESA (16 U.S.C. § 1536(a)(2)) on the basis that its failure to fully and timely implement the RPA measures is jeopardizing the UWR Chinook and steelhead and is causing adverse modification to the species' critical habitat. Second, Plaintiffs allege the Corps is causing unlawful "take" of the UWR Chinook and steelhead in violation of Section 9 of the ESA (16 U.S.C. § 1538) because the Corps' operation of the WVP continues to kill, harm, and harass the listed salmonids. Third, Plaintiffs claim the Corps failed to timely reinitiate formal ESA consultation with NMFS. In Claim Two, Plaintiffs allege NMFS unreasonably delayed and/or unlawfully withheld the reinitiation of ESA consultation with the Corps in violation of the APA, 5 U.S.C. § 706.[4]

---

[3] Intervenor-Defendants' Response opposes Plaintiffs' requested remedies relating to the Detroit Dam and reservoir. Accordingly, their arguments are premature, and will instead be considered during the remedy phase of this case. Further, Intervenor-Defendants motion for summary judgment as to their crossclaims against the Corps was due no later than September 25, 2019. *See* Order, ECF 85. However, they did not file a motion for summary judgment, and instead withdrew their crossclaims in an Amended Answer [ECF 93] filed on September 12, 2019.

[4] Given the exhaustive briefing by the parties, the Court finds the parties' motions for summary judgment suitable for decision without oral argument pursuant to L.R. 7-1(d)(1). *See* Order, ECF 111.

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). However, '[t]he legal standards for resolving a motion for summary judgment are inconsistent with the standards for judicial review of agency action[.]" *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016) (citation omitted). Nonetheless, where, as here, there are no material factual disputes and the administrative record before the Court is complete, summary judgment serves as the appropriate vehicle for the court to conduct its review of the agency action. *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769-70 (9th Cir. 1985); *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D. Mont. 2010).

Citizen-suit claims brought pursuant to the ESA are analyzed under the APA's standard of review, which requires a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); *Karuk Tribe of California v. U.S. Forest Serv*., 681 F.3d 1006, 1017 (9th Cir. 2012). Agency action is arbitrary and capricious where: "the agency fails to consider an important aspect of a problem," the agency "offers an explanation for the decision that is contrary to the evidence," the agency's decision "is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise," or "the agency's decision is contrary to the governing law." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)

(citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); 5 U.S.C. § 706(2)).

The arbitrary and capricious standard is "searching and careful, but the ultimate standard of review is a narrow one." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)) (internal quotation marks omitted). The court asks whether the agency's action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* An agency's decision-making is "entitled to a presumption of regularity" and a reviewing court "may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601 (citation omitted). Although deference is owed, a reviewing court "must not 'rubber-stamp . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *N.L.R.B. v. Brown*, 380 U.S. 278, 291 (1965)) (first alteration in original, remaining alterations added).

## DISCUSSION

## I.    ESA Section 7(a)(2)

Plaintiffs argue the Corps is violating ESA Section 7(a)(2) because its ongoing operation and maintenance of the WVP is jeopardizing the continued existence of UWR Chinook and steelhead and destroying and/or adversely modifying the species' critical habitat.

### A.    Relevant Law

Under ESA Section 7(a)(2), a federal "action agency," such as the Corps, is required to ensure that any action it authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse

modification" of the species' designated critical habitat. 16 U.S.C. § 1536(a)(2). "Jeopardize the

continued existence of" means engaging "in an action that reasonably would be expected,

directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a

listed species in the wild by reducing the reproduction, numbers, or distribution of that species."

50 C.F.R. § 402.02.

    **B.**    **Analysis**

    Plaintiffs' theory of liability is relatively straightforward: Because the 2008 BiOp

concluded that the Corps' operation of the WVP would jeopardize the continued existence of the

UWR Chinook and steelhead, and because the RPA represented the steps that the Corps needed

to take to avoid such jeopardy, the Corps' operation of the WVP without timely implementing

the most critical RPA measures is jeopardizing the listed salmonids.

    Plaintiffs first note that the BiOp identified lack of downstream passage and poor water

quality as two of the largest impediments to ensuring the survival and recovery of the salmonids.

NMFS detailed that "lack of passage is one of the single most significant adverse effects on both

the fish and their habitat," and "[w]ater quality problems are one of the major limiting factors in

[downstream] habitat[.]" BiOp 9-33, 9-52, 9-61. NMFS determined that the Corps' proposed

operation of the WVP did not sufficiently address these problems and would cause jeopardy and

adverse habitat modification. BiOp 8-4 to -5.

    Although the Corps "included studies to consider passage at Project dams," it "did not

include specific passage measures and time frames associated with the measures." BiOp 9-33.

NMFS found that "specific passage measures are necessary to address the effects" of the WVP

and avoid jeopardy. BiOp 9-33. In addition, the Corps' proposed actions relating to water quality

did "not require any interim temperature control measures nor d[id] it provide certainty that any

permanent facilities would be constructed[.]" BiOp 9-60. NMFS found the Corps' operational

plan would cause "unacceptable water temperature and [total dissolved gases] TDG downstream

of the Project dams where listed fish are forced to spawn." BiOp 9-60. As such, the record

demonstrates that NMFS' jeopardy and adverse critical habitat modification findings were

largely based on the Corps' failure to propose actions that would adequately improve the lack of

downstream fish passage and poor water quality caused by the Corps' maintenance and operation

of the WVP.

Because NMFS concluded that the Corps' operation of the WVP would violate the ESA,

NMFS set forth "approximately 96 RPA measures" necessary to avoid jeopardy and adverse

habitat modification. Defs.' Mot. Summ. J. ("Defs.' Mot.") 10, ECF 101 (citing BiOp 9-7

to -90). The BiOp provided strict deadlines for completing many of the RPA measures "[i]n

order to assure timely progress toward implementing critical on-the-ground actions." BiOp 9-6.

Relevant here, to improve downstream juvenile migration, the RPA directed the Corps to:

> (1) Conduct operational measures for downstream juvenile fish passage through all
>     Project reservoirs and dams in the four key subbasins, with implementation to begin
>     by May 2011;
>
> (2) Complete the Willamette Configuration Operation Plan by September 2012 to
>     evaluate additional actions for fish passage;
>
> (3) Construct a fish passage facility at Cougar Dam by December 2014 with operations to
>     begin by 2015;
>
> (4) Construct a fish passage facility at Lookout Point Dam by December 2021 with
>     operations to begin by March 2022; and
>
> (5) Construct a fish passage facility at Detroit Dam by December 2023 with operations to
>     begin by March 2024.

BiOp 9-42, 9-48 to -58.

To address water quality issues, the RPA directed the Corps to:

     (1)   Conduct and study interim operations to improve water temperature and TDG at Detroit and Big Cliff dams beginning in 2009;

     (2)   If feasible, conduct interim operations to improve water temperatures and TDG levels at Project dams in the South Santiam and Middle Fork subbasins beginning April 2010;

     (3)   Evaluate and, if feasible, implement complex measures for temperature and TDG control at dams in the North Santiam, South Santiam, and Middle Fork subbasins beginning May 2011;

     (4)   Construct a water temperature control facility by December 2018, with highest priority being Detroit Dam; and

     (5)   Develop and apply protocols to protect water quality during emergency and unusual events.

BiOp 9-61 to -67.

       Further, NMFS' no jeopardy and no adverse critical habitat modification findings presumed the Corps would fully and timely implement the RPA measures. Indeed, the BiOp states, "NMFS is providing the [Corps] with the following [RPA] to avoid jeopardizing the continued existence of UWR Chinook salmon and UWR steelhead, and avoid destroying or adversely modifying their critical habitat." BiOp 9-5. The BiOp required the Corps to "complete each Project measure no later than the final date listed for each measure." BiOp 9-57; *see also* BiOp 9-61 ("[B]ecause some of the UWR Chinook salmon populations are presently at such low abundance levels and at high risk of extinction, interim [water quality] measures are needed as soon as possible to avoid further declines in abundance."); BiOp 9-90 ("NMFS' RPA provides a package of measures that will allow for the survival with an adequate potential for recovery for these two species."). The BiOp is unequivocal; the Corps needed to implement the entire RPA—especially the measures addressing downstream passage and water quality issues—to avoid jeopardizing the listed salmonids and adversely modifying their critical habitat.

The Corps, however, has failed to carry out several of the most important RPA measures listed above. Defendants concede "[t]here is no disagreement that the Corps has not completed the RPA measures relating to downstream passage within the time period specified in the RPA." Defs.' Mot. 1; *see also* Defs.' Reply 6, ECF 104 ("[T]he Corps has not completed all of the RPA measures relating to downstream passage and water quality."). The most significant example of the Corps' departure from the RPA is its failure to timely construct what NMFS dubbed the "Big 4," *i.e.*, downstream passage facilities at Cougar, Detroit/Big Cliff, and Lookout Point/Dexter dams, and a water temperature control structure at Detroit Dam. USACE 841136, 006584.

As mentioned, the RPA provided a 2014 deadline for construction of a downstream passage facility at Cougar Dam; however, the Corps is now only in the design phase and estimates the project will not be completed until 2022. BiOp 9-53; Defs.' Notice, Ex. 2 ("Defs.' Timeline"), at 10, ECF 81-2. Despite a 2023 deadline, the Corps estimates construction of the downstream passage facility at Detroit Dam will not be completed until 2028. BiOp 9-55; Defs.' Timeline 11. The Corps has essentially abandoned designing a downstream passage facility at Lookout Point Dam and will therefore not meet the RPA's 2021 deadline for that project. BiOp 9-54; USACE 335767 (noting the Corps will not even begin designing the Lookout Point passage structure until after the BiOp expires in 2023). The Corps will therefore not achieve the BiOp's requirement that all three downstream passage facilities be completed by 2023, much less NMFS' expectation that the Corps would have made significant progress on designing a fourth downstream passage facility by then. BiOp 9-49, 9-52. The RPA also provided a 2018 deadline for constructing a water temperature control structure at Detroit Dam, but the Corps estimates that it will not complete that project until 2024. BiOp 9-65; Defs.' Timeline 12. As the Court previously concluded, "Plaintiffs have established the Corps has not timely implemented many

of the RPA measures most vital for improving fish-passage and water-quality conditions." Op. & Order 22; *see also* Defs.' Timeline 8-10; Pls.' Notice 1-5, ECF 82-1.

The Corps asserts that the issue "does not depend on whether the full RPA has been implemented, but on whether the Corps has a reasonable basis for concluding [its] actions comply with Section 7(a)(2)." Defs.' Mot. 13. The Corps argues that it need not implement every aspect of the RPA to comply with the ESA because in *Bennett v. Spear*, the Supreme Court stated that the "action agency is technically free to disregard the Biological Opinion and proceed with its proposed action." *Bennett*, 520 U.S. 154, 170 (1997). The Corps, however, conveniently neglects to mention that the Supreme Court also cautioned that an agency choosing this path, "does so at its own peril." *Id.*

The Corps' reliance on *Tribal Vill. of Akutan v. Hodel*, for the proposition that an agency's "departure from the suggestions in the biological opinion does not by itself constitute a violation of [the] ESA" is misplaced. 869 F.2d 1185 (9th Cir. 1988). There, NMFS included an RPA measure recommending the Secretary of Interior institute a 25-mile buffer zone for offshore oil leases along the Alaska Peninsula to reduce the risk of oil spills to gray whales. *Id.* The Secretary did not fully adopt the measure; instead, he "deleted all tracts within 11 miles of shore and adopted alternative measures he considered sufficient to prevent preliminary activities from endangering the whales." *Id.* The Ninth Circuit found the Secretary's action did not violate the ESA because the alternative measures sufficiently ensured the whales would not be jeopardized. *Id.* at 1194.

Although the RPA is technically non-binding, the Corps has not identified any "alternative, reasonably adequate steps" it has taken to comply with the requirements of Section 7(a)(2). *Id.* at 1193. The actions identified by the Corps are merely other RPA measures, some of

which the Corps has only partially implemented. *See* Defs.' Timeline 8, 11-12. For example,

NMFS anticipated the "Big 4" could not be completed until later into the BiOp's 15-year term,

and therefore included RPA measures directing the Corps to study and carry out interim

operational changes to address downstream passage and water quality issues. BiOp 9-42 to -44,

9-61 to -64. The Corps contends that shortly after the BiOp was issued, it "began to investigate

and test numerous operational changes" at several WVP dams. Defs.' Mot. 19. The Corps also

notes that it replaced and extended operations of the Foster Dam fish weir, constructed a portable

floating fish collector at Cougar Reservoir, implemented nighttime use of the regulating outlets

at Cougar Dam, performed surface spill operations at Detroit Dam, and conducts an annual

drawdown of Fall Creek Reservoir. *Id.* Notably, however, the Foster fish weir is no longer in use

due to high fish mortality, and the experimental fish collector at Cougar Reservoir proved

unsuccessful. Schroeder Decl., Ex. A, ECF 97-1; USACE 832528; NMFS 6543.

      The Corps also notes that it built three new adult fish collection facilities and enhanced

adult fish release sites upstream of five dams. Def. Timeline 7.[5] The Corps argues those

improvements "also have the effect of improving downstream passage." Defs.' Reply 7. The

Corps' position is meritless; the RPA's upstream passage measures, while important, only

benefit discrete aspects of the salmonids' lifecycle—adult migration and spawning. Regardless

of how many adult fish the Corps traps below the dams, hauls by truck, and replants above the

dams, their offspring cannot further propagate the species if most of the juvenile salmonids are

unable to successfully navigate downstream of the dams to continue their lifecycle in the marine

---

[5] RPA measure 4.6 called for upgrades to a total of four adult fish collection facilities. Defs.'
Timeline 7; BiOp 9-40. Despite a 2014 construction deadline, the Corps only has "plans and
specifications prepared" for the Dexter facility. Defs.' Timeline 7. Further, the Corps was two
years behind schedule in completing the upgrades to the Fall Creek adult fish collection facility.
*Id.*

environment. The geographic and temporal complexity of the salmonids' various life stages supports Plaintiffs' assertion, and NMFS' opinion, that the RPA needed to be fully implemented to avoid jeopardy.

The Corps next contends that it had to conduct in-depth studies before it could proceed with the RPA's long-term water quality and downstream passage measures. Yet, the delays in completing those studies are attributable to the Corps. The RPA provided a 2012 deadline for the Corps to finish its assessment of options for long term fish passage, but it did not complete the Willamette Configuration Operation Plan ("COP") until 2015. BiOp 9-58; USACE 834521. In a November 2014 memorandum, NMFS' biologists stated, "The RPA deadline for the COP report was Jan[uary] 2012, which was not met because the BPA and Corps created a COP process far more complicated than NMFS expected or agreed was necessary." NMFS 3827. Similarly, the Corps was six years behind schedule in completing the initial Willamette Fish Operations Plan ("WFOP"), which was intended to identify optimal operating criteria to minimize fish injury and mortality, including operational measures for passage and water quality. BiOp 9-36; Defs.' Timeline 6.

Additionally, even assuming the Corps consistently carried out interim operational measures in all the relevant subbasins, which it concedes it has not, those measures were only intended as stopgaps until the "Big 4" became operational. BiOp 9-42, 9-61. As discussed, NMFS' no jeopardy and no adverse habitat modification findings were "based on the benefits attributed to successful completion" of the RPA, especially the "Big 4." BiOp 9-5; NMFS 3774 ("Recovery in Willamette cannot be achieved without downstream fish passage in all 4 basins. This is essential to avoiding jeopardy[.]"). Simply put, the Corps did not take "alternative, reasonably adequate steps" to ensure against jeopardizing the listed salmonids by only partially

implementing the RPA's temporary measures, and its departure from the RPA was not "well

reasoned [nor] supported by the record." *Tribal Vill. of Akutan*, 869 F.2d at 1193-94.[6]

Instead, the Corps failure to construct the "Big 4" is similar to previous case involving

the Corps, *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987), *abrogated on other grounds as*

*recognized in Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015).

There, the U.S. Fish and Wildlife Service ("FWS") issued a biological opinion on the Corps'

plan to construct a flood control channel that would destroy more than 40 acres of critical habitat

for two listed species of birds. *Id.* at 1379. FWS included an RPA measure directing the Corps to

acquire and preserve 188 acres of nearby wetlands to mitigate for the loss of habitat. *Id.* at 1379-

80. The Corps, however, commenced construction of the flood control channel before

completing the land transfer, and "took no legal action . . . to transfer the mitigation lands until

almost one year after the deadline for performance had passed[.]" *Id.* at 1385. The Ninth Circuit

held the Corps violated Section 7(a)(2), because its "actions f[e]ll far below insuring that the

project [wa]s not likely to jeopardize the continued existence of the [species]." *Id.* at 1385-86. As

*Sierra Club* and *Tribal Vill. of Akutan* illustrate, an agency violates Section 7(a)(2) where, as is

the case here, it fails to timely carry out critical RPA measures without taking alternative actions

to avoid jeopardizing a listed species.

Nonetheless, the Corps contends that despite its noncompliance with the RPA, it is not

violating Section 7(a)(2) because the UWR salmonids' ESA listing status of "threatened" has not

---

[6] The Corps argues that it just recently determined that it does not have the authority to carry out operational changes that forego hydropower production for an extended period of time. Nevertheless, it is undisputed that the Corps has the authority to construct the "Big 4" and will not meet the BiOp's deadlines for any of those projects. Therefore, the Corps' purported lack of authority to implement certain interim measures does not explain its failure to implement the "Big 4." Moreover, given that Plaintiffs are likely to request the type of relief they did in their request for a preliminary injunction, the issue of the Corps' authority to carry out interim operational measures is a question that should be resolved at the remedy phase of this case.

been elevated to "endangered" since the issuance of the 2008 BiOp. NMFS 6562, 6604. This
contention reveals a fundamental misunderstanding of the ESA on the Corps' part; "[t]he
purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely
the survival of their existing numbers." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 550-51
(9th Cir. 2016) (citing 16 U.S.C. §§ 1531(b), 1532(3)). Importantly, "the longer a listed species
remains at depressed population levels, the[] greater likelihood that chance events will severely
affect it or even wipe out its population." USACE 040282; *see also Nat'l Wildlife Fed'n v. Nat'l
Marine Fisheries Serv.* ("*NWF*"), 524 F.3d 917, 930 (9th Cir. 2008) (observing that a "slow slide
into oblivion is one of the very ills the ESA seeks to prevent").

Far short of moving towards recovery, the Corps is pushing the UWR Chinook and
steelhead even closer to the brink of extinction. The record demonstrates that the listed
salmonids are in a more precarious condition today than they were at the time NMFS issued the
2008 BiOp. USACE 049439 ("The ESA-protected fish are on the decline; the [NMFS] science
center is thinking about upgrading their status from 'Threatened' to 'Endangered.'"); USACE
213868-69, 213896; USACE 765136. As NMFS found in its 2019 BiOp on the Corps' plan to
reallocate water stored in the WVP reservoirs, "[t]he status of both species has declined since
2008," and "[b]oth species remain at high risk as they continue to experience the adverse effects
caused by operation of the WV[P] without full implementation of the RPA." Pls.' Ex. 59, at 95,
ECF 103-1.

Despite NMFS' concern that the salmonids' status might need to be changed from
threatened to endangered, the Corps maintains that it is not violating Section 7(a)(2) because
"NMFS did not object to its continuing operation and maintenance of the WVP pursuant to the
new RPA implementation schedule during the reinitiation period." Defs.' Reply 9. NMFS

Regional Administrator, Barry Thom, notes that delays "are typical for a project of this magnitude," and working towards completing the belated RPA measures during the reinitiated consultation process would be the "prudent course of action." Thom Decl. ¶¶ 4-5, ECF 68. If, however, multi-year delays in carrying out critical RPA measures are as typical as Thom describes, the BiOp should have anticipated those setbacks and accounted for their impacts on the listed salmonids. Instead, the RPA explicitly required the Corps to "complete each Project measure no later than the final date listed for each measure." BiOp 9-57. Basically, Defendants are "attempting to say that the [RPA] deadlines are not essential when it has already been established [in the BiOp] that they are." *Sw. Ctr. for Biological Diversity v. Babbitt* ("*Biological Diversity II*"), No. CIV. 97-0474 PHX-DAE, 2000 WL 33907602, at *10-11 (D. Ariz. Sept. 26, 2000).

The Court recognizes that the "Big 4" may still represent a path for the Corps to avoid jeopardizing the salmonids and does not necessarily disagree with Thom's opinion that continuing to implement the belated RPA measures during the reinitiated consultation process might be "prudent." However, Thom's belief as to the sensible way for the agencies to move forward does not, as the Corps asserts, equate to a determination by NMFS that the Corps is not causing jeopardy by continuing to operate the WVP without the critical RPA measures in place. As Defendants note, NMFS would first have to complete a new consultation process and issue a new biological opinion before it could even make such a determination. Defs.' Reply 9. Instead, the Court finds more persuasive the 2008 BiOp's conclusion, and the NMFS-biologists' contemporaneous opinions, that the RPA measures needed to be timely implemented to ensure against jeopardizing the listed salmonids. *See, e.g.*, NMFS 3417 (NMFS' February 2013 draft letter: "The analyses in the BiOps are based upon implementation of all components of NMFS

[RPA]"); NMFS 3774 (June 2014 comments on the Corps' strategy: "Recovery in Willamette cannot be achieved without downstream fish passage in all 4 basins. This is essential to avoiding jeopardy . . . . [and] has been reached through multiple analyses," including "NMFS' Willamette [Biological] Opinion 2008 [and] NMFS' Recovery Plan 2011"); USACE 841136 (March 2015 draft recommendation letter to the Corps: "[E]very one of the Big 4 are necessary to avoid jeopardizing the continued existence of ESA-listed species in the Upper Willamette River . . . . and should be constructed before the RPA expires in 2023"); NMFS 3904 (May 2015: "[I]mplementation of the RPA is critical to improve [the species'] status, especially the reintroduction, passage, and temperature control elements"); *see also Auer v. Robbins*, 519 U.S. 452, 462 (1997) (noting a court should not give deference to a "*post hoc* rationalization advanced by an agency seeking to defend past agency action against attack") (citation omitted).

Finally, Plaintiffs have shown the Corps' operation of the WVP without completing the RPA measures is causing the species' decline. The Corps argues that lack of downstream passage is a consequence of the physical presence of the dams, not its discretionary operations. The Corps further contends that Congress approved and funded the construction of the WVP dams even though it knew at the time that the dams would block upstream and downstream passage and "would be too high to permit the passage of migrant fish by means of facilities of demonstrated efficacy." Defs.' Mot. 18 (quoting H.R. Doc. No. 81-531, App. J, at 1732 (1950)). Similarly, the Corps insists—and Plaintiffs readily agree—that UWR Chinook and steelhead are negatively impacted by factors other than the WVP, including sea lion predation, warming ocean conditions, climate change, and habitat degradation. *See* BiOp 3-17; Piaskowski Decl. ¶ 13, ECF 70; Second Johnson Decl. ¶ 6, ECF 99. However, "even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing

additional harm." *NWF*, 524 F.3d at 930. For the reasons discussed, the Corps' continued operation of the WVP without the 2008 BiOp's critical RPA measures is a substantial factor in the listed salmonids' decline.

In sum, the 2008 BiOp included RPA measures specifying the actions the Corps needed to take to ensure its operation and maintenance of the WVP did not jeopardize UWR Chinook and steelhead or adversely modify the salmonids' critical habitat. Although the Corps has completed a significant number of the RPA measures, it has failed to timely implement several RPA measures critical to improving two of the primary impediments to the salmonids' continued existence and recovery—lack of safe downstream fish passage and poor water quality. Nor has the Corps taken any alternative, reasonably adequate steps to address the issues the RPA measures were intended to improve. Further, the status of the species has continued to decline since the BiOp was issued in 2008, and Plaintiffs have shown that the Corps' failure to implement the RPA measures is a cause of that decline. Accordingly, the Corps is violating ESA Section 7(a)(2).

## II.    ESA Section 9

Plaintiffs contend the Corps is violating Section 9 of the ESA because its operation and maintenance of the WVP is causing unlawful "take" of UWR Chinook salmon and UWR steelhead.

### A. Relevant Law

Section 9 of the ESA prohibits the "take" of species listed under the ESA. 16 U.S.C. § 1538(a)(1); *see also* 50 C.F.R. §§ 223.102, 223.203(a) (extending prohibition against take to UWR Chinook salmon and UWR steelhead). The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such

conduct." 16 U.S.C. § 1532(19). The ESA's implementing regulations further define "harm" as an "act which actually kills or injures wildlife" and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon* ("*Sweet Home*"), 515 U.S. 687, 696-700 (1995) (upholding the regulatory definition of "harm").

If, after consultation, the expert agency, such as NMFS, concludes that an agency action—as proposed or with RPA measures—is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, but determines that the action will nevertheless result in the "take" of listed species, the expert agency must issue an Incidental Take Statement ("ITS"). 16 U.S.C. § 1536(b)(4). The ITS specifies the impact of the incidental taking on the listed species, establishes reasonable and prudent measures that are necessary or appropriate to minimize the amount or extent of incidental take, and states the terms and conditions that the action agency must comply with to implement the reasonable and prudent measures. *Id.*; 50 C.F.R. § 402.02 (reasonable and prudent measures, which are distinct from RPA measures, "refer to those actions the [expert agency] believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take.").

Significantly, the ITS functions as a safe harbor provision from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with the ITS's terms and conditions. 16 U.S.C. § 1536(o). If the action agency disregards the terms and conditions of the ITS and a taking does occur, the agency may be subject to potentially severe civil and criminal penalties under Section 9. *Arizona Cattle Growers' Ass'n*, 273 F.3d at

1239. An ITS also "set[s] forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation." *Id.* at 1249.

### B. Analysis

Before turning to the merits of Plaintiffs' Section 9 claim, the Court must address Defendants' argument that Plaintiffs have waived the issue. Plaintiffs initially claimed that the Corps' failure to implement the RPA measures, in and of itself, violates Section 9 because the RPA is a term and condition of the ITS: "These terms and conditions constitute no more than minor changes because they only provide further elaboration on the more general measures in the [Proposed Action] and RPA." BiOp 11-40. As the Corps correctly notes, however, the language cited by Plaintiffs is included in the prefatory section of the ITS and does not incorporate the entire RPA as the ITS's terms and conditions or reasonable and prudent measures. Rather, where NMFS intended to adopt a specific RPA measure as a requirement of the ITS, it did so expressly. *See* BiOp at 11-57 (action agencies "must complete all monitoring and reporting requirements in the RPA"); BiOp at 11-40 (listing reasonable and prudent measures, none of which require the Corps to implement the RPA entirely). Perhaps recognizing that the ITS did not incorporate the RPA wholesale, Plaintiffs have altered course and expressly argue for the first time on summary judgment that the Corps is exceeding the take limits in the ITS. Specifically, Plaintiffs contend that the Corps is exceeding the ITS's mortality limits relating to downstream juvenile passage.

The Corps argues Plaintiffs waived their "takings" claim because Plaintiffs failed to allege that the Corps exceeded the take limits in their notice of intent to sue letter. The ESA precludes the commencement of citizen suits "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or

regulation." 16 U.S.C. § 1540(g)(2)(A)(i). The notice requirement is jurisdictional, and thus "failure to strictly comply" is an "absolute bar to bringing suit under the ESA." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation* ("*Biological Diversity I*"), 143 F.3d 515, 520 (9th Cir. 1998) (citations omitted).

Here, Plaintiffs alleged in their November 2017 notice letter that they intended to sue the Corps because its continued operation of the WVP without the RPA's passage measures, among other things, was violating ESA Section 9 by "causing unlawful 'take' of the[] species," "illegal take of individual fish," and was "killing, harming, and harassing the fish and degrading their habitat[.]" Defs.' Reply, Ex. A, at 1, 16, ECF 104-1. Although Plaintiffs did not specifically allege that the Corps is exceeding the ITS's take limits relating to downstream passage, "a notice need not provide the exact details of the legal arguments that the plaintiffs intend to eventually make." *Conservation Cong. v. Finley*, 774 F.3d 611, 618 (9th Cir. 2014) (citing *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1072-73 (9th Cir. 1996)). "The purpose of the [ESA]'s notice provision is 'to put the agencies on notice of a perceived violation of the statute' and to give them the 'opportunity to review their actions and take corrective measures if warranted.'" *Id.* (quoting *Biological Diversity I*, 143 F.3d at 520). Plaintiffs' letter fulfilled this purpose by notifying the Corps that its failure to implement the RPA was causing unlawful "take" of UWR Chinook salmon and steelhead in violation of Section 9, and demanding the Corps minimize the adverse impacts to the listed salmonids by modifying its operations of the dams.[7] Accordingly, Plaintiffs' letter gave the Corps sufficient notice of the Section 9 claim.

---

[7] The Corps' reliance on two Clean Water Act ("CWA") cases, *ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002), and *Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 803 (9th Cir. 2009), is unavailing. In comparing the CWA and ESA notice provisions, the Ninth Circuit stated: "Unlike the citizen suit statutory provision in the CWA, the ESA's notice provision has no implementing regulation. Accordingly, to the degree

In a similar vein, the Corps contends that the claim is waived because Plaintiffs did not allege the same "take" theory in their Complaint. The Corps argues that the Court may not reach arguments raised for the first time in a summary judgment response. For a claim to be properly pleaded in a complaint, "[t]he necessary factual averments are required with respect to each material element of the underlying legal theory[.]" *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citation omitted). The elements of a "takings" claim are that (1) an unlawful "take" has occurred, and (2) the "take" was caused by the agency action at issue. *Biological Diversity II*, 2000 WL 33907602, at *12.

Here, the Complaint alleges "the Corps is violating ESA Section 9" by "causing or contributing to take of [UWR] Chinook salmon and steelhead that is not authorized by NMFS," because "the operation of the [WVP] continues to kill, harm, and harass the fish." Compl. 28, ECF 1. Plaintiffs allege that the Corps' operation of the WVP included its "failure to implement many [RPA] measures, particularly key measures to improve fish passage[.]" *Id.* at 27-28. This was sufficient to put the Corps on notice of Plaintiffs' Section 9 claim. *Cf. Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (finding waiver where the complaint gave no notice of the plaintiffs' theory that the agency violated NEPA by failing to adequately consider the risks posed by human ingestion of artificial snow).

Although the Court acknowledges that Plaintiffs have somewhat shifted gears, the Corps' claimed lack of notice is without merit. As mentioned, Plaintiffs originally argued that the RPA was part of the ITS's terms and conditions, and therefore the Corps was violating the ITS—and

---

that the CWA implementing regulation might be thought to require more specific notice than would be required under the [ESA], standing alone, [a court is] not bound to adopt that more demanding requirement." *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 650 (9th Cir. 2015) (citation omitted). As discussed, Plaintiffs satisfied the ESA's notice requirement because the intent to sue letter provided "sufficient information of a violation so that the [Corps] could identify and attempt to abate the violation." *Biological Diversity I*, 143 F.3d at 522.

ESA Section 9's prohibition against unlawful takings—by operating the WVP without implementing the RPA, including the measures addressing downstream passage. Plaintiffs now argue that the Corps is violating Section 9 because its continued operation of the WVP without the RPA's downstream passage measures is killing—causing "take" of—more juvenile salmonids than permitted by the ITS. Essentially, the Corps' position is that it has known Plaintiffs' "takings" claim was premised, in part, on the Corps unlawfully killing listed fish, but it had no reason to know Plaintiffs also believe the Corps is killing too many fish. The Court is not persuaded. Moreover, as Plaintiffs note, the Corps had the opportunity to, and did, address Plaintiffs' "take" theory. Therefore, the Corps is not prejudiced by reaching the merits of the claim.

As to the merits, to prove a violation of Section 9 of the ESA, Plaintiffs must demonstrate by a preponderance of the evidence that the Corps' operation of the WVP "causes 'take' beyond that allowed in the ITS." *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, No. 3:12-CV-00431-HA, 2013 WL 12120102, at *11 (D. Or. May 16, 2013) (citing *Sweet Home*, 515 U.S. at 696 n.9 & 700 n.13 (noting "harm" is subject to "ordinary requirements of proximate causation and foreseeability")); *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000).[8] "[T]akes outside the scope of an ITS can give rise to the requirement to reinitiate consultation *and* liability for violation of Section 9." *California Trout, Inc. v. United States Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1115 (C.D. Cal. 2015) (citing *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1239; *S. Yuba River Citizens League v. Nat'l Marine Fisheries*

---

[8] Plaintiffs argue the Corps bears the burden of proving that it stayed within the ITS's take limits. The case on which Plaintiffs rely, *United States v. Charette*, is inapposite. 893 F.3d 1169, 1174 (9th Cir. 2018). That case held that a private party being prosecuted for "take" of an endangered species in violation of the ESA bears the burden of proving he or she had a valid take permit as an affirmative defense *in a criminal action*. *Id.*

*Serv.*, 629 F. Supp. 2d 1123, 1132-33 (E.D. Cal. 2009)); *see also Native Fish Soc'y*, 2013 WL 12120102, at *11; *Strahan v. Roughead*, 910 F. Supp. 2d 358, 374 (D. Mass. 2012) (ITS shields an agency from Section 9 liability as long as "the agency complies with the conditions and take limits established by the ITS").

The ITS specifies the following mortality limits with regard to downstream passage for juvenile UWR Chinook: (1) up to 65% at Detroit and Big Cliff dams in the North Santiam subbasin; (2) up to 10% at Foster Dam in the South Santiam subbasin; (3) up to 32% at Cougar Dam in the McKenzie subbasin; and (4) up to 68.3% at Fall Creek Dam and 21% at Lookout Point and Dexter dams in the Middle Fork Willamette subbasin. BiOp 11-11 to -13. The ITS also permits up to 10% downstream passage mortality for juvenile UWR steelhead passing Foster Dam in the South Santiam subbasin. BiOp 11-14. NMFS expected, "*at most*, the (quantifiable) amounts of incidental take of UWR Chinook and steelhead due to project passage[.]" BiOp 11-6 (emphasis added). In fact, NMFS anticipated that "incidental take in the form[] of . . . juvenile passage mortality" would decline "[a]s the RPA and Proposed Action are implemented." BiOp 11-6.

In support of their argument that the Corps exceeded the ITS's take limits, Plaintiffs cite to a 2016 PowerPoint presentation prepared by the Corps estimating juvenile passage mortality at the dams was between 71% and 89%. USACE 006584. The Corps offers no evidence to rebut Plaintiffs' argument. Instead, the Corps asserts that the presentation does not specify which "dams" the data refers to. Defs.' Reply 18 n.4. The Corps' footnoted argument, however, ignores the context of its own presentation, which is titled "Willamette Valley Project . . . Biological Opinion(s) Implementation IPR-Discussion." USACE 006579. The purpose of the presentation was to "[p]rovide an update on the work accomplished . . . and outline the regional analysis for

executing the remaining work (in the BiOps)[.]" USACE 006580. The slide containing the

passage mortality estimate notes that the "'Big 4' measures are the most important and necessary

to avoid jeopardy due to harm caused by blocked passage," and specifically refers to the

percentage of habitat blocked by "the dams" in the McKenzie, North Santiam, South Santiam,

and Middle Fork Willamette subbasins. USACE 006584. The remaining slides generally discuss

the Corps accomplishments in carrying out some of the RPA measures, its need to implement the

"Big 4," various options for the downstream passage facilities, and funding for the projects.

USACE 006585-94. Clearly, the "dams" referenced in the presentation are the WVP dams

corresponding with the "Big 4" projects—Detroit, Cougar, and Lookout Point. USACE 006588.

The Corps next argues that no source data is provided for the juvenile passage mortality

estimates in the presentation. Yet the slide indicates that the source of the data is "NOAA,"

which stands for the National Oceanic and Atmospheric Administration, NMFS' parent agency.

USACE 006584. Moreover, the Corps' COP Phase II report provides *identical* data concerning

juvenile passage mortality. Relevant here, downstream passage mortality under baseline

operations was modeled at 71% for juvenile Chinook salmon passing Detroit and Big Cliff dams;

35% for juvenile Chinook salmon and 51% for juvenile steelhead passing Foster Dam; 89% for

juvenile Chinook salmon passing Cougar Dam; and 80% for juvenile Chinook salmon passing

Lookout Point Dam. USACE 835807 (North Santiam), 835830-32 (South Santiam), 835856

(McKenzie), 835873 (Middle Fork Willamette); *see also* USACE 841136-40 (NMFS'

recommendation for implementation of the "Big 4" discussing substantially similar downstream

passage mortality data).

As the record demonstrates, the Corps is violating the ITS's take limits for each of the

relevant subbasins within the WVP. First, in the North Santiam subbasin, only UWR Chinook

are trapped and hauled above the Big Cliff/Detroit complex, meaning juvenile UWR steelhead do not pass downstream through the North Santiam dams. Piaskowski Decl. ¶ 26. At 71% mortality, the Corps is exceeding the ITS's 65% mortality limit for juvenile Chinook salmon outmigrating past the Big Cliff/Detroit complex. USACE 835807; BiOp 11-11. Second, in the South Santiam subbasin, both species are replanted above Foster Dam, but not Green Peter Dam. Piaskowski Decl. ¶¶ 22, 84. At 35% mortality for juvenile Chinook salmon and 51% mortality for juvenile steelhead, the Corps is surpassing the ITS's 10% limit for Foster Dam. USACE 835830-32; BiOp 11-11. Third, in the McKenzie subbasin, at 89% downstream passage mortality for juvenile UWR Chinook, the Corps is eclipsing the ITS's 32% limit for Cougar Dam. USACE 835856; BiOp 11-12. Finally, in the Middle Fork Willamette, at 80% downstream passage mortality for UWR Chinook, the Corps is greatly exceeding the ITS's 21% limit for Lookout Point Dam. USACE 835873; BiOp 11-12. The Corps is therefore violating the ITS's take limits in each subbasin.

As to causation, Plaintiffs have shown that the Corps' discretionary actions are causing the unlawful "take" of UWR Chinook and steelhead. In a familiar argument, the Corps contends that it cannot be held liable for "takes" caused by "the mere existence of dams that Congress authorized decades ago knowing that they would block passage." Defs.' Mot. 22. NMFS, however, has already addressed this issue in a Final Rule and commentary. *Our Children's Earth v. Leland Stanford Junior Univ.*, No. 13-CV-00402-EDL, 2015 WL 12745786, at *7 (N.D. Cal. Dec. 11, 2015) (citing Endangered and Threatened Wildlife and Plants; Definition of "Harm", 64 Fed. Reg. 60727-01 (Nov. 8, 1999)). Several commenters to the Rule "stated that the current owner of a dam lawfully installed before a species is listed should not be liable for take based on subsequent listing." 64 Fed. Reg. 60729. NMFS agreed that "simply holding title to a barrier . . .

is not necessarily a take under the ESA"; however, "maintaining or improving an existing facility

may actually injure or kill members of a listed species if it significantly impairs essential

behavioral patterns such as spawning, rearing or migrating." *Id.*

Here, the Corps does much more than merely hold title, it operates and maintains the

WVP dams. *See Our Children's Earth*, 2015 WL 12745786, at *7. As the BiOp recognizes, the

Corps' operation of the WVP and the configurations it chooses for downstream fish passage

cause juvenile salmonid mortality. BiOp 5.2-12, 5.3-9, 5.5-9, 5.6-9; *see also* BiOp 11-6 ("NMFS

anticipates that the continued operation of the [WVP] dams and reservoirs under the PA and

RPA will result in incidental take of the species[.]"). Because the Corps' is causing "take" of

juvenile salmonids in excess of the ITS's limits, the Corps is violating ESA Section 9.

## III.    Failure to Reinitiate Consultation

As mentioned, shortly after Plaintiffs brought this action, Defendants reinitiated formal

ESA consultation over the Corps' operation and maintenance of the WVP in April 2018. NMFS

7139, USACE 021143. Defendants argue Plaintiffs' failure-to-reinitiate claim is now moot

because they have reinitiated consultation. Plaintiffs counter that the claim presents a live

controversy because the Court can still grant effective relief.

Article III of the United States Constitution requires that there be a live "case" or

"controversy." A federal court must decide mootness before it can assume jurisdiction. *North

Carolina v. Rice*, 404 U.S. 244, 246 (1971). "The starting point for analysis is the familiar

proposition that 'federal courts are without power to decide questions that cannot affect the rights

of litigants in the case before them.'" *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (quoting

*Rice*, 404 U.S. at 246). "[A] suit becomes moot, 'when the issues presented are no longer "live"

or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 568 U.S. 165,

172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Mootness is determined

on a claim by claim basis. *Pac. Nw. Generating Coop. v. Brown*, 822 F. Supp. 1479, 1506 (D.

Or. 1993), *aff'd* 38 F.3d 1058 (9th Cir. 1994) (citing *Headwaters, Inc. v. Bureau of Land Mgmt.,*

*Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989)). The burden of establishing mootness is

"heavy; a case is not moot where any effective relief may be granted." *Forest Guardians v.*

*Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (citation omitted).

      The cases cited by Defendants illustrate that a failure-to-reinitiate claim is moot where

the only requested relief is for an agency to reinitiate consultation and it already has done so.

*See*, *e.g.*, *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014)

("Reinitiation of consultation is the precise relief sought . . . . Accordingly, [the plaintiff]'s

Section 7 claim is moot."); *All. for the Wild Rockies v. U.S. Army Corps of Eng'rs*, 237 F. Supp.

3d 1079, 1084, 1086 (D. Or. 2017) (same); *Ctr. for Biological Diversity & Desert Survivors v.*

*U.S. Bureau of Land Mgmt.*, No. CV 08-7679-JFW (EX), 2009 WL 10675702, at *2 (C.D. Cal.

Mar. 23, 2009) (same). Therefore, Plaintiffs' claim is moot to the extent it seeks reinitiation of

formal consultation.

      Plaintiffs, however, assert there are other types of effective relief the Court could grant.

Plaintiffs contend, and the Court agrees, that this case is similar to *Hoopa Valley Tribe v.*

*National Marine Fisheries Service*. 230 F. Supp. 3d 1106 (N.D. Cal. 2017), *modified sub nom.*

*Tribe v. U.S. Bureau of Reclamation,* No. 3:16-CV-04294-WHO, 2017 WL 6055456 (N.D. Cal.

Mar. 24, 2017), *order clarified sub nom. Tribe v. Nat'l Marine Fisheries Serv.*, No. 16-CV-

04294-WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018). There, the biological opinion

governing the Bureau of Reclamation ("Reclamation")'s operation of the Klamath River

Irrigation Project set forth incidental take limits on the permissible rate of *Ceratanova shasta*

infection in Coho salmon. *Id.* at 1112. Reclamation greatly exceeded the infection rate limits for two years before reinitiating ESA consultation. *Id.* In addition to a court order directing the defendants to reinitiate consultation, the plaintiffs requested "an injunction in the form of specific protective flows to be put in place while the agencies complete the consultation process." *Id.* at 1132. The district court found the failure-to-reinitiate claim was not moot because the court could still grant effective injunctive relief. *Id.*

Here, Plaintiffs have similarly requested injunctive relief in the form of operational changes to the WVP during the pendency of the reinitiated consultation process. Injunctive relief is appropriate "where the violation complained of may have caused continuing harm and where the court can still act to remedy such harm by limiting its future adverse effects[.]" *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) ("[T]he damage can still be repaired or mitigated—obviously not by restoring the fish harvested in 1986, but by allowing more fish to spawn in 1989."); *see also Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) ("A request for injunctive relief remains live only so long as there is some present harm left to enjoin."). Moreover, "a declaratory judgment could help to remedy the effects of the agency's statutory violations and to ensure that similar violations would not occur in the future[.]" *Forest Guardians*, 450 F.3d at 462 (citing *Nw. Envtl. Def. Ctr.*, 849 F.2d at 1245).

As discussed, the Corps' operation of the WVP without timely implementing critical RPA measures is jeopardizing and unlawfully taking UWR Chinook and steelhead. Defendants could have identified means to mitigate those harms by reinitiating formal consultation sooner. Plaintiffs' failure-to-reinitiate claim is not moot because an injunction could remedy the present and future adverse effects caused by the agencies' delay in reinitiating consultation. Furthermore, a declaratory judgment would also put NMFS on notice that it must reinitiate consultation sooner

when an action agency substantially deviates from the RPA or exceeds the ITS's take limits. *Nw. Envtl. Def. Ctr.*, 849 F.2d at 1244-45 ("[I]n deciding a mootness issue, 'the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief.'") (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986)) (emphasis original); *see also WildEarth Guardians v. U.S. Forest Serv.*, No. CV-10-385-TUC-DCB, 2011 WL 11717438, at *5 (D. Ariz. July 21, 2011) (finding failure-to-reinitiate claim not mooted by reinitiation of consultation where the defendants were "unable to comply with the [requirements] of the [prior] BiOp [so] there could be ongoing and future harm to [the species]"). Therefore, Defendants have not carried the heavy burden of establishing Plaintiffs' failure-to-reinitiate claim is moot because there potentially remains effective injunctive relief that the Court could grant to address the ongoing harms caused by Defendants' unlawful delay.

Nonetheless, like the federal defendants in *Hoopa Valley Tribe*, Defendants contend that "the only appropriate remedy for a failure to reinitiate claim is an order directing the agencies to reinitiate formal consultation, not an injunction," because "any injunctive relief must be narrowly tailored to the alleged violation." 230 F. Supp. 3d at 1133. Contrary to Defendants' assertion, however, "injunctive relief is an appropriate remedy for a substantial procedural violation of the ESA." *Id.* at 1134 (citing *Washington Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005); *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985)). Thus, the issue turns on whether the Corps' failure reinitiate ESA consultation was a substantial procedural violation, *i.e.*, "a violation that is not technical or de minimis." *Washington Toxics Coal.*, 413 F.3d at 1034. The Court finds a substantial procedural violation.

Relevant here, reinitiation of ESA consultation "is required and shall be requested" if: (1) "the amount or extent of take specified in the incidental take statement is exceeded"; or (2) "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." 50 C.F.R. § 402.16(a). The duty to reinitiate consultation applies to both the Corps and NMFS. *Sierra Club*, 816 F.2d at 1386 (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.16). Because the Corps' failure to timely implement the critical RPA measures modified the operation and maintenance of the WVP in a manner that was not considered in the 2008 BiOp, and because the Corps' exceeded the ITS's take limits, Defendants were required to reinitiate consultation. *See* NMFS 3408-09 ("Delays in the implementation of multiple RPA components have prevented many anticipated benefits to ESA-listed fish without clear documentation or rationale, compromising the analyses in the BiOp.").

As Plaintiffs note, it became apparent that the Corps was not going to meet the RPA deadlines several years before the agencies reinitiated consultation in April 2018. The RPA directed the Corps to complete the WFOP by 2008, begin carrying out interim operational measures in 2010 and 2011, finish the COP by 2012, complete the Dexter adult fish facility and the Cougar downstream passage facility by 2014, construct the Detroit temperature control structure by 2018, and build the Lookout Point downstream passage structure by 2021. BiOp 9-36, 9-40, 9-42, 9-53 to -55, 9-58, 9-62, 9-65. Yet by 2013, the Corps had not completed the WFOP or the COP, had not implemented interim operational measures at most of the dams, and did not plan to begin constructing the Dexter adult collection facility or Cougar juvenile passage facility until 2014. Defs.' Timeline 6-12. NMFS began expressing its concerns about the Corps missing critical RPA deadlines in early 2013, but it did not request to reinitiate consultation.

NMFS 3408-09; NMFS 3417-18. In a May 2013 letter, the Assistant Regional Administrator of NMFS' Hydropower Division stated: "The purpose of this letter is to inform [the Corps], pursuant to NMFS regulations at 50 CFR 402.16, that we believe it is now necessary to reinitiate consultation and prepare a revised Opinion." NMFS 3795-96. Unfortunately, that letter was never transmitted to the Corps.

Further, it became clear in 2014 and 2015 that the Detroit temperature tower would be significantly delayed, and the Corps was no longer planning to construct the Lookout Point downstream passage facility or the Dexter adult collection facility. NMFS 3768; NMFS 3852-53. In June 2014, a NMFS' biologist noted that the Corps was "missing firm deadlines in the RPA," and that it was "highly unlikely that [the Corps will] get [the RPA measures] all finished by 2023." NMFS 3723. But instead of formally reinitiating consultation, NMFS began strategizing ways to use the threat of requesting consultation as a way of incentivizing the Corps to "make a commitment to do fish passage asap at Cougar or Detroit." NMFS 3713; *see also* NMFS 3714 ("The reason to consider [reinitiating consultation] would be if we are aware of [a] potential litigator, and we want to distance ourselves from the [Corps'] implementation of the RPA"). And in October 2014, NMFS noted that the agencies were "at a pivotal point in RPA implementation," but the "Corps' Portland District managers continue[d] to postpone dates for sharing their draft proposals" on how to implement the RPA. NMFS 3808. Despite clear indications in 2013, 2014, and 2015 that the Corps was not going to meet the deadlines for the "Big 4" and other critical RPA measures—triggering Defendants' duty to reinitiate formal ESA consultation—the agencies did not do so until April 2018, and only after Plaintiffs brought suit.

Finally, as discussed, Defendants failed to reinitiate consultation despite exceeding the ITS's downstream passage mortality limits for several years. "It is not a de minimis violation for

[D]efendants to fail to reinitiate formal consultation for[] years after the requirement to reinitiate was triggered where that trigger [undermines] the BiOp's no-jeopardy determination." *Hoopa Valley Tribe*, 230 F. Supp. 3d at 1135. Therefore, the Corps' significant delay in reinitiating consultation was a substantial procedural violation of the ESA. For the same reason, NMFS' decision not to reinitiate consultation until 2018—despite acknowledging that it should have done so as early as 2013 and knowing the Corps was greatly exceeding the ITS's take limits— was arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).

## CONCLUSION

For the reasons discussed, the Court GRANTS Plaintiffs' Motion for Summary Judgment [ECF 96] and DENIES Defendants' Motion for Summary Judgment [ECF 101]. The parties shall submit a joint briefing schedule within fourteen days of this Opinion & Order.

IT IS SO ORDERED.

DATED:_____August 15, 2020_____.

_Marco Hernandez_
MARCO A. HERNÁNDEZ
United States District Judge