JEAN E. WILLIAMS, Deputy Assistant Attorney General
SETH M. BARSKY, Chief
S. JAY GOVINDAN, Assistant Chief
MICHAEL R. EITEL, Senior Trial Attorney
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-1050
Facsimile: (202) 305-0275
Email: michael.eitel@usdoj.gov; kaitlyn.poirier@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, et al. | Case No.: 3:18-cv-00437-HZ |
| Plaintiffs, | FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' OPENING BRIEF ON REMEDY |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants, | |
| and | |
| CITY OF SALEM and MARION COUNTY, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND.....................................................................................................2

III.  STANDARD OF REVIEW....................................................................................3

IV    ARGUMENT..........................................................................................................3

   A.  Plaintiffs have not established that they will be imminently, irreparably harmed by the Corps' operations during the reinitiated consultation period. ...........................................................................................4

      1.  Plaintiffs' allegations of harm to individual salmonids and the lack of biological recovery do not establish irreparable harm. ....................................................................5

      2.  Plaintiffs cannot establish irreparable harm because the Corps' interim measures are likely to improve conditions for UWR Chinook and steelhead. ..................................8

   B.  The Court should not grant Plaintiffs' proposed injunction. ...........................................12

      1.  Plaintiffs improperly rely on a technical advisory team to fill holes in their proposed injunction and create new injunction actions. ..............................................................12

      2.  Plaintiffs propose other injunction actions that would impermissibly require the Corps to violate the law. ........................................................................................................14

         i. Plaintiffs' Injunction Violates the Flood Control Act. ...........................................14

         ii. Plaintiffs' Injunction violates the CWA. ...............................................................18

      3.  Of Plaintiffs' proposed operational injunction actions that can be implemented, Plaintiffs neglect how those actions add harms and risks to the UWR Chinook and UWR steelhead species. ........................................................................................................19

      4.  Plaintiffs' proposed injunction does not materially benefit UWR Chinook and UWR steelhead when compared to the Corps' interim measures. ..........................................26

   C.  Plaintiffs have not established that the Court should grant their non-operational injunction measures. ..............................................................................................................28

   D.  Plaintiffs' proposed injunction is vague and not implementable. ...................................30

   E.  The balancing of harms and public interest weigh decidedly against granting Plaintiffs' preferred injunction ..........................................................................................................32

V.    CONCLUSION....................................................................................................35

# TABLE OF AUTHORITIES

**CASES**  **PAGE**

*All for the Wild Rockies v. Kruger,*
  35 F. Supp. 3d 1259 (D. Mont. 2014) ...................................................................32

*Amoco Prod. Co. v. Village of Gambell,*
  480 U.S. 531 (1987) ...........................................................................................7

*Armstrong v. Brown,*
  768 F.3d 975 (9th Cir. 2014) ...........................................................................13

*Atl. Coast Line R. Co. v. State of Fla.,*
  295 U.S. 301 (1935) ...........................................................................................7

*Cal. by & through Becerra v. Env't Prot. Agency,*
  978 F.3d 708 (9th Cir. 2020) ....................................................................... passim

*Britt v. Corps,*
  769 F.2d 84 (2d Cir. 1985) ..........................................................................17, 18

*Burlington N. R. Co. v. Dep't of Revenue of State of Wash.,*
  934 F.2d 1064 (9th Cir. 1991) .........................................................................13

*Cascadia Wildlands v. Kitzhaber,*
  911 F. Supp. 2d 1075 (D. Or. 2012) ................................................................13

*City & Cty. of San Francisco v. Barr,*
  965 F.3d 753 (9th Cir. 2020) ...........................................................................29

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
  789 F.3d 1075 (9th Cir. 2015) ...........................................................................8

*Creppel v. Corps,*
  670 F.2d 564 (5th Cir. 1982) ...........................................................................17

*Ctr. for Food Safety v. Vilsack,*
  636 F.3d 1166 (9th Cir. 2011) .........................................................................29

*Environmental Defense Fund v. Alexander,*
  467 F. Supp. 885 (N.D. Miss. 1979) ...............................................................18

*Fed. Power Comm'n v. Idaho Power Co.,*
    344 U.S. 17 (1952) ............................................................................................30

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ...........................................................................................3

*Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.,*
    736 F.3d 1239 (9th Cir. 2013) .........................................................................12

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010) ...........................................................................................7

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ...........................................................................12

*Idaho Rivers United v. Corps,*
    156 F. Supp. 3d 1252 (W.D. Wash. 2015) ...................................................32-33

*In re Operation of Missouri River System Litigation,*
    421 F.3d 621 (8th Cir. 2005) ...........................................................................18

*Immigr. & Naturalization Serv. v. Pangilinan,*
    486 U.S. 875 (1988) .........................................................................................14

*Kimberly v. Arms,*
    129 U.S. 512 (1889) .........................................................................................13

*La Buy v. Howes Leather Co.,*
    352 U.S. 249 (1957) .........................................................................................13

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) .........................................................................................16

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...........................................................................................6

*Meeropol v. Meese,*
    790 F.2d 942 (D.C.Cir.1986) ..........................................................................13

*Michigan v. U.S. Army Corps of Eng'rs,*
    667 F.3d 765 (7th Cir. 2011) .............................................................................2

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ................................................................................3, 29, 33

*Nat'l Wildlife Fed'n v. NMFS,*
  886 F.3d 803 (9th Cir. 2018) .................................................................. 6, 7, 29, 32

*Nat'l Wildlife Fed'n v. NMFS,*
  524 F.3d 917 (9th Cir. 2008) .................................................................. 30

*Oceana, Inc. v. Pritzker,*
  75 F. Supp. 3d 469 (D.D.C. 2014) ........................................................... 5

*Office of Pers. Mgmt. v. Richmond,*
  496 U.S. 414 (1990) ................................................................................ 14

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez,*
  606 F. Supp. 2d 1195 (E.D. Cal. 2008) .................................................... 6

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust,*
  636 F.3d 1150 (9th Cir. 2011) ................................................................ 11

*Parker v. Winnipiseogee Lake Cotton & Woolen Co.,*
  67 U.S. 545 (1862) .................................................................................. 12

*Price v. City of Stockton,*
  390 F.3d 1105 (9th Cir. 2004) .................................................................. 8

*Robertson v. Seattle Audubon Soc'y,*
  503 U.S. 429 (1992) ................................................................................ 14

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,*
  2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) ....................................... 11

*Salazar v. Buono,*
  559 U.S. 700 (2010) ................................................................................ 35

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) ............................................................ 14, 34

*Schmidt v. Lessard,*
  414 U.S. 473 (1974) ................................................................................ 31

*Sierra Club v. Trump,*
  929 F.3d 670 (9th Cir. 2019) .................................................................. 35

*Tenn. Valley Auth. v. Hill,*
  437 U.S. 153 (1978) ..................................................................................................4, 7, 33

*Union Pac. R.R. v. Mower,*
  219 F.3d 1069 (9th Cir. 2000) ........................................................................................30

*United States v. 2,606.84 Acres of Land in Tarrant County, Texas,*
  432 F.2d 1286 (5th Cir. 1970) ........................................................................................17

*United States v. Bernardine,*
  237 F.3d 1279 (11th Cir. 2001) ......................................................................................13

*United States v. Oakland Cannabis Buyers' Coop.,*
  532 U.S. 483 (2001) ........................................................................................................33

*United States v. Or. State Med. Soc'y,*
  343 U.S. 326 (1952) ..........................................................................................................4

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
  435 U.S. 519 (1978) ........................................................................................................30

*W. Watersheds Project v. Salazar,*
  692 F.3d 921 (9th Cir. 2012) ..........................................................................................32

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ........................................................................................................32

*Wild Equity Inst. v. City and Cty. of San Francisco,*
  No. C 11-00958 SI, 2011 WL 5975029 (N.D. Cal. Nov. 29, 2011) ..........................5-6

*Winter v. Nat'l Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ....................................................................................................passim

*Zepeda v. U.S. Immigr. & Naturalization Serv.,*
  753 F.2d 719 (9th Cir. 1983) ............................................................................................3

## STATUTES

16 U.S.C. § 1536(a)(2) ....................................................................................................5, 33

16 U.S.C. § 1539 ............................................................................................................5, 13

16 U.S.C. § 1540(g)(1) ..........................................................................................................3

16 U.S.C. § 1531(b) ...............................................................................................................5

16 U.S.C. § 1538(a)(1) ...................................................................................................13, 33

33 U.S.C. § 1313 ...................................................................................................................18

33 U.S.C. § 1323 ...................................................................................................................18

1938 Flood Control Act, Pub. L. No. 75-761 .....................................................................15

1950 Flood Control Act, Pub. L. No. 81-516 .....................................................................15

## FEDERAL REGULATIONS

Federal Rule of Civil Procedure 65 ...........................................................................2, 4, 30

## OTHER AUTHORITIES

House Document 531 .......................................................................................................15, 16

## ACRONYMS AND ABBREVIATIONS

APA – Administrative Procedure Act

BiOp – biological opinion

Bonneville – Bonneville Power Administration

CWA - Clean Water Act

Corps – United States Army Corps of Engineers

ESA – Endangered Species Act

EPA - Environmental Protection Agency

FCA - Flood Control Act

FWS – United States Fish and Wildlife Service

HD - House Document

NMFS – National Marine Fisheries Service

NEPA – National Environmental Policy Act

ODFW - Oregon Department of Fish and Wildlife

RPA – reasonable and prudent alternative

TAT - Plaintiffs' proposed six-member Technical Advisory Team

TDG – total dissolved gas

UWR – Upper Willamette River

UWR salmonids – Upper Willamette River Chinook salmon evolutionarily significant unit and

Upper Willamette River winter steelhead distinct population segment

WATER - Willamette Action Team for Ecosystem Restoration

WVP – Willamette Valley Project

## I.    INTRODUCTION

"If it was an easy decision, an easy problem, it already got fixed." – *Major General John S. Kem, United States Army Corps of Engineers (Retired)*[1]

      Plaintiffs have lost sight of this reality. They present a multi-faceted injunction to restructure the United States Army Corps of Engineers' operation of the Willamette Valley Project ("WVP"). And they ask the Court to strip the Corps of its operational authority, assigned to it by Congress, and transfer those functions to six unidentified individuals. Plaintiffs present this draconian remedy as if the decision were easy and free from doubt. But Plaintiffs can do so only because they did not bother to first ensure that the Corps could implement the injunction in compliance with the United States Constitution and Congress' laws, much less without harming Upper Willamette River Chinook and steelhead ("UWR salmonids") or other project purposes.

      Plaintiffs propose some injunction actions, like deep reservoir drawdowns, that conflict with Congress' authorizations on how the Corps should operate the WVP, supplanting those authorizations with Plaintiffs' own priorities. Plaintiffs propose other actions, like providing spill over the dams, that may require the Corps to operate the dams in violation of the Clean Water Act ("CWA") and standards established by the State of Oregon's Department of Environmental Quality. Other actions would require the Court to delegate Article III judicial functions to a six-member panel in violation of the Constitution and Ninth Circuit precedent. Still other actions negatively impact authorized project purposes that bring important benefits to the region, such as recreation and hydropower. Of the operational actions that remain, the actions at best tweak measures the Corps already implements or is going to implement. At worst, Plaintiffs' proposed injunction actions add harms and "take" that are likely to degrade the status of UWR salmonids.

      Federal Defendants recognize that the Court has identified serious violations of the Endangered Species Act ("ESA"), which the Corps and the National Marine Fisheries Service ("NMFS") will address on remand or appeal. But ESA violations should not be met with Court

---

[1] https://cumberlink.com/news/local/military/carlisle-community-connection-key-for-maj-gen-john-kem-as-he-moves-on-from-post/article_56a5a4ee-a4b2-51e7-8ab7-0ec6d77028e2.html. Major General Kem was the Corps' Northwestern Division Commander from 2013-2015.

orders enjoining Federal agencies to disregard the authority Congress granted them to operate the WVP or requiring agencies to violate the law. The Court's remedy must follow Congress' laws, not circumvent them. When the Court eliminates Plaintiffs' measures that violate Congress' laws and the Constitution, what remains are measures that are not implementable, harm UWR salmonids, will require biological tradeoffs, negatively impact other authorized purposes, or do not materially add to the protections the Corps already performs for the benefit of UWR salmonids. In this situation, where the "harms are in equipoise" and when the Corps and NMFS, in concert with regional parties, "are actively pursuing an array of efforts to solve the problem," the Court should stay its hand. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 796 (7th Cir. 2011). In accord, the Court should exercise its discretion to enforce the ESA through declaratory relief and, at most, retain jurisdiction to ensure the agencies' timely completion of the ESA reinitiated consultation already underway.

## II.    BACKGROUND

Plaintiffs brought this action in early 2018, alleging that the Corps is violating the ESA through its operation and maintenance of the WVP and that NMFS had violated the Administrative Procedure Act ("APA") by not reinitiating ESA consultation earlier on its 2008 biological opinion ("BiOp"), which analyzed the effects of operating and maintaining the WVP on ESA-listed UWR salmonids. The parties filed competing motions for summary judgment. On August 17, 2020, the Court issued an Opinion & Order granting Plaintiffs' motion for summary judgment and denying Federal Defendants' motion for summary judgment. ECF 112. The Court held that: (1) the Corps is violating ESA Section 7(a)(2) by not completing certain measures in the 2008 reasonable and prudent alternative ("RPA") by the time periods specified therein and not undertaking other actions that would avoid jeopardizing UWR salmonids; (2) the Corps is violating ESA Section 9 by causing excess take of juvenile UWR salmonids; and (3) the Corps violated the ESA, and NMFS violated the APA, by not reinitiating consultation on the 2008 BiOp sooner. ECF 112 at 10-36. The Court established a schedule for addressing the appropriate remedy in this case. ECF 116.

Plaintiffs filed a remedy proposal on October 9, 2020 (ECF 117), which constitutes their proposed injunction order under Federal Rule of Civil Procedure 65. Plaintiffs also filed two expert

declarations—the expert testimony they proffer in support of their proposed remedy. *See* ECF 119-120. These expert declarations are akin to expert reports and thus establish the evidentiary basis for Plaintiffs' remedy proposal. Federal Defendants are responding to the expert testimony by designating and proffering the rebuttal expert testimony of Mr. Piaskowski, Mr. Taylor, Mr. Askelson, and Ms. Coffey. Plaintiffs also submitted three non-expert declarations from members of Plaintiffs' organizations to establish Article III standing necessary to raise their claims for injunctive relief. *See* ECF 121-123. Federal Defendants will evaluate this testimony through depositions and, if appropriate, cross-examination at an evidentiary hearing. Below, we address the legal and evidentiary basis for Plaintiffs' proposed remedy, including their sweeping requests for injunctive relief.

## III.    STANDARD OF REVIEW

Injunctions are extraordinary remedies that a court should grant only where it has no other choice but to direct the agency. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff thus carries a heavy burden to establish entitlement to permanent injunctive relief. To meet this burden, a plaintiff must establish: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) the balance of the hardships between the plaintiffs and the defendants favor relief; and (4) the public interest would not be disserved by a permanent injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010). In granting any relief, courts must narrowly tailor relief to the specific harms shown rather than enjoin all possible breaches of the law. *Id.* at 158-60; *Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 728 n.1 (9th Cir. 1983).

## IV.    ARGUMENT

Given its Opinion & Order, the Court should now determine how to enforce the ESA. *See* 16 U.S.C. § 1540(g)(1) (providing jurisdiction "to enforce" the ESA). Plaintiffs presume the Court must issue injunction actions that would restructure WVP operations and dictate agency action during a lengthy remand. But a "grant of jurisdiction to issue [equitable relief] hardly suggests an absolute duty to do so under any and all circumstances." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Even in ESA cases, the Court "is not mechanically obligated to grant an injunction for every

violation of law." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 193 (1978). Rather, in choosing how to enforce the ESA, the Court "has many remedial tools at its disposal, including declaratory relief or an injunction tailored to" completing statutory processes and analyses. *Winter*, 555 U.S. at 33.

The Court should avail itself of non-injunctive remedies here for four reasons. First, Plaintiffs have failed to establish that they will be irreparably harmed absent the injunctive relief they demand. This is particularly true as the Corps is continuing to implement the 2008 RPA and is implementing substantial interim measures, developed with NMFS, to protect UWR salmonids during the interim period before ESA reinitiated consultation is completed. *See* Section IV.A. Second, Plaintiffs' experimental relief would, if granted, violate both the law and the Constitution and ultimately fail to materially increase protections for ESA-listed salmonids. *See* Section IV.B. Third, Plaintiffs' proposed studies, monitoring, and construction measures do not address imminent irreparable harm but, instead, improperly interfere with ongoing statutory and administrative processes. *See* Section IV.C. And fourth, Plaintiffs' injunction is not in the public interest and would violate Federal Rule of Civil Procedure 65. *See* Sections IV.D., E. Therefore, the Court should deny Plaintiffs' motion for permanent injunctive relief and issue a final order remanding the ESA violations to NMFS and the Corps so that the agencies may comply with the ESA.

### A.    Plaintiffs have not established that they will be imminently, irreparably harmed by the Corps' operations during the reinitiated consultation period.

Plaintiffs must prove they are likely to suffer irreparable harm without their proposed injunction actions. *Winter*, 555 U.S. at 20. Plaintiffs argue they have made this showing because the Corps' *past* operations harmed salmonids and led to their current status. ECF 118 at 6-10. Plaintiffs address the wrong question. Rather than remedy past harms, an injunction addresses *only* prospective harms. "The sole function of an action for injunction is to forestall future violations." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). In *Winter*, for example, the Supreme Court's inquiry focused on future harms stemming from the Navy's prospective implementation of interim mitigation measures. *Winter*, 555 U.S. at 23. The Supreme Court specifically found error with the lower courts' failure to address irreparable harm in view of these future measures. *Id.* In accord, the

Court should examine the operations the Corps will conduct during the reinitiated consultation period, including its interim measures, and determine whether Plaintiffs' proposed injunction is necessary to remedy irreparable harm during that period. *See* WVP Interim Measures Implementation Plan, Exhibit 1.

Plaintiffs seek an injunction through December 2024, based on their own assessment of when the agencies should complete the ESA consultation. ECF 117-1 at 1; ECF 118 at 15-16. However, the agencies currently plan to complete the ESA consultation by the end of 2023 and the concurrent National Environmental Policy Act ("NEPA") process in the spring 2024, barring any unforeseen delays. Coffey Decl. ¶ 5. Because Plaintiffs cannot show the agencies' timeline is infeasible, the Court should evaluate only whether irreparable harm is likely through 2023. *See Cal. by & through Becerra v. U.S. Env't. Prot. Agency*, 978 F.3d 708, 716–17 (9th Cir. 2020) (consistent with separation of powers principles, equitable injunctions operate prospectively only as long as the agency has not altered the applicable legal regime; for instance, by taking administrative action).

### 1.    Plaintiffs' allegations of harm to individual salmonids and the lack of biological recovery do not establish irreparable harm.

Plaintiffs argue that they have established irreparable harm justifying their expansive injunction because the Corps' operations "take" salmonids and have not led (and will not lead) to biological recovery. Neither argument establishes imminent, irreparable harm that justifies their proposed injunction.

First, Plaintiffs err in arguing that "take" of any magnitude constitutes irreparable harm. *See, e.g.*, ECF 118 at 5. ESA Section 7(a)(2)—the provision that Plaintiffs alleged the Corps violated by not meeting all of the timelines in the 2008 RPA—protects against jeopardizing "species," not individual specimens. 16 U.S.C. §§ 1531(b), 1536(a)(2); *see also Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014). Even ESA Section 9, which prohibits take, contains exceptions reflecting Congress' judgment that any level of take is not forbidden, and thus not irreparable, under the ESA. *See* 16 U.S.C. § 1539(a), (b); *see also id.* § 1536(o); *Wild Equity Inst. v. City & Cty. of San Francisco*, No. C 11-00958 SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011) ("The plaintiff may be simply

assuming that the death of any listed animal, or any of its eggs, constitutes irreparable harm for purposes of issuing a preliminary injunction. However, the law does not go quite so far. No court has held that as a matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes irreparable harm.").

*National Wildlife Federation v. NMFS*, 886 F.3d 803 (9th Cir. 2018), is not to the contrary. The Ninth Circuit held that plaintiffs seeking an injunction under the ESA must "adequately show[] harm to themselves as a result of harm to listed salmonids." *Id.* at 820. Plaintiffs' declarants do not assert that a single take injures them in a "personal and individual way" for standing purposes, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992), much less irreparably harms them. The declarants instead express concern with broader impacts to the *species*. *See* ECF 123 ¶ 12 (expressing an interest in the species recovering to levels so the declarant can target them when fishing); ECF 122 ¶ 13-14 (same); ECF 121 ¶ 13-15 (expressing harms associated with declines and interests in the UWR salmonids' recovery). While "[s]howing an extinction-level threat to listed species is not required," Plaintiffs must at least show "a threat of harm to a *listed species*." *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d at 819 (emphasis added); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008) (injunction appropriate only where "the loss of those individuals would be significant for the species as a whole").

Indeed, Plaintiffs' conflation of take with irreparable harm is self-defeating, as their proposed injunction causes irreparable harm to ESA-listed species. At Green Peter Dam, for example, Plaintiffs want the Court to issue an injunction requiring the Corps to capture adult salmonids and move them. *See* Plaintiffs' Remedy Proposal List, Exhibit 2 at Injunction Action 14. This take will then cause more take in the form of juvenile mortality, which could be as high as 99 percent. *See* Taylor Decl. ¶ 28; Second Piaskowski Decl. ¶ 64-65, 67, 121).[2] If any take constitutes

---

[2] Other proposed injunction actions will create hazards that take juveniles (for example, lower gate settings on regulating outlets and spillgates). Taylor Decl. ¶ 24, 35, 47. Still other injunction actions will degrade in-river conditions in ways that directly take salmonids (by creating higher TDG levels, dewatering redds, reducing flows, changing temperatures, and so on). *See, e.g.*, Taylor Decl. ¶ 18, 21, 41-42; Second Piaskowski Decl. ¶ 50; Askelson Decl. ¶ 59-60, 64-65, 118.

irreparable harm, then Plaintiffs ask the Court to order irreparable harm. While Plaintiffs find their preferred level of irreparable harm acceptable, there is a large difference between the Court acting in equity to enjoin conduct that causes irreparable harm and the Court affirmatively ordering an agency to irreparably harm ESA-listed species. *See Atl. Coast Line R. Co. v. State of Fla.*, 295 U.S. 301, 314-15 (1935) (when actions in equity would exceed appropriate bounds, "inaction and passivity [is] in line with the historic attitude of courts of equity for centuries").

Second, Plaintiffs wrongly categorize the lack of biological recovery, or actions during reinitiation that do not advance recovery, as irreparable harm justifying an injunction. *See, e.g.*, ECF 118 at 5-6. While biological recovery is the ultimate goal of the ESA, Congress did not create a framework that suggests agency actions necessarily cause irreparable harm by failing to recover species by themselves. In Section 7(a)(2), Congress prohibited actions that jeopardize the species' continued existence, thereby equating species-level harms with irreparable harm. *See Tenn. Valley Auth.*, 437 U.S. at 173-74, 193-95 (finding that the action leads to extinction, which creates an "irreconcilable conflict" with the ESA that justifies injunctive relief). Congress did not similarly condition an agency's ability to act on whether it recovers a species. While actions that harm recovery might, at some point, constitute irreparable harm, *see, e.g.*, *Nat'l Wildlife Fed. v. NMFS*, 886 F.3d at 818, an agency's failure to attain or advance recovery does not.

Plaintiffs provide no evidence that the Corps' operations during the interim reinitiated consultations period will create a permanent or long-lasting harm to recovery. They present no evidence on the effects of the Corps' prospective operations on the UWR Chinook or UWR steelhead species' recovery prospects, much less compare that unidentified "harm" to the harms caused by their own injunction. Plaintiffs all but concede that any interim harms are not irreparable because they do not provide evidence establishing that future actions cannot be taken to advance or achieve recovery. And, in any event, a temporary delay in moving toward recovery is not "permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987); *Hollingsworth v. Perry*, 558 U.S. 183, 195 (2010) (harm is irreparable where it "would be difficult—if not impossible—to reverse").

By arguing that any take or the lack of recovery warrants an injunction, Plaintiffs want to avoid any meaningful inquiry into the likelihood of irreparable harm. They argue any level of harm justifies relief, thereby resurrecting a presumption of irreparable harm the Ninth Circuit rejected in *Cottonwood Environmental Law Center v. Forest Service*, 789 F.3d 1075, 1091 (9th Cir. 2015). By failing to present evidence on the harms to the species from the Corps' actions, Plaintiffs also want to dispense with the requirement that injunctive relief be "narrowly tailored" to the established harm. *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004). Without sizing the harm from the Corps' interim measures, Plaintiffs cannot ensure their proposed injunctions are tailored to addressing *that harm*. The Court should reject these sleights of hand. Before entertaining an injunction request, the Court should require evidence establishing both the existence and quantum of irreparable harm to UWR salmonids caused by the Corps' discretionary actions during the consultation period, so that it can assure itself that injunctive relief is both necessary and narrowly tailored.

> ### 2. Plaintiffs cannot establish irreparable harm because the Corps' interim measures are likely to improve conditions for UWR Chinook and steelhead.

Rather than circumvent the irreparable harm inquiry, Plaintiffs must establish that the Corps' discretionary prospective operations during the reinitiated consultation period, including the interim measures the Corps is implementing for the benefit of UWR salmonids, cause irreparable harm. *Winter*, 555 U.S. at 22-23. While Plaintiffs refer to the Corps' interim measures (ECF 118 at 10-12), they do not confront the full scope of those measures or show whether and how the Corps' operations will cause irreparable harm during the interim period.

In April 2018, NMFS and the Corps reinitiated ESA consultation. During these proceedings, the agencies told the Court that they would work collaboratively to identify additional actions the Corps can implement to benefit UWR salmonids during the reinitiated consultation process. Thom Decl., ECF 68 ¶ 4-5. They followed through. Before the Court issued its Opinion & Order, the agencies collaborated to develop a comprehensive suite of 23 interim measures that either directly benefit UWR salmonids or support the development of future actions that may benefit UWR

salmonids. Exhibit 1. These measures are within the Corps' authority to implement, are technically feasible, and the Corps either has (or is likely to receive) funding for them. *Id.* Coffey Decl. ¶ 7.

The interim measures reflect the agencies' expertise and adjust prospective WVP operations in ways targeted to improve conditions for UWR salmonids during the reinitiated consultation. The interim measures address habitat and hatcheries actions, passage, water quantity and quality below the dams, and research and monitoring. Exhibit 1; Second Piaskowski Decl. ¶ 14. Indeed, given the comprehensiveness and benefits of the interim measures, Plaintiffs have incorporated various interim measures developed by Corps and NMFS (or the core concepts addressed in the measures) into their own proposed injunction actions. *Compare* Exhibit 1 (Corps' Interim Measures 5 and 9-10) *with* Exhibit 2 (Plaintiffs' Proposed Injunction Actions 5, 22, 24, and 25). The Corps' interim measures are likely to benefit UWR salmonids, not hinder or irreparably harm the species.

But even setting the interim measures aside, the species' status is unlikely to degrade (and thus be irreparably harmed) during the ESA reinitiated consultation period. As Plaintiffs observe, ECF 118 at 7, the UWR Chinook and UWR steelhead species' status has deteriorated since 2008, although not to the degree of altering the species' status under the ESA. *See* ECF 36-3 at 45 (NMFS observing that the species' status has not declined to the extent that the species are now endangered). But, as NMFS also has observed, much of the decline is not attributable to the Corps' discretionary WVP operations. *See* 2020 Columbia River System Biological Opinion, Exhibit 3 at Ch. 2.13 (UWR Chinook), Ch. 2.14 (UWR Steelhead), *available at* https://repository.library.noaa.gov/view/noaa/26460. Ocean conditions heavily influence the status of UWR salmonids, and those conditions were negative over the past five years. *See id.* at 1240, 1282-83, 1290-91, 1330-33. These unfavorable baseline conditions have shifted, and UWR salmonids are responding favorably. Second Piaskowski Decl. ¶ 117. For UWR steelhead, the 2020 counts at Willamette Falls exceed the 5-, 10-, and 20-year averages for adult returns. *Id.* ¶ 9. And for UWR Chinook, 33,888 adults were counted in 2020, compared to 20,617 in 2019. *Id.* ¶ 12.

The positive shifts in the species' abundance show that the Corps' operations since 2008 have not harmed the species' ability to respond to favorable environmental and baseline conditions.

Further improvements are likely during the ESA reinitiated consultation period. Ocean conditions driving salmonid population dynamics are shifting in favorable directions. *Id.* ¶ 9, 12, 117. Other limiting factors for the species, like sea lion predation and cessation of the Corps' non-native summer steelhead hatchery program,[3] are now being actively managed. *Id.* ¶ 9, 117. The Corps' interim measures will likely add to these improvements. *Id.* ¶ 4, 14-47.

Combined, evidence on the species' status, favorable environmental conditions, abatement of baseline harms, and the Corps' interim measures establish that UWR salmonids are unlikely to be irreparably harmed by any action, let alone Corps' discretionary actions, through 2023. *See id.* ¶ 13, 128. Plaintiffs do not seriously try to establish that the Corps' prospective operation of the WVP irreparably harms salmonids. They do not address the total effects from the Corps' interim actions, qualitatively or quantitatively, in view of all the factors affecting the species. Nor do they show that the Corps' operations will degrade the species' status during the consultation period.

Plaintiffs instead myopically focus on specific harms, like downstream juvenile passage and water quality impacts, while ignoring any negative tradeoffs to the species from their proposed injunction. *See generally* Taylor Decl. (describing the tradeoffs and potential impacts to the species that may occur if the Court orders Plaintiffs' proposed injunction); Second Piaskowski Decl. ¶ 48-114 (same); Askelson Decl. ¶ 49-121 (describing effects of Plaintiffs' proposed injunction actions on system). Even then, Plaintiffs recast baseline actions—those actions the Corps is not implementing or causing to occur—as irreparable harm justifying an injunction against the Corps. Plaintiffs, for example, label high downstream juvenile mortality past the dams as irreparable harm justifying relief. ECF 118 at 7 (Corps' juvenile passage operations "kill and injure many fish" and "impair[]" survival and recovery). But Plaintiffs' position abruptly shifts when they discuss their proposed injunction. At Green Peter Dam, for example, Plaintiffs want the Corps to move adults above the dam, knowing that most juvenile offspring will die. Taylor Decl. ¶ 28; Second Piaskowski Decl. ¶ 64. Yet,

---

[3] While the Corps has ceased certain hatchery practices, Oregon has not. Oregon also continues to take many other actions that harm salmonids, belying the implications in its filings (*see* ECF 124 and 124-1) that it places the priorities of UWR Chinook and UWR steelhead above other State interests.

for Green Peter Dam, Plaintiffs suggest that *any level of juvenile survival* constitutes such a large benefit that the Court must grant a mandatory injunction. *See* ECF 118 at 19. In Plaintiffs' view, the same action is beneficial when Plaintiffs want it (outplanting at Green Peter Dam with high juvenile mortality), but suddenly negative and irreparable when the Corps implements it (outplanting at Detroit, Cougar, Lookout Point Dams with high juvenile mortality).[4]

Plaintiffs' tack shows that they complain about harms caused by Congress (the dams' effects of blocking adult and juvenile migrations) and not irreparable harm caused by the Corps' prospective WVP operations. Plaintiffs' focus on other aspects of the Corps' operations—like degrading downstream temperatures, total dissolved gas ("TDG"), and flows—prove only the existence of adverse effects that also occur with their proposed injunction. *See, e.g.*, Second Piaskowski Decl. ¶ 55, 59, 74; Taylor Decl. ¶ 19, 24-25, 32, 34, 42; Askelson Decl. ¶ 59, 60, 88, 138, 135, 171. These arguments do not establish that the Corps' discretionary operations are likely to degrade the status of UWR salmonids during the reinitiated consultation period. Plaintiffs' focus on the status of UWR salmonids fails for the same reasons—it disregards whether the Corps' prospective operations, not baseline actions or conditions, irreparably harm the species. *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013) (denying relief where Plaintiffs "made no real effort to quantify the effects of continued dam operation on these species" during the period before the agencies complete ESA consultation).

Plaintiffs have failed to establish irreparable harm and have not produced evidence that their injunction is necessary in light of the Corps' interim measures. *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[T]hose seeking injunctive relief, not those opposing that relief, are responsible for showing irreparable injury"). Therefore, the Court should appropriately defer to the Corps' interim measures by declining to issue an injunction. *Cf.*

---

[4] If juvenile mortality from downstream passage constitutes irreparable harm, as Plaintiffs argue, then the Court should order the Corps to cease trapping and hauling fish above the dams. That injunction would prevent high juvenile mortality levels that Plaintiffs complain about. But Plaintiffs are not asking for that relief, which confirms their intent to transform Corps' actions contributing to recovery of the species into irreparable harm, simply to justify an injunction.

*Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1405-06 (9th Cir. 1995); *see also Parker v. Winnipiseogee Lake Cotton & Woolen Co.,* 67 U.S. 545, 552 (1862) (when "the evidence be conflicting and the injury doubtful, this extraordinary remedy [of an injunction] will be withheld").

      **B.**    **The Court should not grant Plaintiffs' proposed injunction.**

      Even if the Court assumes that Plaintiffs will be irreparably harmed by the Corps' discretionary actions during the reinitiated consultation period, both the Corps' interim measures and Plaintiffs' proposed injunction cause the same types of harms and take UWR salmonids (via downstream passage, water quality conditions, etc.). Legal standards aside, a species-level inquiry is necessary to differentiate between the Corps' interim measures and Plaintiffs' proposed injunction. To prevail in this inquiry, Plaintiffs must first show that their proposed injunction: (1) can be implemented; and (2) causes less harm to the species than the Corps' interim measures. Plaintiffs satisfy neither requirement. The Corps cannot implement many of Plaintiffs' Proposed Injunction Actions for both legal and practical reasons. Of those injunction actions that remain, the actions are no better (and, in some cases, worse) for UWR salmonids than the Corps' interim measures and/or negatively impact other authorized purposes of these projects.

      **1.**    **Plaintiffs improperly rely on a technical advisory team to fill holes in their proposed injunction and create new injunction actions.**

      Plaintiffs justify their injunction by standing on the back of a hypothetical six-member technical advisory team ("TAT"). Exhibit 2 at Injunction Actions 7, 9-10, 13, 20-22, 26, 31, 34, 41, 43, 53. Rather than put forward an injunction the Court can evaluate, the Corps can implement, and the evidence shows will benefit salmonids, Plaintiffs cobble together an initial set of actions that a TAT presumptively will render effective at some later time. *See id.* Initially, Plaintiffs cannot show their injunction avoids any harm, does not cause extinction, or is narrowly tailored when they have no idea what measures or adjustments the TAT will direct or order the Corps to implement. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,* 736 F.3d 1239, 1250 (9th Cir. 2013) (holding allegations of irreparable harm must be grounded in evidence, as "cursory and conclusory" assertions and speculation do not suffice).

In any event, Plaintiffs' proposal to delegate development and oversight of injunction actions to a TAT is unconstitutional. For a TAT to work as Plaintiffs envision, the Court would have to delegate its Article III injunction powers to the TAT so that the TAT could order the Corps to act. The Constitution prohibits this delegation of judicial functions "to an official who has not been appointed pursuant to article III of the Constitution," *Meeropol v. Meese,* 790 F.2d 942, 961 (D.C. Cir. 1986), as the courts have repeatedly held in many contexts. *See Kimberly v. Arms*, 129 U.S. 512, 524 (1889) (court may not abdicate its judicial functions through appointment of a master or otherwise); *La Buy v. Howes Leather Co.,* 352 U.S. 249, 256 (1957) (same); *Armstrong v. Brown*, 768 F.3d 975, 987-88 (9th Cir. 2014) (courts may not delegate injunction implementation and dispute resolution authority to an expert); *Burlington N.R.R. Co. v. Dep't of Revenue of State of Wash.*, 934 F.2d 1064, 1072 (9th Cir. 1991); *United States v. Bernardine,* 237 F.3d 1279, 1283 (11th Cir. 2001).[5]

Even if the TAT could operate as Plaintiffs conceptualize without violating the Constitution, the TAT would not advance the ESA's purpose of conserving listed species. Plaintiffs' TAT excludes the Corps, the agency responsible for operating and maintaining the WVP and thus the entity with the most expertise on the feasibility, efficacy, merit, and potential negative impacts of different operational regimes. The TAT also would not benefit from NMFS's participation, as NMFS will not voluntarily participate in a process that over-steps its statutory authority (by running a Corps project instead of just consulting with the Corps on that project regarding ESA -listed species) and would expose TAT members to criminal and civil liability.[6]

Moreover, the TAT would exclude the Bonneville Power Administration ("Bonneville"), the Bureau of Reclamation, the United States Fish and Wildlife Service ("FWS"), Tribes, and other

---

[5] The TAT would also violate the Tenth Amendment and federalism principles by turning over WVP operational authority to, in part, the State of Oregon.

[6] TAT participants that direct and authorize WVP operations would cause the take of species in violation of the ESA's take prohibitions. 16 U.S.C. §§ 1538(a)(1), 1539(b)(1); *see, e.g.,* *Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1085 (D. Or. 2012) ("state officials can indeed be liable for directly authorizing third-party activities, such as logging, that are likely to result in take"). TAT and its members also likely would be liable for any other laws violated or torts committed when directing the Corps' operations (i.e., if flooding were to occur as a result of a TAT operation).

stakeholders needed to safeguard all affected resources, including ESA-listed species under FWS's jurisdiction. There is an existing regional coordination forum, the Willamette Action Team for Ecosystem Restoration ("WATER"), that was established by the 2008 RPA and provides this advisory function. WATER would be rendered superfluous by the TAT and, thus, likely disbanded. Second Piaskowski Decl. ¶ 114; Askelson Decl. ¶ 95, 100, 182. Without the comprehensive operational and biological expertise provided by the federal government[7] and WATER, the TAT cannot be expected to contribute positively to WVP operations.

## 2.  Plaintiffs propose other injunction actions that would impermissibly require the Corps to violate the law.

A "statutory directive binds *both* the executive officials who administer the statute *and* the judges who apply it in particular cases." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 439 (1992). In *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990), the Court considered a judicial order for executive branch officials to make extra-statutory payments of federal funds. If the employees volitionally made such payments, they would violate Federal law and be subject to prosecution. Because the employees could not lawfully make the payments, neither could courts acting in equity compel them to do so. *Id.* at 430; *see also Immigr. & Naturalization Serv. v. Pangilinan,* 486 U.S. 875, 883 (1988). The Ninth Circuit has affirmed this principle in addressing NEPA and ESA violations. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 645 n.49 (9th Cir. 2014) (noting the "fact that a court cannot grant an injunction based on the judgment that Reclamation violated NEPA if doing so would cause a violation of Section 7 of the ESA"). To avoid a separation of powers conflict, courts issuing remedies may not "pick and choose what law governs the executive branch's ongoing duties." *Becerra*, 978 F.3d at 718. Plaintiffs' injunction actions violate this precedent.

### i. Plaintiffs' Injunction Violates the Flood Control Acts. Plaintiffs argue the

Corps has unfettered discretion to revise WVP operations to benefit ESA-listed species, even if doing so means operating the WVP in a manner that conflicts with the laws that established both

---

[7] This is precisely the reason that federal agencies like the Corps and NMFS exist—to use specialized knowledge and expertise to carry out the functions that Congress and the Executive Branch assign to them for the benefit of the American people.

the dams and their purposes. *See* ECF 118 at 32-35. Plaintiffs rely on the language Congress used when authorizing the WVP in the 1950 Flood Control Act ("FCA") and judicial opinions construing the Corps' authorities to revise operations prospectively. *Id*. But Plaintiffs misapply the law. Both the Corps and the Court lack the authority to redefine operations in ways that eliminate a Project purpose and thus substantively revise Congress' original authorizations to the Corps.

In 1938, the Corps submitted a Chief of Engineers' report to Congress that included a comprehensive plan for flood control, navigation, and other purposes in the Willamette River Basin. H.R. DOC. No. 75-544. In the 1938 FCA, Congress authorized the Chief of Engineers' comprehensive plan. 1938 FCA, Pub. L. No. 75-761, § 4, 52 Stat. 1215, 1222 (1938). Periodically, the Chief of Engineers submitted new reports to Congress updating its comprehensive plan for the Willamette River Basin, which Congress would then approve in subsequent FCAs. Of importance here, and uncontested by Plaintiffs, the 1950 FCA authorized the Corps to build, operate, and maintain the WVP "substantially in accordance with" the Chief of Engineers' Report contained within House Document ("HD") 531.[8] 1950 FCA, Pub. L. No. 81-516, 64 Stat. 163, 179 (1950).

Nine dams in the WVP have been authorized by Congress to generate power.[9] HD 531 specified that five dams of these dams (Detroit, Lookout Point, Cougar, Hills Creek, and Green Peter) have designated power storage, which is "that increment of storage which lies directly above dead storage [and directly below flood control storage], and which is reserved *exclusively* for power generation." *See* HD 531 at Table IV-53; HD 531 Appendix J at 2239 (emphasis added). Thus, during the "critical power-production period, October through March", HD 531 reserves the water

---

[8] House Document 531 includes a report from the Corps' Division Engineer and Appendix J, a detailed document from the Corps' Portland District that contained more elements and details on the Corps' proposed comprehensive plan of development and operations for the WVP to meet all authorized purposes.

[9] WVP dams are authorized through the FCAs to operate for certain purposes (known as "authorized purposes"). Petersen Decl., ECF 65 ¶ 4. The authorized purposes of the dams include flood control, power generation, water quality, municipal and industrial water supply, irrigation, public recreation, fish and wildlife conservation, and navigation. *Id*. The authorized purposes differ from dam to dam. *Id*. at Figure 2.

in the power storage *exclusively* for power production. HD 531 Appendix J at 2054. This exclusive power storage area makes the WVP unique among dam systems that the Corps operates and maintains in the Pacific Northwest. While Corps projects in the Columbia River can produce power (such as The Dalles or John Day dams), they do not have exclusive power storage designated in their authorizations—despite also being authorized in the 1950 FCA. *See* HD 531 Appendix L.

Plaintiffs argue there is extensive ambiguity in the authorizing legislation that allows the Corps to write off HD 531, pretend that no power pool exists, and use the exclusive power storage solely for fish and wildlife purposes. ECF 118 at 35. Specifically, Plaintiffs' Actions 30 and 36 propose deep reservoir drawdowns that would eliminate water in power storage, and thus preclude power generation, during the critical power production period for Cougar and Lookout Point dams. Coffey Decl. ¶ 9. But no ambiguity in the 1950 FCA or HD 531 would allow this result. Those documents are explicit—power storage exists for the purpose of generating power during the critical power production period. *See* 64 Stat. at 179; HD 531 Appendix J at 2239, 2054.

Even if some ambiguity exists (which it does not), the Corps has analyzed in a legal memorandum whether it possesses the discretion to eliminate a Project purpose and completely reallocate that storage to something Congress did not intend when authorizing the Project. Attachment 1 to Coffey Decl. Through the Declaration of Beth Coffey, the Corps has adopted this legal memorandum for the WVP. *Id.* ¶ 9. The agency's interpretation is reasoned; it accords directly with the law authorizing the projects. Because of this, the interpretation is entitled to deference. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (reviewing authoritative interpretation issued during litigation, responding to changed circumstances and addressing statutory ambiguities).

Plaintiffs cannot overcome the plain language of the authorizing legislation or the Corps' interpretation of its authorities. Congress' express limitation, not Plaintiffs' preference for an alternative statutory scheme, controls. Nor does it benefit Plaintiffs to continue citing decisions from this Court and the Ninth Circuit relating to the Columbia River dams to try to confer discretion on to the Corps in the Willamette. *See* ECF 118 at 33-34. As discussed above, Columbia River dams do not contain designated exclusive power storage. *See* HD 531 Appendix L;

Attachment 1 to Coffey Decl. at 10, 12. Therefore, the discretion that the agencies had in those cases to benefit fish and wildlife does not exist here as it pertains to exclusive power storage. Nor does it behoove Plaintiffs to continue relying on the Fish and Wildlife Coordination Act and Northwest Power Act. *See* ECF 118 at 33. While those Acts may have placed fish and wildlife concerns on an equal footing with power production, they do not trump power production and require its elimination. *See* 16 U.S.C. § 661(b); *id.* § 839 *et seq.*

Finally, Plaintiffs misconstrue the law in arguing that the Corps has unfettered discretion to alter Project purposes during implementation, notwithstanding clear direction in authorizing legislation. *See* ECF 118 at 35. In *Britt v. Corps*, 769 F.2d 84 (2d Cir. 1985), the Second Circuit held that the Corps had lawfully approved a new location for a bridge even though the bridge's location would differ from what was originally contemplated when approved by Congress. *Id.* at 90. The Second Circuit concluded that the change in location was within the Corps' authority because it "appears generally to serve the purpose of facilitating automobile traffic across the northern end of the Bay" and a new location was not so "foreign to the original purpose of the project." *Id.* Similarly, in *United States v. 2,606.84 Acres of Land in Tarrant County, Texas*, 432 F.2d 1286 (5th Cir. 1970), *cert denied*, 402 U.S. 916 (1971), the Fifth Circuit determined that the Corps acted within its authority when it built a dam that was larger and approximately three miles away from the dam Congress authorized in HD 403. *Id.* at 1293. "It is undisputed that the Congressional authorization was for a flood control project on the Clear Fork of the Trinity River. This is what the Corps of Engineers built. The area served and the project purposes were not changed." *Id.*[10] Unlike in these two cases, where the Corps' modifications meant that the projects still served the same Congressionally-authorized purpose, Plaintiffs' propose actions that completely eliminate an authorized purpose. Proposed Injunction Actions 30 and 36 are thus "so foreign to the original purpose of the project" that performing them would violate the 1950 FCA and be arbitrary. *See Britt*, 769 F.2d 84 at 89.

---

[10] Plaintiffs citation to *Creppel v. Corps*, 670 F.2d 564 (5th Cir. 1982), also does not help their case as the Corps' project in that case, and the agency's decision to change the project, did not require congressional approval. *See id.* at 572-73, n.12.

The Corps has no discretion to eliminate a Congressionally-authorized purpose and the Court cannot order it to do so in violation of the 1950 FCA.[11] *See In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 629 (8th Cir. 2005); *Britt v. U.S. Army Corps of Eng'rs*, 769 F.2d at 89; *Env't Def. Fund, Inc. v. Alexander*, 467 F. Supp. 885 (N.D. Miss. 1979), *aff'd* 614 F.2d 474 (5th Cir. Miss. 1980).

        **ii.**      **Plaintiffs' Injunction violates the CWA.** The CWA requires states to develop water quality standards for intrastate waters, subject to the Environmental Protection Agency's ("EPA") approval. *See* 33 U.S.C. § 1313(a). Absent an exception, federal agencies must comply with state water quality standards once approved by the EPA. 33 U.S.C. § 1323. Oregon's Department of Environmental Quality has set, and the EPA has approved, such a standard for TDG. TDG may not exceed 110 percent saturation in the Willamette Basin or 105 percent in hatchery-receiving waters. Oregon Admin. Rule 340-041-0031.

During normal operations, the Corps operates the system to comply with these standards: where discretionary operations allow, it avoids operations that it knows will result in exceedances of state water quality standards. Plaintiffs want to change this framework and require the Corps to intentionally violate State water quality standards. Although Plaintiffs were concerned about the Corps meeting Oregon's water quality standards during this litigation (*see* ECF 36 at 20-21), several of Plaintiffs' proposed injunction actions (Actions 4, 6, 16, 22, 32, 37-39, and 43) could result in the State limit being exceeded. *See* Askelson Decl. ¶ 59, 63, 67, 72-73, 88, 99, 145, 167, 171, 176, 181.

Plaintiffs acknowledge their injunction requires violating State pollution laws by requesting the Court modify the standards. In essence, Plaintiffs want to change Oregon's water quality standards, from precluding any exceedances, to an alternative regime that precludes exceedances only when (1) the TAT thinks doing so is bad (Actions 7 and 22), or (2) spawning and incubation is occurring (Action 12). Plaintiffs cite no legal basis that would justify a Court ordering such ad hoc modifications when granting an injunction.

---

[11] Plaintiffs, in fact, appear intent on eliminating Project purposes, rather than to benefit salmonids. Among other examples, they propose measures that lack any fish objectives and are geared more toward ensuring non-fish and wildlife purposes of the projects cannot be implemented. *See, e.g.*, Askelson Decl. ¶ 161-62; *see also* Taylor Decl. ¶ 45; Second Piaskowski Decl. ¶ 87.

Plaintiffs acknowledge their injunction violates the State water quality standards by asking the Corps to work with Oregon to change those standards. Exhibit 2 at Injunction Action 55. But Plaintiffs provide no reason why the Corps should violate State law *before* the State changes its standards (if it ever does). Nor does the State of Oregon, in its proposed amicus filings, explain why the Corps may volitionally violate its water quality standards, simply because non-governmental organizations request it. ECF 124, 129. Finally, Plaintiffs' request for an injunction requiring the Corps to work with Oregon to change Oregon's standards is absurd. *See* Exhibit 2 at Injunction Action 55. The Corps should not be compelled, under threat of contempt, to act as Plaintiffs' own advocates by being ordered to pursue their agenda with the State of Oregon. If Plaintiffs want the State of Oregon to adopt new water quality standards that allow the Corps to increase pollution in the rivers, they are free to ask Oregon to do so. And if Oregon wishes to start a State-driven process to change the TDG standard in its rivers, it is free to do so with or without the Corps' involvement.

### 3.    Of Plaintiffs' proposed operational injunction actions that can be implemented, Plaintiffs neglect how those actions add harms and risks to the UWR Chinook and UWR steelhead species.

In their attempt to remedy downstream passage and water quality issues for juvenile salmonids by prescribing new operations, Plaintiffs have neglected to analyze how their proposed operational injunction actions will effect salmonids at other points of the year, different lifecycle stages, and whether the tradeoffs that occur by implementing these measures make sense. Plaintiffs have also not considered whether these injunction measures are feasible and whether they conflict with other operations and purposes of the WVP. Outlined below are some of Plaintiffs' operational injunction actions that could have a negative effect on UWR salmonids and/or cannot be implemented.

**Proposed Injunction Action 4:** Action 4 has a number of potential biological tradeoffs. Taylor Decl. ¶ 17. First, implementing Action 4 could require a reservoir drawdown that occurs at an accelerated rate, meaning higher outflows would occur than under normal operations during a time when spawning is occurring downstream of Big Cliff Dam. Second Piaskowski Decl. ¶ 50.

UWR Chinook salmon redds that are deposited at higher river elevations during these high flows could potentially be dewatered later in the season when flows drop, which can result in the reduced survival of salmon fry emerging from the redds. *Id.*; Taylor Decl. ¶ 18. 2008 RPA Measure 2.5 identifies a maximum outflow rate (which the Corps complies with) to avoid this. Taylor Decl. ¶ 18. Alternatively, the reservoir drawdown could begin earlier than under normal Corps' operations in order to achieve the elevation 1450 feet by November 1. Second Piaskowski Decl. ¶ 50. But that would reduce the length of time spill operations could occur in the summer and early fall, impacting temperature control (leading to the early emergence of UWR Chinook incubating below Big Cliff Dam) and juvenile downstream passage. *Id.*; Taylor Decl. ¶ 19.

**Proposed Injunction Action 5:** Action 5 conflicts with Plaintiffs' proposal to use the lower regulating outlet from November 1 through December 1 for temperature control (Action 4) as the upper regulating outlet will draw in warmer water. Taylor Decl. ¶ 21. Drawing in warmer water can lead to the early emergence of juvenile UWR Chinook below Big Cliff Dam, meaning the fry are less likely to survive. *Id.* Thus, there would necessarily be a tradeoff between juvenile downstream passage (Action 4) and the on-time emergence of juvenile UWR Chinook salmon incubating below Big Cliff Dam (Action 5). *Id.*

**Proposed Injunction Action 6:** Action 6 would require the Corps to begin spillway operations at Detroit Dam a month or two earlier than normal (before June 1 in many years) and at a lower water elevation than would occur during normal Corps' operations. *Id.* ¶ 22; Second Piaskowski Decl. ¶ 56. This would reduce the number of days that surface spill can be performed, limiting the period during which fish can pass downstream over the spillway. Second Piaskowski Decl. ¶ 56. In addition, because most juvenile UWR Chinook salmon do not approach the dam until after June 1, there would be few juveniles present at the dam to take advantage of the spill specified by Action 6. *Id.*; Taylor Decl. ¶ 22.

**Proposed Injunction Action 7-8:** Plaintiffs' injunction would require the Corps to monitor TDG within 1 mile below Big Cliff Dam from November 1 through February 1 and during the spring spill operation (Proposed Injunction Actions 5-6), manage discharge at Detroit Dam to

reduce TDG (Action 8), and spread spill across the gates at Big Cliff Dam (Action 11). The Corps is already implementing interim measures to reduce TDG from its operations. *See* Exhibit 1 Corps' Interim Measures 6 and 10. But Plaintiffs' Proposed Injunction Actions 6 will likely result in more TDG than current Corps' operations (including exceeding Oregon's state water quality standards). Askelson Decl. ¶ 73.

**Proposed Injunction Actions 14-17:** The Corps had previously outplanted UWR Chinook salmon above Green Peter Dam. But the Oregon Department of Fish and Wildlife ("ODFW") conducted studies in the 1970s and 1980s that found survival of UWR Chinook salmon juveniles passing through Green Peter Reservoir and the downstream bypass system was less than 1 percent. Taylor Decl. ¶ 28. ODFW identified low reservoir survival of juveniles, possibly due to reservoir predation from smallmouth bass and northern pikeminnow, as a major limitation in maintaining production of UWR Chinook salmon and steelhead above Green Peter Dam. *Id.* ODFW further concluded that the cold water temperatures discharged through the adult fish collection facility at the base of Green Peter Dam impeded upstream migration and collection of adult UWR Chinook salmon. Second Piaskowski Decl. ¶ 64. The conditions at Green Peter that limited reservoir and downstream passage survival of juveniles, as well as outplanting adults above Green Peter Dam, are still present. *Id.*; Taylor Decl. ¶ 28. "Thus, reintroduction of UWR Chinook salmon or UWR steelhead above Green Peter Dam is unlikely to be successful if these critical impediments are not addressed prior to the commencement of outplanting of adults above the dam." Second Piaskowski Decl. ¶ 24. Unlike the Corps' interim measures (Exhibit 1 Corps' Interim Measure 8), Plaintiffs' proposals do not provide a plan for studying and resolving these issues prior to fish being outplanted above Green Peter Dam.

Even if the fish were outplanted successfully, survived in the reservoir, and made it to Green Peter Dam under Plaintiffs' Proposed Injunction Actions 14-15, Action 16 may not be possible. To meet the mainstem and tributary flow objectives required by the 2008 RPA, the Corps may not be able to provide spill for downstream passage every year and, when spill is provided, it will likely exceed State water quality standards. Taylor Decl. ¶ 31; Askelson Decl. ¶ 88. Proposed Injunction

Action 17 is not feasible as written, as the fish horns at Green Peter Dam were dismantled in 2009-2010 based on the findings from ODFW that survival of UWR Chinook salmon juveniles passing through the reservoir and downstream bypass system was less than 1 percent. Second Piaskowski Decl. ¶ 24. The separator unit, attraction pumps, and collection horn have been removed. Taylor Decl. ¶ 29. All that remains are four lateral pipes at the back of the wet well (12 inches in diameter) connected to a stainless steel pipe on the downstream slope of the dam. *Id.* If Plaintiffs modified Action 17 to use these pipes rather than the fish horn, it would be technically possible although there would likely be little-to-no hydraulic signal to attract juvenile fish to pass through the pipes. *Id.*

Finally, assuming the hatchery fish outplanted above Green Peter Dam make it through the gauntlet described above, they may negatively impact the locally-adapted, natural-origin population of UWR Chinook salmon above Foster Dam by potentially competing with the natural-origin population and reducing the fitness of the population. *Id.* ¶ 26.

**Proposed Injunction Action 22:** The Corps is already implementing an interim measure similar to Proposed Injunction Action 22. *See* Exhibit 1 at Corps' Interim Measure 9. The Corps originally contemplated beginning its interim measure on October 1 as Plaintiffs' Injunction Action 22 requires, but later modified the operation following coordination with NMFS and Bonneville to avoid excessive TDG levels that could harm fish, excessive fluctuation in flows during spawning downstream, and damage to the turbines at Foster Dam. Taylor Decl. ¶ 32.

**Proposed Injunction Action 23:** Under Proposed Injunction Action 23, the Corps would need to use storage from Green Peter Reservoir in combination with flows from the South Santiam River to refill Foster Reservoir after May 15. This could impact the timing and duration of proposed spill operations at Green Peter Dam in some years and potentially conflict with Proposed Injunction Action 16 as a result. *Id.* ¶ 33.

**Proposed Injunction Action 24:** The Corps is implementing an operation at Foster Dam to reduce TDG and optimize water temperatures downstream for fish migration and collection of adult salmonids at the Foster Adult Fish Collection Facility by using both turbines and spill over fish weirs for one to two months beginning in July. Exhibit 1 at Corps' Interim Measure 10. While

spreading spill across multiple gates as Plaintiffs propose can reduce TDG, this requires smaller spillway gate openings, which can reduce the survival of downstream migrants. Taylor Decl. ¶ 35. Fish passing under smaller gate openings have a higher probability of physically striking the spillway or experiencing larger changes in differential pressure, which can cause barotrauma. *Id.* ¶ 24. Note that this could also occur under Plaintiffs' Proposed Injunction Actions 6, 11, and 44. *Id.* ¶ 24, 47. Therefore, Actions 6, 11, 24, and 44 would require a tradeoff between survival rates of juveniles in the reservoir passing downstream (through smaller gate openings) and juveniles downstream of the dams (which would benefit from lower TDG).

**Proposed Injunction Actions 28 and 31:** Actions 28 and 31 require many biological tradeoffs that Plaintiffs need to prioritize. First, starting refill at Cougar on May 1 will likely result in minimum flow releases in May. *Id.* ¶ 38. Minimum flow releases will result in small gate openings on the regulating outlet, which could lower survival of juveniles migrating downstream through the regulating outlet. *Id.* Second, this proposal reduces the available conservation storage at Cougar Reservoir from 189,000 acre-feet at elevation 1690 feet to 97,800 acre-feet at elevation 1600 feet. *Id.* The tradeoff will be a reduction of 97,200 acre-feet of stored water to release from June to September, which impacts the ability to meet downstream flow objectives outlined in the 2008 RPA. *Id.* Third, the loss of conservation storage in Cougar Reservoir can negatively affect juvenile UWR Chinook rearing in the reservoir because it will result in fewer large smolts in the reservoir to pass downstream during the fall (the juveniles will have to rear at higher densities in Cougar Reservoir, which could decrease growth rates and increase risk of disease). *Id.* ¶ 39-40. Smaller smolts are less likely to survive to return as adults. *Id.* Fourth, the Cougar Dam water temperature control tower is only operable at reservoir elevations between 1571 and 1690 feet. *Id.* ¶ 41. Limiting the pool elevation below 1600 feet as Proposed Injunction Action 28 requires would reduce the number of days during which the temperature tower could be used to skim warm surface water from the reservoir during the warmest part of the summer so that cooler water remains in the fall. *Id.* This will result in warmer water temperature releases in the fall than under normal operations. *Id.* As a result, the estimated UWR Chinook emergence timing will occur about one month earlier than current

conditions, which would harm UWR Chinook salmon downstream of Cougar Dam. *Id.*

**Proposed Injunction Action 35**: Several in-depth engineering design efforts have considered operations to improve juvenile passage at Cougar Dam, and none to date have identified use of "fish friendly coatings" on the regulating outlet or construction of a flip lip as a solution. Second Piaskowski Decl. ¶ 83.

**Proposed Injunction Action 39:** Action 39 requires a tradeoff between supporting downstream juvenile fish passage by prioritizing refill at Lookout Point reservoir and then spilling while providing adequate flows to support migration, spawning, and rearing of juveniles downstream. Taylor Decl. ¶ 46. Lookout Point Reservoir has been the primary source of water used to meet the mainstem flow objectives demanded by the 2008 RPA. *Id.* In years with low water supply in the Middle Fork Willamette River sub-basin, it will be difficult to prioritize refill and maximize the opportunity for spring spill while also meeting the mainstem flow objectives. *Id.*

**Proposed Injunction Action 44:** Action 44 will actually decrease survival of juvenile UWR Chinook passing downstream without providing meaningful benefits to the fish spawning downstream of the dam. *Id.* ¶ 47. Because water temperature conditions downstream of Dexter Dam are poor, the few UWR Chinook that spawn successfully below the Dam will do so regardless of any improvements in TDG levels that may result from this Action. *Id.* But by requiring smaller spillway gate openings, Action 44 can cause barotrauma to fish. *Id.*

**Proposed Injunction Action 47:** As explained in the Taylor and Second Piaskowski declarations, Action 47 is unnecessary from a biological perspective. *Id.* ¶ 48-49; Second Piaskowski Decl. 95. And it will introduce risk to Fall Creek Dam itself through increased wave-action and scouring of the earthen embankment. Taylor Decl. ¶ 49; Askelson Decl. ¶ 193. Action 47 would likely cause prolonged transport of sediment downstream and elevated turbidity, while also exposing Tribal cultural resources in Fall Creek Reservoir for a longer period of time than under Corps operations. Taylor Decl. ¶ 49; Askelson Decl. ¶ 191.

**Proposed Injunction Action 48:** Action 48 jeopardizes the substantial improvements that the Corps' operations have made to UWR Chinook in the Fall Creek Basin. Under current Corps

operations, juvenile UWR Chinook entering the reservoir in the late winter and spring rear until the fall and then are passed downstream during the deep drawdown to streambed in November. Taylor Decl. ¶ 50. These juveniles grow large in the reservoir and are hypothesized to have higher smolt-to-adult survival rates. *Id.* In 2020, 834 unmarked adult UWR Chinook returned to the Fall Creek Adult Fish Collection Facility. *Id.* This return to Fall Creek is "remarkable" because it significantly exceeded pre-dam estimates. *Id.* The fishery agencies estimated that, prior to construction of Fall Creek Dam, Fall Creek above the present dam location had annual runs of only approximately 600 UWR Chinook and 75 UWR steelhead. *Id.* From a biological perspective, implementing Action 48 could endanger these improvements. *Id.*

Holding Fall Creek Reservoir at elevation 728 feet will also reduce conservation storage from 115,960 acre-feet at elevation 830 feet to 9,505 acre-feet. *Id.* ¶ 51. This results in a flow reduction of approximately 595 cfs per day during this time period. *Id.* The tradeoff will be a reduction of 106,455 acre-feet of stored water that would normally be released from July to September to meet mainstem flow objectives in the 2008 RPA. *Id.*; Askelson Decl. ¶ 197. The loss of conservation storage will also negatively affect juvenile UWR Chinook salmon rearing in Fall Creek Reservoir because it will result in fewer large smolts in the reservoir to pass downstream during the fall. Taylor Decl. ¶ 52. Modeling shows that only 1,100 fish per year can grow at an optimum rate under Action 48, while 234,000 fish could grow at an optimum rate under the Corps' operations. *Id.*

In addition, Action 48 will negatively impact the operation of the Fall Creek Adult Fish Collection Facility by lowering the reservoir to 728 feet. *Id.* ¶ 53. The facility requires approximately 100 cfs to supply the trap and auxiliary water supply so that fish can be collected. *Id.* Because average inflows drop below 100 cfs the first week of July, Plaintiffs' proposal would result in a draft of the reservoir and the Corps would be unable to operate the facility from July through October—when inflow generally increases above 100 cfs and the reservoir elevation would reach 728 feet again. *Id.* Fish collected from July through October can account for up to 30 percent of the adult UWR Chinook returns. *Id.*

Finally, Action 48 would be potentially detrimental to juvenile UWR Chinook passing

downstream through the regulating outlet in the spring. *Id.* ¶ 54. When accounting for the 100 cfs necessary to flow through the Fall Creek Adult Fish Collection Facility, these flows result in an average regulating out gate opening of 2.83 feet in April, 1.73 feet in May, and 1.17 feet in June. *Id.* These gate openings are significantly smaller than the 7.5-foot gate opening used during the Corps' fall drawdown to streambed operation. *Id.* NMFS has concluded that the most important factor for survival of juvenile UWR Chinook passing downstream may be to operate Fall Creek Dam with larger gate openings when juvenile salmonids are beginning to pass the project. *Id.* Juvenile survival would decrease with these smaller gate openings under Action 48 compared to the Corps' current drawdown operation. *Id.*

**Proposed Injunction Actions 7, 9, 10, 20, 26, 34, 41-42:** Plaintiffs also include several proposed injunction actions that require TAT to make determinations about future operations. As explained above, TAT is unconstitutional. But even putting that issue aside, Plaintiffs do not know what TAT will order in the future.[12] Those decisions could lead to significant tradeoffs (even if they do happen to be physically implementable). TAT is ill-equipped to make those decisions without the expertise of the Federal government and the WATER regional forum currently in place. *See id.* ¶ 55.

> ### 4.    Plaintiffs' proposed injunction does not materially benefit UWR Chinook and UWR steelhead when compared to the Corps' interim measures.

As alluded to above, if the Court considers Plaintiffs' operational injunction actions, it must confront a foundational question: does Plaintiffs' proposed injunction cause less harm or confer more benefits to salmonids than the Corps' interim measures? Plaintiffs avoid this question because the answer is unfavorable for them. The Corps' interim measures are implementable and will benefit salmonids, two points Plaintiffs do not seriously contest. *See* Second Piaskowski Decl.14-47 (explaining the benefits the Corps' interim measures confer to UWR salmonids). Plaintiffs' proposed injunction, by contrast, is not implementable as proposed. The proposed injunction includes measures that violate the Constitution and federal laws. Nor have Plaintiffs fully considered the

---

[12] Thus, Plaintiffs cannot show that their injunction will remedy any irreparable harm.

risks, tradeoffs, and consequences of their measures, many of which the evidence shows are likely to harm UWR salmonids. And Plaintiffs have not proven that the proposed injunction will result in less (or no) take of UWR salmonids or that it will further the recovery prospects of the species.

Even if some of Plaintiffs' proposed injunction actions could be lawfully implemented and would actually improve juvenile survival rates, Plaintiffs cannot connect the dots and show—on the whole, considering all the factors affecting the species—that their injunction is likely to increase abundance or productivity. Second Piaskowski Decl. ¶ 116, 123, 128. Plaintiffs deflect by arguing that juveniles will survive at higher rates when they pass the concrete (thereby ignoring all other consequences and outcomes). Even worse, they try to marginalize other experts that disagree with them by casting aspersions, rather than confronting the evidence. ECF 118 at 30. Plaintiffs' tactics speak volumes. If they could prove a benefit *to the species* from their injunction, they would have done so. They instead chose to piecemeal their analysis, focusing on survival past the concrete without considering the tradeoffs, the consequences, and the overall impacts to the species of their proposed injunction actions.

Indeed, Plaintiffs' filings show that they lack the expertise and capability of defining injunction measures that would benefit salmonids. For example, Plaintiffs do not understand the physical structures they want to operate, pointing to dam features that do not exist (fish horns at Green Peter Dam) and asking for the Corps to implement measures that conflict with each other (simultaneous use of upper and lower regulating outlets). Exhibit 2 at Injunction Actions 4-5, 16-17. Nor can Plaintiffs identify when their proposed operations will harm UWR salmonids.

At Fall Creek Dam, for example, Plaintiffs want to modify a Corps' operation that is facilitating the largest adult returns since before the dam was constructed. Exhibit 2 at Injunction 47-48. Yet Plaintiffs did not adequately consider the consequences of the operation and thus propose measures that will harm UWR salmonids and negate substantial benefits to the population that the Corps has achieved. Taylor Decl. ¶ 50. These same problems arise when considering Plaintiffs' proposed measures at more granular levels. For example, in proposing spill at Foster Dam, Plaintiffs propose to start spill on October 1. Exhibit 2 at Injunction Action 22. But the

experts determined that starting spill 15 days later will avoid harm to salmonids from excessive TDG, fluctuations in flow during spawning, and damage to turbines used to moderate TDG levels below the dam. Taylor Decl. ¶ 32. Plaintiffs and their experts were unable to catch this problem, highlighting the dangers associated with ordering widespread "experimental" changes to WVP operations without evidence that the changes are beneficial to listed species.

The Corps has stringent processes in place to evaluate changed operations for a reason— these evaluation processes avoid harms that *necessarily* will arise with ad hoc modifications to complex water management systems. *See, e.g.*, Askelson Decl. ¶¶ 31-34. Plaintiffs' cavalier approach to altering WVP operations and bypassing environmental reviews that Congress mandated must *precede* agency action confirms what the evidence says—Plaintiffs' proposed injunction actions does not confer a greater material benefit to UWR salmonids than the Corps' interim measures and, as established above, some actions may do more harm than good. *See* Second Piaskowski Decl. ¶ 128.

### C.    Plaintiffs have not established that the Court should grant their non-operational injunction measures.

Plaintiffs want to use this Court's summary judgment order as a vehicle to obtain their "wish list" of agency studies, monitoring, and construction projects. They propose non-operational measures, like studies and monitoring, to generate or obtain information for use in ongoing NEPA and ESA processes. Exhibit 2 at Injunction Actions 2, 7, 13, 18, 21, 33, 40, 45, 49, 50-52, 56, and 58. And they propose the Corps implement construction and infrastructure projects *before* it completes mandatory environmental reviews under NEPA and the ESA. *Id.* at Actions 27, 35, 46. Plaintiffs' non-operational injunction actions go too far.

First, Plaintiffs' proposed nonoperational injunction measures are disconnected from their allegations of irreparable harm. Plaintiffs argue injunctions are warranted to address irreparable harm to their interests in salmonids, *see* ECF 118 at 13, but they propose non-operational measures that they hope could someday be used in future decisions. *See, e.g.*, ECF 118 at 19-20 (proposing modeling "to inform decisions about future passage operations"); *id.* at 28 (pathogen study "may help" inform future actions). For the construction projects, Plaintiffs have no idea if they are

technically feasible or would benefit salmonids, but simply toss out ideas and hope something sticks. *Compare* Exhibit 2 at Injunction Action 13 (proposing a flip lip structural addition at Big Cliff dam), *with* Askelson Decl. ¶ 80-84 (Plaintiffs lack knowledge on the feasibility or merit of such actions).

When injunction proposals like Plaintiffs' nonoperational actions would do "nothing to remedy the specific harms alleged by the Plaintiffs in this case," the injunction is "overbroad and an abuse of discretion." *City & Cty. of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020), *petition for cert. docketed sub nom., Barr v. City & Cnty of San Francisco,* No. 20-666 (Nov. 13, 2020). Plaintiffs' reliance on *National Wildlife Federation v. NMFS*, 886 F.3d 803, confirms this defect. ECF 118 at 28. The Ninth Circuit upheld the lower court's "monitoring" injunction because of expert findings that the monitoring would have a "biological benefit" immediately, *during implementation. Nat'l Wildlife Fed'n*, 886 F.3d at 824. Plaintiffs cannot say the same thing. Their non-operational measures are either neutral for salmonids (observation, analysis) or affirmatively harm them (sampling, tagging, in-river construction work). *See* Second Piaskowski Decl. ¶ 101. Even if the non-operational harms were neutral or beneficial for salmonids, the Ninth Circuit rejected the propriety of issuing injunctions simply because they "will do no harm to the defendant." *Becerra*, 978 F.3d at 717. More "positive reasons" to grant injunctions are required; here, to avoid imminent irreparable harm. *Id*.; *Winter*, 555 U.S. at 20, 32.

Second, Plaintiffs presume that the Corps' future decisions made after NEPA and ESA will not comply with the law, and so the Court must intervene preemptively to substantively control those actions the Corps must take to comply with the law. *See, e.g.*, ECF 118 at 20 (assuming the Corps will not implement specific measures prospectively and so asking the Court to order them now). Plaintiffs cannot establish that the agencies will act on remand in ways that result in future violations or harms; the agencies have not yet acted. Nor may injunctions issue as prophylactic measures to address contingent and hypothetical future decisions or harms. *Monsanto*, 561 U.S. at 164; *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173-74 (9th Cir. 2011).

Third, and related, Plaintiffs' nonoperational measures direct *how* the agencies comply with the ESA and NEPA on remand. Plaintiffs want specific studies, monitoring, and construction

projects because they consider those necessary to ensure the agencies' ongoing ESA and NEPA compliance proceed appropriately. ECF 118 at 28-30. When granting relief, however, courts must "leave the substance and manner of achieving compliance *entirely* to the [agency]." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 937 (9th Cir. 2008) (emphasis added). The "guiding principle … is that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). Doing otherwise would propel the "court into the domain which Congress has set aside *exclusively* for the administrative agency." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 545 (1978) (citation omitted) (emphasis added).

In their zeal to obtain injunctions, Plaintiffs miss the bigger picture. Plaintiffs no doubt would cry foul if special interest litigants opposed to Plaintiffs' positions prevailed on a legal challenge and obtained relief to manipulate future decisions by controlling the timing and contents of agency actions on remand. Oregon, for its part, would resist injunctions that transfer State authority over State projects to Federal or private entities. This case does not present an exception. Litigation should not be used as a vehicle for special interest groups to advance private interests by, under the guise of an injunction, commandeering federal resources and circumventing future environmental review and decision-making processes.

### D.    Plaintiffs' proposed injunction is vague and not implementable.

Even if the Court were inclined to grant Plaintiffs' injunction, their proposed measures violate Federal Rule of Civil Procedure 65. Injunction orders must be "state [their] terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65. Specificity is needed to give the Corps' employees fair notice of what the injunction requires. The "one basic principle" built into Rule 65 is that "those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000).

Plaintiffs have not even tried to comply with these requirements. To begin, Plaintiffs want the Corps to implement injunction actions "to the maximum extent practicable" unless the Corps

cannot do so because of "necessary" flood control operations. Exhibit 2 at Injunction Action 3, 12. Plaintiffs cannot define these terms, much less what constitutes a "necessary" flood control operation. Plaintiffs' vague language means there is no definition to the injunction actions. Plaintiffs, for example, can simply threaten contempt for any flood control operations they subjectively consider "unnecessary," which would chill the Corps' ability to exercise its professional judgment to implement critical flood risk management operations as envisioned by Congress. It also places the Corps in the untenable position of guessing whether its actions comply with a Court order.

The same problems exist for many of Plaintiffs' other requests. They include injunction actions containing aspirational goals to "manage discharge . . . to reduce TDG" (Action 8); spread spill "to the maximum extent possible" (Action 11); "prohibit operations that would result in TDG" exceedances in spawning areas (Action 12); "improve" temperatures and meet flow targets (Action 19); perform unidentified operations to meet unidentified temperature targets (Action 25), implement unidentified "structural improvements and operations" (Action 27); "prioritize refill" (Action 39); model "other passage operations" (Action 40); conduct a study (Action 45); "improve" a fish facility (Action 46); fund monitoring and research (Actions 50-53); follow unidentified schedules and protocols and take "reasonable and practical steps" (Action 54), and so on. Plaintiffs also include operational actions that the Corps cannot implement under all hydraulic or hydrological conditions, based on conditions outside the Corps' control. *See, e.g.*, Askelson Decl. ¶ 73. Plaintiffs hardly acknowledge these factors exist. Combined with the incredible complexity of WVP operations in any given year, Plaintiffs' vagueness in their proposed injunction actions seek to override the expertise and judgment of the agency Congress vested responsibility in to make such decisions, adding substantial uncertainty and confusion on what operations the Corps must implement to comply with the law.

Rule 65 was imposed to prevent this very "uncertainty and confusion" and thus the possibility of "founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476-77 (1974). Nor is Plaintiffs' vagueness necessary. If Plaintiffs want the Corps to have discretion to conduct flood risk management operations, manage TDG, or perform

the other vaguely described tasks in their proposed injunction, they do not require a judicial order. The Corps already conducts many operations and generalized tasks Plaintiffs' want to wrap into the injunction order. *See* Exhibit 1. And the Corps does so with regard for all of the project's purposes, the structural and operational integrity of the dams, and the health and welfare of Oregonians and the public. Askelson Decl. ¶ 15. The Court therefore should reject Plaintiffs' invitation to bypass Rule 65 and the Corps' standard operations by issuing ambiguous orders to "do good things."

## E. The balancing of harms and public interest weigh decidedly against granting Plaintiffs' preferred injunction

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (citation omitted). Plaintiffs argue the Court can ignore the balance of equities because they raise ESA claims. But courts *presume* the balance of equities tips in favor of endangered species; they do not ignore the inquiry. *Nat'l Wildlife Fed'n*, 886 F.3d at 817; *see, e.g.,* W. *Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (affirming denial of an injunction in a case involving the desert tortoise, a threatened species, where the district court properly considered, *among other things*, protecting jobs).

In any event, the Court certainly may balance harms that the injunction would inflict on the ESA and ESA-listed species. "The law is clear that threatened and endangered species are the beneficiaries [of an injunction], rather than plaintiffs professing to act on their behalf. It follows that a plaintiff cannot merely state that the balance of the hardships and the public interest falls in its favor." *All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1266–67 (D. Mont. 2014). Plaintiffs' injunction here contravenes the ESA. Although suing to enforce the ESA, Plaintiffs inexplicably seek injunction actions that would contravene and violate various RPA measures. *See, e.g.,* Askelson Decl. ¶ 131, 197; Taylor Decl. ¶ 18. Even Plaintiffs' requests for a TAT contravenes the 2008 RPA, as it would render superfluous WATER and other robust regional coordination forums required by the 2008 RPA. "[A]n injunction that hinders full implementation of" NMFS 2008 RPA "is not in the public interest and weighs against issuing the preliminary injunction." *Idaho Rivers United v. Corps*, 156

F. Supp. 3d 1252, 1266 (W.D. Wash. 2015).

Not only would Plaintiffs have the Court order the Corps to violate the 2008 RPA, they want the Court to circumvent the ESA entirely. In Section 7(a)(2), Congress required procedural consultation *before* agencies implement new actions with adverse effects. 16 U.S.C. § 1536(a)(2). When those new actions cause "take," as here, that take is prohibited unless subject to an exemption or permit. *Id.* § 1538. Yet Plaintiffs would have the Corps implement a series of actions that result in take, where those actions have not undergone consultation and will take species without an exemption or permit. In essence, Plaintiffs ask that the Court suspend the ESA (and NEPA, and any other law that the agencies must comply with) because Plaintiffs prefer their actions.

This is not an injunction to enforce the ESA. It is one to circumvent it. And Plaintiffs' request in this regard is improper. "A district court cannot . . . override Congress' policy choice, articulated in a statute." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). Even with the ESA, courts may not preempt the ESA's substantive and procedural provisions through the grant of equitable relief. *Tenn. Valley Auth.*, 437 U.S. at 195; *see also Monsanto,* 561 U.S. at 162 (identifying the incongruence with simultaneously authorizing interim actions without an EIS and enjoining interim actions without an EIS). Plaintiffs thus err in asking the Court to enter relief that displaces the ESA's mandates that the agencies are in the process of carrying out. Coffey Decl. ¶ 4-6.

Compounding these problems, Plaintiffs' proposed relief will likely divert substantial agency resources *away* from the ongoing WVP NEPA and ESA processes and away from other actions the Corps implements to benefit ESA-listed species regionally and potentially nationally. In the Willamette and Columbia River basins (as elsewhere), the Corps rigorously scrutinizes and prioritizes what actions it can fund and implement, given available staff and financial resources, through its annual civil works budget process. Coffey Decl. ¶ 10-14. Implementing actions to protect ESA-listed species plays a prominent role in the resources the Corps expends to operate the Willamette and Columbia Rivers projects for all other project purposes. *See id.* ¶ 10-11. If, as Plaintiffs propose, the Corps suddenly must spend vastly more staff and financial resources than have been carefully planned and prioritized through multi-year planning processes, the Corps will have to try and steal

that staff and funding from other priority actions and efforts. *Id.* ¶ 19-24. These other actions and efforts likely include ongoing WVP ESA and NEPA compliance processes, *id.* ¶ 24, as well as actions the Corps' implements to protect salmonids, bull trout, and other ESA-listed species throughout the Pacific Northwest, the Puget Sound, the Missouri River basin, and other areas under the supervision of the Corps' Northwestern Division, *id.* ¶ 21-23.

Additionally, other than conceding injunction actions should not impact flood risk management operations, Plaintiffs do not even acknowledge the many negative impacts, or tradeoffs, to other congressionally-authorized WVP purposes that benefit the region. For example, many of their proposed actions will negatively impact recreation at these reservoirs, decrease reliable hydropower generation, or modify flows in the system as a whole in a manner that impacts the Corps' ability to meet its authorized purposes. Askelson Decl. ¶ 45, 61, 64, 72, 142, 146, 160, 172.

Plaintiffs choose not to acknowledge these consequences. They instead apparently presume the Corps has unlimited staff and funding to reallocate to their injunction, with no thought about the consequences to ESA-listed species, other project purposes, or even other Corps projects if the Corps is required to implement their injunction actions. But, much like court-imposed deadlines, injunctions that direct day-to-day agency operations and reallocate staff and funding over years will monopolize agency resources and constrain what the Corps can do on remand. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 606 (Court-imposed deadlines "become a substantive constraint on what an agency can reasonably do"). Put simply, the Corps will be unable to implement Plaintiffs' injunction and comply with the ESA and NEPA on the existing schedules, Coffey Decl. ¶ 24, which would frustrate the Corps' compliance with the ESA and NEPA on remand.

In the end, Plaintiffs' proposed injunction contravenes the ESA and frustrates its implementation, neither of which tips the balance in favor of granting relief or advances the public interests as expressed in the ESA. Because of this, the Court should consider the other harms to the public interest caused by Plaintiffs' injunction. The injunction will severely constrain the Corps' ability to generate power at the dams, which harms the public interest in the power supplied by the project. *Id.* ¶ 9. Indeed, the power from the Willamette system protects downstream water quality, as

the turbines reduce and moderate TDG levels, aid in maintaining electric transmission system reliability, and provides flexibility to local communities to function and adapt during emergencies.[13] Plaintiffs' injunction threatens local water supplies by mobilizing over 16 thousand tons of sediment. Askelson Decl. ¶ 159-60. Plaintiffs' injunction would compromise recreation at various dams throughout the WVP, which will affect local and rural Oregon communities during unprecedented conditions marred by a pandemic, economic strain, fires, social conflict and strife. *Id.* ¶ 61, 103, 120, 127, 142, 163. Finally, the public interest does not favor injunctive relief that requires the Court to transfer the Corps' operational control over dams Congress entrusted it to operate and maintain to anyone, let alone Plaintiffs' preferred "advisory" team. *Becerra*, 978 F.3d at 718; *Sierra Club v. Trump*, 929 F.3d 670, 707 (9th Cir. 2019) ("public interest in ensuring protection of [the Constitution's] separation of powers is foundational and requires little elaboration").

## V.    CONCLUSION

Despite the complexity of the WVP, the Corps has developed interim measures with experts in the region, and that process is working to benefit salmonids during the ESA reinitiated consultation. Coffey Decl. ¶ 4-6. Plaintiffs' proposed injunction will not aid that process or provide a foundation that supports future efforts to protect and conserve ESA-listed salmonids; in fact, as articulated above, it will likely detract from it. The Court, in fact, has issued targeted relief—a declaratory judgment—that "allows for correction while still maintaining the proper allocation of responsibilities between the courts and the agencies." Wright & Koch, Jr., *Federal Practice & Procedure* § 8312 at 82 (2006). Combined with the interim measures Plaintiffs' effectively concede benefit salmonids, the Court's declaratory relief constitutes a viable alternative to Plaintiffs' proposed injunctions. *Salazar v. Buono*, 559 U.S. 700, 721-22 (2010) (it is incumbent on courts "to consider less drastic relief" when granting remedies). Federal Defendants therefore request that the Court deny Plaintiffs' proposed remedy and issue a final order remanding the ESA violations to NMFS and the Corps.

---

[13] *See, e.g.*, https://www.registerguard.com/story/news/2020/10/14/lane-electric-bpa-power-feed-blue-river-restored-thursday/3655232001/; Askelson Decl. ¶ 67.

Dated: November 30, 2020

JEAN E. WILLIAMS, Deputy Assistant Attorney General
SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Assistant Section Chief

*/s/ Kaitlyn Poirier*
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Fax: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov

*/s/ Michael R. Eitel*
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace 370
Denver, Colorado 80202
Telephone: (303) 844-1479
Fax: (303) 844-1350
Email: michael.eitel@usdoj.gov

Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

I certify that on November 30, 2020, the foregoing was electronically filed through the Court's electronic filing system, which will generate automatic service on all Parties enrolled to receive such notice.

*/s/ Kaitlyn Poirier*
Kaitlyn Poirier
Trial Attorney, U.S. Department of Justice