TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
MICHAEL R. EITEL, Senior Trial Attorney
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov; michael.eitel@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, et al., | Case No.: 3:18-cv-00437-HZ |
| Plaintiffs, | RESPONSE IN OPPOSITION TO PLAINTIFFS' FILING REGARDING THE BIANNUAL STATUS REPORT |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants, | |
| and | |
| CITY OF SALEM and MARION COUNTY, | |
| Defendant-Intervenors. | |

**I.      Introduction**

Plaintiffs were given an extraordinary opportunity during the expert panel process to craft implementation plans prescribing the Corps' actions in operating and maintaining the Willamette Valley Project. When the expert panel was established, Federal Defendants were concerned that the

expert panel process may not end with the submission of the last implementation plan and that Plaintiffs may attempt to continue dictating Corps' actions—even if the Corps was complying with the Interim Injunction. Those concerns have been borne out.

In response to the Corps' latest biannual status report, Plaintiffs are requesting new injunction actions. These requests were filed without a motion, without meeting the necessary legal standards, and without acknowledgement that Plaintiffs are attempting to get a second bite of the injunctive relief apple, despite having failed to include these requests in the expert panel's implementation plans. Plaintiffs also request Court orders that are needless and unwarranted. As discussed below, Plaintiffs' request for several Court orders should be denied.

II.  Argument

   A.  **Request for an Order to Fund Long-Term Research Monitoring & Evaluation ("RM&E") and Contracting Issues**

Plaintiffs first request a Court order requiring the Corps "to provide the funding and staffing necessary to implement all of the planned RM&E described in the fourth status report." Plaintiffs' Response, ECF 280 at 8. A Court order requiring the Corps to provide funding should be rejected for two separate reasons. First, Plaintiffs' request goes further than what was contemplated by the expert panel's Long-Term RM&E Plan, which explicitly states that "the Corps may not be able to carry out some aspects of the RM&E set forth in this plan due to lack of funding . . . ." and outlines a plan for what to do if this occurs. Long-Term RM&E Plan, ECF 240-1 at 2. Plaintiffs fail to mention the expert panel's recognition that funding could be an issue during the term of the injunction or explain why the process outlined by the expert panel should be abandoned or overruled. *See generally* Plaintiffs' Response, ECF 280. Second, Plaintiffs' request for a Court order is unwarranted given that the Corps has funded all of the RM&E actions required of it so far. The Corps has spent $24.7 million to date on RM&E actions, with that amount anticipated to increased to over $31 million by the end of this fiscal year. Corps' Technical/Substantive Response to Plaintiffs' Concerns Regarding the Fourth

Biannual Status Report,[1] Attachment 1 at 1. The Corps anticipates spending $14 million in fiscal year 2024. Given these facts, the Court should not enter a preemptive order in anticipation that the Corps may fail to fund RM&E at some point in the future. In sum, a Court order requiring the Corps to secure funding is inapt given the expert panel's process and the Corps' funding to date of the RM&E actions.

Plaintiffs are correct that some of the RM&E actions planned for 2022 and early 2023 were not started/completed on the schedule originally contemplated by the expert panel. *See* Plaintiffs' Response, ECF 280 at 3; Attachment 1 at 1-4. As Plaintiffs admit, factors beyond the Corps' control played a role in some of these delays. Plaintiffs' Response, ECF 280 at 3. For example, some active tag studies planned for spring 2023 had to be cancelled due to the illness of the spring Chinook that were set to be utilized in the study. Attachment 1 at 2, 4. Other issues also occurred including environmental conditions (e.g., high river flows, high debris passage) impacting rotary screw trap sampling. *Id.* at 3. However, some of the RM&E actions planned for 2022 and early 2023 were not started/completed on schedule due to staffing shortages in the Corps' Portland District Contracting Office. *Id.* at 1-3.

The Corps manages research across the Columbia River Basin. Due to limited capacity within the Corps, the Corps often contracts with researchers to conduct RM&E, including the RM&E outlined in the Long-Term RM&E Plan. *See generally id.* at 1-4 (discussing contractor actions); Fourth Biannual Status Report, ECF 279-1 (same). The process of issuing contracts for the injunction is handled by the Corps' Portland District Contracting Office. Only warranted contracting officers can bind the Federal Government to a contract. Attachment 1 at 1. Staffing resources and issues hiring

---

[1] Because the Corps authored the biannual status report at issue, the Corps (rather than Federal Defendants as a whole) also provided the technical/substantive responses to Plaintiffs' concerns regarding the status report. *See* Attachment 1. The National Marine Fisheries Service were able to review and comment on Attachment 1 even though the agency is extremely busy working on the new biological opinion.

3

additional staff have been a nationwide concern for the Corps and the Portland District Contracting Office was no exception. *Id.* Over the last year, there has been a lack of sufficient and/or qualified applicants for open contracting staff positions as well as numerous offers of employment and subsequent rejection of those offers. *Id.* That said, the Portland District Contracting Office has recently increased staffing by over 30% and has increased the quantity of warranted contracting officers by two, with another key contacting officer position set to onboard in October 2023. *Id.*

The Portland District Contracting Office has also shifted workload priorities so that there will be sufficient dedicated staff for the RM&E contracting actions going forward. *Id.* These collective efforts will assist in remedying any RM&E actions that have been delayed due to prior resource constraints. *Id.* Should staffing issues become an issue in the future, the Corps will prioritize injunction RM&E contracting actions by either shifting workload or tapping into resources elsewhere in the Corps. *Id.* While these issues did lead to delays in implementing some of the RM&E actions scheduled for early 2023 (and possibly fall 2023), the RM&E actions have already occurred or are in development and will occur. *Id.* at 1-4.

      **B.**      **Request for an Order to Repair and Operate Passive Integrated Transponder ("PIT") Tag Detection Sites**

Plaintiffs' next request is an order "directing the Corps to provide funding, staffing, expertise, or other resources needed to repair and operate PIT tag detection sites, including at a minimum[,] sites at Willamette Falls and Lebanon Dam." Plaintiffs' Response, ECF 280 at 8. Plaintiffs' request regarding Lebanon Dam is pointless given that the Corps has already installed a PIT tag detection system there in compliance with the expert panel's implementation plans and has undertaken any needed repairs.[2] *See* Fourth Biannual Status Report, ECF 279-1 at 101-02 (describing installation of

---

[2] The biannual status report describes the repairs that needed to be made to the PIT tag detection system. These repairs were completed September 21, 2023. The contractor will tune the receivers in the next few days, but the system should be operable again very soon.

system, the problems that have occurred with the system, and the Corps' solutions). And Plaintiffs' brand-new request for a Court order regarding installing a PIT tag detection system at Willamette Falls is an overreach. As explained below, the Corps has already completed its legal requirements relating to PIT tag detection sites. Moreover, Plaintiffs' new request for a PIT tag detection system at Willamette Falls is not legally supported and infeasible.

The Corps is under no legal obligation to install a PIT tag detection system at Willamette Falls. The expert panel's implementation plans contain only a few requirements regarding the installation or repair of PIT tag detection systems. First, the expert panel required the Corps to initiate discussions with the City of Albany (the owner of Lebanon Dam) by September 1, 2021, regarding installing a new PIT tag detection system at Lebanon Dam. Foster Dam Fall Spill Injunction Measure Implementation Plan, ECF 212-1 at 6; Interim Injunction, ECF 212 at 4. The Corps completed this task. Fourth Biannual Status Report, ECF 279-1 at 101. Second, based on the successful conversations the Corps had with the City of Albany, the Corps was to install a PIT tag detection system at Lebanon Dam in 2022. Long-Term RM&E Plan, ECF 240-1 at 27. The Corps likewise completed that task. Fourth Biannual Status Report, ECF 279-1 at 101. Third, the Corps was to identify a timeline for installing PIT tag antennas at Foster Dam. Long-Term RM&E Plan, ECF 240-1 at 27. The Corps convened an engineering team to investigate the feasibility of installing PIT antennas at Foster Dam. *Id.* at 105. The team ultimately determined that PIT antennas on the spillway would be the best option for achieving the desired result, but it would require a "massive reconstruction" of the spillway which would present significant dam safety, life safety, and water quality concerns. *Id.* at 106. The team recommended that this option be re-evaluated next time major spillway maintenance is proposed—meeting the Corps' last obligation in the implementation plan relating to installing or repairing PIT tag detection systems. *See id.* at 106.

The expert panel's implementation plans do not require the Corps to provide funding, staffing, expertise, or other resources needed to repair and operate a PIT tag detection system at Willamette Falls. Therefore, this is a new request for injunctive relief requiring Plaintiffs to meet certain legal standards.

Plaintiffs did not state what legal authority governs their request, but Plaintiffs presumably rely on either (1) Federal Rule of Civil Procedure 59(e), allowing the Court to alter or amend its judgment; or (2) the Court's common-law authority to rescind, reconsider, or modify an interlocutory order as long as the Court retains jurisdiction over the matter. But either way, Plaintiffs' request should be denied. Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *See Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (quoting 12 James Wm. Moore *et al.*, § 59.30). Under Rule 59(e), reconsideration is appropriate if newly discovered evidence is presented, the Court's initial decision was clear error or manifestly unjust, or if there is an intervening change in the controlling law. *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). This same standard has been applied to a request for the Court to reconsider an interlocutory order under its inherent common law powers. *See In Re Galena Biopharma, Inc.*, Case No.: 3:14-cv-382, 2014 U.S. Dist. LEXIS 154652, at *3 (D. Or. Oct. 30, 2014). "Raising arguments or providing evidence in a motion for reconsideration that could have been included when litigating the original motion are not proper grounds for reconsideration." *Id.* Plaintiffs would also need to prove that the factors for injunctive relief articulated in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), regarding the need to establish likely irreparable harm, etc. have been met.

Plaintiffs have not adequately demonstrated why the Court should entertain, much less issue, this "extraordinary remedy." Plaintiffs argue that the lack of a PIT detection system at Willamette Falls "limits the ability to assess long-term survival of fish that pass the dams" and "may" jeopardize the

6

usefulness of certain studies. Plaintiffs' Response, ECF 280 at 4. But Federal Defendants disagree with this assessment for a number of reasons, including that PIT tag detection systems will not support assessing specific passage conditions at each dam and they are not developed to justify assumptions for providing meaningful estimates of downstream passage survival. *See* Attachment 1 at 5-8. Additionally, Plaintiffs could have included this request in the expert implementation plans or their motion for remedy. Having failed to do so, this is an improper request for reconsideration. *See In Re Galena Biopharma, Inc.*, 2014 U.S. Dist. LEXIS 154652 at *3. And legally, Plaintiffs cannot show that an alleged failure to obtain additional information could be the cause of any irreparable harm to Plaintiffs (or ESA-listed species) during the remaining injunction period, which ends in December 2024 when Federal Defendants will issue a new biological opinion. Plaintiffs have failed to meet the applicable legal standards and their request must be denied.

Moreover, contrary to Plaintiffs' statements, the agencies' experts were not under the assumption that there would be a functional PIT tag detection system at the juvenile bypass system at Willamette Falls when crafting the Long-Term RM&E Plan, much less that the Corps would be required to make it operable. *See* Plaintiffs' Comments on Fourth Status Report, ECF 280-1 at 2. Federal Defendants' understanding is that Portland General Electric ("PGE") owns the Sullivan Power Plant at Willamette Falls and the associated juvenile fish bypass system, including the PIT antenna array. Attachment 1 at 7-8. However, the PIT antenna array was co-managed by PGE and the Oregon Department of Fish and Wildlife ("ODFW"), with ODFW operating the array. *Id.* at 8. Once PGE met its targets with respect to downstream fish passage, PGE decided it would no longer use the antenna array. *Id.* At that point, ODFW initiated talks to retain the functionality of the antenna array, but these talks broke down. *Id.* The antenna array was turned off around September 2018, but the Corps believes they are operated periodically by ODFW. *Id.* The Corps does not know ODFW's future plans for their operation. *Id.* Another PIT antenna array at Willamette Falls is near the adult

fish ladder and is owned by ODFW. *Id.* According to notes from Willamette Action Team for Ecosystem Restoration ("WATER") meetings, this array is operated intermittently as needed by ODFW.

As described above, neither of the PIT antenna arrays at Willamette Falls are within the Corps' control or authority.[3] Therefore, an order requiring the Corps to repair and operate the PIT tag detection system at Willamette Falls may not even be implementable; PGE or ODFW could decline to allow changes to be made to their infrastructure or for the Corps to enter their property. For this additional reason, the Court should deny this request.

### C. Request for an Order Requiring the Corps to Implement Four Actions from the RM&E Plan

Plaintiffs also ask for an order requiring the Corps to implement four particular actions from the expert panel's Long-Term RM&E plan. *See* Plaintiffs' Response, ECF 280 at 4-5. However, the Corps is already implementing each of these actions where feasible, rendering a Court order redundant.

The first and second RM&E actions that Plaintiffs identify as not being completed are related: (1) develop a plan to capture and tag juvenile steelhead in the South Santiam River and spawning tributaries upstream of Foster Reservoir; and (2) develop a plan, in coordination with ODFW and NMFS, to collect age-0 steelhead at the South Santiam trap to use as surrogate steelhead for tagging studies to address a shortage of available steelhead. *Id.* at 4. As for the first RM&E action, the Corps already captures, PIT tags, and releases juvenile steelhead in in the South Santiam sub-basins collected in screw traps. Attachment 1 at 9. With respect to the second action, the Corps has determined it is

---

[3] Furthermore, Plaintiffs do not specify whether they have approached the State of Oregon, an amicus in this case, about making the arrays operational or operating them full time. There is a WATER subcommittee, which includes ODFW, currently reviewing the issues with the PIT tag detection infrastructure at Willamette Falls, further counseling against a superfluous order requiring the Corps to evaluate the same issue. *See* Attachment 1 at 8.

not feasible to collect age-0 steelhead at the South Santiam trap to use as surrogates for active tag studies. *See id.* These studies would require several thousand steelhead and the fish would need to be longer than 90 mm FL. *Id.* The age-0 steelhead found in the reservoir are too small for an active tag study, even if the fish were to be held and reared for the study season. *Id.* Nor is it feasible to use the screw traps to collect a few steelhead at a time and rear them until they are large enough for the study. *Id.* Prior screw trapping reports by ODFW above and below Foster Reservoir show that only a few steelhead are caught in the traps daily or weekly. *Id.* It would take a long period of time to collect the thousands of fish needed for the study and the study would be biased if these fish were used (e.g, did the tagged fish die after release because they were originally compromised from being caught in the screw trap and handled or from some other effect?). *Id.* As an alternative, age-2 surrogate steelhead are being used for RM&E studies in the South Santiam sub-basin. *Id.* at 10.

The third RM&E action identified by Plaintiffs as necessitating a Court order is for the Corps to design a study in 2023 to investigate the life history of the progeny of outplanted adult Chinook salmon in streams upstream of Green Peter Dam and tag juvenile salmon, with implementation occurring in 2024. Plaintiffs' Response, ECF 280 at 5. The Corps accomplished this RM&E action ahead of schedule. *See* Attachment 1 at 10. The study was initiated in 2023 and will be ongoing through 2024. *Id.* The sample period for fish in 2023 is approximately June 2023 through November 2023 (which is why the information regarding this study included in the biannual status report is limited) and the sample period for the following year is February 1 to November 30, 2024. *Id.* More information regarding this study will be available in the next biannual status report.

Similarly, the Corps is already completing the fourth RM&E action identified by Plaintiffs: monitoring impacts of operations at Hills Creek Dam on bull trout in coordination with the U.S. Fish and Wildlife Service and Bull Trout Working Group. *See* Plaintiffs' Response, ECF 280 at 5. Rotary screw traps are currently being operated seasonally below Hills Creek Dam and will continue to be

9

operated during the fall/winter fish passage operation. Attachment 1 at 10. Any bull trout capture data from the screw traps will be reported by Federal Defendants in the upcoming biannual status report or on the Corps' website: https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/. Furthermore, the Corps contracted with ODFW in 2020 to annually monitor bull trout in the Middle Fork sub-basin, providing meaningful data that can be used by the U.S. Fish and Wildlife Service and Bull Trout Working Group for assessing the effects of the injunction operations at Hills Creek Dam. *See id.* at 10-11.

In short, there is no need for a Court order requiring the Corps to perform any of these actions and Plaintiffs' request should be denied on these grounds.

### D.    Request for Further RM&E Analysis

Plaintiffs argue that "analysis of RM&E results in the fourth status report is incomplete" and then use this assertion as a springboard to request that the Court require the Corps to undertake additional analyses. Plaintiffs' Response, ECF 280 at 5-6. But Plaintiffs' complaint largely stems from a disagreement the parties have regarding the contents of the biannual status reports. The Interim Injunction explicitly states the information that must be included in the biannual status report, including "all RM&E that was conducted during the prior six months and any available results of that research." Interim Injunction, ECF 212 at 2. Federal Defendants have interpreted the Court's order to require the Corps to provide results or summaries of the RM&E that has occurred, but not as Plaintiffs suggest (Plaintiffs' Response, ECF 280 at 5-6), in-depth details of those results or technical/scientific reports discussing and interpreting those results. *See* Attachment 1 at 11. The Corps already provides those details and technical/scientific reports on the following website: https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/. The Corps reasonably made this decision, in part, because the biannual status reports take months to assemble and are already very lengthy. *See* First Biannual Status Report, ECF 242-1 (67 pages); Second Biannual Status Report,

ECF 267-1 (89 pages); Third Biannual Status Report, ECF 273-1 (121 pages); Fourth Biannual Status Report, ECF 279-1 (107 pages). Including details of the RM&E (for example, all of the results of screw trap sampling that Plaintiffs are requesting) would tremendously increase the burden on the Corps and make the biannual status report unwieldy for anyone attempting to review it. By using the website, Plaintiffs can search for data in which they have an interest and review the relevant portions.

As to Plaintiffs' specific requests, the Corps has included data regarding screw trap sampling on its website. Attachment 1 at 12. The website also includes analysis of fish size effects on trap efficiency (as feasible). *Id.* This analysis will continue to be updated and refined as more results of sampling and trap efficiency trials are conducted. *Id.* And, as mentioned in the biannual status report, the Corps contracted with the Pacific Northwest National Laboratory ("PNNL") to conduct the active tag studies at Green Peter and Foster Reservoirs in 2023. Biannual Status Report, ECF 270-1 at 11. PNNL will complete the requested analysis in their next report. Attachment 1 at 13. However, due to their workload issues, PNNL will likely not complete that report until early November 2023. *Id.* This information will be included in the next biannual status report in February 2024 and/or on the Corps' website.

To the extent Plaintiffs are interested in further analysis of the results in the biannual status reports and the data/analysis on the website that is not required by the expert panel's implementation plans, they are free to conduct that analysis. The Corps is not Plaintiffs' personal research agency and does not have the obligation to conduct every possible analysis of the data. The Corps has more than fulfilled its obligations regarding the biannual status report.

### E.  Request for Court Orders Relating to Total Dissolved Gas ("TDG")

Plaintiffs request two separate Court orders relating to TDG. Plaintiffs' Response, ECF 280 at 8-9. Plaintiffs first ask the Court to require the Corps to provide a supplemental report containing "missing" TDG data from Detroit, Green Peter, and Lookout Point Dams. *Id.* at 7-8. But Plaintiffs

11

are mistaken that any data is missing. Attachment 1 a 13. The biannual status report includes data from TDG monitors downstream of each of those dams. Fourth Biannual Status Report, ECF 279-1 at 18-23 (TDG monitoring data downstream from Detroit Dam); *id.* at 31-32 (TDG monitoring data downstream of Green Peter Dam); *id.* at 77-78 (TDG monitoring data downstream of Lookout Point Dam). TDG monitoring data can also be found on the Corps' website, just as the expert panel recommended in the Long-Term RM&E Plan. *See* Attachment 1 at 13; https://www.nwd-wc.usace.army.mil/dd/common/dataquery/www/; Long-Term RM&E Plan, ECF 240-1 at 1.

Plaintiffs also request that the Corps be required to provide data from a TDG monitor in Big Cliff Reservoir. *See* Plaintiffs' Response, ECF 280 at 7. However, there is no TDG monitor in Big Cliff Reservoir.[4] Nor are Federal Defendants under a duty to place a TDG monitor in Big Cliff Reservoir. There is no Court order requiring the Corps to install such a monitor. Nor does the expert panel's Long-Term RM&E Implementation Plan require the Corps to do so. *See generally* Long-Term RM&E Plan, ECF 240-1.

Therefore, this request is similarly a new request for injunctive relief, requiring Plaintiffs to meet the legal standards discussed above. Plaintiffs have not demonstrated why the Court should issue this "extraordinary remedy" or how their interests will be irreparably harmed in the absence of the remedy. Plaintiffs state that data from a TDG monitor in Big Cliff Reservoir would be of "particular interest" for further data collection. *See* Plaintiffs' Response, ECF 280 at 7. Without further justification, their request must be denied.

Plaintiffs' second request for a Court order relating to TDG involves directing the Corps to "avoid high spill rates following a flood surcharge when existing conditions and weather forecasts

---

[4] If Plaintiffs are instead referring to the instruments deployed by the Corps to monitor TDG in the tailrace and near the tailrace rotary screwtrap downstream of Big Cliff Dam, data from those instruments can be found in the latest biannual status report (with more data forthcoming in the next status report) and on the Corps' website. *See* Fourth Biannual Status Report, ECF 270-1 at 22; https://www.nwd-wc.usace.army.mil/dd/common/dataquery/www/

allow, to the maximum extent possible." *Id.* at 9. As a preliminary matter, this order would be superfluous. The Corps already agreed to this action in the expert panel's implementation plan for Detroit and Big Cliff Dams that was subsequently adopted by the Court. 2021 Interim Measure Implementation Plan Detroit and Big Cliff Dams, ECF 213-1 at 5-6; Order, ECF 220 at 4.

Furthermore, such an order would not have altered the Corps' January 2023 operation that Plaintiffs identified as the impetus for its request. *See* Plaintiffs' Response, ECF 280 at 7. The Corps' January 2023 operation did result in TDG levels above 125% downstream of Big Cliff and Detroit Dams. Fourth Biannual Status Report, ECF 279-1 at 18. But as explained below, the January 2023 operation was a flood risk management operation required by existing and forecasted hydrologic conditions. Attachment 1 at 16-17. The Corps thus complied with the Court's Interim Injunction and would have been in compliance with Plaintiffs' requested order. *See* Interim Injunction, ECF 212 at 1 ("[T]he Corps SHALL implement the interim injunction measures to the greatest extent practicable **under existing hydrologic conditions and necessary flood control operations**.") (emphasis added); Plaintiffs' Response, ECF 280 at 9 (requesting a Court order to "avoid high spill rates following a flood surcharge **when existing conditions and weather forecasts allow**, to the maximum extent possible") (emphasis added).

A strong atmospheric river impacted the North Santiam River basin between December 26-28, 2022. Attachment 1 at 16. During this event, the Corps used Detroit Reservoir's flood storage capability to reduce the risk of flooding downstream of Big Cliff Dam (i.e., storing the water in Detroit Reservoir rather than letting all of it pass downstream). *Id.* However, this raised the level of water in Detroit Reservoir's flood storage to 50 feet above the rule curve as of January 1, 2023. *Id.* In situations where the level of water is above the rule curve, the Corps' Water Control Manual dictates that the Corps evacuate water as quickly as is safe to do so while not exacerbating downstream flooding. *Id.* The Corps determined that releases in excess of 6,000 cfs would be necessary to evacuate the flood

13

storage within the standard 10-day window. *Id.* However, the Corps decided to limit outflows at Big Cliff Dam to 6,000 cfs, until medium-range weather forecast suggested that higher releases would be required to evacuate the flood pool in advance of a new heavy precipitation event. *Id.* The Corps, cognizant of the Court's prior orders and the expert panel's implementation plans discussing the potential impact of high TDG on ESA-listed species, made this decision in an attempt to curb TDG levels downstream of Big Cliff and Detroit Dams.

Unfortunately, by January 5, probabilistic weather forecasts indicated a more than 80% probability of another atmospheric river impacting the Willamette Basin from January 12-13. *Id.* Given the lack of flood storage capability in Detroit Reservoir, the Corps determined that it could no longer maintain 6,000 cfs outflows; it was necessary to implement a flood risk management operation. *See id.* The Corps sent a message to the Detroit Dam and Big Cliff Dam operators on January 5 to increase outflows to 10,000 cfs the following day in an effort to evacuate water stored in Detroit Reservoir's flood storage and prepare for additional inflows. *See id.* The Corps instructed the operators to use the turbines at Detroit Dam as well as spread spill at Big Cliff Dam in an effort to limit downstream TDG to the extent possible. *Id.* at 16-17. Even with those precautions in place, TDG reached 136%. *See* Fourth Biannual Status Report, ECF 279-1 at 18. Given that this was a flood control operation, the Corps complied with the Interim Injunction and Plaintiffs' newly requested Court order. This makes Plaintiffs' requested order both unnecessary and unjustified.

Plaintiffs also state that the Corps should "use real-time weather and run-off information and short-term forecasts to adjust its spill volume to avoid TDG >130% as it did in winter 2021-2022." Plaintiffs' Response, ECF 280 at 8. It is inaccurate to suggest that the Corps does not use forecast information to plan spill releases at Detroit and Big Cliff Dams. Attachment 1 at 14. As Plaintiffs recognize, the Corps has successfully used forecast information to adjust its spill volume in the winter of 2021-2022 in an effort to minimize TDG. Plaintiffs' Response, ECF 280 at 7-8. And the Corps

14

continues to use forecasts when making operational decisions. Attachment 1 at 14. As mentioned above, the Corps used forecasts to assess the flood storage capabilities in Detroit Reservoir after the December 2022 atmospheric river event and to decide when to implement the January 2023 operation. *See id.* at 15-16. But forecasts are not always sufficiently accurate to ensure that spill at Big Cliff and Detroit Dams never leads to TDG greater than 125%. *Id.* at 14. For example, the Corps relied on 10-day look ahead forecasts in May 2023 that predicted snowmelt-driven high flows near Detroit and Big Cliff Dams and implemented an operation to spill water while limiting TDG. *Id.* But due to an inaccurate forecast regarding when water levels would recede below 3200 cfs, as well as high Big Cliff local inflows that are not forecasted at all, TDG was greater than 125%. *Id.* Therefore, the Court could order the Corps to use forecasts to adjust its spill volume to avoid TDG greater than 130%. But this would not change how the Corps operates. Nor would it necessarily prevent TDG exceedances. Federal Defendants strongly encourage the Court to continue its deference concerning how best to accomplish necessary flood risk management purpose to the highly trained, experienced Corps engineers who execute these operations.

### III. Conclusion

Plaintiffs' request for various Court orders should be denied.

Dated: September 22, 2023

Respectfully submitted,

TODD KIM, Assistant Attorney General
SETH M. BARSKY, Deputy Assistant Attorney General
S. JAY GOVINDAN, Section Chief

*/s/ Kaitlyn Poirier*
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-6623

Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov

Attorneys for Federal Defendants